# EXHIBIT 27

<u>Declaration of Susan E. Hassig, MPH, DrPH</u>

1. I am Susan E. Hassig, MPH, DrPH, Associate Professor of Epidemiology, Director of the MPH Program in Epidemiology, Tulane School of Public Health and Tropical Medicine, New Orleans, LA.  I have conducted research and taught in the subject area of infectious diseases epidemiology for over 30 years.  This time period spans the major epidemic threats of HIV, SARS, H1N1 (2009), influenza, Zika, Ebola, and now COVID-19.  I base my declaration on the knowledge and experience I have gained in those years regarding the dynamics of spread in infectious disease and what steps can be taken to minimize or eliminate that spread in populations.

2. The virus that causes the COVID-19 disease is a novel (new) pathogen to the human race.  As such, we are all susceptible to infection.  Infection with this virus moves easily from person to person in **two basic ways**: **direct**, by close (within 6 feet) contact between an infected and an uninfected person, with infection occurring by the inhalation of infected droplets or aerosols from the infected person's mouth while talking, shouting, singing, coughing, sneezing, etc.; and **indirect,** by the contamination of surfaces in the environment (tabletops, handrails, doorknobs, etc.) by an infected person via direct deposition of infected respiratory droplets or secretions to the surfaces, or by indirect deposition from the contaminated hands of the infected person.  An uninfected person who then touches these same surfaces with their hands and subsequently touches their face (mouth, nose, eyes) can then become infected.  Each newly infected person can become infectious to others in a matter of days, with or without presenting with symptoms, and may remain infectious for a week or more.[1]

3. There is no vaccine or medication to prevent infection from COVID-19.  In order to limit the spread of the disease, the CDC and other health agencies recommend the following: washing hands frequently, keeping shared surfaces clean, covering a cough with a disposable tissue or the inside of your elbow, staying away from other people if you are sick, and finally wearing a mask in all public environments.[2]  However, the cornerstone of the CDC's guidance is social distancing—remaining at least 6 feet away from all other persons and generally avoiding congregate spaces, which is necessary even if individuals practice all the other preventative measures.[3]  Therefore by definition, persons confined in correctional facilities are at risk of coronavirus infection because they are unable to

---

[1] *How COVID-19 Spreads*, Centers for Disease Control and Prevention, April 13, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html
[2] How to Protect Yourself & Others,  Centers for Disease Control and Prevention, April 13, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html
[3] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, March 23, 2020, available at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

1

implement distancing behaviors independently.  They must rely on the facility to house them in a manner that conforms to that distancing guidance.

4. While we are all equally susceptible to infection with COVID-19 if we are exposed, some members of the population are more vulnerable and at elevated risk of very serious outcomes, up to and including death, if infected.  These include persons 65+ years of age with or without pre-existing conditions and persons **of any age** with any of a number of chronic health conditions, including but not limited to: hypertension and other cardiovascular disease, obesity, diabetes, asthma, other chronic lung diseases, chronic kidney or liver disease due to any cause, and suppressed immune systems for any reason.[4]

5. The CDC has promulgated guidance for correctional and detention facilities.[5]  This guidance appears to form the basis for the East Baton Rouge Parish Prison's response to this pandemic.  However, it is my position that this guidance is, at best, the bare minimum and is not stringent enough to actually achieve the goal of keeping both staff and detainees safe from the virus.  Anything less than 6 ft distancing is inadequate, and even that is not sufficient in the absence of universal face covering and frequent surface disinfection.  The threat of coronavirus as it relates to correctional facilities is most reasonably divided into two parts: preventing introduction of the virus into the center population, and preventing the spread of coronavirus within the center once it is introduced.

6. To prevent the transmission of the virus in the correctional facility setting, the first thing that must change is the mindset of the facility.  The assumption should be that the virus is already present in the facility, as borne out by the detection of confirmed COVID cases in most local correctional facilities.[6]  A system of disinfection by staff, equipped with appropriate personal protective equipment (PPE) and cleaning materials, must be established on a daily basis for all living areas, especially those used in common.  The cleaning should be vigorous and occur as frequently as possible, especially in common areas.  Facilities should be cleaned multiple times per shift, and particularly between use of common areas by different groups of prisoners, since the virus can survive for extended periods of time on different surfaces.[7]

---

[4] *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, April 15, 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

[5] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, March 23, 2020, available at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[6] https://www.wdsu.com/article/majority-of-covid-19-cases-in-louisiana-prisons-that-mass-test-are-asymptomatic/32634504#

[7] van Doremalen N, Morris D, Bushmaker T et al., Aerosol and Surface Stability of SARS-CoV-2 as compared with SARS-CoV-1. New Engl J Med (2020)

