# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CLIFTON BELTON, JR., JERRY BRADLEY, CEDRIC FRANKLIN, CHRISTOPHER ROGERS, JOSEPH WILLIAMS, WILLIE SHEPHERD, DEVONTE STEWART, CEDRIC SPEARS, DEMOND HARRIS, and FORREST HARDY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SHERIFF SID GAUTREAUX, in his official capacity as Sheriff of East Baton Rouge; LT. COL. DENNIS GRIMES, in his official capacity as Warden of the East Baton Rouge Parish Prison; CITY OF BATON ROUGE/PARISH OF EAST BATON ROUGE,<br><br>Defendants. | Case No. 3:20-cv-000278-BAJ-SDJ |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

BACKGROUND AND FACTS ........................................................................................... 2

    I.      The COVID-19 Crisis is a Health Crisis Unmatched in Living Memory .............. 2

    II.     A COVID-19 Jail Outbreak is an Extreme Threat to Public Health ...................... 4

    III.    Defendants Are Not Able to–and at Present–Cannot Take Necessary Steps to Prevent A Widespread Outbreak in the Jail ............................................................ 6

          A.      Social Distancing is Impossible at the Jail and Sanitation and Hygiene is Dangerously Insufficient ............................................................................. 7

          B.      Defendants' testing and identification of COVID-19 has been inadequate ...................................................................................................... 8

          C.      Defendants maintain dangerous conditions at the Jail ............................... 9

          D.      Defendants' use of "lockdown" to treat detainees with COVID-19 ......... 11

          E.      Defendants in lockdown lack access to basic medical services ............... 12

          F.      Defendants do not provide basic personal hygiene supplies or sufficient personal protective equipment to detainees in response to COVID-19 .... 15

          G.      Defendants fail to provide adequate and timely medical care. ................ 16

               1.      Defendants' medical procedures are inadequate and have been for years. ............................................................................................. 16

               2.      Defendants ignore and retaliate against detainees for filing grievances concerning the lack of medical care or unsanitary conditions of confinement ............................................................ 18

          H.      Defendants' failure to control the COVID-19 outbreak and use of punitive solitary confinement threatens the mental health and safety of all detainees ...................................................................................................... 19

          I.      Defendants fail to provide information about COVID-19 and its spread ........................................................................................................... 20

J.     Expert Medical Opinion Demonstrates that Release from Detention is the Only Remedial Measure that Will Protect Medically Vulnerable Detainees ................................................................. 21

ARGUMENT ................................................................................................. 23

I.     SUBCLASS MEMBERS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A TRO MANDATING THEIR RELEASE ................................. 25

II.     SUBCLASS MEMBERS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS .......................................................................... 27

A.     Subclass Members Who Are Pretrial Are Subject to Unreasonable, Punitive Conditions of Confinement in Violation of the Fourteenth Amendment .......................................................................... 29

B.     Under a Deliberate Indifference Standard, Post-Conviction Subclass Members' Eighth Amendment Rights Are Being Violated ................... 32

1.     Plaintiffs are objectively at a substantial risk of serious harm ...... 33

2.     Defendants have acted and are continuing to act with subjective indifference towards Plaintiffs' substantial risk of harm ............. 33

III.     THE PUBLIC INTEREST AND BALANCE OF EQUITIES WEIGH HEAVILY IN PLAINTIFFS' FAVOR ............................................................... 38

IV.     IMMEDIATE RELEASE IS OF MEDICALLY VULNERABLE SUBCLASS MEMBERS IS THE ONLY EFFECTIVE REMEDY FOR PLAINTIFFS' UNLAWFUL DETENTION, WHICH THE COURT HAS AMPLE AUTHORITY TO ORDER ................................................................. 39

V.     THE COURT SHOULD NOT REQUIRE PLAINTIFFS TO PROVIDE SECURITY PRIOR TO ISSUING A TEMPORARY RESTRAINING ORDER ................................................................................... 41

CONCLUSION ............................................................................................. 42

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*In re Bahadur*,
No. EP-19-CV-00357-DCG, 2020 U.S. Dist. LEXIS 33455 (W.D. Tex. Feb. 27, 2020) ......................................................................................................25

*Bell v. Wolfish*,
441 U.S. 520 (1979)...........................................................................................28, 29

*Boumediene v. Bush*,
553 U.S. 723 (2008)....................................................................................................41

*Brown v. Plata*,
563 U.S. 493 (2011)....................................................................................................41

*Cameron v. Bouchard*,
-- F. Supp.3d --, 2020 WL 2569868 (E.D. Mich. May 21, 2020)...........................37

*Cameron v. Bouchard*,
No. 20-cv-10949, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020) ........................27

*Campos v. I.N.S.*,
70 F. Supp. 2d 1296 (S.D. Fla. 1998) ....................................................................41

*Castillo v. Barr*,
-- F. Supp. 3d --, CV 20-00605 TJH, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020) ......................................................................................................................27

*Chambers v. Coventry Health Care of Louisiana, Inc.*,
318 F. Supp. 2d 382 (E.D. La. 2004)....................................................................25

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*,
636 F.2d 1084 (5th Cir. Unit B Feb. 13, 1981)......................................................41

*City of Revere v. Mass. Gen. Hosp.*,
463 U.S. 239 (1983)...............................................................................................27, 28

*Cohen v. Coahoma Co.*,
805 F. Supp. 398 (N.D. Miss. 1992)........................................................................38

*Daniels Health Scis., L.L.C. v. Vascular Health Scis. L.L.C.*,
710 F.3d 579 (5th Cir. 2013) ................................................................................25

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989).................................................................................................28

*DSC Commc'ns Corp. v. DGI Techs., Inc.*,
  81 F.3d 597 (5th Cir.1996) ...........................................................................25

*Duran v. Elrod*,
  713 F.2d 292 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984)...........................................41

*Duvall v. Dallas Cty. Tex.*,
  631 F.3d 203 (5th Cir. 2011) .......................................................................30

*El Paso Cty., Texas v. Trump*,
  407 F. Supp. 3d 655 (W.D. Tex. 2019)...............................................................38

*Elrod v. Burns*,
  427 U.S. 347 (1976) ...................................................................................27

*Estelle v. Gamble*,
  429 U.S. 97 (1976) ....................................................................................27

*Farmer v. Brennan*,
  511 U.S. 825 (1994)..............................................................27, 32, 33, 34, 37

*Gates v. Collier*,
  501 F.2d 1291 (5th Cir. 1974) .......................................................................34

*Gates v. Cook*,
  376 F.3d 323 (5th Cir. 2004) .......................................................................34

*Hare v. City of Corinth, Miss.*,
  74 F.3d 633 (5th Cir. 1996) ...............................................................28, 29, 32

*Harris v. Nelson*,
  394 U.S. 286 (1969).................................................................................39

*Harris v. Nelson*,
  395 U.S. 286 (1969).................................................................................41

*Helling v. McKinney*,
  509 U.S. 25 (1993).............................................................25, 33, 34, 35

*Hilton v. Braunskill*,
  481 U.S. 770 (1987)................................................................................41

*Honshul v. Foti*,
  No. 94-30723, 1995 WL 153425 (5th Cir. Mar. 30, 1995).....................................34

*Hope v. Pelzer*,
  536 U.S. 730 (2002)................................................................................34

*Ingebretsen v. Jackson Pub. Sch. Dist.*,
    88 F.3d 274 (5th Cir. 1996) ...................................................................38

*Johnson v. Epps*,
    479 Fed. App'x 583 (5th Cir. 2012) ......................................................33

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996)......................................................................33

*Jones ex rel. Varden*,
    No. 2:15cv34-MHT, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015) ....................................31

*Jones v. Texas Dep't of Crim. Justice*,
    880 F.3d 756 (5th Cir. 2018) ...................................................................34

*Lake Charles Diesel, Inc. v. General Motors Corp*,
    328 F.3d 192 (5th Cir. 2003) ...................................................................24

*Malam v. Adducci*,
    -- F. Supp. 3d --, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020)......................................22, 40

*Mobile Cty. Jail Inmates v. Purvis*,
    581 F. Supp. 222 (S.D. Ala. 1984)..........................................................41

*Monumental Task Comm., Inc. v. Foxx*,
    157 F. Supp. 3d 573 (E.D. La. 2016), *aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017) .......................................................25

*New Orleans Home for Incurables Inc. v. Greenstein*,
    911 F. Supp 386 (E.D. LA 2012)..............................................................41

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................................38

*Palmer v. Johnson*,
    193 F.3d 346 (5th Cir. 1999) ............................................................28, 32

*Pierce v. City of Velda City*,
    4:15-CV-570-HEA, 2015 WL 10013006 (E.D. Mo. June 3, 2015)........................................31

*Pierre v. United States*,
    525 F.2d 933 (5th Cir. 1976) ...................................................................40

*Poree v. Collins*,
    866 F.3d 235 (5th Cir. 2017) ...................................................................40

*Powell v. City of St. Ann*,
    No. 4:15-cv-840-RWS (E.D. Mo. 2015)...................................................31

*Schultz v. Alabama*,
    330 F. Supp. 3d 1344 (N.D. Ala. 2018) ........................................................................41

*Shepherd v. Dallas Cty.*,
    591 F.3d 445 (5th Cir. 2009) ....................................................................................29

*Thakker v. Doll*,
    -- F. Supp. --, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) ....................................22

*United States v. Garlock*,
    No. 18-Cr-00418, 2020 WL 1439980 (N.D. Cal. Mar. 25, 2020) ...........................27

*United States v. Stephens*,
    -- F. Supp. 3d --, No. 15-CR-95, 2020 WL 1295155 (S.D.N.Y. Mar. 19,
    2020) .........................................................................................................................6

*Unknown Parties v. Johnson*,
    No. CV- 15-00250-TUC, 2016 WL 8188563 (D. Ariz. No. 18, 2016), *aff'd
    sub nom Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017) .............................................26

*Vazquez-Berrera v. Wolf*,
    No. 20-cv-1241, 2020 WL 1904497 (S.D. Tex. Apr. 17, 2020) .................26, 39, 40

*Wilson v. Seiter*,
    501 U.S. 294 (1991) .................................................................................................34

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ....................................................................................................24

*Youngberg v. Romeo*,
    457 U.S. 307 (1982) .................................................................................................28

*Zhang v. Barr*,
    No. ED CV 20-00331-AB, 2020 WL 1502607 (C.D. Cal. Mar. 27, 2020) ...........27

**STATUTES:**

18 U.S.C. § 3142(c)(2) ....................................................................................................31

28 U.S.C. § 2241 ..............................................................................................................2

28 U.S.C. § 2243 ......................................................................................................39, 41

42 U.S.C. § 1983 ..............................................................................................................2

D.C. Code § 23-1321 ......................................................................................................31

**OTHER AUTHORITIES:**

*ACLU Sues Louisiana Prison After 5 COVID-19 Deaths Reported*, Democracy
Now (Apr. 7, 2020),
https://www.democracynow.org/2020/4/7/headlines/aclu_sues_louisiana_pris
on_after_5_covid_19_deaths_reported ..................................................................26

*AMA, AHA, ANA: #StayHome to confront COVID-19*, Am. Medical Ass'n (Mar.
24, 2020), https://www.ama-assn.org/press-center/press-releases/ama-aha-ana-
stayhome-confront-covid-19...................................................................22, 36

Chief Justice Bernette Joshua Johnson, Letter to the Louisiana District Judges
(Apr. 2, 2020) https://www.lasc.org/COVID19/2020-04-02-LASC-
ChiefLetterReCOVID-19andjailpopulation.pdf; ...................................................23

*Coronavirus – What Social Distancing Means*, Am. Red Cross (Apr. 14, 2020),
https://www.redcross.org/about-us/news-and-events/news/2020/coronavirus-
what-social-distancing-means.html ...................................................22, 36

*COVID-19*, La. Dep't of Health (May 26, 2020), http://ldh.la.gov/Coronavirus/ ..........................3

Mean Crepeau, *Cook County Jail Drops Below 6,000 Inmates to Lowest Level in
Decades*, Chi. Trib., (Dec. 22, 2017)
http://www.chicagotribune.com/news/local/breaking/ct-met-cook-county-jail-
under-6000-inmates-20171221-story.html ...............................................31

Ctrs. for Disease Control & Prevention, *Coronavirus 2019: Cases in the U.S.*,
https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html
(last visited May 26, 2020). ...............................................................2

Ctrs. for Disease Control & Prevention, *Correctional and Detention Facilities*,
(May 26, 2020), https://www.cdc.gov/coronavirus/2019-
ncov/community/correction-detention/index.html...................................................35

Ctrs. for Disease Control & Prevention, *How to Protect Yourself & Others*, (Apr.
13, 2020) ...................................................................22, 36

Ctrs. for Disease Control & Prevention, *Social Distancing, Quarantine, and
Isolation*, (Apr. 4, 2020), https://www.cdc.gov/coronavirus/2019-
ncov/prevent-getting-sick/social-distancing.html...........................................22, 36

Ctrs. for Disease Control & Prevention, *When and How to Wash Your Hands*,
https://www.cdc.gov/handwashing/when-how-handwashing.html (last visited
May 26, 2020)....................................................................15

