## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**CLIFTON BELTON, JR., JERRY**          **CIVIL ACTION**
**BRADLEY, CEDRIC FRANKLIN,**
**CHRISTOPHER ROGERS, JOSEPH**
**WILLIAMS, WILLIE SHEPHERD,**
**DEVONTE STEWART, CEDRIC SPEARS,**
**DEMOND HARRIS, and FORREST**
**HARDY, individually and on behalf of all**
**Others similarly situated**

**VERSUS**

**SHERIFF SID GAUTREAUX, in his official**      **NO. 3:20-CV-278-BAJ-SDJ**
**Capacity as Sheriff of East Baton Rouge; L.T.**
**COL. DENNIS GRIMES, in his official**
**Capacity as Warden of the East Baton Rouge**
**Parish Prison; CITY OF BATON**
**ROUGE/PARISH OF EAST BATON**
**ROUGE**

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

**MAY IT PLEASE THE COURT:**

Defendant, the City of Baton Rouge/Parish of East Baton Rouge ("City/Parish"), respectfully submits this Memorandum in Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order.

### I.   INTRODUCTION

Plaintiffs seek a TRO via writ of habeas corpus or, in the alternative, through 42 U.S.C. 1983, ordering the immediate release of Plaintiffs and members in the purported subclass "Medically Vulnerable Subclass." Plaintiffs argue that the court must issue a TRO requiring immediate release because "no measures" that defendants can take will protect them from "an unconstitutionally high risk of death or serious bodily harm" through exposure to the "surging

COVID-19 virus."  The three named plaintiffs in the subclass they purport to represent, however, all tested positive for COVID-19 and recovered from the disease.

Plaintiffs fail to meet their burden of establishing any of the requirements for preliminary injunctions.  Plaintiffs fail to show a substantial likelihood of success on the merits of their claims under the Eighth Amendment and the Fourteenth Amendment of the Constitution. Further, they ignore the numerous safeguards put in place to combat COVID-19 at the jail. And they ask the court to disregard the deference entitled to government officials charged with the operation of correctional facilities. For the reasons set forth below, Plaintiffs' Motion for Temporary Restraining Order should be denied.

## II.    BACKGROUND

### A.  Procedural History

On May 4, 2020, Clifton Belton, Jr. (hereinafter referred to as "Belton") filed his pro se *Complaint* regarding the conditions of the East Baton Rouge Parish Prison (hereinafter referred to as "the jail") during the ongoing COVID-19 pandemic.[1]  On May 22, 2020, attorney David Utter filed an *Ex Parte Motion to Enroll* as counsel of record on behalf of Belton.[2]  On May 27, 2020, Mr. Utter filed an *Amended Class Action Complaint* along with attached exhibits regarding the condition of the jail.[3]  The named Plaintiffs are Clifton Belton Jr. Jerry Bradley, Cedrick Franklin, Christopher Rogers, Joseph Williams, Willie Shepherd, Devonte Stewart Cedrick Spears, Demond

---

[1] Rec. Doc. 1.
[2] Rec. Doc. 3.
[3] Rec. Doc. 4.

Harris, and Forrest Hardy.[4]  In the Amended Complaint, Plaintiffs describe a medically vulnerable subclass of plaintiffs who are allegedly at a greater risk of infection and death from COVID-19.[5]

On the same day, Plaintiffs filed an *Emergency Motion for Temporary Restraining Order* against the City/Parish, Sheriff Sid Gautreaux, and Warden Dennis Grimes (in their official capacities) asking the Court to release the medically vulnerable subclass members immediately.[6] A telephone status conference took place on June 1, 2020; wherein the Court set an opposition filing deadline of June 5, 2020 to the plaintiffs' *Emergency Motion for Temporary Restraining Order*. Additionally, the parties reached agreement on the terms and conditions of a Rule 34 inspection of the jail facility to take place on June 5, 2020.

### B.  The Jail's Response to COVID-19

The situation involving COVID-19 pandemic has been a rapidly changing and evolving situation for the world. On March 11, 2020, the World Health Organization declared the novel coronavirus a pandemic.[7] The Louisiana Department of Health reported Louisiana's first presumptive positive case of COVID-19 on March 9, 2020. The Governor of Louisiana declared a statewide public health emergency on March 11, 2020.[8] The CDC recognized that correctional institutions provide essential public services for protecting of the health and safety of incarcerated persons, staff and visitors. and have added challenges during the outbreak of COVID-19 and therefore provided that guidance to these institutions on March 23, 2020.

Kellie Jolivette, EBRSO Human Resources Director, sent out several departmental notifications regarding COVID-19. When the State of Louisiana had six (6) presumptive positive

---

[4] *Id.*

[5] *Id.*

[6] Rec. Doc. 7.

[7] *See* WHO Director-General's opening remarks at the media briefing on COVID-19 – 11, March 2020 (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-COVID-19---11-march-2020.

[8] 25 JBE 2020

cases. On March 11, 2020, Kellie Jolivette sent a departmental wide communication out to all employees to educate them on the virus.[9] On March 25, 2020 instructional videos were posted to YouTube and all EBRSO users were notified that videos had been created to demonstrate the proper use of personal protective equipment. (Kwan affidavit and conventionally filed exhibits) On March 27, 2020 Kellie Jollivette sent an email to deputies to provide a process for reporting COVID-19 exposures, testing protocol and return to work information. On April 9, a flow chart to show what actions should be taken by employees was also disseminated. The Sheriff's office was actively working to educate deputies, including the correctional staff regarding the virus at the onset of the situation.[10] The sheriff's office recognized that the best method to stem the spread of the virus was to ensure that the deputy was not infected and educate everyone regarding the symptoms. Understanding that the jail needed extra protection to ensure the health of the deputies to not bring the virus into the jail, on April 3, 2020 the sheriff made available a decontamination trailer to all including deputies assigned to the jail.

In response to the COVID-19 pandemic, the Warden implemented special guidelines. On March 12, 2020, the Warden prepared and disseminated a document entitled, "COVID 19 (Coronavirus) prevention and contingency Plan for East Baton Rouge Parish Prison (3/12/2020)" to all deputies working at the prison and to all inmates.[11] This communication promoted cleaning, and despite plaintiffs' assertions specifically mandated that Central Booking be cleaned twice per day. Under this policy, inmates are given cleaning supplies daily to clean their areas. The bars of the cells are sprayed daily by the Deputies with Opticlean-v-Liquid detergent with bleach and Maxim Fresh scent.