2

7. The CDC's Interim Guidance states that "whenever possible, all staff and detainees should maintain a distance of six feet from one another." However, the use of "whenever possible" does not comport with scientific consensus on this matter. It is my scientific opinion that all persons detained in the facility should be, **at all times**, no closer than 6 ft from any other detainee. This translates to ~144 sq ft per detainee for those held in some kind of congregate setting. Bunk beds should not be used, as the vertical separation would not meet the 6 ft buffer, and would place the person on the lower bunk at risk of exposure from an infected upper bunk inhabitant. If individuals are held in individual spaces with solid walls, the sq ft needs may be lower, but any open (barred) cell wall setting would still require 144 sq feet/detainee. This space is needed to provide the physical buffer zone to reduce the risk of droplet spread between detainees. If detainees move out of their living spaces for meals, medical care, access to phones, etc. all persons should be masked and maintain 6 ft of separation during movement and at the destination.

8. The Interim CDC Guidance also recommends screening only new entrants to a detention center.[8] However, it is my opinion that detainees should be temperature and symptom screened twice daily, morning and evening, as the clinical status of a COVID infected person can change quickly, and we know that shedding increases as symptoms emerge. Twice daily screenings are particularly important in correctional facilities, where staff come and go between the facility and the community daily. Anyone presenting with fever or other symptoms consistent with coronavirus should be immediately removed to medical isolation, consisting of a private, well-ventilated and sanitary environment, preferably in a medical setting, for further evaluation, including testing for flu and coronavirus. Medical follow-up should be provided based on the findings of the testing. Any detainee who was in close contact with the symptomatic individual without a face covering should also be placed in individual quarantine, also a private, well-ventilated and sanitary environment, for observation for a period of 14 days. A quarantined detainee should be medically monitored twice a day for development of symptoms and tested prior to being released back into the general population. However, proper isolation will only slow, rather than stop, the spread of COVID-19 in congregative environments as many COVID-19 carriers are contagious even before they experience symptoms.[9]

9. Cohort quarantining, as mentioned in the CDC Guidance, and as implemented in the case of the East Baton Rouge Parish Prison (EBRPP) in groups ranging from 40-100 inmates,

---

[8] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention, March 23, 2020, available at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[9] Wei WE, Li Z, Chiew CJ, Yong SE, Toh MP, Lee VJ. Presymptomatic Transmission of SARS-CoV-2 — Singapore, January 23–March 16, 2020. MMWR Morb Mortal Wkly Rep 2020;69:411–415. DOI: http://dx.doi.org/10.15585/mmwr.mm6914e1

3

does not meet the most basic necessity of distance between detainees to prevent further transmission of the virus in the cohort. In the absence of appropriate distancing of at least 6 feet apart at all times within the cohort, additional infections will occur, expanding the number of infected detainees (and likely staff as well), amplifying the virus in the facility, and should not be utilized. It is once again critical to remember that this virus is extremely contagious and is shed by infected individuals prior to the presence of symptoms.[10] Any cohorting that mixes individuals with different status related to COVID infections (e.g., infected, suspected/under investigation or awaiting test results, exposed and unexposed) will only serve to increase the likelihood of expanded transmission.

10. If the jail does not have the space to implement these most basic of virus spread suppression methods, the jail needs to decrease the size of the detainee population to fit the physical spacing needed to prevent transmission. The persons at greatest risk, those with the aforementioned pre-existing medical conditions, should be prioritized for release to family or friends, to make room within the facility to maintain safe distancing. If the number of detainees in the jail after release of the most vulnerable still does not allow for adequate distancing, then additional detainees should be released to achieve it. Movement of detainees between jails or other correctional facilities is not advised, as this may introduce infection into additional facilities and increase the chance of uncontrolled community spread in facilities in which COVID-19 is already present.

11. The CDC Guidance states that "facilities should quarantine all new entrants for 14 days before they enter the general population."[11] However, to reduce the likelihood of introduction and spread of the virus into a specific jail, NO new detainees should be introduced to any existing jail population unless social distancing conditions (above) can be maintained, and any new detainee(s) have cleared a 14-day individual quarantine period at the destination facility. This quarantine would apply to any new arrival, irrespective of their COVID status. Any transfer of any detainee known or suspected of infection should NOT occur, except to release them to an external health care facility or an official isolation center set up outside of the correctional facility to care for such persons. Transfer to a different correctional facility which does not meet basic requirements for the provision of sound medical care, as has occurred at EBRPP in the