Executive Order 2020-27 (Mar. 13, 2020),
https://gov.louisiana.gov/assets/ExecutiveOrders/27-JBE-2020-COVID-
19.pdf ....................................................................35

Executive Order (May 15, 2020),
    https://gov.louisiana.gov/assets/Proclamations/2020/58-JBE-2020.pdf.................................25

Executive Order (May 15, 2020),
    https://gov.louisiana.gov/assets/Proclamations/2020/58-JBE-2020.pdf.................................35

*Fifteen Days to Slow the Spread* (Mar. 16, 2020),
    https://www.whitehouse.gov/articles/15-days-slow-spread/ .....................................................2

Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, N.Y.
    Times (Mar. 16, 2020), https://www.nytimes.com/2020/03/16/us/coronavirus-
    fatality-rate-white-house.html...................................................................................................3

Anna Flagg & Joseph Neff, *Why Jails Are So Important in the Fight Against
    Coronavirus*, N.Y. Times (Mar. 31, 2020), https://nyti.ms/3aIBHjv; ...................................35

Lisa Freeland, David Patton, & Jon Sands, *We'll See Many More Covid-19
    Deaths in Prisons if Barr and Congress Don't Act Now*, Wash. Post (Apr. 6,
    2020), https://www.washingtonpost.com/opinions/2020/04/06/covid-19s-
    threat-prisons-argues-releasing-at-risk-offenders/ ...................................................................3

General Order No. 18.8A- Procedures for Bail Hearings and Pretrial Release,
    http://www.cookcountycourt.org/Manage/DivisionOrders/ViewDivisionOrder
    /tabid/298/ArticleId/2562/GENERAL-ORDER-NO-18-8A-Procedures-for-
    Bail-Hearings-and-Pretrial-Release.aspx ...............................................................................31

Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, Am. J. of
    Psychiatry 140 (1983) .............................................................................................................20

Craig Haney, *Infamous Punishment: The Psychological Effects of Isolation*, 8
    Nat'l Prison Project Journal 3 (1993) .....................................................................................20

Lael Henterly, *When Bail Is Set, the Rich Walk and the Poor Go to Jail*, Seattle
    Weekly Times, (Aug. 23, 2016), http://www.seattleweekly.com/news/when-
    bail-is-set-the-rich-walk-and-the-poor-go-to-jail/...........................................................30, 31

*How Do I Prevent and Prepare For COVID-19?*, Fla. Dep't of Health (Apr. 24,
    2020), https://floridahealthcovid19.gov/prevention/ ..............................................................22

La. Dep't of Health, http://ldh.la.gov/index.cfm/page/3938#spread (last visited
    May 26, 2020)..........................................................................................................................36

Teresa Mathew, *More Than 40 People Have Died in Custody of the East Baton
    Rouge Jail.  Will Voters Oust the Sheriff?*, The Appeal (Oct. 9, 2019),
    https://theappeal.org/more-than-40-people-have-died-in-custody-of-the-east-
    baton-rouge-jail-will-voters-send-the-sheriff-packing/ .............................................................6

Jeffrey Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. of the Academy of Psychiatry and Law 104 (2010), http://www.hrw.org/sites/default/files/related_material/Solitary%20Confinement%20and%20 Mental%20Illness%20in%20US%20Prisons.pdf.........................................20

Brentin Mock, *How New Jersey in Leading the Post-Bail* Revolution, CityLab, (Nov. 2, 2017) https://www.citylab.com/equity/2017/11/how-new-jersey-is-leading-the-post-bail-revolution/544691/. .............................................31

David Mills & Emily Galvin-Almanza, *As Many as 100,000 Incarcerated People in Our Prisons Will Die from the Coronavirus, Unless the US Acts Now*, Bus. Insider (Apr. 2, 2020), https://www.businessinsider.com/failure-to-release-prisoners-is-condemning-thousands-to-death-2020-4 ............................35

Melissa Neal, *Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail*, Justice Policy Institute (2012), http://www.justicepolicy.org/uploads/justicepolicy/documents/bailfail.pdf .........................32

*New Model Shows COVID-19 Death Toll is 100,000 Higher Than Current Projections* (Apr. 22, 2020), https://www.aclu.org/press-releases/new-model-shows-covid-19-death-toll-100000-higher-current-projections................................38

*NYSDOH COVID-19 Tracker*, N.Y. State Dep't of Health, https://covid19tracker.health.ny.gov/ (last visited May 26, 2020) .........................................37

Udi Ofer & Lucia Tian, *New Model Shows Reducing Jail Population will Lower COVID-19 Death Toll for All of Us*, ACLU (Apr. 22, 2020), https://www.aclu.org/news/smart-justice/new-model-shows-reducing-jail-population-will-lower-covid-19-death-toll-for-all-of-us/ .........................................3

Oregon Knowledge Bank, http://okb.oregon.gov/portfolio-item/auto-notification/....................30

Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients...........................................3

Jan Ransom & Alan Feuer, *We're Left for Dead: Fears of Virus Catastrophe at Rikers Jail*, N.Y. Times (Mar. 30, 2020) ...........................................4, 5

Rules Order, Maryland Court of Appeals, http://mdcourts.gov/rules/rodocs/ro192.pdf...........................................31

Lea Skene and Jacqueline DeRoertis, *East Baton Rouge Sheriff: It's Only a Matter of Time Before Coronavirus Arrives in Jail*, The Advocate (Mar. 17, 2020),
https://www.theadvocate.com/baton_rouge/news/coronavirus/article_be4301c6-6887-11ea-b794-ab2c5dcccad8.html...................................................................35

Lea Skene, *Coronavirus Hits Louisiana Prisons: Medical Director, Head Warden, First State Inmate Die*, The Advocate (Apr. 20, 2020),
https://www.theadvocate.com/baton_rouge/news/coronavirus/article_697c5eb6-8354-11ea-a205-9726a420e972.html ..................................................................5

Lea Skene, *East Baton Rouge Deputy — 'A Dedicated Public Servant' — Dies from Coronavirus, Sheriff Says*, The Advocate (Apr. 5, 2020),
https://www.theadvocate.com/baton_rouge/news/coronavirus/article_27ecdcac-7759-11ea-9ab3-e72613b104ed.html ...............................................35, 36

Lea Skene, *Officials Close Three Wings at Aging East Baton Rouge Prison Because of Safety Concerns*, The Advocate (Dec. 31, 2018),
https://www.theadvocate.com/baton_rouge/news/article_56230150-0315-11e9-b84f-97327cf57814.html ...............................................................11, 16

Peter Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, in Michael Tonry (Ed.), Crime and Justice (2006) .................................................................................................20

St. Louis Univ., *"Ticking Time Bomb," Prisons Unprepared For Flu Pandemic*, ScienceDaily (2006),
https://www.sciencedaily.com/releases/2006/09/060915012301.htm.....................................5

Asher Stockler, *More Than 700 People Have Tested Positive for Coronavirus on Rikers Island, Including Over 440 Staff*, Newsweek (Apr. 8, 2020),
https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872 .........................5

Javonti Thomas, *Louisiana Chief Justice calls for reduced jail populations to combat COVID-19 outbreak*, KALB (Apr. 3, 2020)
https://www.kalb.com/content/news/Louisiana-Chief-Justice-calls-for-reduced-jail-populations- to-avoid-COVID-19-outbreak--569348241.html ..........................23

Hans Toch, Men in Crisis: Human Breakdowns in Prisons, Aldine Publishing Co. (1975)....................................................................................................................20

Grace Toohey, *East Baton Rouge Parish jails people at rates far higher than New Orleans and Lafayette: Here's Why*, The Advocate (Sept. 14, 2019),
https://www.theadvocate.com/baton_rouge/news/courts/article_aa68a582-c45b-11e9-8439-a7110c42fa80.html ...................................................................15

Alexandra Villarreal, *'I feel defeated': inside New Jersey hospitals overwhelmed by Covid-19*, The Guardian (Apr. 10, 2020), https://www.theguardian.com/us-news/2020/apr/10/new-jersey-coronavirus-hospital-overwhelmed. ...........................................3

*Warden, Medical Director of Louisiana Prison Die After Contracting Coronavirus, State Says*, WDSU News (Apr. 20, 2020), https://www.wdsu.com/article/2-new-covid-19-related-deaths-reported-by-louisiana-prison-system-1-inmate-1-employee/32214252 ......................................................6

Ryan Whirty, *As COVID-19 cases increase, La. hospitals take care to ensure they remain resourced*, The Louisiana Weekly (Apr. 20, 2020), http://www.louisianaweekly.com/as-covid-19-cases-increase-la-hospitals-take-care-to-ensure-they-remain-resourced/ ..........................................................................38

*WHO Announces COVID-19 Outbreak a Pandemic*, World Health Org. (Mar. 12, 2020), http://www.euro.who.int/en/health-topics/health-emergencies/coronavirus-covid-19/news/news/2020/3/who-announces-covid-19-outbreak-a-pandemic ...........................................................................................2

Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020), https://nyti.ms/2Jmnf4z........................35

## INTRODUCTION

This motion seeks urgent – and modest relief – in light of extraordinary circumstances.  An outbreak of the novel coronavirus is occurring in the East Baton Rouge Parish Prison (the "Jail"), where approximately 1,200 detainees are held in life-threatening conditions.  Plaintiffs sleep as close as two feet from each other, have limited or no access to hygiene products and cleaning supplies, are not properly quarantined when sick, and do not have access to medical care or equipment anywhere near sufficient in quality or volume to respond to a COVID-19 outbreak.  Above all, those detainees who are medically vulnerable to the COVID-19 disease face the highest risk of sickness and death in the Jail.  In Louisiana alone, at least 167 Department of Corrections officials have contracted COVID-19, and several high-level officials have died.  Because social distancing cannot be meaningfully implemented at the current population levels and the Jail has failed to implement additional basic mitigating measures, this number will multiply exponentially at a rapid pace.  *See* Ex. 9 to Pet. for Writ of Habeas Corpus and Compl. ("Compl."), Declaration of Dr. Fred Rottnek ¶¶ 30-31 ("Rottnek Decl."); Ex. 27 to Compl., Declaration of Dr. Susan Hassig ¶ 9 ("Hassig Decl.").

As COVID-19 spreads inside and outside the Jail, time is running out to save Plaintiffs' lives and to prevent the Jail from becoming an epicenter of community infection.  Plaintiffs seek immediate relief for medically-vulnerable detainees, requiring Defendants to immediately release from confinement the subclass of people who, because of age or preexisting medical conditions, are at particularly grave risk of death from COVID-19—a risk that cannot be sufficiently mitigated by safeguards or preventive measures in the Jail.  Because the risk of infection, illness and death is both excessive in relation any legitimate government interest and deliberately indifferent to the medical needs of medically vulnerable prisoners, their continued detention violates the Fourteenth

1

and Eighth Amendments, respectively. Because continued detention is in violation of the Constitution, this Court should order release of medically vulnerable detainees either through 28 U.S.C. § 2241 or, in the alternative, through 42 U.S.C. § 1983.

This extraordinary moment requires the Court's immediate intervention. The "horizon of risk for COVID-19 in this facility is a matter of days, not weeks." Ex. 4 to Compl., Declaration of Dr. Adam Lauring ¶ 45, *Russell v. Wayne Cty.*, No. 20-cv-11094 (E.D. Mich. May 4, 2020), ECF No. 1-15 ("Lauring Decl."). Immediate relief is also in the public interest. A rapid outbreak within the Jail population would drain the Baton Rouge metropolitan area of limited healthcare resources, including ventilators. For these reasons, and for the reasons explained further below, the Court should grant Plaintiffs' motion for temporary restraining order.

**BACKGROUND AND FACTS**

## I.     The COVID-19 Crisis is a Health Crisis Unmatched in Living Memory.

We are in the midst of an unprecedented public health emergency. The number of people infected by COVID-19 has grown exponentially in this country since the first case was identified in January.[1] By March 11, 2020, the World Health Organization had classified the outbreak as a global pandemic.[2] As of May 26, over 1,600,000 people have been diagnosed with COVID-19 in the United States, with over 97,000 deaths.[3] Without effective public health interventions, the Centers for Disease Control and Prevention ("CDC") project that as many as 2.2 million Americans will die.[4]

---

[1]  *See* Ctrs. for Disease Control & Prevention, *Coronavirus 2019: Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 26, 2020).

[2]  *See WHO Announces COVID-19 Outbreak a Pandemic*, World Health Org. (Mar. 12, 2020), http://www.euro.who.int/en/health-topics/health-emergencies/coronavirus-covid-19/news/news/2020/3/who-announces-covid-19-outbreak-a-pandemic; *see also Fifteen Days to Slow the Spread*, WhiteHouse.gov (Mar. 16, 2020), https://www.whitehouse.gov/articles/15-days-slow-spread/

[3] *Coronavirus 2019*, *supra* n. 1.

[4] *See* Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, N.Y. Times (Mar. 16, 2020), https://www.nytimes.com/2020/03/16/us/coronavirus-fatality-rate-white-house.html.