---

[9] Jolivette affidavit – Exhibit 4.
[10] Jolivette affidavit – Exhibit 4.
[11] Warden Affidavit – Exhibit 1.

The CDC guidelines were promulgated on March 23, 2020. The Warden is currently following the CDC guidelines for the management of coronavirus in correctional and detention facilities.[12] In addition to the CDC guidance. Subsequently, the jail has also followed policies from the Louisiana Department of Corrections which policy was initially issued on April 6, 202, and updated on May 11, 2020.[13] In response to the DOC guidance issued, the Louisiana Sheriff's Association published "COVID-19 FAQ and Guidance to Prisons Re: Screening, Assessment, Testing and Infection Control". The jail has used this document to educate jail staff and inmates on the COVID-19 situation. (Exhibit C) Although communicated to the staff before, the Warden formally adopted the CDC guidelines into policy at EBRPP on April 14, 2020 with policy No. D. 201 (warden affidavit) on April 14, 2020.

In order to address infection control, several operational changes were made. Communications were made to inmates to educate inmates on the spread of COVID and protocols for addressing the spread of COVID. Inmates were provided education and information regarding the spread of COVID-19 through signage. Additionally, informational videos were played on the monitors in the jail to inform and educate inmates reading COVID-19.[14] Deputies distributed additional cleaning supplies and hygiene items at the same time verbally requesting inmates to clean areas due to Coronavirus.[15]

Cleaning protocols were enhanced. The mattresses, toilets and shower areas are sprayed and cleaned regularly. Attached are logs evidencing the cleaning of these items. Additional cleaning supplies were obtained, and Logs of additional supplies distributed have been kept documenting efforts to provide disinfectant, bleach, soap, and other efforts by the jail staff to

---

[12] Affidavit of Warden Grimes - Exhibit 1, Attachment A.
[13] Affidavit of Warden Grimes - Exhibit 1, Attachment A.
[14] Affidavit of Warden Grimes - Exhibit 1.
[15] Affidavit of Warden Grimes - Exhibit 1.

ensure that there are available cleaning supplies. In addition to these cleaning supplies, inmates are provided additional supplies for personal hygiene. Inmates are provided with extra soap for personal hygiene and plenty of towels to clean their cells.[16] An example of a typical shift where in water is offered, phones wiped down and chemicals issues, is for May 23, 2020 in B wing is attached to the Wardens affidavit

The jail staff works to ensure social distancing. For all inmates that are positive, all meals and pill call is brought to the inmates, meals are served on Styrofoam to ensure social distancing and contamination. Additionally, all inmates which are being monitored, also have all food and pill call brought to the inmates to reduce movement within the jail and potential exposure.[17] Inmates are allowed recreation, but it has been limited or curtailed to reduce movement within the prison. They are allowed Hall time with limited numbers in order to promote social distancing. As more was learned regarding the spread and containment of the COVID-19 virus, the jail provided started providing all inmates with face coverings, and continues to provide all inmates with face coverings, and promotes to inmates the importance of social distancing.[18] The jail is required to do an inmate count every day. The inmates on a wing are required to be present. This is one of the most important procedures in the jail. During the court inmates are given orders to wear a mask and social distances as much as possible.[19]

 Limitations have been instituted to reduce the transmission of the virus from visitors. Any individual, whether, an individual is being booked or a member of law enforcement, is screened before entering the jail with questions asked to elicit whether that individual has any COVID Symptoms. Additionally, temperatures are checked for all individuals going into the jail, and well

---

[16] Affidavit of Warden Grimes - Exhibit 1 and attachments.
[17] *Id.*
[18] Affidavit of Warden Grimes – Exhibit 1.
[19] *Id.*

as staff leaving the jail. Screening at the jail was implemented the first week in March before the first reported cases in Louisiana for all incoming inmates. Temperatures on new arrestees were taken recorded by Correcthealth. If there was a suspected case of COVID, both the arrestee and the law enforcement officer would be provided PPE and sent to a hospital.[20] All visitation to the prison was stopped effective March 13, 2020.  Visitation at the jail has not resumed.

The jail uses the recommended personnel protective equipment. The warden took part in a conference to educate himself on the CDC requirements on March 11, 2020. On March 12, 2020, the warden promulgated, "COVID 19 (Coronavirus) prevention and contingency Plan for East Baton Rouge Parish Prison (3/12/2020)" within the jail This document outlines that PPE and supplies will be provided and must be worn. The CDC recommended PPE for both inmates and staff was followed by the warden is attached to his affidavit.  A reminder regarding the proper and necessary use of PPE was sent by Major Fontenot on March 27,2020. As of 3-31-2020, an email from Major Fontenot to all prison users confirmed that PPE was available, encouraged use, and promoted cleaning and disinfection.[21] Supplies of PPE are constantly monitored, and updates sent periodically. As has been widely publicized at times PPE was difficult to obtain. The Sheriff's office kept inventory and reported the status of PPE arability.

Initially, positive individuals were moved from the jail to another facility. Confirmed cases and suspected cases were isolated and quarantined. The jail was segregated into Isolation areas C1, B1 and SO5. These isolated and quartered inmates all were issued masks/bandanas. Temperatures are checked twice daily, and, in the event, anyone had a temperature, they are moved immediately to the isolation area and checked for COVID-19.

---

[20] Correcthealth Affidavit – Exhibit (to be supplemented upon receipt).
[21] Fontenot Affidavit – Exhibit 2, attachment A (April 7 email).

Due to COVID-19 all arrestees are screened before entering central booking in the sally port by the medical department. A series of questions are asked to determine if they have any symptoms, and temperatures are checked.[22] (Warden aff ) Inmates remain in booking for two (2) days due to court hearings, Prison Rape Elimination Act ("PREA") orientation, and then transfer to the intake line which was J-1 where the inmates are monitored for fourteen (14) days separate from general population.[23] Booking is cleaned twice per day (warden aff). All cells in the jail are cleaned throughout the day and night. Subsequently, positive cases of COVID were no longer transported to another facility but remained at the facility and have been placed on quarantine.

In the event an inmate has symptoms of COVID-19, he is tested by Correcthealth staff. The jail is advised of the pending test, and pending a test result, he is housed in isolation with other inmates with symptoms of COVID-19.  If he is negative, the inmate is housed in general population area. In the event he is positive, he is housed… An inmate must have at a minimum of two (2) negative test results before he may move back to general population. If it is determined that an inmate has been in contact with an inmate that tested positive for COVID-19, that inmate is housed in quarantine for fourteen (14) days.