---

[10] Kimball A, Hatfield KM, Arons M, James A, et al., Asymptomatic and Presymptomatic SARS-CoV-2 Infections in Residents of a Long-Term Care Skilled Nursing Facility — King County, Washington, March 2020. MMWR, 3 April 2020, 69(13);377–381; Guoqing Qian, Naibin Yang, Ada Hoi Yan Ma, et. al, *A COVID-19* Transmission within a family cluster by presymptomatic infectors in China, Clinical Infectious Diseases, ciaa316, https://doi.org/10.1093/cid/ciaa316

[11] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention, March 23, 2020, available at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

past, should not occur.[12]  The transport process in and of itself often places both detainees and accompanying staff in potentially risky proximity (less than 6 feet in all directions) to one another, potentially enabling viral transmission, and should be minimized or avoided until local social distancing restrictions are modified or lifted altogether.[13]

12. All jail staff should be screened for fever and cough daily, and for illness in household members/recent close contacts upon arrival for their duty shift.  Ill staff should return home and not return to work until symptoms have ceased for at least 24 hours.  The CDC guidance states, "cloth face coverings should be worn by detainees and staff (when PPE supply is limited) to help slow the spread of COVID-19."  Since community and asymptomatic spread is established throughout the country and N-95 masks are needed in health care settings, all staff should wear cloth or surgical masks, or other fabric face coverings while on duty to reduce the possibility of spread from staff members to others, since they move in the community when not at work.  However, it must be remembered that cloth face coverings, unlike N-95 masks, are not sufficient to prevent infection in the wearer,[14] but rather serve as a "source reduction," reducing the likelihood of widespread viral shedding by the wearer.  While at work, staff should also maintain at least 6 ft separation from each other and detainees, whenever possible, for added protection against infection.

13. No visitors should be allowed to physically enter the facility, but a mechanism to facilitate safe, remote contact with counsel and family should be maintained.

14. Importantly, the CDC Guidance does not mandate testing; however, the State of Louisiana has begun a process of testing state facilities, and local jails around the state are beginning to follow suit.[15,16]  Early studies have found that the false negative rate of COVID-19 tests is approximately 30 percent.[17]  These figures suggest both that testing is insufficient at the jail and that the true number of COVID-19 carriers may be orders of

---

[12] https://jjie.org/2020/04/27/desperate-louisiana-prisoners-say-wardens-staff-not-following-coronavirus-rules/

[13] Liew MF, Siow WT, Yau YW, See KC. Safe patient transport for COVID-19. Crit Care. 2020;24(1):94. Published 2020 Mar 18. doi:10.1186/s13054-020-2828-4

[14] Rengasamy S, Eimer B, Shaffer RE. Simple respiratory protection—evaluation of the filtration performance of cloth masks and common fabric materials against 20-1000 nm size particles. Ann Occup Hyg 2010 Jun 28;54(7):789-98

[15] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention, March 23, 2020, available at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[16] https://www.wdsu.com/article/majority-of-covid-19-cases-in-louisiana-prisons-that-mass-test-are-asymptomatic/32634504#

[17] Yang Yang, Minghui Yang, Chenguang Shen, et al., Evaluating the accuracy of different respiratory specimens in the laboratory diagnosis and monitoring the viral shedding of 2019-nCoV infections, medRxiv 2020.02.11.20021493; doi: https://doi.org/10.1101/2020.02.11.2002149

magnitude higher.[18] This certainly suggests that the current guidance in use by the jail is inadequate to prevent and contain COVID-19 infections in their facility.  Much more aggressive and effective action must be taken to reduce the threat of coronavirus to both detainees and staff in the jail.  I have reviewed the following declarations from individuals currently in, or previously in the EBRPP: Joseph Williams, Christopher Rogers, Clifton Belton, Forest Hardy, Cedric Spears, Jerry Bradley, Cedric Franklin, and Willie Shepherd.  Taking these declarations as true, it is abundantly clear to me that EBRPP is adhering to neither the spirit nor the letter of the CDC Guidance, and thus is placing the facility staff and inmates at elevated and unnecessary risk of infection with coronavirus and all of the potential consequences of that infection.[19]

I declare under penalty of perjury that the foregoing is true and correct.

_____       Date: May 25, 2020
Susan E. Hassig, MPH, DrPH

---

[18] Justin D Silverman, Nathaniel Hupert, Alex D Washburne, Using ILI surveillance to estimate state-specific case detection rates and forecast SARS-CoV-2 spread in the United States, medRxiv 2020.04.01.20050542; doi: https://doi.org/10.1101/2020.04.01.20050542
[19] Williams Decl.; Rogers Decl.; Belton Decl.; Hardy Decl.; Spears Decl.; Bradley Decl.; Franklin Decl.; Shepherd Decl.