2

Louisiana has reported over 37,000 cases and over 2,500 deaths, with nearly ten percent of those cases (3,386) in East Baton Rouge Parish.[5]  This number is sure to rise if conditions in this country's jails and prisons are not addressed rapidly.[6]

COVID-19 is a highly contagious virus that can severely damage lung tissue, impede cardiac functions (causing heart failure), and permanently harm other organs.  Ex. 11 to Compl., Declaration of Dr. Jonathan Louis Golob ¶¶ 7, 8, *Dawson v. Asher*, Case No. 2:20-cv-00409-JLR-MAT (D. Or. Filed March 16, 2020), ECF No. 5 ("Golob Decl.").  The experience of a severe case of COVID-19 has been compared to "drowning in [one's] own blood."[7]  Approximately 20% of people infected experience life-threatening complications; between 1% and 3.4% die.[8]  The fatality rate is about ten times higher than a severe seasonal influenza, even in countries with highly effective health care systems.[9]  Complications manifest at an alarming pace, and the required levels of medical support—which include highly specialized equipment like ventilators as well as an entire team of care providers—have been rapidly overwhelming hospitals nationally and globally.[10] There is no vaccine against COVID-19, nor any known medication to prevent or treat infection from the virus.  Hassig Decl. ¶ 3.  The only effective measure to reduce the risk of infection and thus severe illness or death to vulnerable individuals is to enforce regular social distancing.  *Id.*

---

[5] *COVID-19*, La. Dep't of Health (May 26, 2020), http://ldh.la.gov/Coronavirus/.

[6] *See* Lisa Freeland, David Patton, & Jon Sands, *We'll See Many More Covid-19 Deaths in Prisons if Barr and Congress Don't Act Now*, Wash. Post (Apr. 6, 2020), https://www.washingtonpost.com/opinions/2020/04/06/covid-19s-threat-prisons-argues-releasing-at-risk-offenders/; Udi Ofer & Lucia Tian, *New Model Shows Reducing Jail Population will Lower COVID-19 Death Toll for All of Us*, ACLU (Apr. 22, 2020), https://www.aclu.org/news/smart-justice/new-model-shows-reducing-jail-population-will-lower-covid-19-death-toll-for-all-of-us/.

[7] *See, e.g.*, Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[8] *Id.*

[9] *Id.*

[10] Alexandra Villarreal, *'I feel defeated': inside New Jersey hospitals overwhelmed by Covid-19*, The Guardian (Apr. 10, 2020), https://www.theguardian.com/us-news/2020/apr/10/new-jersey-coronavirus-hospital-overwhelmed.

Accordingly, public health experts and officials urge that people isolate from others at a minimum distance of six feet, as well as wash their hands frequently, use hand sanitizer, and frequently clean and disinfect high touch surfaces and objects. *See, e.g.*, Rottnek Decl. ¶ 14. These measures are particularly important in jail, a setting that can rapidly become a "public health disaster unfolding before our eyes."[11]

Although everyone is at risk of contracting COVID-19, some populations are at higher risk for severe health outcomes. Hassig Decl. ¶ 4. Certain underlying medical conditions—including lung disease, asthma, chronic obstructive pulmonary disease, chronic liver or kidney disease, diabetes, epilepsy, hypertension, compromised immune systems, blood disorders, inherited metabolic disorders, strokes, and pregnancy—increase the risk for individuals of any age. *Id.* People over the age of sixty-five also face greater chances of serious illness or death. *Id.* The only known effective measure to mitigate these more extreme risks is to prevent infection in the first instance. *Id.* ¶ 5.

## II.   A COVID-19 Jail Outbreak is an Extreme Threat to Public Health.

People incarcerated in jail are at heightened risk of infection and death from COVID-19.[12] According to public health experts, "the risk posed by COVID-19 in jails and prisons is significantly higher than in the community . . . in terms of risk of transmission, exposure, and harm to individuals who become infected."[13] This is due to a number of factors, including forced proximity of detained individuals, their inability to protect themselves through social distancing,

---

[11] Jan Ransom & Alan Feuer, *We're Left for Dead: Fears of Virus Catastrophe at Rikers Jail*, N.Y. Times, (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.

[12] *See* Ex. 3 to Compl., Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, 2 (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidancecorrectional-detention.html.

[13] *See, e.g.*, Ex. 7 to Compl., Declaration of Dr. Jaimie Meyer ¶ 7, *Velesaca v. Wolf*, No. 1:20-cv-01803-AKH (S.D.N.Y. Mar. 16, 2020), ECF No. 42 ("Meyer Decl.").

lack of medical and hygiene supplies, heavy reliance on outside hospitals for serious medical care, forced labor of incarcerated people in cleaning the facilities with insufficient supplies, constant cycling of people through the jails, and inadequate medical care within jails and prisons. Rottnek Decl. ¶¶ 15-17.

The growing devastation in jails around the country is a harbinger for what has already impacted East Baton Rouge Parish and what it should expect. In New York City, less than a month from the detection of the first case at Rikers Island, 167 detainees, 114 correction staff, and 20 health workers tested positive for COVID-19, and two jail officers had died.[14] The COVID-19 infection rate in New York City's jails is far higher than the rates for the most infected regions of the world.[15] In Louisiana, the warden and medical director at the state prison in Avoyelles Parish died of COVID-19-related conditions.[16] East Baton Rouge Parish (the "Jail") is at risk for a similar explosion.

An outbreak cannot be contained inside the Jail. What happens to the people trapped inside this "ticking time bomb"[17] affects others who cycle through, including correctional and medical staff. *See, e.g.*, Rottnek Decl. ¶ 57, 64. The outbreak then spreads to staff's families and the community. *Id.* Prison outbreaks can quickly overwhelm regional hospitals, making resources unavailable to treat others suffering from COVID-19 or unrelated life-threatening conditions like heart attacks. *Id.* ¶ 10. As courts have noted, "[t]he more people we crowd into [a] facility, the more we're increasing

---

[14] *See* Jan Ransom & Alan Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail*, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.

[15] Asher Stockler, *More Than 700 People Have Tested Positive for Coronavirus on Rikers Island, Including Over 440 Staff*, Newsweek (Apr. 8, 2020), https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872.

[16] Lea Skene, *Coronavirus Hits Louisiana Prisons: Medical Director, Head Warden, First State Inmate Die*, The Advocate (Apr. 20, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_697c5eb6-8354-11ea-a205-9726a420e972.html.

[17] St. Louis Univ., *"Ticking Time Bomb," Prisons Unprepared For Flu Pandemic*, ScienceDaily (2006), https://www.sciencedaily.com/releases/2006/09/060915012301.htm.

the risk to the community." *United States v. Stephens*, __ F. Supp. 3d __, No. 15-CR-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (internal citation omitted).

## III.    Defendants Are Not Able to–and at Present–Cannot Take Necessary Steps to Prevent A Widespread Outbreak in the Jail.

The Jail is designed to hold nearly 1,600 detainees, the majority of whom are members of the Pre-Trial Subclass. The Jail also holds individuals on work-release, and post-conviction detainees serving sentences with the Department of Corrections. Currently, the jail confines over 1,235 people. Prior to the outbreak of COVID-19, the detainees slept in "lines" designated by letters, which are open spaces with dozens of bunk beds. At the end of each line (or pair of lines) is a shared bathroom and shower facility. The detainees all share "day rooms," where they socialize, watch television, and speak with their loved ones.

Aggressive measures are required to stop the spread of COVID-19 between and within the lines, as an outbreak in one part of the Jail would all but guarantee a spread of the virus to other detainees and staff. *See, e.g.*, Rottnek Decl. ¶ 12. This risk is not hypothetical given the number of Jail staff and detainees who have already contracted COVID-19. Defendants are well aware of COVID-19 and its grave risks,[18] but they have failed to undertake the necessary measures to protect detainees from contracting the virus, instead directly placing detainees in harm's way.[19] Indeed, for medically vulnerable detainees, because proper social distancing is not possible in the Jail, there can be no measures to protect them from serious illness or death short of release, as least until there is a vaccine. *See infra* Section J.

---

[18] *See, e.g.*, *Warden, Medical Director of Louisiana Prison Die After Contracting Coronavirus, State Says*, WDSU News (Apr. 20, 2020), https://www.wdsu.com/article/2-new-covid-19-related-deaths-reported-by-louisiana-prison-system-1-inmate-1-employee/32214252.

[19] This is not new for the Jail, which has a lengthy history of detainee deaths. *See, e.g.*, Teresa Mathew, *More Than 40 People Have Died in Custody of the East Baton Rouge Jail. Will Voters Oust the Sheriff?*, The Appeal (Oct. 9, 2019), https://theappeal.org/more-than-40-people-have-died-in-custody-of-the-east-baton-rouge-jail-will-voters-send-the-sheriff-packing/.

This is compounded by the parish's detainee intake procedures.  Instead of entering the Jail directly, many detainees are processed through central booking, where they can stay for several days before being transferred to the Jail.  Ex. 1, Declaration of Cedric Franklin ¶ 7 ("Franklin Decl.").  The cells in central booking are rarely mopped or cleaned, and detainees get cycled in and out through the day.  *Id.*  None of the cells have mattresses or bedding, and the detainees sleep on the wooden benches or concrete floor.  *Id.* ¶ 8.  Detainees report that central booking does not test for COVID-19.  *See id.* ¶ 9.

### A. Social Distancing is Impossible at the Jail and Sanitation and Hygiene is Dangerously Insufficient.

At current populations, social distancing is impossible throughout the Jail.  On the F, J, and Q lines of the Jail, where the detainees normally reside, social distancing is unachievable. Detainees are brought to the day room twice a day for roll call and shift change, during which they must stand next to each other while the staff completes the process, and cannot practice social distancing.  Ex. 2, Declaration of Willie Shepherd ¶ 6 ("Shepherd Decl."); Ex. 3, Declaration of Christopher Lee Rogers ¶ 48 ("Rogers Decl.").  Both roll call and shift change each take one hour to complete.  Rogers Decl. ¶48.  All of the beds in the Q line, for example, are contained in one open room, spaced about two feet apart.  Ex. 4, Declaration of Forrest Hardy ¶¶ 5-6 ("Hardy Decl.); Ex. 5, Declaration of Jerry Bradley ¶ 4 ("Bradley Decl.").  The detainees can easily touch other beds while laying in their own.  Shepherd Decl. ¶ 5.  Detainees are also permitted to visit the day room at certain hours to socialize and watch television, but it is not designed for social distancing. The benches and tables in the room are bolted to the ground and cannot be moved.  Hardy Decl. ¶ 7; Shepherd Decl. ¶ 6. Prior the beginning of April, the detainees were also forced to violate social distancing norms in the dayroom for "pill call" twice a day, during which they received their medication.  Ex. 6, Declaration of Cedric Spears ¶ 28 ("Spears Decl.").

The guards do not spray surfaces such as the toilet, sink, or door handles as part of their cleaning protocol in the Jail. Rogers Decl. ¶ 22. Plaintiffs are prevented from adequately cleaning any of these surfaces and spaces more frequently themselves because the Jail controls access to basic cleaning supplies, like mops and buckets, and provides them to detainees, at most, twice a day. Rogers Decl. ¶ 25; Ex. 7, Declaration of Demond Harris ¶ 23 ("Harris Decl."); Hardy Decl. ¶ 16. This failure to provide cleaning supplies is especially important in the bathroom because "[i]f two guys are using the toilets next to each other, their legs could touch." Hardy Decl. ¶ 6. Detainees also are generally not given bleach to clean these shared surfaces, even though the Jail staff apparently has such chemicals available for this purpose. Ex. 8, Declaration of Joseph Williams ¶ 21 ("Williams Decl."); Rogers Decl. ¶ 24; Spears Decl. ¶ 10 (describing guards' use of bleach to kill leeches in the bathroom drain). Most days, phones and tablets, shared by all detainees on a given floor to communicate with loved ones or attorneys, are not cleaned. Bradley Decl. ¶ 14. Many detainees resort to placing socks over their hands when they handle the communal phone. *Id.*; Hardy Decl. ¶ 17; Shepherd Decl. ¶ 28. Finally, laundry is now done twice a week, but the detainees do not believe that the Jail is using proper detergents to sanitize their one uniform and set of sheets. Spears Decl. ¶ 25.

**B. Defendants' testing and identification of COVID-19 has been inadequate**

Even though COVID-19 has already infiltrated the Jail, Defendants are not taking adequate measures to prevent the virus from spreading by providing appropriate care for detainees who may be or are positive for COVID-19. Although the first detainee tested positive for COVID-19 on March 9 (and later died in the hospital), the Jail did not change its procedures to account for the virus until late March. Spears Decl. ¶ 27. And when Defendants did introduce steps to identify detainees with COVID-19, they started only by checking the detainees' temperatures. Hardy Decl. ¶ 10; Harris Decl. ¶ 6; Bradley Decl. ¶ 5. Some detainees who had high temperatures were then

sent back to the line. Spears Decl. ¶ 11.  Testing for COVID-19 was introduced only in the second week of April, though not all detainees have been tested.  *See* Franklin Decl. ¶ 19; Ex. 9, Declaration of Clifton Belton, Jr. ¶ 4 ("Belton Decl").