Correcthealth is the medical provider that evaluates and screens for the ongoing and suspected cases of COVID-19. The Sheriff has been in contact with Dr. Catherine O'Neal, Chief Infectious Disease Physician at Our Lady of the Lake Regional Medical Center ("OLOL"), come into the jail on April 2, 2020. Dr. Catherine O'Neal has over seventeen (17) years of experience in infectious disease and internal medicine. Dr. O'Neal came to the jail to provide updated

---

[22] Affidavit of Warden Grimes - Exhibit 1.
[23] Fontenot Affidavit – Exhibit 2, attachment A (April 7 email).

information and reviewed testing and quarantine, isolation and other areas, and found that the jail was following the recommended guidelines.[24]

Although Plaintiffs assert that the first case of COVID from the jail was on March 9, 2020, and that person died from COVID, that is not accurate. The first case of an inmate diagnosed with COVID-19 at EBRPP was on March 28, 2019. An individual at the jail on March 28, 2020 was suffering with symptoms of drug withdrawal and was brought to OLOL. While at the hospital, that individual was checked, and diagnosed with COVID-19. That individual recovered, was released from OLOL and did not die.[25] Since that time, there have been a total of ninety-two (92) positive test results in the jail, of that number eighty-seven (87) are separate individuals and eighty-one (81) have recovered. Additionally, twenty-nine (29) of those eighty-one (81) have been released from jail. As of June 1, 2020, the jail has only six (6) inmates that have tested positive for COVID-19.[26]  The City/Parish has been able to expedite testing results in one to two days whereas in the general public, test results have taken five or more days.[27]

In order to ease the hardships faced by individuals in the jail, all co-pays and fees for medical treatment or a sick call have been waived.[28] This will also encourage all to seek medical attention for any symptoms they may experience. A sign regarding the waiver of all co-pays is posted in all areas of the jail.[29] Further, all inmates are now allowed two (2) free phone calls to

---

[24] Fontenot Affidavit – Exhibit 2, attachment A (April 7 email).
[25] Affidavit of Correcthealth – exhibit (to be supplemental upon receipt).
[26] Affidavit of Warden Grimes - Exhibit 1.
[27] Affidavit of Darrel Gissel - Exhibit 3.
[28] *Id.*
[29] Affidavit of Warden Grimes - Exhibit 1.

family and loved ones and can communicate with counsel via phone which phone conversations with counsel are not monitored.

The jail has maintained a protocol in the event an inmate must be transferred for medical care, for the family to be kept informed.[30] Daily briefings with jail staff ensure that guidelines are being followed, and that any changes are communicated promptly and effectively.[31]  The Policy and Procedures for Mental Health and Special Needs Housing; suicide Prevention E111 updated on 3-6-2020 is still being followed to ensure that inmates with special needs are giving periodic reviews and that treatment plans are put in place by the social workers for Correcthealth.[32] Chaplains have continued to work with inmates and be available for counseling.[33]

### C.  The Criminal Justice System's Response to COVID-19

As a result of the Coronavirus ("COVID-19") pandemic, the City/Parish has taken all responsive measures available for testing, personal protective equipment ("PPE"), education on same to protect the citizens of the City/Parish as much as possible.[34] Defendants have worked diligently to address the harms posed by COVID-19 in exceedingly difficult circumstances, with available information and medical guidance changing on a daily basis.[35] An extraordinary, collaborative effort was made by Baton Rouge community and criminal justice leaders, including the Mayor, the District Attorney, the Public Defender, the City Prosecutor, and the judiciaries of the 19th Judicial District Court and Baton Rouge City Court, to effectively balance the need to continue to detain rightfully held arrestees to ensure the safety for our community versus the public

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] Fontenot Affidavit – Exhibit 2, attachment A (April 7 email).
[34] Affidavit of Darrel Gissel, Exhibit 3.
[35] Affidavit of Darrel Gissel, Exhibit 3.

health.[36] The benefits of a lower jail population also, in these trying times, protects the safety of the community, arrestees, and law enforcement.[37]

As a result of these efforts, the jail presently holds a decade-low for both male and female average daily populations.[38] Prison Medical provided the Warden and the District Attorney a copy of their "Chronic Care Clinic List" to assist in the release of persons with medical issues.[39]

Multiple meetings and conferences have taken place with the respective groups comprising the Criminal Justice Coordination Council to achieve this end.[40] Namely, Warden Dennis Grimes; Sheriff Sid Gautreaux; CorrectHealth; the City/Parish's Medical Director of the Department of Emergency Medical Services ("EMS"), Dr. Dan Godbee; and representatives from outside medical teams (i.e. Dr. Catherine O'Neal, Chief of the Infectious Disease Unit at Our Lady of the Lake Regional Medical Center) have met with Mayor-President Broome and Darrel Gissel, the Chief Administrator Officer to the Office of the Mayor-President, to monitor the circumstances at the jail under the current COVID-19 pandemic.[41]

Communications included daily updates on the jail population and health conditions inside of the jail.[42]  Once restrictions and closures began to take form, the prosecuting agencies worked with the Public Defender's Office and the judiciary to reach consensus on which defendants could be seen for detention hearings and have warrants recalled so detainees could be safely released back into the community under these extraordinary circumstances.[43]

---

[36] Affidavit of Darrel Gissel, Exhibit 3.
[37] Affidavit of Hillar Moore, Exhibit 5.
[38] Affidavit of Darrel Gissel, Exhibit 3..
[39] Affidavit of Darrel Gissel, Exhibit 3.
[40] Affidavit of Darrel Gissel, Exhibit 3.
[41] Affidavit of Darrel Gissel, Exhibit 3.
[42] Affidavit of Hillar Moore, Exhibit 5.
[43] Affidavit of Brandi Littles-Lawrence, Exhibit 6.