Detainee Christopher Rogers, for example, reported that he wasn't feeling well in the middle of April.  Rogers Decl. ¶ 8.  He was told by one of the nurses that because no one on his side of the Jail had the virus, nothing was wrong with him and they would take his temperature later.  *Id.*  In fact, Rogers was left on the line for several days with a bad headache and body aches, and only had his temperature checked on April 20.  *Id.* ¶ 9.  He was then tested for coronavirus, and received a positive result four days later, at which point he was transferred from his line to a different location in the Jail.  *Id.*  In all, Rogers was left on the line for nearly one week while exhibiting symptoms of coronavirus, *see id.* ¶¶ 8-9—potentially exposing hundreds of other detainees.  Similarly, Willie Shepherd was left on the line for three days with a headache and body aches before being transferred from the line, and he too tested positive for coronavirus.  Shepherd Decl. ¶ 7.

Other detainees similarly report that in spite of the fact that they reported symptoms of coronavirus to the nurses, they were not provided adequate treatment unless their temperatures were above the normal level.  Ex. 10, Declaration of Devonte Stewart ¶ 5 ("Stewart Decl.").  During April, there was widespread sickness on the lines, but the Jail was either unable or unwilling to control the spread of disease.  Spears Decl. ¶ 11 (describing numerous sick detainees in his line who were never transferred).

### C.  Defendants maintain dangerous conditions at the Jail.

The Jail's living conditions are abhorrent.  Defendants are not taking basic measures to maintain safe, hygienic conditions at the Jail and are instead creating and perpetuating a dangerous, unsanitary environment that is putting detainees at risk.  On the "lines" where the detainees reside,

9

there is "mold growing and rust everywhere," the roof leaks, and there is mold and scum in the bathrooms.  Hardy Decl. ¶ 4; Shepherd Decl. ¶ 27.  Detainees report that there is "blood and other bodily fluids" on the walls, and that some of the lines have cockroaches, leeches, and gnats.  Spears Decl. ¶ 5.  There is not sufficient air circulation on the lines, and the cells can reach in excess of 100 degrees on some days.  Rogers Decl. ¶ 18.

The bathrooms and showers the detainees share are unsanitary or often not even functioning.  The shower mats have mold on them, and the showers themselves are rusted.  Rogers Decl. ¶ 27.  In some of the bathrooms, up to half the urinals are broken, as are some toilets.  Spears Decl. ¶ 10.  Detainees estimate that the showers are fully sanitized approximately once a week, even though at least 80 detainees share each set of showers, in an area that is not large enough for detainees to have sufficient personal space.  Hardy Decl. ¶ 18; Spears Decl. ¶ 19 (describing how the detainees must clean the showers, and are rarely given bleach to do so).  The showers that do work are "ice cold," and some detainees resort to using the sink to shower.  Shepherd Decl. ¶ 17; Harris Decl. ¶ 23; Williams Decl. ¶ 23.  The drains in the bathrooms are often clogged with waste water, and when the showers are used, water "pour[s] out onto the floor and leak[s] down the whole line."  Rogers Decl. ¶ 27.

Detainee Cedric Spears, who worked in the kitchen from mid-February to mid-March, describes it as such:

> The kitchen is filthy.  You can smell the spoiled food when you walk into the kitchen.  There is also old food caked into the cracks in the serving line area, on the counter, and on the walls.  There are food particles everywhere.  They don't sanitize anything properly, most of the dishes aren't cleaned properly, and they use the same broom for sweeping the floors and cleaning out the hot box where food is stored.

Spears Decl. ¶ 7.

### D.  Defendants' use of "lockdown" to treat detainees with COVID-19

For those detainees identified as sick, the Jail has established a policy of isolation and

denial of basic medical services, placing detainees at increased risk of medical distress.   In response to the outbreak of COVID-19, the Jail re-opened the A, B, and C blocks of the Jail, which had been closed down two or three years earlier for "safety concerns."[20]  Harris Decl. ¶ 8; Rogers Decl. ¶ 13; Bradley Decl. ¶ 9.

The conditions in the decrepit A, B, and C blocks are even worse than the conditions on the F, J, and Q lines.  Because these areas of the Jail had not been outfitted for human habitation for several years, there are rats, cockroaches, and spiders in the cells, and the detainees have seen fibers or hairs in the water and do not know if the sinks in their cells are safe to drink from.  Harris Decl. ¶ 8; Rogers Decl. ¶ 22; Franklin Decl. ¶ 37; Shepherd Decl. ¶ 14; Williams Decl. ¶ 11 ("I have to store [my property] high up so the rats can't get into it" and describing a rat "the size of an opossum"); Bradley Decl. ¶ 9.  Many of the showers, toilets, and sinks are leaking, and mold grows abundantly in those areas.  Rogers Decl. ¶ 27.  The guards only rarely clean the blocks, and this limited sanitation is confined to the hallway floor, not door handles or other communal areas.  Rogers Decl. ¶ 22.  The cells are so close to one another that detainees can reach out through the iron bars of their cell into an adjacent cell, which they did to pass items such as food and toilet paper.  Williams Decl. ¶ 9; Rogers Decl. ¶ 17; Harris Decl. ¶ 9.  Detainees are given a single piece of paper towel to clean down their cells, and were not provided with any cleaning supplies apart from soap and water from their sinks.  Bradley Decl. ¶¶ 10, 12.

Detainees in the A and C blocks are held in solitary confinement, while detainees in the B block share their cells with up to two other detainees.  Williams Decl. ¶ 8; Harris Decl. ¶ 8.  Within the B block cells, it is impossible for the detainees to practice social distancing.  Williams Decl. ¶

---

[20] *See also* Lea Skene, *Officials Close Three Wings at Aging East Baton Rouge Prison Because of Safety Concerns*, The Advocate (Dec. 31, 2018), https://www.theadvocate.com/baton_rouge/news/article_56230150-0315-11e9-b84f-97327cf57814.html.

10 ("We can't stay 6 feet apart from the people in our cell because there's not that much space in the cell."). Not all of the detainees in the blocks have tested positive for COVID-19, and detainees who have tested positive for COVID-19 are sometimes placed in the same cells as those who have tested negative. Shepherd Decl. ¶ 8.

Detainees on "lockdown" in the A, B, and C blocks are locked in their cells for most of the day. Some detainees report that they were kept in their cell the entire day for their first week in lockdown, and were only permitted to leave their cells for up to an hour thereafter (and some for less time), permitting them finally to shower or use the phone to call their loved ones. Harris Decl. ¶ 11; Rogers Decl. ¶ 14; Stewart Decl. ¶ 13; Shepherd Decl. ¶ 15. Detainee Devonte Stewart explains that he has been threatened with mace and beatings if he asks to be let out of his cell for more than thirty minutes. Stewart Decl. ¶ 16. While in isolation, the detainees are largely prohibited from speaking with their families or receiving any news from the outside world. Shepherd Decl. ¶ 8; Rogers Decl. ¶¶ 14, 21, 33 (describing the lack of a television in the day room in Block B).

### E. Defendants in lockdown lack access to basic medical services

Because detainees in lockdown are isolated from the rest of the Jail, they are often denied the same access to medical care even though they are most vulnerable. Detainees report that the guards rarely visit the cells in the blocks, and therefore fail to respond to the detainees' concerns. Harris Decl. ¶ 20 ("The nurses were so scared to go back to the lockdown lines that they would only come back to check our temperatures and then literally run out of there"); Stewart Decl. ¶ 17. The nurses, who are supposed to visit twice a day for pill call, do not arrive every day, and jail staff with no experience or training in medicine are left to administer medication. Rogers Decl. ¶ 37. Sometimes the nurses do temperature checks during pill call, and sometimes they do not. Franklin Decl. ¶ 42.

Willie Shepherd has high blood pressure and a bleeding ulcer.  Shepherd Decl. ¶ 4.  On April 11, 2020, he reported that he had a headache and body aches.  *Id.* ¶ 7.  Three days later, a Jail nurse administered a COVID-19 test to Shepherd.  Five days later, Shepherd tested positive for Covid-19.  *Id.*  For a total of eight days, Shepherd remained in the Q3 line with 45 other detainees while he exhibited symptoms of COVID-19.  *Id.* ¶¶ 5, 7.  Shepherd was transferred to the B3 Block, and was placed in a cell with four other detainees who had tested *negative* for COVID-19.  *Id.* ¶ 8.  Shepherd describes the medical care he received in the B3 Block:

> We didn't get any real medical care on B3.  Medical staff came back twice a day for pill calls, when they would give us our prescription medications.  I got medications for my high blood pressure and bleeding ulcer at pill call.  But all they gave us for coronavirus was Tylenol.  After about a week and a half on B3, the nurses also began giving us vitamins.  That was all we got.  We didn't even get Gatorade, and we barely got any water.  I don't know why they moved us if they weren't going to do anything for us but give us Tylenol and vitamins.  The nurses didn't give us any other medical care during pill call.

*Id.* ¶ 9.  One day, Shepherd was throwing up blood.  *Id.* ¶ 11.  It took Jail staff five hours to respond, by which time Shepherd had cleaned up any traces of blood from the toilet into which he vomited.  *Id.*  As a result, the nurse refused to give him any medical treatment.  *Id.*  He received water in his cell only sporadically, and the water in the sink in his cell was "really hot, and if it sat for a little while, brown stuff came out of the sink."  *Id.* ¶ 14.  Three weeks later, Shepherd was moved back to the Q line, but was never given any paperwork to corroborate that he in fact tested negative for COVID-19.  *Id.* ¶ 20.

Jerry Bradley is currently in lockdown.  Previously confined on the Q9-10 line with over 100 other detainees, he was moved to Block C01 on April 13, 2020, even though he did not report any body aches or other symptoms, and his temperature was under 100 degrees.  Bradley Decl. ¶¶ 4, 6.  He learned that he tested positive for COVID-19 on April 14, and was transferred with five other positive detainees to lockdown.  *Id.* ¶ 8.  His first night in lockdown, the Jail staff brought

him only one cup of drinking water, and other nights he was given no water at all. *Id.* ¶ 11. He received no cleaning supplies apart from soap, water, and a paper towel. *Id.* ¶ 12. For medical treatment, Bradley received vitamins, Mucinex, and Tylenol, none of which are proven to treat COVID-19. *Id.* ¶ 15. He received no other medical care, and was transferred to the A1 Block after about a week, where he has remained—on lockdown—for over a month. *Id.* ¶ 17. During the time he has been on lockdown, he has seen more and more sick detainees brought to his block, and he fears becoming sick again. *Id.* ¶ 21. Nor is he improving; Bradley tested negative for COVID-19 on May 1, positive on May 4, and positive again on May 19. *Id.* ¶ 22.

Joseph Williams, is also currently in lockdown, transferred there after recording a temperature of approximately 100 degrees on April 24 and testing positive on a test administered the next day. Williams Decl. ¶¶ 5, 7, 13. He shares his cell with one other detainee, but they cannot stay six feet apart because the cell is only ten by six feet. *Id.* ¶ 10; Shepherd Decl. ¶ 8. Several days after his positive test, he was given Tylenol to manage the symptoms. Other detainees around him were not as fortunate; he describes how he beat on the door of his cell for 15-20 minutes to get medical attention for one of the other detainees, until the guards finally stopped ignoring him. *Id.* ¶ 16. And Williams describes his own experience when he suffered chest and stomach pains, including vomiting:

> I tried to get medical care by beating on the door for 20-30 minutes, but no one responded. I had to call my aunt to get some help. She and several other members of my family called . . . to try to get me some medical attention. Guards finally came on the line to check on me, and I told them to call medical. They kept asking me why, but one of the guards finally called medical. The nurse was mad at me when she got to the line. She just checked my temperature and blood pressure, then gave me Tylenol and another pill for three days. I don't know what that pill was, and I didn't have a temperature. The nurse left immediately after.

*Id.* ¶ 17. Defendants are failing to provide basic medical services to the most vulnerable detainees, including those in lockdown.

**F. Defendants do not provide basic personal hygiene supplies or sufficient personal protective equipment to detainees in response to COVID-19.**

In the face of this global pandemic, Defendants have not and do not provide detainees with enough of the basic hygiene supplies that are critical to preventing the spread of COVID-19. Although the CDC advises that handwashing is one of the best ways to protect against COVID-19,[21] the Jail only provides a single small bar of soap per week to detainees, and even then only sometimes. Hardy Decl. ¶ 19. If the detainees want extra soap, those who can afford it must purchase it from the commissary, an overwhelming burden given that the vast majority of detainees live below the poverty line.[22] Rogers Decl. ¶ 28; Williams Decl. ¶ 25. In addition to using the soap for their personal hygiene, detainees must use the single bar of soap to sanitize their cells and communal spaces. Harris Decl. ¶ 26; Williams Decl. ¶¶ 20. Defendants do not otherwise provide Plaintiffs or putative class members with supplies for hand sanitization. Spears Decl. ¶ 23.