City Court staff researched the East Baton Rouge Prison records to obtain the names of those individuals who had bench warrants in Baton Rouge City Court and prepared a weekly docket for "Jail Call-Out" Courtroom.[44]

City Court Judges also handled Probable Cause hearings in those limited situations where an individual was arrested for Driving While Intoxicated, Domestic Abuse Battery, or related offenses, as BRPD made efforts to only arrest and book individuals in those limited situations.[45]

The City/Parish has been in contact with representatives from various, local groups and organizations to provide updates and information related to the circumstances of the jail under the current COVID-19 pandemic, including East Baton Rouge Prison Reform Coalition, P.R.E.A.C.H., and Voice of the Experienced (Baton Rouge and New Orleans Chapters).[46]

Furthermore, the City/Parish has taken the following measures to ensure communication and coordination with information any and all developments related to COVID-19:

- keep all parties in contact with one another and apprised of any and all developments related to the novel coronavirus.[47]

- All medical copays normally placed upon the individual in the jail have been suspended.[48]

- At all times pertinent herein, CorrectHealth has provided medical services at the jail during the COVID-19 pandemic, and the Mayor's Office is in contact with CorrectHealth for any and all updates.[49]

- As a part of CorrectHealth's day-to-day operation of medical services at the jail, CorrectHealth has adopted the guidelines set forth by the Center for Disease

---

[44] Affidavit of Brandi Littles-Lawrence, Exhibit 6.
[45] Affidavit of Brandi Littles-Lawrence, Exhibit 6.
[46] Affidavit of Darrel Gissel, Exhibit 3.
[47] Affidavit of Darrel Gissel, Exhibit 3.
[48] Affidavit of Darrel Gissel, Exhibit 3.
[49] Affidavit of Darrel Gissel, Exhibit 3.

Control ("CDC"), Louisiana Department of Health ("LDH"), and the Louisiana Department of Corrections ("DOC").[50]

- CorrectHealth is in contact with Dr. Dan Godbee, EMS Medical Director for the City/Parish and Warden Dennis Grimes of the East Baton Rouge Parish Sheriff's Office for collaboration in response to COVID-19.[51]

- The jail is in contact with the LDH regarding all infectious disease at the EBRPP, not limited to COVID-19.[52]

It was agreed universally that the open lines of communication among criminal justice agencies and advocacy groups proved invaluable during this time.[53]

### D. COVID-19 Jail Statistics

As of June 3, 2020, there are six (6) positive cases of COVID-19 in quarantine in the jail.[54] The daily count of inmates in the jail as of June 2, 2019 was 1,347 total inmates made up of 1168 males and 179 females. Extensive efforts of the judiciary of the 19th JDC and Baton Rouge City Court, the District Attorney, the City Prosecutor, Public Defender's Office, and local police agencies reduced the jail population in an effort against the novel COVID-19 pandemic. The daily count of inmates on June 2, 2020, was 1,062 total inmates made up of 976 males and 86 females.[55] The jail has a capacity of approximately 1,420 inmates, split between bed space for 184 females and 1,236 males.

The focus of plaintiffs' motion is the inmates that are currently in the jail facility. There are approximately 233 Louisiana Department of Corrections ("DOC") inmates assigned to East Baton Rouge Parish's Work Release Facility, which is managed by Louisiana Workforce, LLC.

---

[50] Affidavit of Darrel Gissel, Exhibit 3.
[51] Affidavit of Darrel Gissel, Exhibit 3.
[52] *Id.*
[53] *Id.*
[54] Exhibit 4.
[55] *Id.*

This facility is separate, and none of these individuals are housed at the jail facility, therefore, the work release facility, is not at issue before the Court. (Warden affidavit).

### E. The Plaintiffs

The three plaintiffs before the Court on this TRO have identified themselves as medically vulnerable and because of their medical vulnerability are seeking a TRO to be released from the jail. Two of the plaintiffs have pled guilty to crimes: Clifton Belton and Cedric Franklin. Both these plaintiffs are currently serving time related to those convictions. One plaintiff, Willie Shepard is a pre-trial detainee. All three plaintiffs have previously tested positive for COVID-19 and have since recovered from COVID-19.

Clifton Belton is a post-conviction inmate. He was booked into the jail on December 9, 2018 for Retail Theft under La. R.S. 14:67, Resisting an Officer La. R.S. 14:108, and three Fugitive from Justice charges; (1) Fugitive from Justice BRPD file # 26611, (2) Fugitive from Justice West Baton Rouge file #26611, and (3) Fugitive from Justice Livingston file #26611.[56] In the Nineteenth Judicial District ("19th JDC"), before Judge Johnson, he plead guilty to one count of La. R.S. 14:67 Felony Theft in Docket #07-18-0435 on September 25, 2019.[57] He agreed to a sentence of four years at hard labor to run concurrently with any and all other time.  This case was set for sentencing on April 15, 2020, and, at defense counsel's request, it was reset to July 20, 2020 while Mr. Belton resolves his pending cases in other parishes. In West Baton Rouge Parish, he has charges of: (1) La. R.S. 14:67, Felony Theft;[58] (2) La. R.S. 14:67, Misdemeanor Theft;[59] and (3) La. R.S. 14:68, Simple Robbery.[60] Belton's next court date is June 22, 2020.[61] In Livingston Parish, Belton has an

---

[56] *See* Clifton Belton, Jr.'s Booking Records, attached as Exhibit ___ (to be supplemental upon receipt).
[57] *See* Minutes attached as Exhibit ___ (to be supplemental upon receipt).
[58] *See* Clifton Belton Jr.'s WBR Docket #170116, attached as Exhibit ___ (to be supplemental upon receipt).
[59] *See* Clifton Belton Jr.'s WBR Docket #180117, attached as Exhibit ___ (to be supplemental upon receipt).
[60] *See* Clifton Belton Jr.'s WBR Docket #190618, attached as Exhibit ___ (to be supplemental upon receipt).
[61] *See* Clifton Belton Jr.'s WBR Docket / Minutes #170116, attached as Exhibit ___ (to be supplemental upon receipt).

outstanding affidavit warrant for simple burglary, which he has not yet been booked.[62] He also is facing charges in Ascension Parish on La. R.S. 14:27 / La. R.S. 14: 67, Attempted Felony Theft.[63] His next court date is July 21, 2020.[64]

Cedric Franklin is also post-conviction inmate. Franklin was booked into the jail for violations of La. R.S. 14:43, Misdemeanor Sexual Battery and La R.S. 40:966(C)(2) & (C)(23), Felony Possession of Ecstasy.[65] Franklin was arrested and was booked into the jail on January 6, 2020.[66]  On January 6, 2020 before Judge Trudy White, in the 19th JDC, he plead guilty under Docket #07-17-0073 to the amended charge of misdemeanor sexual battery.[67] Franklin was sentenced to 6 months at parish prison.[68] On that same day and before Judge Trudy White, Franklin plead guilty to possession of a schedule 1 controlled substance, specifically Ecstasy, under Docket #03-17-0501.[69] Franklin was sentenced to two (2) years at the jail with both sentences running concurrently.[70] Franklin is scheduled for release on January 2, 2021.[71]