The detainees also are not given access to sufficient personal protective equipment, such as masks and gloves. No detainee received any sort of mask until April 7—a full week after the CDC issued its guidance to prisons—and the masks were provided only to a portion of the detainees. *See* Compl. ¶ 46; Harris Decl. ¶ 16. For the detainees who received masks, they were instructed to use them for a full week. Williams Decl. ¶ 27. Other detainees were given bandanas instead of masks, which they are given the option to turn in for cleaning once a week. *Id.*; Rogers Decl. ¶ 12; Hardy Decl. ¶ 20; Shepherd Decl. ¶ 19. No detainees are given gloves. Rogers Decl. ¶ 12; Spears Decl. ¶ 20. And even the staff does not consistently wear personal protective

---

[21] *See* Ctrs. for Disease Control & Prevention, *When and How to Wash Your Hands*, https://www.cdc.gov/handwashing/when-how-handwashing.html (last visited May 26, 2020).

[22] Grace Toohey, *East Baton Rouge Parish jails people at rates far higher than New Orleans and Lafayette: Here's Why*, The Advocate (Sept. 14, 2019), https://www.theadvocate.com/baton_rouge/news/courts/article_aa68a582-c45b-11e9-8439-a7110c42fa80.html.

equipment when they interact with the detainees. Shepherd Decl. ¶ 22; Williams Decl. ¶ 27; Bradley Decl. ¶ 5.

Following the outbreak of the virus, the guards now bring food to the detainees in their cells. Hardy Decl. ¶ 21; Shepherd Decl. ¶ 13. Some guards wear masks and gloves while they deliver the food, and others do not. Rogers Decl. ¶ 35. Jail staff will sometimes serve food to detainees on the same carts that are used for collecting trash. Spears Decl. ¶ 18; Hardy Decl. ¶ 22.

### G. Defendants fail to provide adequate and timely medical care.

#### 1. Defendants' medical procedures are inadequate and have been for years.

For years, Baton Rouge policymakers have acknowledged that the old closed part of the jail is unfit for the safe detention of people and the provision of health care.[23] In 2015, Sheriff Gautreaux told the Parish's Metro Council the "old part of the prison is really in deplorable condition. We have issues with ventilation; with plumbing. Really it's laid out in the old way, that poses a problem from a safety standpoint for the safety of the inmates in the prison . . . "[24] He concluded that the current facility is "not adequate for providing health care" and admitted the "if [investigators from the federal Department of Justice] came in that prison today, they would shut half of it down." The Metro Council also heard that Dr. Rani Whitfield, who had worked in the jail for 16 years, witnessed a "significant decline in care to patients" due to underfunding and

---

[23] *See* Lea Skene, *Officials Close Three Wings at Aging East Baton Rouge Prison Because of Safety Concerns*, The Advocate (Dec. 31, 2018), https://www.theadvocate.com/baton_rouge/news/article_56230150-0315-11e9-b84f-97327cf57814.html

[24] *See* Ex. 17 to Compl., City of Baton Rouge/Parish of East Baton Rouge, Jan. 14, 2015 Metro. Council Mtg., Items 13P and Q Part 1.

understaffing.[25]  Councilwoman Banks-Daniel presciently described the health care situation in the jail as "catastrophic."[26]

Even for those not on lockdown, the process for obtaining medical attention—for COVID-19 symptoms or more routine medical care—is woefully deficient.  To request medical attention, detainees are required to fill out a "medical request form," and the nurses are supposed to check on the detainees when they distribute pills.  Bradley Decl. ¶ 15; Stewart Decl. ¶ 25 ("I asked them for extra medicine, and they said my injuries are not serious enough and they need paperwork to treat them").  During pill call, detainees speak to the nurses without masks, and are not permitted to wash their hands before handling and taking their pills.  Spears Decl. ¶ 28.  And even when detainees are able to make formal requests for medicine or treatment, their requests are often delayed or ignored.  Rogers Decl. ¶ 39; Stewart Decl. ¶ 16.  In addition, since the outbreak of COVID-19, detainees believe that the medical staff has been less attentive to other medical needs of the detainees.  Shepherd Decl. ¶ 25; Spears Decl. ¶ 31 ("I can't talk to the social worker about my [mental health] diagnosis or my medications because she won't come back on the line to talk to us.").

Many detainees report that they cannot get medical attention when they require it.  Christopher Rogers recalls that there were times when his leg was numb while he had COVID-19 but no one came to help him when he called to the nurse for help.  Rogers Decl. ¶ 40.  For those who are brought to the infirmary, it is described as "nasty," with gnats and pooled water.  Belton Decl. ¶ 8.  There is also no buzzer or call button to alert the staff in the case of an emergency, and all of the infirmary facilities are shared, regardless of the ailments of the detainees in the infirmary.

---

[25] Ex. 18 to Compl., City of Baton Rouge/Parish of East Baton Rouge, Aug. 26, 2015 Metro. Council Mtg. 28:10, Item 9 Part I and II.

[26] *Id.* at 51:39.

*Id.*

Finally, some detainees report that the Jail has now stopped providing even the rudimentary protections it previously permitted, such as checking temperatures and testing for the virus.  Spears Decl. ¶ 27; Shepherd Decl. ¶ 24.

### 2. Defendants ignore and retaliate against detainees for filing grievances concerning the lack of medical care or unsanitary conditions of confinement

Although the Jail has a formal process for filing "grievances," it has ignored most grievances related to COVID-19.  In order to file a grievance, a detainee must complete a specific form. Spears Decl. ¶ 33.  Because the box in which the detainees must place the grievance form is outside the living area, the detainees must give the grievance forms to the guards, and rely on them to put them in the box. *Id.*  In addition, the forms are only sometimes available, and the staff will make excuses as to why a detainee cannot receive a form at the moment.  *Id.* at ¶ 27.

Because the Jail has discouraged grievances since the COVID-19 outbreak and responded to only a very few grievances submitted, detainees fear retaliation if they continue to push for a response.  Hardy Decl. ¶ 24.  In fact, some detainees have been punished for raising grievances. Christopher Rogers asked to speak with the Jail Captain and Warden regarding his grievances as to the conditions in the B Block, and was told that the Sergeant in charge of responding to grievances would not visit the B Block to speak with him.  Rogers Decl. ¶ 43.  After filing a second grievance related to the inability for detainees to use chemical cleaning products in their cells, the Deputy involved came to Rogers' cell, questioned him aggressively, and shoved Rogers into a wall.  *Id.* ¶ 44.  Rogers received no other response to this grievance.

### H. Defendants' failure to control the COVID-19 outbreak and use of punitive solitary confinement threatens the mental health and safety of all detainees

In addition to the physical ailments that the detainees are forced to endure with limited medical attention, their mental health is also suffering as a result of the Jail's policies towards

COVID-19.  Many of the detainees are worried that they are at high risk of contracting the virus because of the close quarters, and because there is frequent transfer of detainees between the different blocks, increasing the likelihood that healthy detainees are put into contact with those who have contracted the virus.

Several detainees report anxiety because they know that the Jail is not adequately prepared to help them:

- "I feel like my life might be in danger if I get the coronavirus in here.  I'm really stressed because no one is listening to me in here."  Spears Decl. ¶ 32;

- "I'm really stressed on B3 because I could be home but I'm stuck here on a parole hold and I'm locked in a cell around sick people . . . "  Williams Decl. ¶ 29.

- "It was really stressful to be on the B3 line because we were bored, isolated, we didn't know what was going on, and there were older people back there in way worse condition.  One man was really sick.  We would bring him water when we could, but it was depressing and stressful to watch him struggle.  I have been diagnosed with depression and anxiety, and being on B3 was making me more depressed and stressed.  Even after I thought I'd beat coronavirus, I was stuck back there with sick people, and I was constantly afraid I'd get sick again."  Rogers Decl. ¶ 42;

- "It's really tough being in lockdown.  I'm depressed, angry, and stressed back here.  And I'm often very hungry, too."  Stewart Decl. ¶ 28;

- "They're really not doing this 'isolation' thing well.  They aren't social distancing us at all, and they're mixing people who haven't been confirmed to have coronavirus with those who have tested positive."  Franklin Decl. ¶ 43.

That anxiety is surely heightened for those held—even for period of weeks—in punishing solitary confinement.  It is well-documented that solitary confinement, even for a period of days or weeks can have profound psychological and physical effects, such as a heightened state of anxiety and nervousness, obsessive thoughts, paranoia, hallucinations, headaches, insomnia, lethargy or chronic fatigue, nightmares, heart palpitations, suicidal ideations and fear of impending

nervous breakdowns.[27]

Because the Jail is failing to take even remedial steps to assuage the fears of the detainees,

legal recourse is necessary in order to protect the detainees' wellbeing.

## I.    Defendants fail to provide information about COVID-19 and its spread.

Defendants have done little to educate the detainees in their care about the pandemic;

detainees are instead forced to rely on the news or information from loved ones—when they can

access it—for details about the virus and how to best protect themselves.  Although some signs

about keeping clean and not touching their faces have been posted, Jail staff have not explained

the symptoms or warning signs of the virus to detainees.  Spears Decl. ¶ 29; Hardy Decl. ¶ 23

("The guards don't give us any information or updates about the coronavirus, and they didn't tell

us about washing our hands.").  As detainee Cedric Spears explains:

> The guards don't tell us anything about the coronavirus or how to take care of
> ourselves during the pandemic.  We haven't seen the Warden since the beginning
> of the pandemic, and no ranking officer comes back to tell us anything.  The guards
> mostly just try to get off the line quickly.  They act like they're in danger being
> around us, but they're the ones who go into the community and get exposed to the
> virus.  We might have had a sign up with information about coronavirus at one
> point, but I don't think I saw signs on each of the lines I was on.  We try to get our
> information about the coronavirus when we watch the news – there are two 32-inch
> tvs in the day room.

Spears Decl. ¶¶ 29-30.  But those detainees who were transferred into the A, B, and C blocks are

prohibited from going to the day room or watching television, leaving them with no "information

about coronavirus, how to protect ourselves, or what was going on in the world."  Rogers Decl.

---

[27] *See, e.g.* Craig Haney, *Infamous Punishment: The Psychological Effects of Isolation*, 8 Nat'l Prison Project
Journal 3 (1993); Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, Am. J. of Psychiatry, 140 at
1450- 54 (1983); Peter Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of
the Literature*, in Michael Tonry (Ed.), Crime and Justice (2006) at 441-528; Hans Toch, Men in Crisis: Human
Breakdowns in Prisons. Aldine Publishing Co. (1975) at 50-55; Jeffrey Metzner & Jamie Fellner, *Solitary
Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. of the Academy of
Psychiatry and Law 104, 104 (2010),
http://www.hrw.org/sites/default/files/related_material/Solitary%20Confinement%20and%20
Mental%20Illness%20in%20US%20Prisons.pdf.

¶ 33; Williams Decl. ¶ 19.  Demond Harris crystallizes the general attitude of his fellow detainees:

> I think the jail staff is trying to create an atmosphere of fear around lockdown so that guys won't report symptoms to avoid going on the line.  They took away almost all of our privileges on lockdown, including commissary, access to hygiene products, mail, open access to phones, and tvs.  Why else would they take all of our privileges away?  If people on the line heard about that, they wouldn't want to tell the nurse they were sick and they would be scared to go to lockdown.  So they kept their symptoms quiet, and the jail staff let the virus spread throughout the jail.  I think this is how the jail has kept their positive-case count down.

Harris Decl. ¶ 33.  In sum, Defendants created and have now perpetuated an environment in which the named Plaintiffs and all class members face grave risks to their health, and endure continual violations of their constitutional rights.

## J.  Expert Medical Opinion Demonstrates that Release from Detention is the Only Remedial Measure that Will Protect Medically Vulnerable Detainees.

The overwhelming medical and scientific consensus is that social distancing of at least six feet is required to reasonably reduce the risk of transmission of the novel coronavirus.  Hassig Decl. ¶ 3; Lauring Decl ¶ 42; Rottnek Decl. ¶ 13.  As Dr. Carlos Franco-Paredes explains, measures short of social distancing like the ones recommended by the CDC are important but "insufficient to interrupt the transmission of COVID-19 infection, unless social distancing is also meaningfully implemented."[28]  Not only is this the judgment of the prominent local and national medical experts,[29] but the Centers for Disease Control and Prevention (CDC),[30] the American Medical

---

[28] *See* Ex. 5 to Compl., Declaration of Dr. Carlos Franco-Paredes at 1, *Cameron v. Bouchard*, No. 20-cv-10949 (E.D. Mich. April 17, 2020), ECF No. 1-6 ("Paredes Report"); *see also* Order at 6, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 22, 2020), ECF No. 22 ("Respondents say that soap and disinfectant are readily available . . . However, these supplies can only be so useful in an environment where the inmates are constantly in close proximity to each other.").

[29] *See* Meyer Decl. ¶ 9 ("When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing."); *id.* ¶ 23 ("As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces . . . to protect those most vulnerable to the disease."); *see also* Ex. 13 to Compl., Declaration of Robert B. Greifinger ¶¶ 4, 8, *Dawson v. Asher*, Case No. 2:20-cv-00409-JLR-MAT (D. Or., filed Mar. 16, 2020), ECF No. 4; Ex. 8 to Compl., Declaration of Elizabeth Y. Chiao ¶ 12, *Russell v. Harris Cty.*, No. 4:19-cv-00226 (S.D. Tex. Mar. 27, 2020), ECF No. 32-2.