Willie Shepherd is a pretrial detainee. Shepherd was booked into the jail on February 26, 2020 on the following charges; La. R.S. 14:35.3, Domestic Abuse Battery, two counts of La. R.S. 14:43.1, Sexual Battery, La. R.S. 14:38, Simple Assault 14:38, La. R.S. 14:46, False Imprisonment, and La. R.S. 14:133.2, Misrepresentation During Booking.[72] A Bill of Information in Docket #20-01854 – La. R.S. 14:108, Resisting an Officer, was filed April 22, 2020.[73] His Bills

---

[62] *See* Clifton Belton Jr.'s AVAIS / Affidavit, attached as Exhibit __(to be supplemental upon receipt).
[63] *See* Clifton Belton Jr.'s Ascension Parish Docket #40477, attached as Exhibit __(to be supplemental upon receipt).
[64] *See* Clifton Belton Jr.'s Ascension Parish Docket / Minutes #40477, attached as Exhibit __(to be supplemental upon receipt).
[65] *See* Cedric Franklin's Booking Records, attached as Exhibit __(to be supplemental upon receipt).
[66] *Id.*
[67] *See* Cedric Franklin's Docket 07-17-0073, attached as Exhibit __(to be supplemental upon receipt).
[68] *Id.*
[69] *See* Cedric Franklin's Docket 03-17-0501, attached as Exhibit __(to be supplemental upon receipt).
[70] *Id.*
[71] *See* Exhibit __(to be supplemental upon receipt).
[72] *See* Willie Shepherd's Booking Records, attached as Exhibit __(to be supplemental upon receipt).
[73] *See* Willie Shepherd's Bill of Information on Docket #20-01854, attached as Exhibit (to be supplemental upon receipt).

of Information for Dockets #20-01855, La. R.S. 14:35.3, Domestic Abuse Battery, La. R.S. 14:46, False Imprisonment, and La. R.S. 14:133.2, Misrepresentation During Booking;[74] and Docket #20-01856, two counts of La. R.S. 14:43.1, Sexual Battery, were filed on May 14, 2020.[75] Currently, he is scheduled for a status conference on all three of his open dockets on June 24, 2020.[76] On March 4, 2020, his bond was set at $15,000 plus abiding by terms of a Protective Order and residing with his mother. He was rearrested and booked into EBRPP on March 7, 2020 on the charge of La. R.S. 14:108, Resisting an Officer.[77]

## III.    LEGAL STANDARD

Preliminary injunctive relief "is an extraordinary and drastic remedy and should only be granted when the movant has clearly carried the burden of persuasion."[78] Further, the purpose of a temporary restraining order is to "preserve the status quo and prevent irreparable harm just so long as is necessary to hold a hearing, and no longer."[79] The movant seeking injunctive relief "must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted."[80]

Specifically, a plaintiff must establish (1) a substantial likelihood of prevailing on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted, and (4) that the injunction will not disserve the public interest.[81]   If a plaintiff fails to meet his

---

[74] *See* Willie Shepherd's Bill of Information on Docket #20-01855, attached as Exhibit __.
[75] *See* Willie Shepherd's Bill of Information on Docket #20-01856, attached as Exhibit __.
[76] *See* Willie Shepherd's Minutes from Docket #20-01854, attached as Exhibit __. *See* Willie Shepherd's Minutes from Docket #20-01855, attached as Exhibit __. *See* Willie Shepherd's Minutes from Docket #20-01856, attached as Exhibit __.
[77] *See* Exhibit ___, page 1.
[78] *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quotation marks omitted).
[79] *RW Development, LLC v. Cuningham Group Architecture, Inc*., 2012 WL 3258782, *2 (S.D. Miss. Aug. 8, 2012) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974)); *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).
[80] *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).
[81] *See Canal Authority*, 489 F.2d at 572-73.

burden regarding any of the necessary elements, the Court need not address the other elements necessary for granting a preliminary injunction.[82]

The requirement of demonstrating a likelihood of success on the merits holds true even where constitutional violations are alleged.[83]    The Fifth Circuit has explained that a party moving for preliminary injunction must always present a prima facie case "because it is inequitable to temporarily enjoin a party from undertaking activity which [that party] has a clear right to pursue."[84]  The Fifth Circuit found "that concern particularly heightened when a federal court is asked to interfere with a state political subdivision's activity."[85]

## IV.    ARGUMENT

### A.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Claim

#### 1.    Plaintiffs do not state cognizable claims under the Fourteenth Amendment and Eighth Amendment

##### a.  Habeas petition is improper vehicle

As an initial matter, an application for writ of habeas corpus is the appropriate means for a prisoner to challenge the fact or duration of confinement.[86] However, a civil rights suit "is the proper vehicle to attack unconstitutional conditions of confinement and prison procedures."[87] The proper vehicle is a civil rights suit if "a favorable determination ... would not automatically entitle

---

[82] *Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990).
[83] *Doe by Doe v. Shenandoah Cty. Sch. Bd.*, 737 F. Supp. 913, 916 (W.D. Va. 1990), citing, *Delaware & H. Ry. Co. v. United Transportation Union*, 450 F.2d 603, 619–620 (D.C. Cir.), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).
[84] *Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250, 252 (5th Cir. 2017), citing *Texas v. Seatrain Int'l, S. A*., 518 F.2d 175, 180 (5th Cir. 1975).
[85] *Monumental Task Comm., Inc.*, 678 F. App'x at 252.
[86] *Preiser v. Rodriguez,* 411 U.S. 475, 500 (1973).
[87] *Cook v. Texas Dep't of Criminal Justice Trans. Planning Dep't,* 37 F.3d 166, 168 (5th Cir.1994).

[the prisoner] to accelerated release[.]"[88]    Plaintiffs cannot show any likelihood of success with

regard to their habeas petition.