[30] Ctrs. for Disease Control & Prevention, *Social Distancing, Quarantine, and Isolation*, (Apr. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html; Ctrs. for Diseases Control

Association,[31] the American Red Cross,[32] and the Florida Department of Health[33] have all concluded that social distancing is essential to preventing transmission of the deadly infection.

Because social distancing at the jail is impossible, *see* Hassig Decl. ¶ 9; Rottnek Decl. ¶ 16, medical experts have concluded, Hassig Decl. ¶ 10; Lauring Decl. ¶¶ 36–37; Paredes Decl. Executive Summary; Stern Decl. ¶¶ 12–13, the *only* way to protect the subclass from the imminent threat of death or life-threatening illness is to order them removed from the jail.[34] Medically-vulnerable detainees should be prioritized, as they are at greatest risk of contracting and spreading COVID-19 and because their underlying morbidities make them highly susceptible to serious illness and death. *Id.* This risk is not only to other detainees; staff, medical professionals, and their communities and families are at increased risk of infection if they work in dangerous conditions. Rottnek Decl. ¶ 57. Nor should detainees be transferred to other facilities where there may be more space, as the transport process often "places both detainees and accompanying staff in potentially risky proximity," and introduces the possibility of introducing infection into new facilities. Hassig Decl. ¶¶ 10, 11.

The Chief Justice of the Louisiana Supreme Court has likewise recognized the perils of not releasing medically vulnerable detainees, encouraging district court judges to release

---

& Prevention, *How to Protect Yourself & Others* (Apr. 13, 2020) (explaining the paramount importance of social distancing, even if taking other precautions such as a mask).

[31] *AMA, AHA, ANA: #StayHome to confront COVID-19*, Am. Medical Ass'n (Mar. 24, 2020), https://www.ama-assn.org/press-center/press-releases/ama-aha-ana-stayhome-confront-covid-19.

[32] *Coronavirus – What Social Distancing Means*, Am. Red Cross (Apr. 14, 2020), https://www.redcross.org/about-us/news-and-events/news/2020/coronavirus-what-social-distancing-means.html.

[33] *How Do I Prevent and Prepare For COVID-19?*, Fla. Dep't of Health (Apr. 24, 2020), https://floridahealthcovid19.gov/prevention/.

[34] *Malam v. Adducci*, __ F. Supp. 3d __, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020) at *4 ("[T]he public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety" (citing declaration by infectious disease epidemiologist Joseph Amon)); *see also Thakker v. Doll*, __ F. Supp. __, 2020 WL 1671563, at *9 (M.D. Pa. Mar. 31, 2020).

detained persons because a coronavirus outbreak in jails and prisons would be "catastrophic for jail staff, the families of jail staff, and inmates."[35]

### ARGUMENT

Plaintiffs and the class members they seek to represent are at imminent risk of death or serious injury.  If this litigation is decided in the ordinary course, many class members, particularly the subclass of medically vulnerable detainees ("Medically Vulnerable Subclass), will become seriously ill and die before final judgment.[36]  Numerous others will suffer severe pain or organ damage.  In order to protect the safety and lives of the subclass members, the Court should issue a temporary restraining order requiring their release from the unsanitary, infectious jail environment because there are no measures that Defendants can take within the facility to protect these detainees from an unconstitutionally high risk of death or serious bodily harm.  Their lives depend on how quickly they are released—subject to reasonable conditions—to preserve the status quo, namely the health and life of subclass members.  This relief is appropriate either through 28 U.S.C. § 2241 or, in the alternative, through 42 U.S.C. § 1983.

Under Rule 65, "[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  *Lake Charles Diesel, Inc. v. General Motors Corp*, 328 F.3d 192, 195 (5th Cir. 2003). The Court likewise has

---

[35] *See* Chief Justice Bernette Joshua Johnson, Letter to the Louisiana District Judges (Apr. 2, 2020) https://www.lasc.org/COVID19/2020-04-02-LASC-ChiefLetterReCOVID-19andjailpopulation.pdf; *see also* Javonti Thomas, *Louisiana Chief Justice calls for reduced jail populations to combat COVID-19 outbreak*, KALB (Apr. 3, 2020) https://www.kalb.com/content/news/Louisiana-Chief-Justice-calls-for-reduced-jail-populations-  to-avoid-COVID-19-outbreak--569348241.html.

[36] Plaintiffs are contemporaneously filing a motion for certification of a class of all persons detained at EBPP, as well as a (i) subclass of medically vulnerable detainees who are the subject of this motion; (ii) subclass of pretrial individuals; (iii) subclass of post-conviction individuals.

independent authority under habeas corpus, 28 U.S.C. § 2241, to order immediate release from unconstitutional confinement. *See infra* Section (IV).

As explained below, the Medically-Vulnerable Subclass members satisfy each of these Rule 65 elements and that release pursuant to habeas and this Court's inherent equitable powers is mandated. There is voluminous evidence in the record showing that the Subclass members are particularly vulnerable to severe illness and death, through their likely exposure to the surging COVID-19 virus. The evidence demonstrating the serious risk they face to their health, including a risk of death, constitutes the clearest form of irreparable harm that the law recognizes. There is no remediation to the risk medically vulnerable subclass members face that Defendants could take, short of release.

Subclass members are likely to succeed on their due process and habeas claims because subjecting pretrial detainees to such an unreasonable health risk constitutes impermissible punishment under the Fourteenth Amendment, particularly as the Defendants can safeguard any legitimate government interest in preventing flight through reasonable alternatives to detention. Further, Defendants are acting unconstitutionally under the Eighth Amendment "deliberate indifference" standard applicable to post-conviction subclass members as their failure to implement the basic steps recommended by health experts, the CDC, and Governor John Bel Edwards[37] when they are well aware of the extreme risks posed by this virus constitutes deliberate indifference.

## I.    SUBCLASS MEMBERS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A TRO MANDATING THEIR RELEASE.

---

[37] *See* Executive Order, (May 15, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/58-JBE-2020.pdf.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582-83 (E.D. La. 2016), *aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017) (quotations omitted). The Fifth Circuit requires only a "substantial threat" of irreparable injury, *DSC Commc'ns Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir.1996), which is defined as "harm for which there is no adequate remedy at law," such as monetary damages. *Daniels Health Scis., L.L.C. v. Vascular Health Scis.*, L.L.C., 710 F.3d 579, 585 (5th Cir. 2013). A court "need not await a tragic event" to afford injunctive relief. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (noting "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

Plaintiffs allege injuries that are irreparable and, therefore, are not suitable for resolution in the ordinary course of litigation. There is no injury that is more irreparable than death, and Plaintiffs face a heightened risk of contracting a deadly virus due to Defendants' actions. *See In re Bahadur, No. EP-19-CV-00357-DCG*, 2020 U.S. Dist. LEXIS 33455, at *14 (W.D. Tex. Feb. 27, 2020); *Chambers v. Coventry Health Care of Louisiana, Inc.*, 318 F. Supp. 2d 382 (E.D. La. 2004) (irreparable harm found where late detection of cancer could lead to death). This risk is neither speculative nor attenuated: in a prison in Oakdale, Louisiana where COVID-19 has been allowed to spread, five people have died in less than a week.[38] With 93 confirmed COVID-19 cases in the Jail[39], the risk of death and physical devastation to subclass members is an absolute certainty of

---

[38] *ACLU Sues Louisiana Prison After 5 COVID-19 Deaths Reported*, Democracy Now (Apr. 7, 2020), https://www.democracynow.org/2020/4/7/headlines/aclu_sues_louisiana_prison_after_5_covid_19_deaths_reported.

[39] *See* Ex. 1 to Compl., EBRPP COVID-19 Statistics (May 14, 2020).

the kind that cries for judicial relief.

Even short of death, Plaintiffs are at grave risk of contracting severe and potentially lifelong medical conditions – including neurologic damage and the loss of respiratory capacity—and may require extensive rehabilitation or profound reconditioning—which also establishes irreparable harm. *See, e.g.*, *Vazquez-Berrera v. Wolf*, No. 20-cv-1241, 2020 WL 1904497, at *6 (S.D. Tex. Apr. 17, 2020) ("Given Plaintiffs' vulnerabilities to serious illness if infected with the coronavirus and the serious and imminent risk of infection if they remain in immigration detention, Plaintiffs have shown irreparable harm."); *see also Unknown Parties v. Johnson*, No. CV- 15-00250-TUC (DCBx), 2016 WL 8188563, at *15 (D. Ariz. No. 18, 2016), *aff'd sub nom Doe v. Kelly,* 878 F.3d 710 (9th Cir. 2017) (irreparable harm where evidence demonstrated "medical risks associated with . . . being exposed to communicable diseases").

The expert evidence in this case demonstrate that short of release, there are no sufficient measures—preventative or palliative—that Defendants can implement to protect Subclass Members from the unprecedented threats to the safety of these individuals—and those who come in contact with them, including staff, healthcare providers, and local populations.  Hassig Decl. ¶¶ 9, 10; Rottnek Dec. ¶¶ 54, 57.  Release is the only option.  *See also* Lauring Decl. ¶¶41-43 (opining that until a vaccine is developed, "For the medically vulnerable . . . immediate release is the only option.  The detainees' inability to practice physical distancing at all times, coupled with the Jail's failure to properly screen, identify, and quarantine infection, and their widespread neglect of medical needs creates a meaningfully higher risk of death for these individuals.").  Recognizing these grave risks, courts across the country have granted immediate relief to people seeking to avoid medically-unsafe confinement.[40]

---

[40] *See Zhang v. Barr*, No. ED CV 20-00331-AB, 2020 WL 1502607, at *6 (C.D. Cal. Mar. 27, 2020) (granting an immediate bond hearing in light of the "global pandemic by which delay in determining Petitioner's release exposes

Moreover, Plaintiffs seek relief from violations of their constitutional rights. In the context of a preliminary injunction, the loss of a constitutional right "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## II. SUBCLASS MEMBERS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

The government has a constitutional duty to protect those it detains from "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This right arises under the and under the Fourteenth Amendment's Due Process Clause pre-conviction, *see City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983), and under the Eighth Amendment post-conviction, *see id.*; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Subclass members are likely to succeed on their claims because Defendants are subjecting detainees to an unreasonable level of risk in violation of pretrial detainees' Fourteenth Amendment rights and are otherwise deliberately indifferent to the substantial risk that Medically Vulnerable Subclass members will contract COVID-19 within the current conditions at the Jail, in violation of the Eighth Amendment.

It is a fundamental constitutional proposition that, when the State holds individuals in its custody, the state officials have an obligation to provide for their basic human needs, including medical care and reasonable safety. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs— e.g., food, clothing, shelter, medical care, and reasonable safety—it

---

him to unnecessary risk"); *United States v. Garlock*, No. 18-Cr-00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (ordering, *sua sponte*, extension of convicted defendant's surrender date and noting "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Castillo v. Barr*, __ F. Supp. 3d __, CV 20-00605 TJH (AFMx), 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020) (noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *Cameron v. Bouchard*, No. 20-cv-10949, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020) (emergency hearing scheduled for medically-vulnerable subclass).

transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id*. (citations omitted); *accord Hare v. City of Corinth, Miss*., 74 F.3d 633, 639 (5th Cir. 1996); *see also Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (the state has an "unquestioned duty" to provide adequate medical care for detained persons).

In the Fifth Circuit, "Pretrial detainees and convicted prisoners, however, look to different constitutional provisions for their respective rights to basic needs such as medical care and safety." *Hare*, 74 F.3d at 639. For pretrial Subclass members, their claims must be evaluated under the Fourteenth Amendment's Due Process Clause, *see City of Revere*, 463 U.S. at 244, which prohibits conditions that are unreasonably excessive to a legitimate government purpose such that they amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Subclass members who are post-conviction are protected by the Eighth Amendment, which prohibits "deliberate indifference to inmate health or safety." *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999). Defendants violate both standards. Defendants' actions demonstrate that they unable to abate the probability of widespread COVID-19 infection and the resultant high risk of severe illness or death. Defendants are thus violating their constitutional duties to all subclass members.

### A. Subclass Members Who Are Pretrial Are Subject to Unreasonable, Punitive Conditions of Confinement in Violation of the Fourteenth Amendment.

Because those Subclass Members who are pretrial have never been adjudicated to be guilty of a crime, they enjoy substantive due process protections stemming from the Fourteenth Amendment, which accordingly protects pretrial detainees from *any* punishment, including

general conditions of confinement that become unreasonably punitive. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *Hare*, 135 F.3d at 169.

A condition of detention amounts to impermissible punishment when "it is not reasonably related to a legitimate goal," if it is "excessive" in relation to a legitimate goal," or if it is otherwise "arbitrary or purposeless"—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Wolfish*, 441 U.S. at 539; *Hare*, 74 F.3d at 640. To make this showing, a person in detention need not demonstrate the defendant's subjective or malicious intent to punish. *Shepherd v. Dallas Cty*., 591 F.3d 445, 452 (5th Cir. 2009). "[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices." *Hare*, 74 F.3d at 644. "A pervasive pattern of serious deficiencies" that subjects an individual in detention to the risk of serious injury or death likewise amounts to punishment. *Shepherd*, 591 F.3d at 454.