### b. Plaintiffs fail to show violations of Plaintiffs' Fourteenth Amendment and Eighth Amendment Rights

The Eighth Amendment forbids cruel and unusual punishments. The Supreme Court has

construed this prohibition to include "deliberate indifference to serious medical needs of

prisoners."[89]    The Eighth Amendment imposes on prison authorities a duty to protect prisoners.[90]

The Fifth Circuit in *Valentine* set forth the following applicable law:

> In a constitutional claim alleging deliberate indifference to the conditions of a
> prisoner's confinement, the plaintiff must satisfy both the "subjective and objective
> requirements" of the Eighth Amendment inquiry. *Farmer* v. *Brennan,* 511 U.S.
> 825, 846 (1994). To satisfy the objective requirement, the plaintiff must show an
> "objectively intolerable risk of harm." *Ibid.* To satisfy the subjective requirement,
> the plaintiff must show that the defendant: "(1) was 'aware of facts from which the
> inference could be drawn that a substantial risk of serious harm exists'; (2)
> subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the
> risk." *Cleveland* v. *Bell,* 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer,* 511
> U.S. at 837). The "incidence of diseases or infections, standing alone," do not
> "imply unconstitutional confinement conditions, since any densely populated
> residence may be subject to outbreaks." *Shepherd v. Dallas Cty.,* 591 F.3d 445, 454
> (5th Cir. 2009). Instead, the plaintiff must show a denial of "basic human needs."
> *Ibid.* "Deliberate indifference is an extremely high standard to meet." *Cadena* v. *El
> Paso Cty.,* 946 F.3d 717, 728 (5th Cir. 2020).[91]

To prove an Eighth Amendment violation, a prisoner must prove that officials acted with

deliberate indifference to a substantial risk of serious harm.[92] Deliberate indifference requires a

showing of "subjective recklessness" as used in criminal law.[93] This is a subjective standard; it

---

[88] *Orellana v. Kyle,* 65 F.3d 29, 31 (5th Cir.1995) (per curiam); *Peterson v Diaz*, 2020 WL 1640008 (E.D. Cal. April 2, 2020)(holding habeas proceedings not appropriate vehicle to raise Eighth Amendment claims related to COVID-19 pandemic).
[89] *Gibson v. Collier*, 920 F.3d 212, 219 (5th Cir.), cert. denied, 140 S. Ct. 653, 205 L. Ed. 2d 384 (2019), citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285..
[90] *Jason v. Tanner*, 938 F.3d 191, 195 (5th Cir. 2019).
[91] *Valentine* at 801.
[92] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).
[93] *Id*. at 839.

requires proof of a prison official's "sufficiently culpable state of mind."[94] "[D]eliberate indifference is a stringent standard of fault,"[95] which precludes liability unless a prison official "knows of and disregards an excessive risk to inmate health or safety."[96]

To prove an Eighth Amendment violation based on access to healthcare, a prisoner must prove deliberate indifference to his serious medical needs. This is "an extremely high standard to meet,"[97] and it "exists wholly independent of an optimal standard of care."[98] This Court has consistently held that "the decision whether to provide additional treatment is a classic example of a matter for medical judgment, which fails to give rise to a deliberate-indifference claim."[99] "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind."[100] To establish liability, the prisoner "must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[101]

A prison official's mere failure to avoid harm or eliminate a risk does not violate the Eighth Amendment. Liability attaches "only if [an official] knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."[102] Actions and decisions that are merely inept, ineffective, or negligent do not constitute deliberate

---

[94] *Id.* (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)).
[95] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).
[96] *Farmer*, 511 U.S. at 837.
[97] *Domino v. TDCJ*, 239 F.3d 752, 756 (5th Cir. 2001),
[98] *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006)
[99] *Dyer v. Houston*, __ F.3d ___, 2020 WL 1778715, *4 (5th Cir. April 9, 2020) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quotation marks omitted)).
[100] *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997).
[101] *Brauner v. Coody*, 793 F.3d 493, 498 (5th Cir. 2015) (quoting *Domino*, 239 F.3d at 756).
[102] *Farmer*, 511 U.S. at 847.

indifference.[103] And complaints that policies or practices are inadequate to prevent harm—even if true—cannot support liability. Even if harm is not averted, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."[104]

Here, to the extent that jail officials have inferred a substantial risk to offender safety from COVID-19, they have not been indifferent, let alone deliberately indifferent.  As outlined above, the jail took and continues to take extensive measures to protect against COVID-19. These actions mitigate against the substantial risk of harm.  The overwhelming evidence establishes that Defendants have implemented detailed policies in response to the threat of COVID-19 and updated those policies to account for new developments. The policies are targeted at preventing the introduction and spread of COVID-19, i.e., the safety and welfare of the individuals at the jail. These policies are a reasonable response to the threat posed by COVID-19. That Plaintiffs find the policies inadequate or insufficient is exactly the kind of "[d]isagreement with medical treatment" the Fifth Circuit held "does not state a claim for Eighth Amendment indifference to medical needs."[105]

Again, the Fifth Circuit's ruling in *Valentine* is significant. The Fifth Circuit found that the defendants' general awareness of the dangers posed by COVID-19 was insufficient since the plaintiffs presented no evidence that the defendants subjectively believed that the protective measures they were taking were inadequate.[106] The same is true in this case.  There is no evidence that the Defendants believe the safeguards they have put in place to mitigate COVID-19 and

---

[103] *Thompson v. Upshur Cty.*, Tex., 245 F.3d 447, 458-59 (5th Cir. 2001) ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.").
[104] *Farmer*, 511 U.S. at 845.
[105] *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019).
[106] *Valentine,* at p. 8

protect individuals at the jail are inadequate. Plaintiffs cannot meet their burden of proving a likelihood of success of their claims under the Eight and Fourteenth Amendments.

### 2. Neither Cedric Franklin nor Willie Shepard have exhausted their remedies under the PLRA

The Prison Litigation Reform Act (the "PLRA") The PLRA imposes a strict exhaustion requirement: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."[107] The PLRA's exhaustion requirement is intended "to eliminate unwarranted federal court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."[108] "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."[109] Mandatory exhaustion statutes like the PLRA foreclose judicial discretion.[110]

If an inmate fails to properly exhaust, his suit must be dismissed pursuant to section 1997e.[111] And failure to exhaust cannot be cured after filing suit. "It is irrelevant whether exhaustion is achieved during the federal proceeding. Pre-filing exhaustion is mandatory, and the case must be dismissed if available administrative remedies were not exhausted."[112] Plaintiffs did

---

[107] 42 U.S.C. § 1997e(a); see *Jones v. Bock*, 549 U.S. 199, 218 (2007).
[108] *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (footnote omitted) (quoting *Porter v. Nussle*, 534 U.S. 516, 525 (2002)).
[109] *Jones*, 549 U.S. at 211.
[110] *Ross v. Blake,* 136 S. Ct. 1850, 1862 (2016) (citing McNeil v. United States, 508 U.S. 106, 111 (1993) ("We are not free to rewrite the statutory text" when Congress has strictly "bar[red] claimants from bringing suit in federal court until they have exhausted their administrative remedies")).
[111] See *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 788 (5th Cir. 2012) ("District courts have no discretion to waive the PLRA's pre-filing exhaustion requirement"); *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004) ("[A] prisoner must pursue a grievance through both steps for it to be considered exhausted.").
[112] *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012) (per curiam).