In *Shepherd*, the Fifth Circuit found that a "jail's evaluation, monitoring, and treatment of inmates with chronic illness was [...] grossly inadequate due to poor or non-existent procedures and understaffing of guards and medical personnel," that "serious injury and death were the inevitable results of the jail's gross inattention to the needs of inmates with chronic illness," and that this amounted to punishment. *Shepherd*, 591 F.3d at 454. Similarly, in *Duvall*, the Fifth Circuit affirmed a jury's finding that Dallas County had an unconstitutionally punitive custom or policy when it allowed infections of Methicillin-Resistant Staphylococcus Aureus (MRSA) to be present in a jail, and failed to take necessary measures for eradication. *Duvall v. Dallas Cty*., Tex., 631 F.3d 203, 208-09 (5th Cir. 2011).

Because pretrial detainees cannot be punished for a crime for which they have not been adjudged guilty, the only legitimate government interest in imprisoning pretrial detainees is prevent flight risk, and to assure appearance at trial. Yet, punishment is what these pretrial detainees are being given in the cramped, unsanitary, and irremediable conditions in the East Baton Rouge jail. These conditions impose a demonstrably substantial risk of contracting COVID-19. Once they are exposed, they are all vulnerable to severe illness or death, either because of their age, or because they have underlying medical conditions. Continued detention of Plaintiffs is an imminent threat to their lives that is clearly excessive in relation to the purported government goal, and therefore amounts to punishment. Such exposure to lethal risks becomes even more unreasonable—downright arbitrary and purposeless—when the government interest can be accomplished through innumerable non-carceral alternatives to detention.

There is compelling evidence that alternatives to monetary release conditions are more effective in ensuring appearance for trial and reduce the risk of re-arrest before trial. A study in Colorado found phone calls to people dates a few days before their court dates brought failure-to-appears down to 8 percent from previous rate of 21 percent.[41] Multnomah County, Oregon reduced its failure-to-appear rate by 31 percent when it started using automated court date reminders.[42] The City of Clanton, Alabama, adopted a new policy of releasing all arrestees on a $500 unsecured bond, *see Jones ex rel. Varden*, No. 2:15cv34-MHT, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015), as did the City of Velda City and the City of St. Ann.[43]

---

[41] *See e.g.*, Oregon Knowledge Bank, *http://okb.oregon.gov/portfolio-item/auto-notification/* for more examples and studies (last visited May 26, 2020); *see also* Lael Henterly, *When Bail Is Set, the Rich Walk and the Poor Go to Jail* Seattle Weekly Times, (Aug. 23, 2016), http://www.seattleweekly.com/news/when-bail-is-set-the-rich-walk-and-the-poor-go-to-jail/.

[42] *Id.*

[43] *See e.g.*, *Pierce v. City of Velda City*, 4:15-CV-570-HEA, 2015 WL 10013006 (E.D. Mo. June 3, 2015); *Powell v. City of St. Ann*, No. 4:15-cv-840-RWS (E.D. Mo. 2015).

Other states have voluntarily made changes to avoid unnecessary pretrial detention. For example, in Washington, D.C., arrestees are released on recognizance with appropriate non-financial conditions.[44]  *See* D.C. Code § 23-1321.  In July 2017, the Chief Judge of the Circuit Court for Cook County, Illinois, issued an order prohibiting judges from using money bail to detain arrestees, and requiring any judge who imposes a secured financial condition to make a finding on the record that the individual "has the present ability to pay" the sum.[45]  90% appeared for all scheduled court dates in the subsequent months following the Order.[46]  Judges of the highest court in Maryland issued a similar Order, prohibiting Judges from requiring secured financial conditions of release that result in detention due to inability to pay.[47]  And a year ago, in January 2017, New Jersey virtually eliminated the use of money bail. Since then, the detained pretrial population has dropped by 34%.[48]

Further, it is well documented that pretrial incarceration harms individuals' lives far beyond their loss of liberty and the conditions they face in jails, outside of a global pandemic like COVID-19. Collateral consequences of pretrial incarceration include:

- Loss of income and wages when individuals lose their jobs because of their incarceration;

---

[44] The federal government and the District of Columbia both removed money bail virtually entirely from their court systems after the Department of Justice, Congress, and an overwhelming consensus of legal experts concluded that the old system of post-arrest detention based on money bail was fundamentally unfair and unconstitutional. Federal law now explicitly forbids obtaining post-arrest detention through the use of money bail that a person cannot meet. *See* 18 U.S.C. § 3142(c)(2) ("The judicial officer may not impose a financial condition that results in the pretrial detention of the person.").

[45] The Order is available at: http://www.cookcountycourt.org/Manage/DivisionOrders/ViewDivisionOrder/tabid/298/ArticleId/2562/GENERAL-ORDER-NO-18-8A-Procedures-for-Bail-Hearings-and-Pretrial-Release.aspx.

[46] Mean Crepeau, *Cook County Jail Drops Below 6,000 Inmates to Lowest Level in Decades*, Chi. Trib., (Dec. 22, 2017)  http://www.chicagotribune.com/news/local/breaking/ct-met-cook-county-jail-under-6000-inmates-20171221-story.html.

[47] The Maryland Court of Appeals' Order is available at http://mdcourts.gov/rules/rodocs/ro192.pdf.

[48] Brentin Mock, *How New Jersey is Leading the Post-Bail* Revolution, CityLab, (Nov. 2, 2017) https://www.citylab.com/equity/2017/11/how-new-jersey-is-leading-the-post-bail-revolution/544691/.

● Loss of housing and missed payments on bills because individuals cannot work or pay bills while incarcerated;

● Loss of physical and/or legal custody of children;

● An increase of mental illness symptoms because conditions in jail can put an individual under a lot of stress and restrict access to needed medications, exacerbating or even causing mental illness; and

● Increased risk of assault, including sexual assault especially in the first few days of incarceration.[49]

Compounding these deleterious health effects – and separating individuals from loved ones and support networks – onto the risk of imminent infection from a lethal disease crosses the threshold from unconstitutionally unreasonable to morally cruel.

### B. Under a Deliberate Indifference Standard, Post-Conviction Subclass Members' Eighth Amendment Rights Are Being Violated.

To demonstrate a violation of the Eighth Amendment, convicted persons must show both an objectively substantial risk of serious harm and that prison officials subjectively "acted with deliberate indifference to inmate health or safety" towards the hazardous condition in question. *Palmer*, 193 F.3d at 352. Courts find deliberate indifference when a detained person can show: (1) "that he is incarcerated under conditions posing a substantial risk of serious harm," and (2) "that the official was deliberately indifferent to inmate health or safety." *Hare*, 74 F.3d at 648 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)).

A "condition of confinement that is sure or very likely to cause serious illness and needless suffering" to someone detained – which includes "exposure of inmates to a serious, communicable disease"—is precisely the type of serious harm that the Eighth Amendment protects against. *Helling*, 509 U.S. at 33 (prison officials must protect against "exposure of inmates to a serious

---

[49] Melissa Neal, *Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail*, Justice Policy Institute (2012), http://www.justicepolicy.org/uploads/justicepolicy/documents/bailfail.pdf.

communicable disease); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease."); *see also Farmer*, 511 U.S. at 833 ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."); *Johnson v. Epps*, 479 Fed. App'x 583, 591-92 (5th Cir. 2012) (holding that a policy that forced inmates to use unsterilized barber clippers constituted deliberate indifference).

### 1. Plaintiffs are objectively at a substantial risk of serious harm

COVID-19 is the quintessential "serious" and "communicable disease" from which the Constitution requires incarcerated people be protected. *Helling*, 509 U.S. 25 at 33-34. To date, this disease has no preventative cure or effective treatment. It can cause severe pain, and in even mild and moderate cases, it can feel like "drowning in [one's] own blood," with even young people in good health feeling like "they've been hit by a truck." *See* Compl. ¶ 35. It has ushered nationwide shutdowns and an unprecedented toll of death and destruction, particularly among medically vulnerable populations. There can be no dispute that the risk of contracting COVID-19 is objectively unacceptable, particularly for medically vulnerable individuals.

### 2. Defendants have acted and are continuing to act with subjective indifference towards Plaintiffs' substantial risk of harm.

Under the second prong of the deliberate indifference standard, the Fifth Circuit asks whether the official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Jones v. Texas Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018). A detained person "does not need to show that death or serious illness has yet occurred to obtain relief. He must show that the conditions pose a *substantial risk* of harm." *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004) (emphasis added). In *Gates*, where

individuals on Death Row challenged overheated temperatures as violating the Eighth Amendment, the Fifth Circuit upheld a finding that the plaintiffs faced a substantial risk of serious harm based on expert testimony, such as that produced in this case, substantiating a possibility of death. *Cook*, 376 F.3d at 339.

Even under the Eighth Amendment's standard that applies to inmates who have been convicted, immediate injunctive relief is appropriate.  That is because Defendants have certainly known of and disregarded an excessive risk to detainee health or safety. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Honshul v. Foti*, No. 94-30723, 1995 WL 153425, at *2-3 (5th Cir. Mar. 30, 1995).

With respect to an impending infectious disease like COVID-19, deliberate indifference is satisfied when corrections officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33 (holding that a prisoner "states a cause of action . . . by alleging that [corrections officials] have, with deliberate indifference, exposed him to conditions that pose an unreasonable risk of serious damage to future health"); *see also Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (court "may infer the existence of [deliberate indifference] from the fact that the risk of harm is obvious" (citing *Farmer*, 511 U.S. at 842)).  *See also Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974) (prison conditions, including the fact that "inmates with serious contagious diseases are allowed to mingle with the general prison population," violate the Eighth Amendment).

This Court need not "await a tragic event" to find that Defendants are maintaining unconstitutional conditions of confinement amid a global pandemic. *See Helling*, 509 U.S. at 33. So long as the risk of serious harm is "likely," as it is here, the Eighth Amendment is violated, even if "the complaining inmate shows no serious current symptoms," and "the possible infection

34

might not affect all of those exposed." *Id.*

Here, amid this global pandemic which has been front page news every day for months, it cannot be seriously disputed that any government officials, including Defendants, are unaware of the risks posed by the coronavirus.[50]  Through government orders,[51] CDC guidance aimed at jails,[52] and nationwide publications,[53] Defendants have been made well aware of the risks to incarcerated people.   The Sheriff's own communications and announcements emphasize this awareness.[54] Similarly, the widespread public discussion regarding the heightened risk to medically vulnerable people makes abundantly clear that Defendants are aware of the mortal peril that Jail conditions pose to such individuals.

In addition, the overwhelming medical and scientific consensus is that social distancing of at least six feet is required to reasonably reduce the risk of transmission of the novel coronavirus.

---

[50] This is particularly true given the death from coronavirus of a deputy sheriff in the parish, Sergeant Gregory Warren, in April of this year.  *See* Lea Skene, *East Baton Rouge Deputy — 'A Dedicated Public Servant' — Dies from Coronavirus, Sheriff Says*, The Advocate (Apr. 5, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_27ecdcac-7759-11ea-9ab3-e72613b104ed.html.

[51] *See* Executive Order 2020-27 (Mar. 13, 2020), https://gov.louisiana.gov/assets/ExecutiveOrders/27-JBE-2020-COVID-19.pdf; Executive Order (May 15, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/58-JBE-2020.pdf.

[52] Ctrs. for Disease Control & Prevention, *Correctional and Detention Facilities*, (May 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html.

[53] *See* David Mills & Emily Galvin-Almanza, *As Many as 100,000 Incarcerated People in Our Prisons Will Die from the Coronavirus, Unless the US Acts Now*, Bus. Insider (Apr. 2, 2020), https://www.businessinsider.com/failure-to-release-prisoners-is-condemning-thousands-to-death-2020-4; Anna Flagg & Joseph Neff, *Why Jails Are So Important in the Fight Against Coronavirus*, N.Y. Times (Mar. 31, 2020), https://nyti.ms/3aIBHjv; Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020), https://nyti.ms/2Jmnf4z.

[54] Lea Skene and Jacqueline DeRoertis, *East Baton Rouge Sheriff: It's Only a Matter of Time Before Coronavirus Arrives in Jail*, The Advocate (Mar. 17, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_be4301c6-6887-11ea-b794-ab2c5dcccad8.html.

The CDC,[55] the American Medical Association,[56] the American Red Cross,[57] and the Louisiana Department of Health[58] have all concluded that social distancing is essential to preventing transmission of the deadly infection.  The CDC itself describes social distancing as "a cornerstone of reducing transmission of respiratory diseases such as COVID-19," as "[t]he best way to prevent illness," and as "extra important" for vulnerable individuals.[59]  Defendant Gautreaux concedes this point, imploring his employees to "please take all necessary precautions and use all available equipment and resources to protect themselves not only at work, but any time they must be out in the community."[60]

Officials' indifference to the significant risk of permanent damage and death to the Medically Vulnerable Subclass is even more unacceptable.  It is well-documented that these individuals face a risk of death or permanent organ damage far in excess of the rest of the population.  *See* Rottnek Decl. ¶ 61; Hassig Decl. ¶ 4.  This risk is evident in the COVID-19 death toll to date—for instance, in New York state, almost 90% of reported COVID-19 deaths involved at least one comorbidity, according to the state's department of health.[61]  Defendants' refusal or

---

[55] Ctrs. for Disease Control & Prevention, *Social Distancing, Quarantine, and Isolation* (Apr. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html; Ctrs. for Disease Control & Prevention, *How to Protect Yourself & Others* (Apr. 13, 2020) (explaining the paramount importance of social distancing, even if one is already taking other precautions such as a mask).