not exhaust their administrative remedies before filing suit, nor did they show that administrative remedies were unavailable.  As such, the PLRA bars their claims.[113]

### 3. The preliminary injunction improperly interferes with the State's response to a public-health crisis

Even if Plaintiffs were able to show a likely violation of the Constitution, an injunction would be improper because it interferes with Defendants' effort to manage the public-health crisis caused by COVID-19. The State's police powers are at their apex during a public-health emergency: "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."[114] And judicial review is available only "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *In re Abbott*, 2020 WL 1685929, at *1 (quoting *Jacobson,* 197 U.S. at 29). This Court emphasized that absent such a clear violation, courts may not second-guess efforts to combat the emergency: "'[i]t is no part of the function of a court' to decide which measures are 'likely to be the most effective for the protection of the public against disease.'" Id. (quoting *Jacobson*, 197 U.S. at 30). Plaintiffs could not possibly show that Defendants' efforts to respond to the COVID-19 pandemic have "no real or substantial relation" to the protection of inmates' health and safety or that Defendants' policies are "beyond all question, a plain, palpable invasion" of their constitutional rights.[115] Even if alternative measures might be

---

[113] In the context of COVID-19 exigencies, the Fifth Circuit has recently made it clear that there is no emergency exception or "interest of justice" exception to the PLRA's exhaustion requirement. *Valentine v. Collier*, 2020 WL 1934431, 956 F.3d 797 (5th Cir. Apr. 22, 2020).

[114] *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905).
[115] *In re Abbott,* 2020 WL 1685929, at *1.

more effective, that would not justify the exercise of "judicial power to second-guess the state's policy choices in crafting emergency public health measures." *Id*. at *6. The district court's failure to respect the principles of federalism reflected in *Jacobson* underscores Plaintiffs' inability to show a likelihood of success on the merits for purposes of the TRO.

### B. The Plaintiffs cannot show a substantial threat of irreparable injury if the injunction is not granted

#### 1. Plaintiffs fail to show the need for urgency.

Plaintiffs cannot show that they will suffer irreparable harm if the injunction is not granted. Plaintiffs' concerns are based primarily upon speculation and conjecture. The evidence establishes that such an unfounded fear is an insufficient basis to grant injunctive relief.  This is particularly true considering the decrease in positive cases, and in particular, that:

- As of June 1, 2020, the jail has only six (6) inmates that have tested positive for COVID-19;[116]

- only three people have been hospitalized and

- there have been zero deaths caused by COVID-19;

#### 2. Plaintiffs' delay in seeking injunctive relief undermines their claim of irreparable injury.

Because irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction,"[117] any delay by a plaintiff in seeking preliminary relief is a relevant factor when considering whether the plaintiff has met his burden to show irreparable harm. "[T]he failure

---

[116] Exhibit 4.
[117] *Bell & Howell: Mamiya Co. v. Masel Supply,* 719 F.2d 42, 45 (2d Cir. 1983) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 431 (1973)); *accord Citibank, N.A. v. Citytrust & Cititrust Bancorp, Inc.,* 756 F.2d 273, 275 (2d Cir. 1985); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.,* 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998).

to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."[118]

### 3. Plaintiffs fail to show harm

Further, contrary to Plaintiffs' passionate but disingenuous assertions, all three Plaintiffs seeking immediate release – i.e., the purported representative members of the Medically Vulnerable Subclass – contracted COVID-19 and have since recovered.   Their release, therefore, is hardly a matter of life and death.

### 4. The judiciary already released eligible detainees

As a result of the Coronavirus ("COVID-19") pandemic, the City/Parish has taken all responsive measures available for testing, personal protective equipment ("PPE"), education on same to protect the citizens of the City/Parish as much as possible.[119] Defendants have worked diligently to address the harms posed by COVID-19 in exceedingly difficult circumstances, with available information and medical guidance changing on a daily basis.[120] An extraordinary, collaborative effort was made by Baton Rouge community and criminal justice leaders, including the Mayor, the District Attorney, the Public Defender, the City Prosecutor, and the judiciaries of the 19th Judicial District Court and Baton Rouge City Court, to effectively balance the need to

---

[118] *Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation marks and citation omitted); *see also Citibank,* 756 F.2d at 276-77 (ten-week delay in seeking an injunction against a trademark infringement "undercuts the sense of urgency" which is the raison d'etre for a preliminary injunction and suggests that no irreparable injury was threatened); *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiffs claim that he or she will face irreparable harm if a preliminary injunction is not entered."); *Gonannies, Inc. v. Goupair.Com, Inc.,* 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) ("Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm.") (citations omitted); *Continental Oil Co. v. Crutcher,* 434 F. Supp. 464, 471-72 (E.D. La. 1977) (citing "long delay" in filing motion for injunctive relief in denying preliminary injunction); *Newdow v. Bush,* 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."); *Fund for Animals v. Frizzell,* 530 F.2d 982, 987 (D.C. Cir. 1975) (plaintiffs had waited 44 days until after final regulations were issued although they had notice of a public comment period).

[119] Affidavit of Darrel Gissel, Exhibit 3.

[120] Affidavit of Darrel Gissel, Exhibit 3.

continue to detain rightfully held arrestees to ensure the safety for our community versus the public health.[121] The benefits of a lower jail population also, in these trying times, protects the safety of the community, arrestees, and law enforcement.[122]

As a result of these efforts, the jail presently holds a decade-low for both male and female average daily populations.[123] Prison Medical provided the Warden and the District Attorney a copy of their "Chronic Care Clinic List" to assist in the release of persons with medical issues.[124]

Multiple meetings and conferences have taken place with the respective groups comprising the Criminal Justice Coordination Council to achieve this end.[125] Namely, Warden Dennis Grimes; Sheriff Sid Gautreaux; CorrectHealth; the City/Parish's Medical Director of the Department of Emergency Medical Services ("EMS"), Dr. Dan Godbee; and representatives from outside medical teams (i.e. Dr. Catherine O'Neal, Chief of the Infectious Disease Unit at Our Lady of the Lake Regional Medical Center) have met with Mayor-President Broome and Darrel Gissel, the Chief Administrative Officer to the Office of the Mayor-President, to monitor the circumstances at the jail under the current COVID-19 pandemic.[126]