[56] *AMA, AHA, ANA: #StayHome to confront COVID-19*, Am. Medical Ass'n (Mar. 24, 2020), https://www.ama-assn.org/press-center/press-releases/ama-aha-ana-stayhome-confront-covid-19.

[57] *Coronavirus – What Social Distancing Means*, Am. Red Cross (Apr. 14, 2020), https://www.redcross.org/about-us/news-and-events/news/2020/coronavirus-what-social-distancing-means.html.

[58] *Defending Against Covid-19*, La. Dep't of Health, http://ldh.la.gov/index.cfm/page/3938#spread (last visited May 26, 2020).

[59] *See* Ex. 3 to Compl., Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidancecorrectional-detention.html.

[60] Lea Skene, *East Baton Rouge Deputy — 'A Dedicated Public Servant' — Dies from Coronavirus, Sheriff Says*, The Advocate (Apr. 5, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_27ecdcac-7759-11ea-9ab3-e72613b104ed.html.

[61] *NYSDOH COVID-19 Tracker*, N.Y. State Dep't of Health, https://covid19tracker.health.ny.gov/ (last visited May

inability to provide circumstances that would limit the subclass's exposure to the virus constitutes deliberate indifference.   At this point, only release will sufficiently protect the medically vulnerable from their very real risk of death.  *See, e.g.*, *Cameron v. Bouchard*, -- F. Supp.3d --, 2020 WL 2569868, at *24 (E.D. Mich. May 21, 2020) ("Considering the weight of the public health evidence demonstrating the medically-vulnerable population's unique, specific, and life-threatening susceptibility to COVID-19—paired with the communal nature of jail facilities, the Court finds that home confinement or early release is the only reasonable response to this unprecedented and deadly pandemic.").

While the risk is great to everyone in the Jail, the members of this subclass have conditions rendering them exceptionally vulnerable to death or serious harm if exposed to COVID-19.  As a result, there is no practicable way to ensure that they can avoid infection and no practicable way to ensure that, if infected, they receive prompt and adequate medical treatment within the Jail. Hassig Decl. ¶ 4.  Serious illness is substantially likely, and older people and those with underlying medical conditions, such as lung disease, heart disease, or diabetes, are more likely to develop serious illnesses.  *Id.* Therefore, their continued detention is a grave risk to their lives and violates the Constitution.

In the face of this awareness, Defendants' ongoing confinement of Plaintiffs is deliberately indifferent to the risks caused by this virus and must be remedied.  "Failing to take reasonable measures to abate [risk]" demonstrates disregard of such risk.  *Farmer*, 511 U.S. at 847. Accordingly, Plaintiffs have shown that they are likely to succeed on the merits of their claims.

## III.   THE PUBLIC INTEREST AND BALANCE OF EQUITIES WEIGH HEAVILY IN PLAINTIFFS' FAVOR.

---

26, 2020).

Where, as here, the government is a party to the case, the third and fourth injunction factors—the balance of the equities and the public interest—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *El Paso Cty., Texas v. Trum*p, 407 F. Supp. 3d 655, 665 (W.D. Tex. 2019).  As an initial matter, the public interest is served by the protection of constitutional rights.  *See Ingebretsen v. Jackson Pub. Sch. Dist*., 88 F.3d 274, 280 (5th Cir. 1996); *Cohen v. Coahoma Co.*, 805 F. Supp. 398, 408 (N.D. Miss. 1992).

The balance of equities and the public interest also favor release of the Medically Vulnerable Subclass members who, as a practical matter, cannot be constitutionally held in the Jail at this time.  Release of these individuals will conserve the Jail's resources and reduce the demands on Jail staff, including guards and nurses.  Further, releasing medically vulnerable individuals is the only way to eliminate the unacceptable risk to their health and the concomitant demand on public health resources—inside the jail and in the broader community —that will result when they become infected.

A worsened outbreak at the Jail has the potential to create a "tinderbox" scenario that drains the Baton Rouge metropolitan area of limited medical resources, including intensive care unit beds and ventilators.[62]  In Louisiana, the COVID-19 outbreak has already resulted in unprecedented public health demands that have strained the local health care system.[63]

Recently, the Western District of Louisiana noted in recommending release of 13 medically vulnerable individuals from ICE detention, that "public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions."  *Dada v. Witte*, No.

---

[62] *New Model Shows COVID-19 Death Toll is 100,000 Higher Than Current Projections*, ACLU.org (Apr. 22, 2020), https://www.aclu.org/press-releases/new-model-shows-covid-19-death-toll-100000-higher-current-projections.

[63] *See* Ryan Whirty, *As COVID-19 cases increase, La. hospitals take care to ensure they remain resourced*, The Louisiana Weekly (Apr. 20, 2020), http://www.louisianaweekly.com/as-covid-19-cases-increase-la-hospitals-take-care-to-ensure-they-remain-resourced/.

1:20-cv-00458-DDD-JPM at *27 (Report and Recommendation) (adopted May 22, 2020).  And, as the Western District of Texas explained in in *Vazquez Barrera*, "an outbreak among the . . . detainee population will inevitably spread through the surrounding community, as MPC staff members, who live outside the detention facility, will be exposed to sick detainees . . . [and] will put additional strain on hospitals and health care resources in the community."  2020 WL 1904497, at *7.  *United States v. Raihan*, No. 20-cr-68-BMC- JO, Proc. at 10:12-19 (E.D.N.Y. Mar. 12, 2020), ECF No. 20 ("[t]he more people we crowd into that facility, the more we're increasing the risk to the community").

The consensus of public health expertise is in accord.  *See supra* Section J.  This immediate, concrete interest in health and life must, in any humane system of justice, outweigh a state's abstract penological interest in continued imprisonment of human beings.

## IV.   IMMEDIATE RELEASE IS OF MEDICALLY VULNERABLE SUBCLASS MEMBERS IS THE ONLY EFFECTIVE REMEDY FOR PLAINTIFFS' UNLAWFUL DETENTION, WHICH THE COURT HAS AMPLE AUTHORITY TO ORDER.

The Court has ample authority under 28 U.S.C. § 2241 and independently under Rule 65 to issue the release of detained persons—a remedy that has been ordered by numerous courts across the country in recent weeks.  Habeas invests in federal courts broad, equitable authority to "dispose of the matter as law and justice require," 28 U.S.C. § 2243, as the "very nature of the writ demands that it be administered with the initiative and flexibility."  *Harris v. Nelson*, 394 U.S. 286, 292 (1969).

While it is clear in this Circuit that habeas authorizes challenges to the fact or duration of detention, there is more ambiguity about whether habeas – authorizes challenges to conditions of

confinement.[64]  *See Poree v. Collins*, 866 F.3d 235, 244 (5th Cir. 2017) (observing that "the Supreme Court has not foreclosed" habeas challenges for conditions claims and "declin[ing] to address whether habeas is available only for fact or duration claims.")*.*  In any event, this habeas petition does not challenge conditions of confinement in the way this purported distinction imagines. By this motion, Medically Vulnerable Subclass members are not seeking judicial intervention in order to alleviate harsh conditions; it is precisely because there is no judicial possibility of remediating their unconstitutional confinement that they are challenging the very *fact* of their confinement. *Vazquez-Berrera*, 2020 WL 1904497, at *4 ("The mere fact that Plaintiffs' constitutional challenge requires discussion of conditions in immigration detention does not necessarily bar such a challenge in a habeas petition."); *see also Dada v. Witte*, No. 1:20-CV-00458, ECF No. 17 at 9 (W.D. La. Apr. 30, 2020) (Report and Recommendation) (explaining that "the remedy for conditions claims is generally corrective. The remedy for fact claims, however, generally terminates the detention altogether, or alters it such that a new form of custody or control is imposed" and recommending release of 13 petitioners under § 2241) *adopted, id.*, Dkt 24.

As such, they seek "relief from unlawful imprisonment or custody."  *Pierre v. United States*, 525 F.2d 933, 935-36 (5th Cir. 1976); *see also Poree*, 866 F.3d at 244 (petition seeking transfer to facility with less restrictive conditions "properly sounds in habeas.").  *See also Malam*, 2020 WL 1672662, at *3 ("where a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas.").  Habeas confers "broad discretion in conditioning a judgment granting habeas relief . . . 'as law and justice require' ".

---

[64] Plaintiffs do seek, under Section 1983, an injunction mandating changes to conditions in the facility.  For Medically Vulnerable Subclass members, however, because those conditions will not abate the acute risk they face, release pursuant to habeas is proper.

*Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) (quoting 28 U.S.C § 2243).  That authority includes an order of release, *Boumediene v. Bush*, 553 U.S. 723, 779 (2008), so as "to insure that miscarriages of justice . . . are surfaced and corrected."  *Harris v. Nelson*, 395 U.S. 286, 291 (1969).

Separately, under Rule 65, Section 1983 and a court's inherent equitable authority to remedy unconstitutional government conduct, courts may issue "orders placing limits on a prison's population."  *Brown v. Plata*, 563 U.S. 493, 511 (2011); *see also Duran v. Elrod*, 713 F.2d 292, 297- 98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (affirming order releasing low-bond individuals in pretrial detention as necessary to reach a population cap); *Mobile Cty. Jail Inmates v. Purvis*, 581 F. Supp. 222, 224-26 (S.D. Ala. 1984) (exercising remedial powers to order a prison's population reduced to alleviate unconstitutional conditions.)

## V.    THE COURT SHOULD NOT REQUIRE PLAINTIFFS TO PROVIDE SECURITY PRIOR TO ISSUING A TEMPORARY RESTRAINING ORDER.

Courts have discretion to waive the Rule 65(c) requirement that the movant for a temporary restraining order provide security.  "The Fifth Circuit has acknowledged that the amount of the security is within the discretion of the district court, who can elect to impose no security at all." *New Orleans Home for Incurables Inc. v. Greenstein*, 911 F. Supp 386, 412-13 (E.D. LA 2012) *citing City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 13, 1981).  District courts in this circuit routinely exercise this discretion to require no security in cases brought by indigent or incarcerated people.  *See, e.g.*, *Schultz v. Alabama*, 330 F. Supp. 3d 1344, 1376 (N.D. Ala. 2018) (county prisoners); *Campos v. I.N.S.*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998) (indigent immigrants).  This Court should do the same here.

## CONCLUSION

For these reasons, Plaintiffs ask this Court to issue a temporary restraining order and

ordering the release of Medically Vulnerable Subclass members.

       Respectfully submitted, this 27th day of May, 2020.

/s/ David J. Utter_____
David J. Utter (LA Bar No. 23236)
William R. Claiborne (GA Bar No. 126363)*
FAIR FIGHT INITIATIVE
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@fairfightinitative.org
will@fairfightinitative.org
*Attorneys for Plaintiffs*

    *Pro Hac Vice motion pending*

/s/Miriam R. Nemeth_____
Thomas B. Harvey (MBE #61734MO)*
Miriam R. Nemeth (DC Bar No. 1028529)**
Tiffany Yang (DC Bar No. 230836)*
ADVANCEMENT PROJECT NATIONAL
OFFICE
1220 L Street NW, Suite 850
Washington, DC 20005
(202) 728-9557 Telephone
tharvey@advancementproject.org
mnemeth@advancementproject.org
tyang@advancementproject.org
*Attorneys for Plaintiffs*

    *Pro Hac Vice motions pending*
    *** Lead Attorney for Plaintiffs*

/s/ Lillian S. Hardy_____
Lillian S. Hardy (DC Bar No. 991282)*
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5884 Telephone
lillian.hardy@hoganlovells.com
*Attorneys for Plaintiffs*

    *Pro Hac Vice motion pending*

/s/ Baher Azmy_____
Baher Azmy (NY Bar No. 2860740)*
Omar Farah (NY Bar No. 4641247)*
Brittany Thomas (NY Bar No. 5683834)*
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 11201
(212) 614-6427 Telephone
bazmy@ccrjustice.org
ofarah@ccrjustice.org
bthomas@ccrjustice.org
*Attorneys for Plaintiffs*

/s/ William P. Quigley_____
William P. Quigley (LA Bar No. 00769)
Loyola University New Orleans
7214 St. Charles Avenue
Campus Box 902
New Orleans, LA 70117
*Attorney for Plaintiffs*

*Pro Hac Vice motions forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2020 at approximately at 11:00 a.m. (EST) a copy of the foregoing was sent to all parties via electronic mail upon the following:

Michael P. Schillage
Assistant Parish Attorney
Office of the East Baton Rouge Parish Attorney
222 St. Louis Street, Suite 902
Baton Rouge, LA 70803
MSchillage@brla.gov

Catherine St. Pierre
Erlingson Banks, PLLC
One American Place
301 Main Street Suite 2110
Baton Rouge, LA 70801
cstpierre@erlingsonbanks.com

/s/ *David J. Utter*
David J. Utter