Communications included daily updates on the jail population and health conditions inside of the jail.[127]  Once restrictions and closures began to take form, the prosecuting agencies worked with the Public Defender's Office and the judiciary to reach consensus on which defendants could

---

[121] Affidavit of Darrel Gissel, Exhibit 3.
[122] Affidavit of Hillar Moore, Exhibit 5.
[123] Affidavit of Darrel Gissel, Exhibit 3.
[124] Affidavit of Darrel Gissel, Exhibit 3.
[125] Affidavit of Darrel Gissel, Exhibit 3.
[126] Affidavit of Darrel Gissel, Exhibit 3.
[127] Affidavit of Hillar Moore, Exhibit 3.

be seen for detention hearings and have warrants recalled so detainees could be safely released back into the community under these extraordinary circumstances.[128]

### C.  The Balance of Any Harm and Public Interest Weigh in Favor of Defendants

The Plaintiffs cannot show that the threatened injury to Plaintiffs outweighs the threatened harm the injunction may do to Defendants and/or that granting the injunction will not disserve the public interest.  When the government is a defendant, the third factor (harm the injunction may do to defendant) and the fourth factor (granting the preliminary injunction will not disserve the public interest) merge into one.[129]

In *Valentine,* the court found that the injunctive relief ordered by the district court visited harm upon the State Department of Corrections. The *Valentine* court found that "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.' "[130] The court further found that the harm to the state Department of Corrections was "particularly acute" because the injunction "interferes with the rapidly changing and flexible system-wide approach ... used to respond to the pandemic so far."[131] This same harm would ensue if this Court imposed Plaintiffs' notions of pandemic response on the DOC in this case.  The *Valentine* court further observed that the Department's "ability to continue to adjust its policies is significantly hampered by the preliminary injunction, which locks in place a set of policies for a crisis that defies fixed approaches."[132]

---

[128] Affidavit of Brandi Littles-Lawrence, Exhibit .
[129] *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 1762 (2009).
[130] *Valentine,* 956 F. 3d 797, 804 (citing *Woodford v. Ngo*, 548 U.S. 81, 94, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)); *see also Missouri v. Jenkins*, 495 U.S. 33, 51, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990)).
[131] *Id.*
[132] *Id.* (citing *Jacobson v. Massachusetts*, 197 U.S. 11, 28–29, 25 S.Ct. 358, 49 L.Ed. 643 (1905); *In re Abbott*, 954 F.3d 772, ―― (5th Cir. 2020)).

Courts often find that "evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the particular institution under examination."[133] In addition, the Supreme Court has acknowledged that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."[134] "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." *Id.* Moreover, when a state penal system is involved, the federal court has an "additional reason to accord deference to the appropriate prison authorities." *Id.* These longstanding principles of separation of powers and deference must not be ignored, especially in the current crisis.  The Plaintiffs' have failed to show that the extraordinary relief they seek is not warranted.

Similarly, this Court finds that an injunction would raise serious potential risk of harm to the Defendants because it would hamstring the DOC "from responding to the COVID-19 threat without a permission slip from the district court."[106] For the same reasoning and analysis articulated by the Fifth Circuit, the Court finds that the second factor weighs in Defendants' favor. Plaintiffs have failed to demonstrate that the requested injunction will not cause irreparable harm to Defendants and potentially to inmates and pre-trial detainees throughout the State of Louisiana.

Individual states are vested with police powers, which allow states to enact reasonable regulations established to protect the public health and public safety of its citizens.[135] States may

---

[133] *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S. Ct. 2400, 2404 (1987) (internal citations omitted).
[134] *Turner* v. *Safley,* 482 U.S. 78, 84-85; 107 S.Ct. 2254, 2259 (1987).
[135] *Jacobson v. Massachusetts*, 197 U.S. 11, 25, 25 S.Ct. 358, 361 (1905).

also invest local bodies—such as the Department of Health or the Department of Corrections—with the authority to carry out such regulations and safeguard public health and safety.[136]

Response to infectious disease outbreaks and epidemics has long been recognized as a function of the state's police power, and federal courts should not intervene in the state's response unless the response is deemed to be arbitrary or in violation of clearly established Constitutional law.[137] Indeed, the Supreme Court held that to intervene in the state's disease control measures

> would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case. We say necessities of the case, because it might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons.[138]

## V.    CONCLUSION

Plaintiffs have not shown a likelihood of success on the merits of any claim presented in their Motion for Temporary Restraining Order. Plaintiffs have not demonstrated a violation of any constitutional right. The City/Parish adopts and re-asserts the arguments set forth in Warden Grimes' and Sheriff Gautreaux' Opposition to the Temporary Restraining Order as if set forth fully herein. Plaintiffs have failed to carry their burden of demonstrating they burden and accordingly, the City/Parish respectfully requests that Plaintiffs' Motion for TRO be denied.

---

[136]*Id.*

[137] *Morgan's La. & T.R. & S.S. v. Bd. of Health of State of* La., 118 U.S. 455, 464-65, 6 S. Ct. 1114, 1118-19 (1886); *Jacobson*, 197 U.S. at 28, 25 S. Ct. at 361; Hickox v. Christie, 205 F. Supp. 3d 579, 594 (D.N.J. 2016).

[138] *Jacobson*, 197 U.S. at 28; 25 S. Ct. at 362.

**RESPECTFULLY SUBMITTED:**

**Attorneys for the City/Parish:**

**/s/      Sarah S. Monsour                    **

**Anderson O. "Andy" Dotson, III, Bar No. 26865**
  *Parish Attorney, City of Baton Rouge/East*
*Baton Rouge Parish*
**Michael Schillage, Bar No. 35554**
**Courtney Humphrey, Bar No. 30818**
**Sarah S. Monsour, Bar No. 30957**
OFFICE OF THE PARISH ATTORNEY
222 St. Louis Street, 9th Floor
Baton Rouge, LA 70802
Telephone: (225) 389-3114
Facsimile: (225) 389-8736
Email: adotson@brla.gov
Email: chumphrey@brla.gov
Email: mschillage@brla.gov
Email: ssmonsour@brla.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Opposition to Motion for Temporary Restraining Order and Preliminary Injunction was this date electronically filed with the Clerk of Court using the Court's CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

Baton Rouge, Louisiana this 5th day of June 2020.

**/s/            Sarah S. Monsour                    **
**SARAH S. MONSOUR**