## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CLIFTON BELTON, JR., JERRY BRADLEY, CEDRICK FRANKLIN, CHRISTOPHER ROGERS, JOSEPH WILLIAMS, WILLIE SHEPHERD, DEVONTE STEWART, CEDRIC SPEARS, DEMOND HARRIS, and FORREST HARDY, individually and on behalf of all others similarly situated.<br><br>              Plaintiffs,<br><br>v.<br><br>SHERIFF SID GAUTREAUX, in his official capacity as Sheriff of East Baton Rouge, LT. COL. DENNIS GRIMES, in his official capacity as Warden of East Baton Rouge Parish Prison; CITY OF BATON ROUGE/PARISH OF EAST BATON ROUGE,<br><br>              Defendants. | Case No. 3:20-cv-000278-BAJ-SDJ |

## <u>MEMORANDUM IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER</u>

**MAY IT PLEASE THE COURT:**

Defendants, SID J. GAUTREAUX, III, SHERIFF OF EAST BATON ROUGE PARISH in his official capacity and LT. COL. DENNIS GRIMES, in is official capacity (hereinafter collectively referred to as "Sheriff Defendants"), respectfully submit this Memorandum in Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order. Sheriff Defendants respectfully request that this Court deny Plaintiffs' Motion for Temporary Restraining Order and dismiss the suit as premature because Plaintiffs failed to exhaust administrative remedies prior to

filing suit.

## I.    INTRODUCTION

Plaintiffs seek the immediate release of all inmates who are part of the proposed Sub-class of medically vulnerable inmates currently incarcerated in the East Baton Rouge Parish Prison. The proposed Sub-class includes all inmates over the age of 65 years old and all inmates who experience an underlying medical condition that places them at particular risk of serious illness or death from COVID-19.[1] Plaintiffs seek immediate intervention based upon their assertion that there is a dire health emergency at the jail and immediate relief is necessary to save lives. Plaintiffs assert that Medically Vulnerable Sub-class of inmates' immediate release is necessary because these inmates are so vulnerable that no procedures could be implemented quickly or successfully enough to protect them. Plaintiffs assert that they believe that the number of confirmed COVID-19 cases have likely already multiplied exponentially.

However, the evidence reflects that there is no health emergency at the jail and that due to extensive safety measures implemented and practiced, the number of inmates testing positive for COVID-19 have significantly declined since May 4. 2020. There have been no COVID-19 related deaths in the jail. Approximately three inmates have been transferred to an outside hospital facility and three recovered. Even more significantly, the number of new infections in the jail has not increased since May 12, 2020 and there are currently only six positive COVID-19 inmates being housed in the jail. The jail population has already been reduced significantly due to the efforts and collaboration of the District Attorney's Office with its criminal justice partners to balance the need to continue to detain rightfully held arrestees to ensure the safety for our community versus the public health benefits of a lower jail population in light of the COVID-19 pandemic. The three

---

[1] Rec. Doc. 8 page 2

named Plaintiffs, proposed class representatives of the Medically Vulnerable Sub-class (Clifton Belton, Cedric Franklin and Willie Shepherd) have all already tested positive for the virus and have recovered. The premise for Plaintiffs request for emergency relief is flawed and this motion for TRO should be denied.

Further, Plaintiffs' claims should be dismissed because Clifton Belton did not exhaust the EBRPP's administrative remedies procedure prior to filing this suit. In addition, Plaintiffs failed to establish the prerequisites for a mandatory TRO.  Plaintiffs have not shown a substantial likelihood of prevailing on their underlying Eighth Amendment and Fourteenth Amendment claims and the Fifth Circuit's recent decisions in *Valentine v. Collier,* 956 F. 3d 797 (5th Cir. 2020) and *Marlowe v. LeBlanc,* 2020 WL 2043425 (5th Cir. 2020) preclude this Court from granting Plaintiffs' motion for TRO. Plaintiffs cannot show the proposed class will suffer irreparable harm in the absence of a TRO mandating release. Defendants have put swift and targeted measures in place based on CDC guidelines and recommendations from a medical expert on infectious disease. Further, the release of all members of the Medically Vulnerable Sub-class, regardless of their charges/convictions and without regard to the risk of society is detrimental to the public interest.

In addition, for the reasons cited herein this Court does not have the authority to order immediate release of the proposed Medically Vulnerable Sub-class members.

## II.     PROCEDURAL HISTORY

On May 4, 2020, Clifton Belton, Jr. (hereinafter referred to as "Belton") filed a pro se *Complaint*[2] regarding the conditions of the East Baton Rouge Parish Prison (hereinafter referred to as "EBRPP") during the ongoing COVID-19 pandemic.  On May 22, 2020, attorney David Utter filed an *Ex Parte Motion to Enroll*[3] as counsel of record on behalf of Belton.  On May 27, 2020,

---

[2] Rec. Doc. 1
[3] Rec. Doc. 3

Mr. Utter filed an *Amended Class Action Complaint*[4] along with attached exhibits regarding the condition of the EBRPP.  The named Plaintiffs are Clifton Belton Jr., Jerry Bradley, Cedric Franklin, Christopher Rogers, Joseph Williams, Willie Shepherd, Devonte Stewart, Cedric Spears, Demond Harris, and Forrest Hardy.[5]  In the Amended Complaint, Plaintiffs describe a medically vulnerable subclass of plaintiffs who are detainees at the East Baton Rouge Parish Prison and allegedly at a greater risk of infection and death from COVID-19.[6]

On May 27, 2020, Plaintiffs also filed an *Emergency Motion for Temporary Restraining Order*[7] against Sheriff Defendants and the City of Baton Rouge/Parish of East Baton Rouge asking the court to release the medically vulnerable subclass members.  Plaintiffs contemporaneously filed a *Motion for Expedited Discovery*[8] requesting an expedited expert's inspection of the EBRPP in anticipation of a hearing on their request for preliminary injunction. Plaintiffs also filed a *Motion for Class Certification.*[9]

On May 28, 2020 EBRP defendants requested that this court schedule a status conference regarding the recent pleadings.[10] A status conference was then set for June 1, 2020.[11] Following the status conference, counsel for defendants were given until the close of business on June 5, 2020 to file an Opposition to the Motion for Temporary Restraining Order.[12] On June 3, 2020 a Hearing on the Emergency Motion for Temporary Restraining Order was set for June 10, 2020 at 9:30 a.m.[13]

---

[4] Rec. Doc. 4
[5] *Id.*
[6] *Id.*
[7] Rec. Doc. 5-2
[8] Rec. Doc. 7
[9] Rec. Doc. 8
[10] Rec. Doc. 22
[11] Rec. Doc. 27
[12] Rec. Doc. 32
[13] Rec. Doc. 33

III.    **FACTUAL BACKGROUND**

The Coronavirus ("COVID-19") crisis has been a rapidly moving and evolving situation for the whole world. While the global pandemic has swept the nation, the East Baton Rouge Parish Prison (EBRPP) was able to swiftly implement procedures based on commonly followed CDC Guidelines.  Through this quick action, EBRPP, in unison with the City and CorrectHealth (the Healthcare provider at the EBRPP), has managed to mitigate the spread of COVID-19 in the jail and provide inmates with adequate personal protective equipment and sanitation products.  The policies and procedures instituted in the jail facility have undoubtedly mitigated the risks of contracting the virus as well as increased the chances of  prevention.

On March 11, 2020, the World Health Organization declared the novel coronavirus ("COVID-19") a pandemic.[14] The Louisiana Department of Health reported Louisiana's first presumptive positive case of COVID-19 on March 9, 2020. The Governor of Louisiana declared a statewide public health emergency on March 11, 2020.[15] The CDC recognized that correctional institutions provide essential public services for the protection of incarcerated persons, staff, and visitors.  Correctional facilities have added challenges during the outbreak of COVID-19. Therefore, the CDC provided guidance to these institutions on March 23, 2020.  Prior to these guidelines being issued, The East Baton Rouge Sheriff's Office (EBRSO) proactively educated staff on the virus and created a plan of action for the safety of inmates and staff.  EBRSO has continued to put the safety of their employees, the community, and the inmate held in their custody first.

---

[14] Exhibit 1 - *See* WHO Director-General's opening remarks at the media briefing on COVID-19 – 11, March 2020 (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.
[15] Exhibit 2 - 25 JBE 2020

A.    **The East Baton Rouge Sheriff's Office Took Active Measures at the Start of the Pandemic to Ensure the Safety of the Inmates and Employees at the Jail Facility.**

Kellie Jolivette (Jolivette), EBRSO Human Resources Director, sent out several departmental notifications regarding COVID-19 when the State of Louisiana had six (6) presumptive positive cases.[16] On March 11, 2020, Jolivette sent a departmental wide communication out to all employees to educate them on the virus.[17] On March 25, 2020, instructional videos were posted to YouTube and all EBRSO users were notified that videos had been created to demonstrate the proper use of personal protective equipment (PPE).[18] On March 27, 2020, Jolivette sent an email to deputies to provide a process for reporting COVID-19 exposures, testing protocol, and return-to- work information.[19] On April 9, a flow chart to show what actions should be taken by employees was also disseminated.[20] Based on these affirmative actions, it is clear that the Sheriff's office was actively working to educate deputies, including the correctional staff, regarding the virus at the start of the state's crisis.[21]

EBRSO recognized that the best method to slow the spread of the virus was to ensure that the deputy was not infected and educate all employees regarding the known symptoms of the virus.[22] On April, 3, 2020, in order to minimize the risk of the deputies carrying the virus into the jail, the Sheriff provided a decontamination trailer for all deputies assigned to the jail facility.[23]

On March 12, 2020, in addition to the information disseminated by EBRSO, the Warden at EBRPP implemented special guidelines in response to the COVID-10 crisis.[24]   A document

---

[16] Exhibit 3 - Affidavit of Kellie Jolivette
[17] Exhibit 3 - attachment A
[18] Exhibit 4 - Affidavit of Kenny Kwan
[19] Exhibit 3 - attachment B
[20] *Id*. - attachment C
[21] Exhibit 3
[22] Exhibit 5 - Affidavit of Warden Dennis Grimes
[23] *Id.*
[24] *Id.*

entitled, "Covid 19 (Coronavirus) prevention and contingency Plan for East Baton Rouge Parish Prison (3/12/2020)" was provided to all deputies working at the prison and to all inmates housed at EBRPP.[25] This communication promoted cleaning, and specifically mandated that Central Booking be cleaned twice per day.[26] Under this policy, inmates are given cleaning supplies daily to clean their living spaces.[27] The bars of the cells are sprayed daily by the deputies with Opticlean-v-Liquid detergent with bleach and Maxim Fresh scent.[28]

> **B.    EBRPP Adopted the CDC Guidelines and DOC Policies for Correctional Facilities as such Standards Became Available.**

The CDC guidelines were promulgated on March 23, 2020. The Warden is currently following the CDC guidelines for the management of COVID-19 in correctional and detention facilities.[29] In addition to the CDC guidance, EBRPP has also followed policies from the Louisiana Department of Corrections (DOC) which policy was initially issued on April 6, 2020 and updated on May 11, 2020.[30] In response to the DOC guidance issued, the Louisiana Sheriff's Association published "COVID-19 FAQ and Guidance to Prisons Re: Screening, Assessment, Testing and Infection Control".[31] The jail has used this document to educate jail staff and inmates on the COVID-19 situation.[32] Although communicated to the staff before, the Warden formally adopted the CDC guidelines into policy at EBRPP on April 14, 2020 with policy No. D. 201 on April 14, 2020.[33]

---

[25] *Id.* - attachment H
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.* - attachment C
[30] *Id.* - attachment D
[31] *Id* - attachment E
[32] *Id*.
[33] *Id.* - attachment F

i.     **EBRPP Provides Educational Support Regarding the Spread and Threat of COVID-19 to Inmates Housed in the Jail Facility.**

EBRPP has effectively communicated the known information regarding COVID-19 to the inmates.[34] Signs in both English and Spanish were posted in the jail which provided access to information designed to educate the inmates regarding the spread of COVID-19.[35] Additionally, informational videos were played on the monitors in the jail to inform and educate inmates regarding COVID-19.[36] Deputies distributed ample cleaning supplies and hygiene items while verbally requesting inmates to clean living areas due to COVID-19.[37]

ii.     **Extensive Cleaning Protocols were Implemented and Personal Hygiene Products are Supplied to Inmates in the Jail Facility.**

Cleaning protocols were enhanced to ensure that mattresses, toilets, and shower areas are regularly sprayed and cleaned.[38] Attached are logs evidencing the cleaning of these items.[39] EBRPP maintains logs of cleaning supplies distributed throughout the facility documenting efforts to provide disinfectant, bleach, soap, and other efforts by the jail staff to ensure that there are available cleaning supplies.[40] In addition to these cleaning supplies, inmates are provided supplies for personal hygiene free of charge.[41] Inmates are provided with extra soap, toothpaste, toilet paper, and plenty of brown paper disposable towels to clean their cells.[42] Prior to COVID-19, the personal hygiene supplies were distributed on the 1st and 15th of each month.[43] Currently, hygiene supplies are distributed twice per week.[44]  However, any inmate can request soap at any time, and

---

[34] *Id.* - attachment K
[35] *Id.*- attachment K
[36] *Id.* - attachment L
[37] *Id*. - attachment M.
[38] Exhibit 5
[39] *Id.*- attachment M
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id*.

it will be provided without charge.[45]   Sheriff Defendants have attached an example of a typical

shift on the B-Wing which shows iced water offered, phones wiped down, and chemicals issued.[46]

### iii.    EBRPP Strongly Promotes Social Distancing

The jail staff works to ensure social distancing.[47] To avoid large gatherings of inmates, the

facility's cafeteria is no longer in use and jail staff brings chow directly to the inmates.[48]   Meals

for isolation inmates are served on Styrofoam to ensure social distancing and prevent

contamination.[49] Additionally, all inmates have all medication brought to them by the healthcare

providers.[50] Inmates are allowed recreation, but it is limited or curtailed to reduce movement

within the prison.[51] They are allowed hall time but restricted to limited numbers of inmates per

cell outing in order to ensure safe distances between the inmates.[52]   As it was recommended,

inmates were provided with face coverings.[53]

For safety and security, the jail is required to do an inmate count every day.[54] The inmates

on a wing are required to be present. This is one of the most important procedures in the jail.

During the count, inmates are given verbal orders to wear a mask and social distance as much as

possible.[55] The process typically lasts less than one hour for each line, but smaller lines are much

shorter (less than 30 minutes).

The jail facility has implemented methods for social distancing in the large dorms where

bunk beds are utilized.   The bunks that are used for sleeping are bolted to the floor and wall so

---

[45] *Id.*
[46] *Id.* – attachment R
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*

moving the beds was not an option.[56] In order to social distance while sleeping, inmates sleep "head to toe" as recommended by the CDC.  In other words, if an individual is in the lower bunk with his head facing north, then in the upper bunk and side bunks the individual's head is facing south.[57]

### iv.    EBRPP Provides a Thorough Screening Process for All Individuals Entering the Jail Facility.

Screening processes are instituted to reduce the transmission of the virus from visitors.[58] Any individual wishing to enter the jail facility is screened before entering the jail with questions asked to elicit whether that individual has any COVID-19 symptoms.[59] The screening questionnaire is attached to the Wardens Affidavit.[60] Additionally, temperatures are checked for all individuals going into the jail as well as staff leaving the jail.[61]

The jail implemented screening processes early on (first week of March) in cases of new arrestees being booked by law enforcement.  Temperatures on new arrestees are taken prior to entering Central Booking and recorded by CorrectHealth.[62] After the screening questions and temperature check are administered, if the medical provider suspects a case of COVID-19, both the arrestee and the law enforcement officer would be provided PPE and sent to a hospital.[63]

If COVID-19 is not suspected, the inmate is allowed into the facility.  Inmates remain in booking for two (2) days due to court hearings and PREA.  After that, they are transferred to the intake line where they are monitored for fourteen (14) days separate from general population.[64]

All visitation to the prison by members of the public was terminated effective March 13,

---

[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.* - attachment I
[61] *Id.*
[62] *Id.*
[63] *Id.* - attachment H
[64] Exhibit 6 - Affidavit of Major Fontenot

2020.[65] Visitation at the jail has not resumed to date.[66]

> ### v.    PPE is Utilized By the Jail Staff and Inmates According to CDC Protocols

Prison officials actively educated themselves regarding the use of PPE in correctional facilities and used the knowledge gained to implement safety measures in the jail.  The Warden took part in a conference to educate himself on the CDC requirements on March 11, 2020.[67] On March 12, 2020, the warden promulgated, "Covid 19 (Coronavirus) prevention and contingency Plan for East Baton Rouge Parish Prison (3/12/2020)" within the jail.[68] This document outlines that PPE and supplies will be provided and must be worn.[69] The CDC recommendation that PPE should be worn by both inmates and staff is adhered to by the jail.[70] Jail officials endeavor to keep jail staff reminded of the PPE requirements and its availability in the facility.[71]

Supplies of PPE are constantly monitored, and updates sent periodically to staff tasked with procuring it.[72] As has been widely publicized at times PPE was difficult to obtain. However, the jail staff kept inventory and reported the status of PPE availability as well as cleaning and disinfectant supplies to Captain Kenny Kwan.[73] Captain Kwan then maintained the stock of available PPE  and cleaning disinfectant supplies.[74] If available stock at the jail fell to the half point, staff would report that supplies are needed.[75]  Upon notification of a declining supply, Captain Kwan would obtain those PPE and cleaning products.[76] At all times since the start of the

---

[65] Exhibit 5
[66] *Id.*
[67] *Id.*
[68] *Id.* - attachment H
[69] *Id*.
[70] *Id.*
[71] Exhibit 6 - attachment A
[72] *Id.* - attachment F and G
[73] Exhibit 4
[74] *Id.* and  Exhibit 6 - attachment F
[75] Exhibit 4
[76] *Id.* and Exhibit 6 – attachment F

COVID-19 pandemic, the jail has met all demand for supplies of PPE and had available cleaning and disinfectant supplies.[77]

All inmates were provided with bandanas to be used as face masks.[78]  The April 3, 2020 the CDC provided "Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community Based Transmission". The CDC recognized that a simple cloth barrier can stop the transmission of the virus. These face coverings are picked up every 3 days by jail staff and laundered with Opticlean-V-Liquid with Bleach detergent in hot water.[79] Contemporaneously with laundering the face covering new bandanas are distributed to every inmate.[80]

### vi.    EBRPP Strives to Ensure that Proper Protocols are Followed in the Effort to Safely Isolate and Quarantine Inmates During this Pandemic.

Initially, positive individuals were moved from the jail to another facility.[81] However, at some point in early April, that process was changed.[82] When no other option was available, there were instances in the early stages of the pandemic where confirmed positive inmates were housed with highly suspected COVID-19 inmates who exhibited symptoms that closely mirrored COVID-19.[83]  In some instances, cohorting confirmed positive cases with non-confirmed suspected cases is allowed by the CDC Guidelines.[84]  Currently, the jail is segregated into general population, isolation areas, and quarantined areas.[85] All inmates in quarantine and isolation were issued

---

[77] *Id.*
[78] Exhibit 5
[79] *Id.* - attachment Q
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.* – attachment C
[85] *Id.*

masks/bandanas and are monitored frequently.[86]

The EBRPP created a process of quarantining inmates potentially exposed to a COVID-19 positive inmate.  The line or unit where the inmate was originally housed is put on a 14-day quarantine where movement is restricted.[87]  Temperatures of the exposed inmates are checked twice daily.[88]  Other symptoms of COVID-19 are also monitored in the quarantine area.[89] No new inmate was moved into a quarantine area during the 14-day quarantine.[90]

Quarantined inmates are not allowed to move within the jail.[91]  They are not allowed outside recreation, but are provided with additional games, cards, and inside entertainment.[92] These inmates continue to have access to television, books, water, and socially distanced recreation.  If during a 14-day quarantine period, no inmate in the quarantine area tests positive for COVID-19, then the quarantine is lifted from that line.  Inmates are then allowed to have outside recreation.[93] Important to note is that quarantined inmates receive ice water during the day and have water available all day.[94]

The EBRPP has utilized its facility as efficiently as possible during this crisis.  Officials have designated isolation lines for inmates who test positive for COVID-19 and strict policies are in place to ensure their safety and to ensure that the virus is contained to such a line.  The isolation line is not a disciplinary line.[95] In isolation, the inmate has access to television, reading materials, and games.[96] The inmates on the isolation line's symptoms are closely monitored by medical

---

[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*

professionals.[97]   In addition, inmates are closely monitored by jail staff while on this line.[98] Staff assigned to an isolation wear additional PPE designed to protect themselves from contracting the virus, thereby limiting the spread throughout the facility and community.[99]

Further, the facility has implemented a policy wherein an inmate must have a minimum of two (2) negative COVID-19 test results before he may be moved back to general population.[100]

### a. A Medical Expert was Enlisted to Evaluate The Quarantine and Isolation Procedures Implemented at the Jail Facility.

EBRSO communicated with Our Lady of the Lake Hospital to enlist the medical expertise of Dr. Catherine O'Neal, an infectious disease specialist with over seventeen (17) years of related experience.[101] On April 2, 2020 she reviewed the jails testing, quarantine, and isolation procedures.[102] She concluded that the jail was following the recommended guidelines.[103]

### vii.    EBRPP's COVID-19 Policies Have Been Successful

EBRPP has successfully implemented policies which work to lower the inmates' risk of contracting COVID-19 as well as increase the likelihood of a successful recovery.  Plaintiffs inaccurately claim that a COVID-19 positive inmate at EBRPP died due to the virus.[104] The first case of an inmate diagnosed with COVID-19 at EBRPP was on March 28, 2019.[105] An individual at the jail on March 28, 2020 was suffering from a drug overdose, and was brought to OLOL.[106] While at the hospital, that individual was checked, and diagnosed with COVID-19.[107] That

---

[97] *Id*.
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] Exhibit 6 - attachment C
[102] *Id.* – attachment D
[103] *Id* – attachment D
[104] Rec. Doc. 5, page 20.
[105] Exhibit 5
[106] *Id*.
[107] *Id*.

individual recovered, was released from OLOL, and did not die.[108] Since that time, there have been a total of 92 positive cases in the jail.[109] The jail released 16 of that number and 70 have recovered.[110] As of June 4, 2020 six (6) inmates are positive for COVID-19.[111]

Evidence shows that, due to safety measures implemented and practiced, the number of positive cases in the jail have consistently gone down since May 4, 2020.[112]  There have been no COVID-19 related deaths in EBRPP.[113]  Only three inmates were transferred to an outside hospital facility and all three recovered.[114]  Even more significantly, the number of new infections in the jail has not increased since May 12, 2020 (prior to the filing of this emergency TRO).[115]  There are currently only six (6) positive cases in isolation.[116]

### viii.    EBRPP has Taken Measures to Ease the Financial Burden on Inmates During this Crisis.

In order to ease the hardships faced by individuals in the jail, all co-pays and fees for medical treatment or a sick call have been waived.[117] This will also encourage all to seek medical attention for any symptoms they may experience. A sign regarding the waiver of all co-pays is posted in all areas of the jail.[118] Further, all inmates are now allowed two (2) free phone calls to family and loved ones and can communicate with counsel via phone. Phone conversations with counsel are not monitored.[119] The jail has measures in place to inform family members when an

---

[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.* - attachment Y
[112] *Id.*
[113] Exhibit 7- Affidavit of CorrectHealth
[114] Exhibit 5
[115] *Id.*
[116] *Id.*
[117] *Id.* – attachment U
[118] *Id*.
[119] *Id*.

inmate has been transferred to the hospital.[120]

### ix. EBRPP Ensures that Regular Facility Services are Continued to Be Provided.

The Policy and Procedures for Mental Health and Special Needs Housing; suicide Prevention E111 was updated on March 6, 2020. It is followed to ensure that inmates with special needs are given periodic reviews and that treatment plans are put in place by the social workers employed by CorrectHealth.[121] Chaplains have continued to work with inmates and be available for counseling.[122]

Daily Briefings with jail staff ensure that guidelines are being followed, and that any changes are communicated promptly and effectively.[123]

### C. Extraordinary Efforts Were Made to Reduce the Jail Population

The District Attorney's Office worked closely with the Public Defender's Office to safely reduce the jail population.[124] The Public Defender's Office provided a list of cases to prosecutors to review for pre-trial release.[125] The joint recommendations were presented to the Court, which led to a historic low in the population size at the East Baton Rouge Parish Prison.[126] During these reviews, jail officials provided daily updates on the jail population and health conditions inside the jail.[127]

### D. Plaintiffs Seek the Release of Three COVID-19 Survivors Described Below

The daily count of inmates in EBRPP as of June 2, 2019 was 1347 made up of 1168 males and 179 females.[128] The daily count of inmates on June 2, 2020, after efforts by the State and City

---

[120] *Id*.
[121] *Id*.- attachment X
[122] Exhibit 6 - attachment B
[123] Exhibit 5
[124] Exhibit 8 – Affidavit of Hillar Moor
[125] *Id*.
[126] *Id*.
[127] *Id*.
[128] Exhibit 5

judges, the district attorney and defense counsel to reduce the jail population, was 1062 made up of 976 males and 86 females.[129] The jail has a capacity of approximately 1420 inmates, split between bed space for 184 females and 1236 males.[130] The focus of plaintiffs' motion are the inmates that are currently in the EBRPP facility.[131] There are approximately 233 Department of Corrections inmates assigned to East Baton Rouge parish's work Release Facility, which is managed by Louisiana Workforce, LLC.[132] This facility is separate, and none of these individuals are housed at the EBRPP facility, therefore, the work release facility, is not at issue before the court.[133]

The three plaintiffs before the court on this TRO have identified themselves as medically vulnerable and because of their medical vulnerability are seeking a TRO to be released from EBRPP.[134] Two plaintiffs have pled guilty to crimes, Clifton Belton and Cedric Franklin. Both of these plaintiffs are currently serving time related to those convictions. One plaintiff, Willie Shepard is a pre-trial detainee. All three plaintiffs have previously tested positive for COVID-19 and are now recovered from COVID-19.[135]

### a. Clifton Belton

Clifton Belton is a post-conviction inmate. He was booked into East Baton Rouge Parish Prison on December 9, 2018 for retail theft under La. R.S. 14:67, Resisting an officer La. R.S. 14:108, and three (3) fugitive from justice charges; (1) Fugitive from justice BRPD file # 26611, (2) Fugitive from justice West Baton Rouge file #26611, and (3) Fugitive from justice from Livingston file #26611.[136] In the Nineteenth Judicial District ("19th JDC"), before Judge Johnson,

---

[129] *Id*.
[130] *Id*.
[131] Rec. Doc. 5-3.
[132] Exhibit 5.
[133] *Id*.
[134] Rec. Doc. 5-3.
[135] Exhibit 6
[136] Exhibit 9 – Clifton Belton Jr.'s Booking Records.

he plead guilty to one count of La. R.S. 14:67 Felony Theft in Docket #07-18-0435 on September 25, 2019.[137] He agreed to a sentence of four years at hard labor to run concurrently with any and all other time.[138]  This case was set for sentencing on April 15, 2020, and, at defense counsel's request, it was reset to July 20, 2020 while Mr. Belton resolves his pending cases in other parishes.[139] In West Baton Rouge Parish ("WBR"), he has charges of: (1) La. R.S. 14:67, Felony Theft;[140] (2) La. R.S. 14:67, Misdemeanor Theft;[141] and (3) La. R.S. 14:68, Simple Robbery.[142] His next court date is June 22, 2020.[143] In Livingston Parish, he has an outstanding affidavit warrant for simple burglary, which he has not yet been booked.[144] He also is facing charges in Ascension Parish on La. R.S. 14:27 / La. R.S. 14: 67, Attempted Felony Theft.[145] His next court date is July 21, 2020.[146]

       **b.     Cedric Franklin**

Cedric Franklin is also post-conviction inmate. He was booked into East Baton Rouge Parish jail on with violations of La. R.S. 14:43 misdemeanor sexual battery and La R.S. 40:966(C)(2) & (C)(23) felony possession of ecstasy.[147] He was arrested and was booked into the East Baton Rouge Parish Prison on January 6, 2020.[148]  On January 6, 2020 before Judge Trudy White, in the 19th JDC, he plead guilty under Docket #07-17-0073 to the amended charge of misdemeanor sexual battery.[149] He was sentenced to 6 months at parish prison.[150] On that same

---

[137] Exhibit 10 – Clifton Belton Jr.'s 19th JDC Minutes from Docket #07-18-0435
[138] *Id.*
[139] *Id.*
[140] Exhibit 11 - Clifton Belton Jr.'s WBR Docket #170116
[141] Exhibit 12 - Clifton Belton Jr.'s WBR Docket #180117
[142] Exhibit 13 - Clifton Belton Jr.'s WBR Docket #190618
[143] Exhibits 11, 12, and 13.
[144] Exhibit 10.
[145] Exhibit 14 - Clifton Belton Jr.'s Ascension Parish Bill of Information
[146] Exhibit 15 - Clifton Belton Jr.'s Ascension Parish Minutes from Docket #40477
[147] Exhibit 16 - Cedric Franklin's Booking Records
[148] *Id.*
[149] Exhibit 17 - Cedric Franklin's 19th JDC Minutes from Docket #07-17-0073.
[150] *Id.*

day and before Judge Trudy White, he plead guilty to possession of a schedule 1 controlled substance, specifically Ecstasy, under Docket #03-17-0501.[151] He was sentenced to 2 years at Parish prison in with both the sentences running concurrently.[152] Mr. Franklin is scheduled for release on January 2, 2021.[153]

  **c. Willie Shepherd**

  Willie Shepherd is a pretrial detainee. He was booked into East Baton Rouge Parish Prison on February 26, 2020 on the following charges; La. R.S. 14:35.3, Domestic Abuse Battery, two counts of La. R.S. 14:43.1, Sexual Battery, La. R.S. 14:38, Simple Assault 14:38, La. R.S. 14:46, False Imprisonment, and La. R.S. 14:133.2, Misrepresentation During Booking.[154] A Bill of Information in Docket #20-01854 – La. R.S. 14:108, Resisting an Officer, was filed April 22, 2020.[155] His Bills of Information for Dockets #20-01855, La. R.S. 14:35.3, Domestic Abuse Battery, La. R.S. 14:46, False Imprisonment, and La. R.S. 14:133.2, Misrepresentation During Booking;[156] and Docket #20-01856, two counts of La. R.S. 14:43.1, Sexual Battery, were filed on May 14, 2020.[157] Currently, he is scheduled for a status conference on all three of his open dockets on June 24, 2020.[158] On March 4, 2020, his bond was set at $15,000 plus abiding by terms of a protective order and residing with his mother. He was rearrested and booked into EBRPP on March 7, 2020 on the charge of La. R.S. 14:108, Resisting an Officer.[159]

  All three of the plaintiffs seeking to be released as medically vulnerable have tested positive for COVID-19 and fully recovered. The jail management system shows that Clifton

---

[151] Exhibit 18 - Cedric Franklin's 19th JDC Minutes from Docket #03-17-0501.
[152] *Id.*
[153] *See* Exhibit 17.
[154] Exhibit 19 - Willie Shepherd's Booking Records.
[155] Exhibit 20 - Willie Shepherd's 19th JDC Bill of Information on Docket #20-01854.
[156] Exhibit 21 - Willie Shepherd's 19th JDC Bill of Information on Docket #20-01855.
[157] Exhibit 22 - Willie Shepherd's 19th JDC Bill of Information on Docket #20-01856.
[158] Exhibit 23 - Willie Shepherd's 19th JDC Minutes from Docket #20-01854. Exhibit 24 - Willie Shepherd's 19th JDC Minutes from Docket #20-01855. Exhibit 25 - Willie Shepherd's 19th JDC Minutes from Docket #20-01856.
[159] Exhibit 19, page 1.

Belton was moved after being positive from an isolation line on May 19, 2020.[160] Willie Shepherd was moved from an isolation line on May 4, 2020.[161] Cedric Franklin was moved from an isolation line on May 8, 2020.[162] All three tested negative twice before being moved from the positive area.[163]

## IV.     LAW AND ARGUMENT

### A.     Plaintiffs' claims should be dismissed because they failed to exhaust administrative remedies prior to filing suit.

Under the Prison Litigation Reform Act ("PLRA"), "no action shall be brought with respect to prison conditions under Section 1983…by a prisoner confined in any jail…until such administrative remedies as are available are exhausted."[164] "[T]he PRLA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[165] Exhaustion is a mandatory prerequisite to filing suit.[166]

The Fifth Circuit requires inmates to fully exhaust the applicable prison grievance procedures before filing a suit in federal court.[167] Courts have no discretion to excuse an inmate's failure to properly exhaust the prison grievance process, even to take "special circumstances" into account.[168] Recently,  the Fifth Circuit discussed this issue in *Valentine v. Collier,* 956 F. 3d 797 (5th Cir. 2020). In *Valentine,* the plaintiffs were seeking a preliminary injunction related to the

---

[160] Exhibit 6 - attachment H.
[161] Exhibit 6- attachment I
[162] Exhibit 6 - attachment J
[163] Exhibit 5
[164] 42 U.S. C. Section 1997e(a); *Jones v. Bock,* 549 U.S. 199, 202 (2007)
[165] *Porter v. Nussle,* 534 U.S. 516, 532 (2002)
[166] *Booth v. Churner,* 532 U.S. 731, 739 (2001)
[167] *Gonzales v. Seal,* 702 F. 3d 785, 788 (5th Cir. 2012) ("It is irrelevant whether exhaustion is achieved during the federal proceeding. Pre-filing exhaustion is mandatory, and the case must be dismissed if available administrative remedies were not exhausted."); *Dillon v. Rogers,* 596 F. 3d 260, 268 (5th Cir. 2010) (finding that mere "substantial compliance" with administrative procedures is insufficient exhaustion); *Wright v. Hollingsworth,* 260 F. 3d 357, 358-59 (5th Cir. 2001).
[168] *Ross v. Blake,* 136 S. Ct. 1850, 1856-57 (2016); *Gonzalez,* 702 F. 3d at 788.

State of Texas's response to COVID-19 in a prison for the elderly and infirm. The Fifth Circuit in

*Valentine,* stated as follows:

> The PLRA requires inmates to exhaust 'such administrative remedies as are available' before filing suit in federal court to challenge prison conditions. 42 U.S.C. Section 1997e(a). This exhaustion obligation is mandatory-there are no "futility or other [judicially created] exceptions [to the] statutory exhaustion requirements…" *Booth v. Churner,* 532 U.S. 731, 741 n.6, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001). So long as the State's administrative procedure grants 'authority to take *some* action in response to a complaint,' that procedure is considered 'available,' even if it cannot provide 'the remedial action an inmate demands.' *Id.* at 736, 121 S.Ct. 1819 (emphasis added); see also id *at* 739, 121 S. Ct. 1819 ('Congress meant to require procedural exhaustion regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible'). [169]

The Fifth Circuit in *Valentine* explained that a remedy is not "available," and exhaustion is not

required in the following limited circumstances:

1. The procedure "operates as a simple dead end" because "the relevant administrative procedure lacks authority to provide any relief," or "administrative officials have apparent authority but decline to exercise it."

2. The "administrative scheme [is] so opaque that…no reasonable prisoner can use them."

3. Or when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."[170]

The Fifth Circuit in *Valentine* held that under these standards plaintiffs' suit was premature,

that the TDCJ's grievance procedure is "available" and plaintiffs were required to exhaust. [171]

The Fifth Circuit in *Valentine* rejected the district court's argument that the TDCJ has not

acted speedily enough because that was an exception under the old Section 1997e(a), not the

---

[169] *Valentine* at 804
[170] *Valentine* at 804 citing *Ross v. Blake,* ---U.S.---, 136 S. Ct. 1850, 1859-60, 195 L. Ed. 2d 117 (2016) (quotation omitted).
[171] *Valentine* at 804

current one. The Fifth Circuit concluded that the district court's holding that the TDCJ process "presents no 'possibility of some relief'" was unsupported by the evidence. [172] Further, the Fifth Circuit held that they were not persuaded by the district court's reliance on *Fletcher v. Menard Correctional Center,* 623 F. 3d 1171 (7th Cir. 2010), in which Judge Posner hypothesized that administrative remedies might "offer no possible relief in time to prevent…imminent danger from becoming actual harm."[173] The Fifth Circuit noted that "in that hypothetical, the State procedure "could offer no *possible* relief because State law prohibited a response to the grievance until two weeks after it was filed—rendering the procedure of no use to an inmate threatened with death in 24 hours. The Fifth Circuit held that under those circumstances, the procedure is unavailable because "'it lacks authority to provide any relief,' *Ross,* 136 S. Ct. at 1859, because as a matter of law it cannot respond quickly enough."[174] The Fifth Circuit concluded that the TDCJ faces no legal bar to offering timely relief, noting that the TDCJ is empowered to act on a grievance any time *up to*-not, *after,* as in *Fletcher*-the statutory limit. The Fifth Circuit concluded that "relief by TDCJ therefore remains possible (and the procedure available), even if TDCJ has not acted as swiftly as Plaintiffs would like."[175]

The East Baton Rouge Parish Prison ("EBRPP") Inmate Rules and Regulations handbook sets out the grievance procedure applicable to Plaintiffs' claims.[176] Per the handbook, a grievance procedure is initiated by an inmate completing a grievance form and sending it to the grievance investigator or filing a letter to the Warden.[177] Once submitted, the grievance investigator will screen the grievance.[178] Upon acceptance of the grievance by the grievance investigator, the

---

[172] *Valentine* at 805 citing *Ross,* 136 S. Ct. at 1859.
[173] *Valentine* 805 citing *Fletcher,* 623 F. 3d at 1174
[174] *Valentine* 805
[175] *Id.*
[176] See ARP Affidavit of Warden Grimes and the attached EBRPP Inmate Rules and Regulations attached hereto as Exhibit 26a.
[177] *Id.* page 25, F. ii.
[178] *Id.* page 25 G.

grievance will be investigated or referred to the department that may best respond to the request. The grievance will not be referred to an employee who is involved in the grievance. The employee will investigate and will deliver a response to the grievance investigator who will give a copy to the inmate with an explanation for the procedure for further review within **15 days** of filing of the grievance.[179] According to the Inmate Handbook, an inmate may request review by the Warden by filing a request for warden's review. [180] The Warden or his designee will review the grievance and response and deliver a copy of his decision including the reasons to the inmate. The Response to Inmate Grievance form provides that the inmate will receive the Warden's decision within **30 days** of the filing of the request for Warden's review.[181] The Inmate Handbook provides that the deadlines for response and decisions set forth in the Inmate Handbook are maximums and that responses and decisions will be given as quickly as is reasonably possible.[182] Warden Grimes testified in a sworn affidavit that it is his practice to take less than the full thirty days to respond to a Request for Warden's Review.[183]

The EBRPP's grievance procedure also provides for an Emergency Procedure. The Inmate Handbook provides as follows:

> If a grievance is of such a nature that following the regular procedure and time limits would subject the inmate to substantial risk of personal injury or cause other serious and irreparable harm to the inmate, he/she may certify it an emergency by writing "Emergency" at the top of the grievance and the reasons…A written response will be given to the inmate **as soon as possible but no later than 72 hours** after the shift supervisor's receive thereon.[184] (emphasis

---

[179] *Id.* page 26 H
[180] *Id.* page 26 I
[181] See ARP Affidavit of Warden Grimes and the attached EBRPP Inmate Rules and Regulations attached hereto as Exhibit 26a.
[182] *Id.* page 26 I, K
[183] See ARP Affidavit of Warden Grimes attached hereto as Exhibit 26.
[184] See ARP Affidavit of Warden Grimes and EBRPP Inmate Rules and Regulations page 27 M  Exhibit 26a   attached hereto

added)

The inmate may request a Warden's review of the emergency grievance upon receiving a response or upon the passing of 72 hours without a response. The warden or his designee will make a decision within 72 hours of request if the grievance is still an emergency.[185]

In this case, Clifton Belton filed this suit on May 4, 2020.[186] Mr. Belton did not exhaust the EBRPP administrative remedies relating to COVID-19 prior to filing suit.[187] On May 7, 2020, three days after this suit was filed, the Sheriff's Office received an inmate grievance from Mr. Belton related to his testing positive for the corona virus.[188] On May 15, 2020 the Sheriff's Office responded to Mr. Belton's grievance as unfounded.[189] Thereafter, Mr. Belton submitted a Request for Warden's Review.[190] On June 4, 2020 Warden Grimes responded to Mr. Belton's Request for Warden's Review as unfounded.[191]

An administrative remedy procedure was clearly available to Mr. Belton. In fact, Mr. Belton filed a grievance and requested a Warden's Review pursuant to the procedure. However, the Sheriff's Office did not receive Mr. Belton's grievance until after Mr. Belton filed this suit on May 4, 2020. Further, Mr. Belton did not exhaust the EBRPP's administrative remedies prior to filing this suit. Therefore, this suit is premature and should be dismissed.

We anticipate that Plaintiffs may argue that the U.S. Supreme Court's decision in *Valentine,* provides them with an exception to completing the administrative remedy procedure in

---

[185] *Id.* page 27 Mii
[186] Rec. Doc. 1
[187] In fact, the other two named Plaintiffs in the proposed Sub-class of medically vulnerable inmates (Cedrick Franklin and Willie Shepherd) have not exhausted administrative remedies relating to a COVID-19 grievance. (See APR Affidavit of Warden Grimes attached hereto as Exhibit 26)
[188] See ARP Affidavit of Warden Grimes attached hereto as Exhibit 26b with Clifton Belton Inmate Grievance attached.
[189] See ARP Affidavit of Warden Grimes attached hereto as Exhibit 26c with Sheriff's Office Response to Clifton Belton's grievance attached.
[190] *Id.*
[191] See ARP Affidavit of Warden Grimes attached hereto as Exhibit 26d with Warden Grimes' Response to Clifton Belton's Request for Warden's Review

this case. However, the Supreme Court's ruling in *Valentine* does not provide Plaintiffs in this case with relief from failing to complete the Administrative Remedy Procedure prior to filing suit. The U.S. Supreme Court denied plaintiffs' application to vacate the Fifth Circuit's stay of the preliminary injunction in the *Valentine* case which was based in part on a finding that the plaintiffs suit was premature because they failed to exhaust administrative remedies and such remedies were "available" as set forth above. In a "statement" by Justice Sotomayor, with whom Justice Ginsburg joined respecting the denial of application to vacate stay, Justice Sotomayor did not rule out the possibility that "where plaintiffs demonstrate that a prison grievance system cannot or will not respond to an inmate's complaint, they could well satisfy an exception to the PLRA's exhaustion requirement."[192] Justice Sotomayor commented that "if a plaintiff has established that the prison grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like Covid-19, the procedures may be "unavailable" to meet the plaintiff's purposes, much in the way they would be if prison officials ignored the grievances entirely."[193] Justice Sotomayor cautioned "that in these unprecedented circumstances, where an inmate faces an imminent risk of harm that the grievance process cannot or does not answer, the PRLA's textural exception could open the courthouse doors where they would otherwise stay closed."[194]

In this case, the EBRPP's administrative remedy procedure is capable of responding the COVID-19 pandemic. EBRPP's procedures provide a method to file an emergency grievance that will be decided in 72 hours with a decision by the Warden pursuant to a Warden's review within another 72 hours. The fact that Mr. Belton did not file an emergency grievance in this case, does not mean that the procedures are not available for inmates to avail themselves of expedited relief where the time limits would subject the inmate to substantial risk of personal injury or cause other

---

[192] *Valentine v. Collier,* 2020 WL 2497541 *1 (2020)
[193] *Id*
[194] *Id* *3

serious and irreparable harm.

An administrative remedy procedure was clearly available to Mr. Belton. Mr. Belton did not exhaust the EBRPP's administrative remedies prior to filing this suit. Therefore, this suit is premature and should be dismissed.

### B.    Plaintiffs fail to establish the prerequisites for a mandatory TRO and cannot meet the heightened burden.

In order to obtain injunctive relief, Plaintiff must establish: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) that the injunction will not disserve the public interest.[195] Plaintiffs are seeking a mandatory injunction.  A "mandatory injunction affirmatively compels the doing of some act, rather than merely negatively forbidding continuation of a course of conduct…"[196] Mandatory preliminary relief, which goes well beyond the maintaining of the status quo, is extremely disfavored, and only should be granted if the facts and law absolutely favor the moving party.[197] If Plaintiffs fails to meet their burden regarding any of the necessary elements, the Court need not address the other elements necessary for granting a preliminary injunction.[198]

As discussed below, Plaintiffs cannot meet their heightened showing for the mandatory TRO and therefore, their TRO should be denied.

---

[195] See *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008).
[196] *State of Ala. v. United States*, 304 F.2d 583, 590 (5th Cir.1962), *aff'd sub nom. Alabama v. United States*, 371 U.S. 37 (1962).
[197] *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir.1976).
[198] See *Roho, Inc. v. Marquis*, 902 F.2d 356, 261 (5th Cir. 1990) (declining to address the remaining elements necessary to obtain a preliminary injunction after finding that the plaintiff failed to show a substantial likelihood of success on the merits).

**C.    Plaintiffs cannot show a substantial likelihood of prevailing on the merits of their underlying claims.**

**1.    Eighth and Fourteen Amendment Claims**

Plaintiffs claim that Defendants are violating the Subclass members who are post conviction's Eighth Amendment rights and the pretrial Subclass members' Fourteenth Amendment rights. Plaintiffs assert that Subclass members are likely to succeed on their claims because Defendants are subjecting detainees to an unreasonable level of risk in violation of pretrial detainees' Fourteenth Amendment rights and are otherwise deliberately indifferent to the substantial risk that Medically Vulnerable Subclass members will contract COVID-19 within the current conditions at the jail, in violation of the Eighth Amendment.[199]  Plaintiffs assert that Defendants are unable to abate the probability of widespread COVID-19 infection and resultant high risk of severe illness or death.[200] Plaintiffs assert that only release will sufficiently protect the medically vulnerable from the risk of death.[201]

Defendants have shown that they have in fact been able to abate widespread COVID-19 infections in the EBRPP.  Further, Defendants have shown that the COVID-19 infection has not resulted in a high rate of severe illness or death of the inmates in EBRPP. Evidence shows that, due to safety measures implemented and practiced, the number of positive cases in the jail have consistently gone down since May 4, 2020.[202] There have been no COVID-19 related deaths of inmates in EBRPP.[203]  Only three inmates were transferred to an outside hospital facility and all three recovered.[204] Even more significantly, the number of new infections in the jail has not

[199] Rec. Doc. 5-3 page 39
[200] Rec. Doc. 5-3 page 40
[201] Rec. Doc. 5-3 page 49
[202] Exhibit 5y Graph of Positive Cases
[203] Exhibit 7 Affidavit of CorrectHealth
[204] Exhibit 5 Affidavit of Warden Grimes

increased since May 12, 2020 (prior to the filing of this emergency TRO).[205] There are currently only 6 COVID-19 positive cases in the EBRPP.[206]  As set forth below, Plaintiffs have failed to demonstrate a substantial likelihood of success on their Eighth Amendment and Fourteenth Amendment claims.

    a.  **Plaintiffs have not demonstrated a substantial likelihood of success on their Eighth Amendment Claims.**

   The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."[207] Prison officials who act reasonably cannot be found liable under the Eighth Amendment.[208]An Eighth  Amendment conditions of confinement claim has two components, one objective and one subjective.[209] To satisfy the objective requirement, the plaintiff must show "an objectively intolerable risk of harm."[210] To satisfy the subjective requirement, the plaintiff must show that the defendant  (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively drew the inference that risk existed; and (3) disregarded the risk.[211] The incidence  of diseases or infections, standing alone, do not imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks.[212]Instead, the plaintiff must show a denial of "basic human needs."[213] "Deliberate indifference is an extremely high standard to meet."[214]

   On April 22, 2020, the Fifth Circuit issued an opinion in *Valentine,* a case involving the

---

[205] Exhibit 5 Affidavit of Warden Grimes
[206] Exhibit 5 Affidavit of Warden Grimes
[207] U.S. Const. Amend. VIII
[208] *Farmer v. Brennan,* 511 U.S. 825, 845 (1994)
[209] *Id.* at 845
[210] *Valentine v. Collier,* 956 F. 3d 797, 801 (5th Cir. 2020), *denying motion to vacate stay*2020 WL 2497541 (May 14, 2020).
[211] *Id.*
[212] *Id.* (citing *Shepherd v. Dallas Cty.,* 591 F. 3d 445, 454 (5th Cir. 2009) (A Fourteenth Amendment conditions of confinement case)
[213] *Id.*
[214] *Id.* (quoting *Cadena v. El Paso Cty.,* 946 F. 3d 717, 728 (5th Cir. 2020).

COVID-19 pandemic and the Texas prison system. The *Valentine* opinion forecloses this Court's ability to grant the injunctive relief Plaintiffs seek. [215] The plaintiffs in *Valentine* were inmates at a Texas Department of Criminal Justice (TDCJ) prison for the elderly and infirm.[216] They filed a class action lawsuit on behalf of disabled and high-risk inmates against TDCJ, its executive director, and the prison warden. Like in this case, the plaintiffs alleged violations of the Eighth Amendment. The district court granted the plaintiffs a preliminary injunction that required TDCJ to take many specific steps regarding the TDCJ's handling of the COVID-19 pandemic. TDCJ appealed and sought a stay of the preliminary injunction pending appeal.[217]

The Fifth Circuit granted TCDJ's motion to stay the preliminary injunction. The Fifth Circuit determined that TDCJ was likely to prevail on appeal in part because, after accounting for the protective measures taken by TDCJ, Plaintiffs had not shown a "substantial risk of serious harm" that amounts to cruel and unusual punishment.[218] The Fifth Circuit noted, "There is no doubt that infectious diseases generally and COVID-19 specifically can pose a risk of serious or fatal harm to prison inmates."[219] TDCJ submitted evidence of the protective measures it had taken, including access to soap, tissue, gloves, masks, regular cleaning, signage and education, and quarantine of new prisoners.[220] The legal question was whether the Eight Amendment requires TDCJ to do more to mitigate the risk of harm.[221] The district court acknowledged that its injunction required extra measures beyond TDCJ and CDC policies. The Fifth Circuit stated that there is no precedent holding that the CDC's recommendations are insufficient to satisfy the Eighth

---

[215] See *Valentine,* 956 F. 3d 797.
[216] *Id.* at 799
[217] *Id.* at 801
[218] *Id.* at 801-02
[219] *Id.* at 801-802.
[220] *Id.* at 801-802
[221] *Id* at 802

Amendment.[222]

Further, the Fifth Circuit in *Valentine* held even assuming there is a substantial risk of serious harm, the *Valentine* plaintiffs did not have evidence of TDCJ's subjective indifference to that risk.[223] Deliberate indifference requires the defendant to have a subjective state of mind "more blameworthy than negligence."[224]The Fifth Circuit pointed out that the district court cited no evidence that TCDJ subjectively believed its measures were inadequate.[225] The evidence showed TCDJ had taken and continued to take measures, informed by the CDC and medical professionals, to abate and control the virus.[226] The Fifth Circuit stated that even if the district court might have done things differently, its disagreement with TDCJ's medical decisions does not establish deliberate indifference.[227]

In a Fifth Circuit decision decided on April 27, 2020, *Marlowe v. LeBlanc,* 2020 WL 2043425 (5ᵗʰ Cir. 2020), the court held that it did not question that COVID-19 presents a risk of serious harm to those confined in prisons, nor that Plaintiff, as a diabetic is particularly vulnerable to the virus's effects. But, for purposes of resolving Plaintiff's constitutional claim, the question is whether the constitution requires Defendants to do more than they have already done to mitigate the risk of harm.[228] The Court held that even if the first *Farmer's* requirement is satisfied, there was no evidence establishing that Defendants subjectively believed that the measures they were (and continue) taking were inadequate.[229] The Court noted that inadequate measures is not dispositive of the defendants' mental state. The Fifth Circuit noted the record shows a plethora of measures the defendants are taking to abate the risks posed by COVID-19, from providing

---

[222] *Id.*
[223] *Id.*
[224] *Id.* (quoting
[225] *Id.*
[226] *Id.*
[227] *Id.* at 803
[228] *Marlowe* at *2
[229] *Id.* at *3

prisoners with disinfectant spray and two cloth masks to limiting the number of prisoners in the infirmary lobby and painting markers on walkways to promote social distancing.  In finding that Plaintiffs' evidence did not demonstrate deliberate indifference, the Court in *Marlowe* noted that Defendants have been heightening their efforts to contain the virus.[230]

Plaintiffs assert that the objective test is met simply because COVID-19 is a serious and communicable disease such that the risk of contracting it is objectively unacceptable, particularly for medically vulnerable individuals.[231] Plaintiffs' argument must be rejected in light of the Fifth Circuit's ruling in *Valentine* and *Marlowe.* The Fifth Circuit recognized that COVID-19 can pose a risk of serious or fatal harm to prison inmates and that certain inmates such as the plaintiff in *Marlowe* who was a diabetic is particularly vulnerable to the virus's effect. However, the Fifth Circuit held that the legal question as to the objective standard was whether the Eighth Amendment requires correctional institutions to do more to mitigate the risk of harm than they are doing. In this case, like in *Valentine* and *Marlowe,* Defendants have shown that they have taken protective measures and continue to take measures, based on CDC guidelines for correctional institutions and by medical professionals. In fact, Defendants have taken the same measures mentioned by the Court in *Valentine* including access to soap, tissue, masks, regular cleaning, signage and education and quarantine of new prisoners. The Fifth Circuit in *Valentine* held that the TDCJ was not required to do more to mitigate the risk of harm. Thus, under the Fifth Circuit's decision in  *Valentine,* this Court must find that Plaintiffs have not demonstrated a substantial likelihood of prevailing on the merits because Plaintiffs have not shown a "substantial risk of serious harm" that amounts to cruel and unusual punishment.

Further, even if this Court were to find that there is a substantial risk of serious harm,

---

[230] *Id.* at *3
[231] Rec. Doc. 5-3 page 45

Plaintiffs have not shown the Defendants' subjective indifference to that risk. Plaintiffs assert that they have shown subjective deliberate indifference because it cannot be seriously disputed that any government official, including Defendants are aware of the risks posed by the coronavirus.[232] However, this is not the test for subjective indifference as explained by the Fifth Circuit in *Marlowe* and *Valentine.* The Fifth Circuit pointed out that plaintiffs in *Valentine* and *Marlowe* did not show that defendants subjectively believed that they the measures that they were taken were inadequate. Like in *Valentine* and *Marlowe,* Plaintiffs have cited no evidence that Defendants believed its measures were inadequate. Plaintiffs have not demonstrated a substantial likelihood of success on their Eighth Amendment claims.

### b.    Plaintiffs have not demonstrated a substantial likelihood of success on their 14th Amendment Claims

The Supreme Court has long-held that, "Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a 'retraction justified by the considerations underlying our penal system.'"[233] The Supreme has further held that, "[T]he fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed."[234] The Supreme Court has held that a particular condition or restriction of pre-trial detention does not constitute "punishment" if it is reasonably related to a legitimate governmental objective.[235] "Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua*

---

[232] Rec. Doc. 5-3 page 47
[233] *Wolff v. McDonnell,* 418 U.S. 520, 535, 94 S. Ct. 2963, 2974, 41 L. Ed. 2nd 935 (1974)
[234] *Id.* 418 U.S. at 556, 94 S. Ct. at 2974
[235] *Id.* 441 U.S. at 539, 99 S. Ct. at 1874

detainees."[236] As the Fifth Circuit has recognized while sitting *en banc,* "the reasonable-relationship test employed in conditions cases is functionally equivalent to the deliberate indifference standard employed in episodic cases."[237]

In evaluating the constitutionality of conditions or restrictions of pre-trial detention, the proper inquiry is whether the conditions amount to punishment of the detainee.[238] The Fifth Circuit has held that "when a pretrial detainee attacks the general conditions, practices, rules or restrictions of pretrial confinement," courts should determine the constitutionality of the conditions using the test enumerated by the Supreme Court in *Bell v. Wolfish,* 441 U.S. 520 (1979).[239]  In *Bell* the Supreme Court explained that "the Government… may detain [a pretrial detainee] to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution"[240] The Court emphasized that "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense."[241]

To successfully set forth a condition of confinement claim, the plaintiff must show "(1) a rule or restriction, or identifiable intended condition or practice, or a jail official's acts or omissions that were sufficiently extended or pervasive which was (2) not reasonably related to a legitimate government objective, and which (3) caused the violation of detainee's constitutional rights.[242] A detainee challenging jail conditions must demonstrate more than an incident; he must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights.[243]  "[I]solated

---

[236] *Wolfish,* 441 U.S. at 539, 99 S. Ct. at 1874
[237] *Duvall v. Dallas Cty., Tex.,* 631 F. 3d 203, 207 (citing *Scott v. Moore,* 114 F. 3d 51, 54 (5th Cir. 1997) (en banc)
[238] *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S. Ct. 1861, 1872, 60 L. Ed. 2d 447 (1979)
[239] *Hare* at 643
[240] *Bell* at 536-537
[241] *Bell* at 537
[242] *Duvall v. Dall. Cnty., Tex.,* 631 F. 3d 203, 207 (5th Cir. 2011)
[243] *Shepherd v. Dallas County,* 591 F. 3d 445, 452-55 (5th Cir. 2009)

examples of illness, injury or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate."

The effective management of a detention facility is a valid objective that may justify imposition of conditions and restrictions on pretrial detention.[244]  The Supreme Court in *Bell* explained that in determining "whether restrictions or conditions are reasonably related to the Government's interest in…operating the institution in a manageable fashion," courts must remember that "'[s]uch considerations are peculiarly within the province and professional expertise of corrections officials.'"[245] Courts must not become "enmeshed in the minutiae of prison operations," which will only distract from the question presented: "does the practice or condition violate the Constitution?"[246]

The Fifth Circuit has also recognized that, "[t]he Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones."[247] Plaintiffs must establish conditions which are so egregious that would offend "contemporary standards of decency."[248]

Finally, the Fifth Circuit in *Valentine* recently pointed out in a case involving a request for injunctive relief related to COVID-19 in a prison, that "the Supreme Court has repeatedly warned that 'it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'"[249] The "incidence of diseases or infections, standing alone," do not imply unconstitutional conditions, since any densely populated residence may be subject to

---

[244] *Estate of Henson v. Wichita County, Tex.,* 795 F. 3d 456 (5ᵗʰ Cir. 2015)
[245] *Bell* at 540
[246] *Id* at 544
[247] *Gates v. Cook,* 376 F. 3d 323, 332 (5ᵗʰ Cir. 2004) (citing *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)
[248] *Hellng v. McKinney,* 509 U. S. 25, 36, 113 S. Ct. 2475, 2482, 125 L. Ed. 2d 22 (1993)
[249] *Valentine,* 803 quoting *Woodford v. Ngo,* 548 U.S. 81, 94, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) (quoting *Preiser v. Rodriguez,* 411 U.S. 475, 491-92, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973))

34

outbreaks."[250] Instead, the plaintiff must show a denial of "basic human needs."[251]

Plaintiffs argue that Defendants are subjecting detainees to an unreasonable level of risk (of contracting COVID-19) in violation of pretrial detainees' Fourteenth Amendment rights.[252] Plaintiffs assert that the unconstitutional conditions are that they are being held cramped and unsanitary conditions.[253] Plaintiff asserts that these conditions impose a substantial risk of contracting COVID-19 and that once they are exposed, they are all vulnerable to severe illness or death, either because of their age, or because have underlying medical conditions.[254]

Plaintiffs have not shown a substantial likelihood of success on the merits of their Fourteenth Amendment conditions of confinement claim. Plaintiffs have not shown that they have been subjected to unconstitutional conditions of confinement related to their incarceration during the COVID-19 pandemic. Plaintiffs have not shown that they are subject to conditions of confinement that impose a substantial risk of contracting COVID-19.  Plaintiffs have not shown that being held in "cramped" conditions or the sanitation conditions at the jail  an unconstitutional condition that offends "contemporary standards of decency" or is a denial of "basic human rights." Defendants have shown that they have taken measures for the inmates to practice social distancing as much as possible in the jail's setting. Further, inmates have been supplied with face masks/coverings to use when/if social distancing is not possible. In addition, Defendants have shown that they have taken steps to increase the sanitation and cleaning of the jail in light of COVID-19 and they have provided inmates with soap, disinfectant, paper towels and other means to improve sanitization during the COVID pandemic.

Further, Plaintiffs have not shown that Defendants' actions are not reasonably related to a

---

[250] *Valentine* at p. 801 citing *Shepherd v. Dallas Cty.,* 591 F. 3d 445, 454 (5th Cir. 2009)
[251] *Ibid.*
[252] Rec. Doc. 5-3 page 39
[253] Rec. Doc. 5-3 page 42
[254] Rec. Doc. 5-3 page 42

legitimate governmental objective as opposed to being arbitrary or purposeless. Plaintiffs have not shown that Defendants knew that the steps they are taking in response to COVID-19 were inadequate. Defendants followed CDC guidelines and the advice of medical experts in infectious disease. Even if the steps taken by Defendants such as having to isolate positive inmates and quarantine those exposed to the virus, as well as the practice of quarantining all new arrivals to the jail result in more crowded or cramped conditions than normal, these actions are not arbitrary or purposeless; but are reasonably related to the legitimate governmental objective of stemming the spread of the virus throughout the jail, which they have successfully done.

Defendants have taken many steps to address the COVID-19 pandemic at the jail. The Fifth Circuit in *Valentine* recognized the importance of allowing prison officials the ability to administer their prisons. Further, the Supreme Court in *Bell* cautioned that Courts should not become "enmeshed in the minutiae of prion operations." Plaintiffs have not demonstrated a substantial likelihood of success on their Fourteenth Amendment claims.

### D. Plaintiffs have not shown that the Proposed Subclass members will suffer irreparable harm in the absence of a TRO mandatory release.

In order for a court to grant a TRO, a plaintiff must prove that he will suffer irreparable harm.[255] In this case, Plaintiffs cannot meet their required burden of proving irreparable harm in the absence of a TRO. Irreparable harm must be likely, not merely speculative.[256] It is not sufficient to claim a possibility of harm when demanding the extraordinary relief of a TRO.[257] Plaintiffs allege that the proposed medically vulnerable subclass are at risk of death or contracting a deadly virus due to defendants' actions. However, Defendants' actions in response the COVID-19 pandemic have been aimed and tailored to protect detainees from the risks of COVID-19. From

---

[255] *Marlowe v. LeBlanc*, 2020 WL 2043425 (M.D. La. 2020)
[256] *See e.g., Winter v. Natural Resources Defense Council*, Inc. 555 U.S. 7, 22 (2008).
[257] *Id*.

the start, officials from EBRPP, the City, and CorrectHealth put swift and targeted measures in place, wholly based on the CDC Guidelines,[258] to mitigate the spread of COVID-19 in the jail.

In *Marlow v. Leblanc*, the Fifth Circuit reviewed a case which granted a preliminary injunction to plaintiff seeking release from detention until the COVID-19 was no longer a threat within the Department of Corrections.[259]  The Defendants appealed and requested a stay order.[260]  The Fifth Circuit granted the Defendants' request to stay the injunctive relief.[261]  The Fifth Circuit importantly noted that the Plaintiff was unable to show irreparable harm when "accounting for the protective measures" put in place by the facility's officials.[262]

Plaintiffs in this matter cannot show that when accounting for the procedures in place at the jail, irreparable harm is likely.  Evidence shows that, due to safety measures implemented and practiced, the number of positive cases in the jail have consistently gone down since May 4, 2020.[263]  There have been no COVID-19 related deaths in EBRPP.[264]  Only three inmates were transferred to an outside hospital facility and all three recovered.[265]  Even more significantly, the number of new infections in the jail has not increased since May 12, 2020 (prior to the filing of this emergency TRO).[266]  There are currently only 6 positive cases in isolation.[267]

Further, the three Plaintiffs described as medically vulnerable have admitted that they have already contracted and survived COVID-19 without severe complications and without hospital intervention.[268]  Plaintiffs have provided no evidence showing that Plaintiffs are likely to contract

---

[258] See Generally Exhibits 5, 6, 7, 27, 28  Affidavits of Warden Grimes, Major Fontenot, CorrectHealth, Darryl Gissel and Dan Godbee.
[259] *Marlowe*
[260] *Id*.
[261] *Id*.
[262] *Id*.
[263] Exhibit 5y . Graph of Positive Cases
[264] Exhibit 7 Affidavit of CorrectHealth
[265] Exhibit 5 Affidavit of Warden Grimes
[266] Exhibit 5 Affidavit of Warden Grimes
[267] Exhibit 5 Affidavit of Warden Grimes
[268] Rec. Doc. 5-14, 5-7, 5-6  Inmate statements of Belton, Shepherd, and Franklin

the virus again, or that if they did become reinfected, the outcome would be any different.

In fact, it is unlikely that Plaintiffs will be reinfected as the literature does not support such a theory. Angela Rasmussen, a virologist at Columbia University has stated, "[i]t appears people are not being reinfected, and the virus is not reactivating.[269]" She further stated that "[w]e can largely stop worrying about reinfection and address the next big questions."[270] This point was affirmed by Carol Shoshkess Reiss, a professor of Biology and Neural Science at New York University who has stated "[b]ut the general consensus in the scientific community- with all the information available to date on the new coronavirus – is that people aren't being reinfected, but rather falsely testing positive."[271] Even the media is filled with stories of doctors, nurses, and other professionals who have recovered from COVID-19 working with those diagnosed with COVID-19 in medical facilities.[272] More so, the FDA has requested those who have recovered from COVID-19 to donate their "anti-body rich" blood or plasma for the use in research to facilitate the much-anticipated therapies to help fight the disease or shorten the length of the illness.[273] Therefore, although much is yet to be discovered about the novel-coronavirus, the current research shows that those who have been infected with the virus are not likely to become reinfected. Thus, Plaintiffs have little to fear since they admittedly recovered from COVID-19.

Any threat of harm to Plaintiffs, should their request for TRO be denied, is speculative at best. Because Plaintiffs cannot show they are likely to suffer irreparable harm, the Court should

---

[269] Erin Garcia de Jesus, *New data suggest people aren't getting reinfected with the coronavirus*, Science News (May 19, 2020), https://www.sciencenews.org/article/coronavirus-covid19-reinfection-immune-response.

[270] *Id.*

[271] Yasemin Saplakoglu, *Recovered patients who tested positive for COVID-19 likely not reinfected*, LIVESCIENCE, (April 30, 2020) https://www.livescience.com/coronavirus-reinfections-were-false-positives.html.

[272] *See* Dave McKinley, Bob Mancuso, *Buffalo nurse who recovered from coronavirus back on front lines*, 2WGRZ, (May 8, 2020), https://www.wgrz.com/article/news/health/coronavirus/buffalo-nurse-who-recovered-from-coronavirus-back-on-front-lines/71-2ea010db-48b6-4442-a0ff-a50fa3a42fba.

[273] Commissioner of Food and Drugs- Food and Drug Administration, Dr. Stephen Hahn, *Coronavirus (COVID-19) Update: FDA Encourages Recovered Patients to Donate Plasma for Development of Blood-Related Therapies* (April 16, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-encourages-recovered-patients-donate-plasma-development-blood.

deny their request for injunctive relief.

E.    **The threatened injury does not outweigh any harm to the Non-Movant**

The injunctive relief requested by Plaintiffs would irreparably injure Sheriff Defendants because Plaintiffs are essentially asking that the federal court system take over the jail.  In *Sanchez v. Brown* the court noted its "grave concerns about the power of the federal courts to take discretion away from such elected officials."[274]  It further noted that sensitive policy decisions regarding safety goals as they relate to the jail population should be left to elected and appointed officials.[275]  Defendants have tirelessly worked towards the implementation of extensive safety policies and procedures to ensure the safety of the jail population.  To usurp policy making power from Defendants at this time would jeopardize the effectiveness of the current system in place for the protection of the inmates.

F.    **Releasing the proposed medically vulnerable inmates is detrimental to the public interest.**

Plaintiffs demand the release of medically vulnerable inmates.  Plaintiffs claim this is the only way to protect the medically vulnerable from the health risks posed by COVID-19.  However, the release of detainees without regard to the risk for society is detrimental to the public interest.

As shown above, COVID-19 has significantly declined in the jail and cases are not increasing as Plaintiffs have suggested.  Plaintiffs have not shown the need for emergency relief under a TRO.  Issuing a blanket release order for the proposed medically vulnerable class without considering society's risk is detrimental to the public interest.

For example, Plaintiffs claim that Belton, Shepherd, and Franklin are medically vulnerable and thereby request their release through an emergency TRO.  However, the release of these inmates places an unreasonable risk on society.

---

[274] *Sanchez v. Brown*, 2020 WL 2615931 (N.D. Tex. 2020)
[275] *Id*.

As outlined above, Belton plead guilty to felony theft, Franklin plead guilty to sexual battery, and Shepherd is being detained on charges related to domestic violence, sexual assault, and false imprisonment. None of these crimes are victimless. Further, the information before the Court today is incomplete. Prior convictions for these three inmates are unknown. Therefore, the release of these three individuals risks the safety of their known victims as well as potential victims throughout society.

Plaintiffs claim that the release of the medically vulnerable will reduce the jail population and conserve resources. As mentioned *supra*, when the pandemic first reached Louisiana, officials from various agencies reviewed the charges of all detainees housed in the EBRPP. Based on their review, they compassionately released numerous amounts of detainees from the jail. Therefore, the jail population was already reduced and resources conserved. To date, the jail has proven to be in control of COVID-19 risks without endangering society. Plaintiffs have not shown that the mass release of medically vulnerable inmates outweighs the substantial threat to public safety.

### G.    Plaintiffs' sworn plans upon release fail to resolve their fears.

Belton, Shepherd, and Franklin all claim to fear the potential deadly effects of contracting COVID-19. However, their plans upon release would continue to expose them to the virus. Belton claims that upon release he would "check into a rehabilitative care facility" because one treated his sister and she recovered.[276] It is unclear why he intends to go to a facility considering he has also fully recovered from COVID-19. His plan to leave the jail and go to a medical facility does not address his fears of reinfection because healthcare workers have a high chance of exposure. He also does not claim that he intends to quarantine or isolate for any amount of time after release.

Franklin claims he intends to resume work at a restaurant where he was a kitchen

---

[276] Rec. Doc. 5-14 Declaration of Clifton Belton

supervisor.[277]   In this role, it would likely be impossible to socially distance and his exposure would likely not be lessened.

Shepherd intends to "stay away from people who are sick."[278]   He does not claim that he intends to quarantine, isolate, or socially distance himself from asymptomatic individuals.   His plan only includes a marginal effort to avoid obviously symptomatic people.

Belton, Franklin, and Shepherd's release plans do not promote the likelihood that their fears of re-contracting the virus will be alleviated.

### H.    This Court does not have the Authority to Order the Immediate Release of Medically vulnerable Sub Class members.

#### 1.    Prison Litigation Reform Act ("PRLA") precludes Plaintiffs' claims.

Rule 65 allows a court to issue and preliminary injunction or temporary restraining order. Rule 65(e) specifically states that Rule 65 does not modify the requirements of PRLA (28 U.S.C § 2284), which relates to actions that must be heard and decided by a three-judge district court.[279] As the Supreme Court explained in *Brown v. Plata*, "[t]he authority to order release of prisoners . . . is a power reserved to a three-judge district court, not a single-judge district court.[280] Most importantly, the PLRA significantly limits the issuance of preliminary and permanent injunctive relief for "civil action[s] with respect to prison conditions" like this one.[281] The PRLA has a specific procedure that **must** be followed:[282]

> *Step #1:* The presiding federal judge must: (1) issue an order for "less intrusive relief"; (2) give the defendant a "reasonable amount of time to

---

[277] Rec. Doc. 5-6 Declaration of Cedrick Franklin
[278] Rec Doc. 5-7  Declaration of Willie Shepherd
[279] 18 U.S.C. § 3626(a)(3)(B).
[280] 563 U.S. 493, 500 (2011) (citing 18 U.S.C. § 3626(a)); *see also id.* at 511 ("By its terms, the PLRA restricts the circumstances in which a court may enter an order 'that has the purpose or effect of reducing or limiting the prison population.'") (quoting 18 U.S.C. § 3626(g)(4)).
[281] *See* 18 U.S.C. § 3626; *id.* at § 3626(g)(2) (defining "civil action with respect to prison conditions" to mean "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison"); *see also Nelson* v. *Campbell*, 541 U.S. 637, 650 (2004).
[282] 18 U.S.C. § 3626 (emphasis added).

comply with the . . . order[]"; and (3) find that this order "failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order."[283]

*Step #2*: Once step #1 is met, either the party requesting relief, or the presiding judge can request the convening of a three-judge court to determine whether a prisoner release order should be entered.[284]

*Step #3:* The three-judge court then determines whether a prisoner release order should be entered, based on clear and convincing evidence that "(1) crowding is the primary cause of the violation of a Federal right, and (2) no other relief will remedy the violation of the Federal right."[285]

It is abundantly clear that the PLRA restricts a court's ability to issue a prisoner release order, and habeas cannot used in this proceeding.[286] Plaintiffs' motion for injunctive relief seeks the "release of Medically Vulnerable Subclass members."[287] The request for release is in violation of all the mandatory elements in 18 U.S.C. § 3626. Further, as discussed above, only a three-judge court can award such relief under the PLRA's clear language and binding Supreme Court precedent. Accordingly, because none of the requirements of the PRLA have been met, this Court has no authority to release the Plaintiffs. Therefore, they cannot show a likelihood to succeed on the merits and their temporary restraining order should be denied.

### 2.    This Court lacks Jurisdiction over Plaintiff's request for Habeas relief.

The Supreme Court has established that habeas is not available to review questions unrelated to the cause of detention.[288] Habeas cannot be properly used for any other purpose than relief from unlawful imprisonment or custody.[289] Plaintiffs have not alleged any legitimate reasons

---

[283] *Id* at § 3626(a)(3)(A).
[284] *Id* at § 3626(a)(3)(C)–(D).
[285] *Id* at § 3626(a)(3)(E).
[286] The PLRA broadly defines a "prisoner release order" to cover "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." *Id.* at § 3626(g)(4).
[287] Rec. Doc. 5-3, page 54.
[288] *Pierre v. U.S.*, 525 F. 2d 933, 935 (5th Cir. 1976). *See also Sanchez v. Brown*, 2020 WL 2615931, at 12 (Tx. N.D. 5/22/2020).
[289] *Id.*

for unlawful imprisonment. The Supreme Court even stated that an inmate is not entitled to relief in an habeas corpus petition from a civil rights claim related to his conditions of confinement.[290] Even so, were this Court to consider such relief, Plaintiffs have failed to exhaust available remedies, a requirement prior to seeking the writ.[291] Finally, such relief is not appropriate for a class of Plaintiffs when the court is not given the opportunity to review the individual circumstances of each Plaintiff's underlying criminal proceedings, much less hear from the victims of the Plaintiffs crimes.[292] Such a review of a release would also require input from the judges and prosecutors who are familiar with the Plaintiffs criminal case, including the Plaintiffs criminal defense attorney.[293]

### 3.    Younger Abstention precludes Plaintiffs' claims

Plaintiffs have admitted that they are seeking "relief from unlawful imprisonment or custody."[294] This is obviously misplaced and continues their show of unlikelihood of success on the merits.

Federal Courts have a "virtually unflagging obligation" to exercise jurisdiction granted to them.[295] Certain doctrines, however, require abstention in "extraordinary circumstances."[296] Such is the case here and in accordance with the Supreme Court decision of *Younger v Harris*.[297]

In *Younger*, the Supreme Court reversed a district federal court that enjoined a state district attorney, Younger, from prosecuting Harris under the California Criminal Syndicalism Act, which Harris claimed violated his constitutional rights. The Supreme Court in *Younger* found that the

---

[290] *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). *See also Sanchez v. Brown*, 2020 WL 2615931, at 12 (Tx. N.D. 5/22/2020).
[291] *See also Sanchez v. Brown*, 2020 WL 2615931, at 12 (Tx. N.D. 5/22/2020).
[292] *Id.*
[293] *Id.*
[294] Rec. Doc. 5-3, page 52
[295] *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) quoting *Colorado River Water Conservation Dist. V. United States*, 424 U.S. 800, 813,817 (1976).
[296] *Deakins* at 203.
[297] 401 U.S. 37 (1971).

injunction ran afoul of a national policy forbidding federal courts from staying or enjoining pending state court proceedings except under special circumstances.[298] In *Younger* the Supreme Court recognized the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the states and their intuitions are left free to perform their separate functions in their separate ways. Central to *Younger* is the recognition that ours is a system in which "the National Government, anxious though it may be to vindicate and protect federal rights and federal interest, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the states."[299]

In determining whether *Younger* applies, the courts apply a three (3) factor test derived from *Middlesex County Ethics Commission v. Garden State Bar Association*.[300] The *Middlesex* factors are: "(1) the dispute must involve an "ongoing state judicial proceeding, (2) an important state interest in the subject matter of the proceeding must be implicated, and (3) the state proceeding must afford an adequate opportunity to raise constitutional challenges."[301] "When these requirements are met the federal district court has no choice but to dismiss the federal action; it may not abstain, nor may it stay the federal action pending resolution of the state proceedings."[302] The *Younger* abstention after a review of the *Middlesex* factors is appropriate in the matter at hand.

### i.    Middlesex factor (1) the dispute must involve an ongoing state judicial proceeding:

Plaintiffs are specifically seeking and asking the federal court to intervene in state court

---

[298] *Id* at 39 – 41.
[299] *See Huffman v. Pursue, Ltd*. 420 U.S. 592, 601 (1975) (quoting *Younger*, 401 U.S. at 43-45).
[300] 457 U.S. 423, 432 (1982).
[301] *Texas Ass'n of Business v. Earle*, 388 F.3fd 515, 519 (5th Cir. 2004) citing *Wightman v. Tex. Supreme Ct.* 84 F3d 188, 189 (5th Cir. 1996).
[302] *Nall v. Stringer*, 4 F.3d 989, 1993 WL 360771 at 3 (5th Cir. 1993).

criminal proceedings.[303] Plaintiffs are "challenging the very *fact* of their confinement."[304]

Plaintiffs make it very clear, multiple times they are asking the Federal Court to enjoin an ongoing criminal state proceeding. The further even clarify, "By this motion, Medically Vulnerable Subclass members are not seeking judicial intervention in order to alleviate harsh conditions…"[305] In their state criminal proceedings all but one plaintiff has yet to be sentenced. In fact, the majority of them are in the status conference or motion stage. The one plaintiff that was sentenced on April 6, 2020, was then notified that he was being held from violating his probation from an earlier charge. He voluntarily waived his hearing before the Probation and Parole Board for the Parole Revocation Hearing and admitted he was in violation of his conditions from the previous probation conditions imposed from this State. Therefore, from their pleadings and the status of the criminal court cases, Plaintiffs are directly asking this Court to interfere with state court proceedings, which this Court, pursuant to *Younger* should abstain.

### ii.    Middlesex factor (2) an important state interest in the subject matter of the proceeding must be implicated:

Plaintiffs request that the federal court intercede and invade the province of the state district court criminal judge and insert itself into the state court proceeding. The State of Louisiana has a clear and significantly strong interest to enforce its criminal laws. Municipalities, states, and the federal government each have their own criminal codes, defining types of conduct that constitute crimes. Comity requires that the prosecution of the criminal proceeding, and the associated orders and judgments that may be issued by the state court in connection with that prosecution be left to the state court, and the federal court should abstain from the matter.

---

[303] Rec. <u>Doc. 5-3</u>, page 52.
[304] *Id.* (emphasis in original)
[305] *Id.*

### iii.     Middlesex factor (3), the state proceeding must afford an adequate opportunity to raise constitutional challenges:

Plaintiffs are afforded the same rights as every other criminal defendant that appears before a state court. They can seek modifications or appeal orders and judgments to a higher state court. State district court judges, state appellate court judges, and even the Louisiana Supreme Court Justices are capable of holding hearings, receiving or requesting evidence, and hearing arguments to vindicate litigant's constitutional rights. Plaintiffs are afforded an adequate opportunity to raise complex constitutional challenges and obtain relief in the state court proceedings. The Supreme Court echoed this in *O'Sullivan v. Boerckel* where they said, "Comity thus dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief."[306] The three medically vulnerable inmates that are designated in Plaintiffs' subclass are Clifton Belton, Jr., Cedric Franklin, and Willie Shepard.

Clifton Belton is a post-conviction inmate. He was booked into East Baton Rouge Parish Prison on December 9, 2018 for retail theft under La. R.S. 14:67, Resisting and officer La. R.S. 14:108, and 3 fugitive from justice charges; (1) Fugitive from justice BRPD file # 26611, (2) Fugitive from justice West Baton Rouge file #26611, and (3) Fugitive from justice from Livingston file #26611.[307] In the Nineteenth Judicial District ("19th JDC"), before Judge Johnson, he plead guilty to one count of La. R.S. 14:67 Felony Theft in Docket #07-18-0435 on September 25, 2019.[308] He agreed to  a sentence to of four years at hard labor to run concurrently with any and all other time.  This case was set for sentencing on April 15, 2020, and, at defense counsel's request, it was reset to July 20, 2020 while Mr. Belton resolves his pending cases in other parishes.

---

[306] *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999), *citing Rose v. Lundy*, 455 U.S. 509, 515-516, (1982); *Darr v. Burford*, 339 U.S. 200, 204, (1950).
[307] *See* Exhibit 9.
[308] *See* Exhibit 10.

In West Baton Rouge Parish, he has charges of: (1) La. R.S. 14:67, Felony Theft;[309] (2) La. R.S. 14:67, Misdemeanor Theft;[310] and (3) La. R.S. 14:68, Simple Robbery.[311] His next court date is June 22, 2020.[312] In Livingston Parish, he has an outstanding affidavit warrant for simple burglary, which he has not yet been booked.[313] He also is facing charges in Ascension Parish on La. R.S. 14:27 / La. R.S. 14: 67, Attempted Felony Theft.[314] His next court date is July 21, 2020.[315] Therefore, it is apparent that Mr. Belton has ongoing state court proceedings to which he is afforded adequate opportunity to raise a constitutional challenge, such as his confinement.

Cedric Franklin is a post-conviction inmate. He was booked into East Baton Rouge Parish jail on with violations of La. R.S. 14:43 misdemeanor sexual battery and La R.S. 40:966(C)(2) & (C)(23) felony possession of ecstasy.[316] He was arrested and was booked into the East Baton Rouge Parish Prison on January 6, 2020.[317]  Before Judge Trudy White, in the 19th JDC, he plead guilty under Docket #07-17-0073 to the amended charge of misdemeanor sexual battery January 6, 2020.[318] He was sentenced to 6 months at parish prison.[319] On that same day and before Judge Trudy White, he plead guilty to possession of a schedule 1 controlled substance, specifically Ecstasy, under Docket #03-17-0501.[320] He was sentenced to 2 years at EBPRR in with the sentences running concurrently.[321] Mr. Franklin is scheduled for release on January 2, 2021.[322] Therefore, it is apparent that Mr. Franklin has an ongoing state court proceedings to which he is

---

[309] *See* Exhibit 11.
[310] *See* Exhibit 12.
[311] *See* Exhibit 13.
[312] *See* Exhibit 11.
[313] *See* Exhibit 9.
[314] *See* Exhibit 14.
[315] *See* Exhibit 15.
[316] *See* Exhibit 16.
[317] *Id.*
[318] *See* Exhibit 17.
[319] *Id.*
[320] *See* Exhibit 18.
[321] *Id.*
[322] *See* Exhibit 17.

afforded adequate opportunity to raise a constitutional challenge, such as his confinement.

Willie Shepherd is a pretrial detainee. He was booked into East Baton Rouge Parish Prison on February 26, 2020 on the following charges; La. R.S. 14:35.3, Domestic Abuse Battery, two counts of La. R.S. 14:43.1, Sexual Battery, La. R.S. 14:38, Simple Assault 14:38, La. R.S. 14:46, False Imprisonment, and La. R.S. 14:133.2, Misrepresentation During Booking.[323] His Bill of Information on Docket #20-01854 – La. R.S. 14:108, Resisting an Officer, was filed April 22, 2020.[324] His Bills of Information for Dockets #20-01855, La. R.S. 14:35.3, Domestic Abuse Battery, La. R.S. 14:46, False Imprisonment, and La. R.S. 14:133.2, Misrepresentation During Booking;[325] and Docket #20-01856, two counts of La. R.S. 14:43.1, Sexual Battery, were filed on May 14, 2020.[326] Currently, he is scheduled for a status conference on all three of his open dockets on June 24, 2020.[327] On March 4, 2020, his bond was set at $15,000 plus abiding by terms of a protective order and residing with his mother. He was rearrested and booked into EBRPP on March 7, 2020 on the charge of La. R.S. 14:108, Resisting an Officer.[328] Therefore, it is apparent that Mr. Shepherd has an ongoing state court proceedings to which he is afforded adequate opportunity to raise a constitutional challenge, such as his confinement.

It should be noted that it is not pled or alleged that any of the Plaintiffs', subclass or not, have attempted to remedy their confinement, as required in *Middlesex* and *O'Sullivan*, therefore affirming that this Honorable Court should abstain from inserting itself in state court proceedings.

Based upon the foregoing, this Honorable Court should deny Plaintiffs' Motion for Temporary Restraining Order pursuant to the *Younger* Abstention Doctrine. This is a clear case in

---

[323] *See* Exhibit 19.
[324] *See* Exhibit 20.
[325] *See* Exhibit 21.
[326] *See* Exhibit 22.
[327] *See* Exhibits 23, 24, 25
[328] *See* Exhibit 19 page 1.

which all three of the *Middlesex* factors are met, as discussed above, and the federal court should not interfere in the state court's authority to enforce its laws in its own courts.

## I.      The Sheriff is not the proper party to release inmates.

Here, the Sheriff does not have the ability to release prisoners. In fact, he can only release a prisoner once the proper State authority orders us too.[329] According to the Louisiana Constitution, "He shall be the chief law enforcement officer in the parish, except as otherwise provided by this constitution, and shall execute court orders and process."[330]  The Sheriff's duty is simply to "be the keeper of the public jail of his parish, and shall by all lawful means preserve the peace and apprehend all disturbers thereof, and other public offenders."[331] He is to supply each prisoner with food and clothing.[332] The Sheriff can transfer prisoners between parishes, and is bound to keep the prisoner safe subject to orders and decrees from the issuing parish.[333] None of the enumerated statutes outlining the duties of the Sheriff grant him the authority to release prisoners. Legislative intent is clear because they later enumerate the Secretary of Louisiana Department of Corrections does have the power to temporary release of **any** inmate.[334] The Legislature even specifically enumerates the only time when the Sheriff can release inmates.[335] It pertains to overcrowding and a declaration of emergency must be made by the Sheriff.[336] That is not present here. Plaintiffs even note that the jail is not overcrowded.[337] They allege EBRPP currently has 1,200 detainees but is designed to hold nearly 1,600.[338] Further, the Sheriff has not made any type of declaration as it relates to overcrowding or otherwise, nor is it alleged that he has done such.

---

[329] *See* La. Const. Art. V, § 27.
[330] *Id.*
[331] La. R.S. 15:704.
[332] La. R.S. 15:705
[333] La. R.S. 15:706
[334] La. R.S. 15:833.2 (emphasis added).
[335] La. R.S. 15:764
[336] *Id* at (A).
[337] Rec. Roc. 5-3, page 13 and 18.
[338] *Id.*

Further, "inmates shall not be released from the institution until **legal authority** and positive identification have been verified."[339] It is well established that "the words "until released according to the law" in warrants of arrest require sheriff to hold person arrested until he is released in method that the law provides, and right to determine that question rests with the District Attorney, but if prisoner furnishes bail, has served his sentence, is acquitted, the District Attorney enters a nolle prosequi or orders his release because of decision not to prosecute, the prisoner should be released."[340] In fact, it is specifically enumerated that "Subject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute."[341] It is well established that the Sheriff also does not have the ability the fix bail or modify it. In fact, the Legislature listed those that do have the authority, "(1) District courts and their commissioners having criminal jurisdiction, in all cases. (2) City or parish courts and municipal and traffic courts of New Orleans having criminal jurisdiction, in cases not capital. (3) Mayor's courts and traffic courts in criminal cases within their trial jurisdiction. (4) Juvenile and family courts in criminal cases within their trial jurisdiction. (5) Justices of the peace in cases not capital or necessarily punishable at hard labor."[342] They further went on to clarify that "an order fixing bail may issue on request of the state or defendant, or on the initiative of the magistrate."[343]

Based on the foregoing it is plain to see the Sheriff is simply the keeper of the jail. He does not decide who to prosecute or how. He does not decide how to apply bond, what bail should be set at, set conditions of release, or retain the ability to issue an order to release an inmate.

---

[339] La. Admin Code tit. 22, Part III, § 3315 (emphasis added).
[340] Op. Atty. Gen. 1936-38, p. 149.
[341] La. Code of Crim. P. art. 61.
[342] La. Code of Crim. P. art. 314(A).
[343] *Id* at (B).

J.    **Plaintiffs' request for the release of medically vulnerable inmates violates the PRLA's requirement that any award of preliminary relief be narrowly drawn.**

Plaintiffs assert that the only remedy to protect medically vulnerable inmates is to order their release from the jail.  This argument runs afoul of the PRLA's requirement that any award of preliminary relief be narrowly drawn. The PRLA also states that any award of preliminary or prospective relief must: (1) be narrowly drawn; (2) extend no further than necessary to correct the violation of the Federal right; and (3) be the least intrusive means necessary to correct the violation of the Federal right.[344] Further, before awarding such relief, the court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."[345] This was even recognized in *Valentine v. Collier* a recently decided by the Fifth Circuit Court of Appeals, during and pertaining to the application of the PRLA during the COVID-19 pandemic. They reiterated that "the PRLA mandates that '[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.'"[346]

K.    **Federal District Courts Have Denied Similar Requests for Protective Orders Seeking Release of Prisoners for Covid Concerns**

Federal District Courts across the country have denied similar requests by inmate Plaintiffs seeking Temporary Restraining Orders or Preliminary Injunctions for the release of inmates to home confinement and/or to be put on medical furlough due to Covid 19 concerns.

In *Money v. J.B. Pritzer*, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020), ten state prison inmates brought a purported class action lawsuit seeking the release of inmates from Illinois Department of Corrections (IDOC) facilities arising from the COVID-19 pandemic, asserting claims under the Eighth Amendment and violation of inmates' right to due process under the

---

[344] 18 U.S.C. § 3626(a)(1)–(a)(2).
[345] *Id. See also Valentine v. Collier*, 956 F. 3d 797, 806 (5th Cir. 4/22/2020).
[346] *Valentine v. Collier*, 956 F. 3d 797, 806 (5th Cir. 4/22/2020), *citing* 18 U.S.C. §3626(a)(2).

Fourteenth Amendment, both pursuant to § 1983, asking the court to preliminarily certify inmates'

proposed subclasses and order Defendants to transfer members of subclasses to their homes to

self-isolate via a temporary medical furlough. The *Money* Court denied Plaintiff's Request for

Injunctive Release for the following reasons.

In determining the applicable law for such requests, the Court held that the PLRA[347]

applied because Plaintiffs' claims seeking an order to "release or relocate" inmates on account of

the COVID-19 pandemic implicates every aspect of the PLRA's remedial scheme.  Having ruled

it applicable, the Court then held that the PLRA "prevents" the Court from granting release of

inmates based on prison conditions and COVID-19, stating:

> PLRA prevents this Court from granting the temporary restraining order on the
> Section 1983 claim, for a number of reasons. First, the statute provides that "no
> court shall enter a prisoner release order unless * * * a court has previously entered
> an order for less intrusive relief that has failed to remedy the deprivation of the
> Federal right," and the defendants have "had a reasonable amount of time to comply
> with the previous court orders." 18 U.S.C. § 3626(a)(3)(A)(i), (ii). Here, there is no
> such "previous court order[ ]." *Id.* Second, the statute provides that "only" a "three-
> judge court" can enter a prisoner release order. 18 U.S.C. § 3626(a)(3)(B). So, this
> Court, standing alone, lacks the authority to issue any order that has the "purpose
> or effect of reducing or limiting the prison population." *Id.*; 18 U.S.C. § 3626(g)(4).
> Third, the statute provides that "[p]reliminary injunctive relief must be narrowly
> drawn, extend no further than necessary to correct the harm the court finds requires
> preliminary relief, and be the least intrusive means necessary to correct that harm."
> 18 U.S.C. § 3626(a)(2).[348]

Although the applicability of the PRLA alone requires denial of Plaintiffs' request

---

[347] The Prison Litigation Reform Act ("PLRA") imposes additional restrictions on a court's ability to grant injunctive relief. Any such "[1] relief must be narrowly drawn, [2] extend no further than necessary to correct the harm the court finds requires preliminary relief, and [3] be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2). The PLRA requires that courts "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity[.]" Id. Preliminary relief relating to prison conditions "shall automatically expire on the date that is 90 days after its entry, unless the court makes findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.".

[348] *Id.* at 14 citing *Plata v. Newsom*, —— F. Supp. 3d ——, ——, 2020 WL 1908776, at * 1 (N.D. Cal. Apr. 17, 2020) (similar). See 18 U.S.C. § 3626(a)(3)(A) (stating PLRA applies to "any civil action in federal court with respect to prison conditions"); *Nettles v. Grounds*, 830 F.3d 922, 934 (9th Cir. 2016) (stating prisoner must comply with PLRA if claim challenges any "aspect of prison life" other than "fact or duration of the conviction or sentence").

for injunctive relieve, the *Money* Court continued its analysis stating that even if it is incorrect in its applicability of the PRLA to the instant case, there are still major hurdles to overcome with regard to class certification, such as, the public interest—which must be taken into account when considering a TRO or preliminary injunction—which mandates *individualized consideration* (which is problematic for the commonality requirement of certification) of any inmate's suitability for release and the appropriate conditions for the safety of the inmate, the inmate's family, and the public at large. The Court explained such conditions as follows:

> From the family perspective, an inmate who has been exposed to someone (inmate or IDOC personnel) who has tested positive may not be suitable for furlough, particularly if the inmate's proposed destination is a residence already occupied by someone equally or more vulnerable. And from the public's perspective, it is important to bear in mind that some portion of the incarcerated population has been convicted of the most serious crimes—murder, rape, domestic battery, and so on. Seven of the ten named Plaintiffs in fact are serving time for murder. As Plaintiffs rightly acknowledge, some release orders would be appropriate only with conditions, such as home detention or lesser forms of supervision. And those conditions can only be imposed with resources (e.g., electronic monitors) and personnel, who are both limited in supply and also subject to the same social distancing imperatives as everyone else.

> *The imperative of individualized determinations, recognized by both sides in this case, makes this case inappropriate for class treatment.*[349] Each putative class member comes with a unique situation—different crimes, sentences, outdates, disciplinary histories, age, medical history, places of incarceration, proximity to infected inmates, availability of a home landing spot, likelihood of transmitting the virus to someone at home detention, likelihood of violation or recidivism, and danger to the community.

The Court then underlines additional problems that Plaintiff's Request for Injunctive relief raises with regard to potential separation of powers issues, stating:

> Plaintiffs' motion also raises serious concerns under core principles of federalism and the separation of powers, especially given their request for sweeping relief in the form of a mandatory injunction. See *Missouri v. Jenkins*, <u>495 U.S. 33, 51</u>, <u>110 S.Ct. 1651</u>, <u>109 L.Ed.2d 31</u> (1990).

---

[349] *Id*. at 15.

There are serious separation of powers concerns, too, because running and overseeing prisons is traditionally the province of the executive and legislative branches. See *Turner*, 482 U.S. at 84-85, 107 S.Ct. 2254 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint."). The judiciary is ill-equipped to manage decisions about how best to manage any inmate population—let alone a statewide population of tens of thousands of people scattered across more than a dozen facilities. And the concern about institutional competence is especially great where, as here, there is an ongoing, fast-moving public health emergency.

Lastly, in spite of the above legal bases for denial of Plaintiff's Request for Injunctive Relief as a matter of law, in the interest of completeness, the Court addressed the merits of Plaintiff's Request for Injunctive Relief and found that under the "deliberated indifference" standard, Plaintiffs have no chance of success on the merits given that Defendants have come forward with a lengthy list of the actions they have taken to protect the inmates. Turning to the remaining factors of injunctive relief, the Court reasoned as follows:

The final factor in the "second stage," the public interest, also cuts both ways. As Plaintiffs stress, the public interest surely is served by avoiding widespread outbreaks of COVID-19 infection, and prison environments present a heightened risk of such outbreaks occurring, as evidenced at Stateville and the Cook County Jail. These are good reasons for Defendants to work hard to reduce the prison population, and especially to remove the highest-risk inmates, either though outright release or transfer to some other location while still in custody, provided that doing so is consistent with the public interest. But every release order carries with it some risk to the rest of the community. Has the inmate been exposed to the virus while in custody? Does another vulnerable person—perhaps an 80-year old mother with emphysema—live at the residence where the inmate will be released? Does the inmate have a history of mental instability or domestic violence? Are there adequate safeguards—monitoring or supervision—for releasees who are both vulnerable and dangerous? How does the increased activity associated with release orders in the quantities sought by Plaintiffs comport with the mandate for social distancing? Finally, as alluded to above, the public interest also commands respect for federalism and comity, which means that courts must approach the entire enterprise of federal judicial intrusion into the core activities of the state cautiously and with humility. This is not to say that intrusion would not justified if the state government sat silently during a pandemic; if that were the case, the Court would

be prepared to request sua sponte the formation of a three-judge court to take up Plaintiffs' complaint. But the absence of a plausible case on the merits and doubts about the balancing of the harms and public interest reinforce the decision to deny injunctive relief at this time.

Relying on the *Money, supra.*, the District Court of Oregon, in *Maney v. Brown*, 2020 WL 2839423 (D. Ore. June 1, 2020), similarly denied a Motion for Temporary Restraining Order and Preliminary Injunction, where Plaintiffs, seven adults in custody at four various Oregon Department of Corrections Institutions, asserted that Defendants' response to COVID-19 violated their Eighth Amendment right to reasonable protection from severe illness or death, and asked the Court to: (1) direct Defendants to "take every action within their power to reduce the risk of COVID-19" in all of ODOC's institutions; (2) require Defendants to "reduce prisoner population to levels" to enable social distancing; (3) appoint an expert to effectuate that reduction; (4) **provide safe and non-punitive separation housing for infected AICs (adults in custody) or those at risk of being infected with COVID-19**; and (5) comply with CDC and OHA guidance. Each of the *Maney* Plaintiffs claimed to have suffered from underlying medical conditions, ostensibly making them more vulnerable to the virus.

Defendants argued that the PLRA prohibited the Court from granting Plaintiffs' motion to the extent Plaintiffs were the Court to order the release the inmates to reduce the prison population. The Court agreed, stating:

> In civil actions concerning prison conditions, federal district courts cannot order the release of individuals in custody unless the "court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right" and "the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A)(i)-(ii). Furthermore, "[a] 'prisoner release order' may be issued only by a three-judge court." *Plata v. Newsom,* --- F. Supp. 3d ---, 2020 WL 1908776, at *10 (N.D. Cal. 2020) (citing § 3626(a)(3)(B)).[350]

---

[350] *Id.* at 12.

With regard to the injunction, the Court explained that The Court must evaluate the four factors outlined by the Supreme Court in *Winter* to determine if Plaintiffs have established the need for preliminary injunctive relief: (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) the balance of equities, and (4) the public interest. See *Winter*, 555 U.S. at 20. After review of the record, the Court held that as the record demonstrated that the correctional institution made a valiant effort to date to respond to the COVID-19 pandemic. Citing *Money*, 2020 WL 1820660, at *18 (finding that the "record simply does not support any suggestion that Defendants have turned the kind of blind eye and deaf ear to a known problem that would indicate 'total unconcern' for the inmates' welfare") (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). Thus, Plaintiffs were therefore unlikely to succeed in demonstrating that Defendants acted with deliberate indifference.

The Court also underscored that injunctive relief would cause issues with regard to separation of powers, stating:

> Any injunctive relief this Court could order would implicate important federalism and separation of powers concerns. See *Money*, 2020 WL 1820660, at *16-19 (explaining that "running and overseeing prisons is traditionally the province of the executive and legislative branches" and that "the public interest also commands respect for federalism and comity, which means that courts must approach the entire enterprise of federal judicial intrusion into the core activities of the state cautiously and with humility").

Thus, the Court denied Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

The Southern District Court of California similarly denied a Motion seeking a TRO for the release of the medically vulnerable pretrial and post-conviction detainee subclasses of inmates whom were medically vulnerable in *Alvarez v. Larose*, 2020 WL 2315807 (S.D. Cal. May 12, 2020), holding that the PLRA precludes the relief sought and therefore, Plaintiffs cannot satisfy the burden of showing that there is a likelihood of success on the merits as required for obtaining

injunctive relief. In *Alvarez*, the medically vulnerable Plaintiffs were defined as individuals of 45 years of age or older or who have medical conditions that the CDC has determined increase their likelihood of becoming severely ill from COVID-19. Plaintiffs alleged that the correctional facilities' failure to implement adequate measures to protect detainees amounted to unconstitutional punishment in violation of the Fifth Amendment and deliberate indifference to the detainees' rights under the Eighth Amendment.

The Court explained that in order to establish a showing of injunctive relief, the Plaintiffs must demonstrate " '[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.' " *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting Winter, 555 U.S. at 20, 129 S.Ct. 365).

In opposition to Plaintiff's request for injunctive relief, Defendants did not concede Plaintiffs' factual allegations but contended that Plaintiffs were not likely to succeed on the merits because the PLRA precludes this Court from issuing Plaintiffs' requested relief.[351] Thus, Plaintiffs could not satisfy the first requisite of injunctive relief.

Given that the Plaintiffs were challenging confinement conditions and requesting release, that Court reasoned that the substance of their claim and form of relief fell squarely within the purview of a "prisoner release order" under the PLRA. Thus, the Court held that because the Court may not grant the requested relief, Plaintiffs cannot establish a likelihood of success on the merits of their claim, stating:

> There is no dispute Plaintiffs are "prisoners" under the PLRA, and if subject to its provisions this Court may not order the release of Plaintiffs. For the reasons set forth below, the Court finds the PLRA applies to Plaintiffs' claims and divests the Court of authority to grant the requested relief. Accordingly, Plaintiffs' motion for temporary restraining order is denied.

---

[351] In light of Defendants' arguments under the PLRA, the Court deferred briefing on class certification.

While the Court made clear that injunctive relief fails on that basis alone, it nonetheless, briefly addressed the remaining three factors and found that even a strong showing of irreparable injury and the fact that there were 66 cases of COVID and the Plaintiffs' subclass members have a heightened risk of contraction COVID, injunctive relief cannot be granted absent a showing of a likelihood of success on the merits. Lastly, with regard to the remaining factors for injunctive relief, the Court held:

> Plaintiffs also do not satisfy the remaining two factors of injunctive relief. The Supreme Court has held that where the government is the party opposing an injunction, the balance of the equities and public interest injunctive relief factors tend to merge. See *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Here, the Court could not issue injunctive relief without unfairly intruding on Defendants' operation of the prison system and defying Congress's clear policy determinations regarding challenges to prison conditions and prisoner release orders. In addition, the public interest does not favor the immediate release of a class of inmates who may lack viable housing outside of OMDC and may be deprived of access to food, means of personal hygiene, and medical care if released, all at once, from the facility. Plaintiffs have failed to meet their burden of demonstrating the injunctive relief factors weigh in favor of granting a TRO.

> For these reasons, Plaintiffs' Motion for Temporary Restraining Order is denied.

In *Baxley v. Jividen*, 2020 WL 1802935 (S.D. W. Va. Apr. 8, 2020), Plaintiffs filed a Motion for a Preliminary Injunction on March 25, 2020, seeking two forms of injunctive relief. First, they moved for an order requiring Defendants to "develop, disclose, and implement a plan that undertakes all appropriate actions to protect Plaintiffs and others who are similarly situated," and second, they requested the Court order "WVDCR to release a sufficient number of inmates [to] reduce overcrowding and allow for appropriate social distancing within the jails and prisons to protect medically vulnerable inmates." The plaintiffs are divided into two putative classes: Class A, which included those inmates *with a discernable, treatable medical and/or mental health*

*problem,* and Class B, which included all others.[352]

Having determined that Plaintiffs would likely suffer irreparable harm absent a plan to mitigate the spread of COVID-19 in state prisons, the Court then considered whether Plaintiffs were likely to succeed on the merits of their deliberate indifference claims, and found this factor not met, stating:

> Deliberate indifference, in turn, "is a very high standard [and] a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). For a prisoner to state a claim for deliberate indifference to her medical needs under § 1983, she "must demonstrate (1) a deprivation of [her] rights by the defendant that is, objectively, sufficiently serious and (2) that the defendant's state of mind was one of deliberate indifference to inmate health or safety." *Carroll v. W. Va. Reg'l Jail & Corr. Facility Auth.*, No. 3:14-1702, 2015 WL 1395886, at *6 (S.D.W. Va. Mar. 25, 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (internal quotations omitted). Regarding the second prong in particular, a plaintiff must demonstrate that a defendant "actually knew of and disregarded a substantial risk of serious injury to the detainee." *Young v. City of Mount Rainer*, 238 F.3d 567, 575–76 (4th Cir. 2001). "The subjective component therefore sets a particularly high bar to recovery." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). It is this high bar that makes it unlikely that Plaintiffs could succeed on the merits of their claims.[353]

The Court further stated:

> Yet determinations regarding release and furlough must be made on a case-by-case basis, taking into account the seriousness of an inmate's underlying offense and the support network into which she will be discharged.

> it is impossible to conclude that Defendants have acted with the sort of deliberate indifference that could give rise to a constitutional violation under the Eighth and Fourteenth Amendments. As such, the Court finds that Plaintiffs have not demonstrated a substantial likelihood of success on the merits of their claims.

> Yet the Court is not free to ignore the steps Defendants have already taken to address the virus, which are comprehensive and based on best practices promulgated by a source Plaintiffs already appear to trust. These facts make it exceedingly unlikely that Plaintiffs could succeed on the merits of their claim that Defendants have acted with deliberate indifference toward inmates' medical needs in light of COVID-19.

---

[352] *Id.* at 1.
[353] *Id.* at 6.

         *             *            *

The Court will not "immerse [itself] in the management of state prisons" absent the most extraordinary circumstances. *Taylor*, 34 F.3d at 268.[354]

Plaintiffs' Motion was therefore denied.

**L.    This Court Recently Denied Injunctive Relief Due to Covid Concerns Under Analogous Circumstances**

In *Gumns v. Edwards*, 2020 WL 2510248 (M.D. La. May 15, 2020), the Court considered the Emergency Motion for Temporary Restraining Order Enjoining Defendants from Transferring COVID-19 Carriers to Louisiana State Penitentiary filed by fifteen inmate Plaintiffs, on behalf of themselves and all similarly situated individuals (collectively, "Plaintiffs"). The subject of Plaintiffs' motion was the COVID-19 response transfer plan developed by Defendants, by which COVID-19 positive inmates housed in state and parish jails and prisons would be transferred to Camp J, at Louisiana State Penitentiary at Angola ("LSP"), for isolation and medical monitoring.[355]

Plaintiffs purported to represent a class defined as: All prisoners and pretrial detainees who are, or will in the future be, subjected to the medical care policies and practices of the DOC, and subjected to the DOC's COVID-19 policies and practices. Plaintiffs proposed a declaratory and injunctive subclass of all incarcerated individuals who are, or will in the future be, subjected to the medical care policies and practices of the DOC, and subjected to the DOC's COVID-19 policies and practices ("Subclass I"). Plaintiffs also proposed a declaratory and injunctive subclass of all individuals being held in pre-trial detention who are, or will in the future be, subjected to the

---

[354] *Id.* at 8.
[355] While in the instant case Plaintiffs are seeking an Order from this Court to compel the release of certain inmates, as opposed to the *Gumn* Plaintiffs, who were seeking to *prevent* the release, the *Gumn* case is authoritative (or highly persuasive at the least)  in that it too involves a request for Judicial intrusion on how best to manage an inmate population, which is traditionally within the province of the executive and legislative branches. See *Money, supra.*

medical care policies and practices of the DOC, and subjected to the DOC's COVID-19 policies and practices ("Subclass II").

Plaintiffs sued Defendants pursuant to 42 U.S.C. § 1983, alleging that Defendants have violated the Eighth Amendment rights of Subclasses I & II in their deliberate indifference to the serious risk of harm posed by COVID-19, and violated the Fourteenth Amendment rights of Subclass II to reasonably safe living conditions. Defendants maintain that Plaintiffs' claims are not justiciable because Plaintiffs failed to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). Defendants further maintain that Plaintiffs have failed to meet the burden for the issuance of a TRO or preliminary injunction.[356]

Applying the PRLA, the Court noted that In the context of COVID-19 exigencies, the Fifth Circuit has recently made it clear that there is no emergency exception or "interest of justice" exception to the PLRA's exhaustion requirement. Of further significance, this Court then stated:

> In accordance with the Prison Litigation Reform Act ('PLRA'), preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm."[357]

Addressing general policy concerns with the Courts intrusion into the affairs of prison administration, this Court stated:

> Federal Courts eschew toward "minimum intrusion into the affairs of state prison administration; state prison officials enjoy wide discretion in the operation of state penal institutions." In a case challenging a state prison transfer policy, the Supreme Court warned against federal courts making decisions regarding "the day-to-day functioning of state prisons and involve[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges," noting that "[t]he federal courts do not sit to supervise state prisons, the administration of which is acute interest to the States."

> As this Court held in *Lavergne v. Cain*, "[w]hen weighing any form of injunctive relief, federal courts must be mindful not to jump at the chance to take prison

---

[356] *Id.* at 2.
[357] *Id.* at 3, citing *Hood v. Vessel*, 2013 WL 12121562, at *1 (M.D. La. May 14, 2013) (citing 18 U.S.C. § 3626(a)).

administration into their own hands and out of the hands of the people entrusted with such tasks by the state." Further, "[c]ourts have recognized that unwarranted intrusions by the courts can be disruptive to the prison administrators, who are often in the best position to operate the prison in a fashion that is best for the security of prisoners and outsiders alike."[358]

The Court then looked to the Fifth Circuit's recent decisions in *Valentine v. Collier* and *Marlowe v. LeBlanc*, which presented challenges to prison conditions in the context of the COVID-19 pandemic, to guide its analysis.[359] In the context of the request for injunctive relief, the Court explained that the question is whether Plaintiffs are substantially likely to succeed on their claims that the Defendants' plan to isolate COVID-19 positive inmates at Camp J violates the Plaintiffs' Eighth Amendment and Fourteenth Amendment rights. Finding that the Defendants' transfer plan was carefully developed to limit the impending harm of the spread of coronavirus throughout all prisons and jails in the state of Louisiana, it belied a claim of deliberate indifference. Similarly, this Court found that an injunction would raise serious potential risk of harm to the Defendants because "it would hamstring the DOC "from responding to the COVID-19 threat without a permission slip from the district court." For the same reasoning and analysis articulated by the Fifth Circuit in *Valentine, supra.*, the Court found that the second factor weighs in Defendants' favor. Plaintiffs have failed to demonstrate that the requested injunction will not cause irreparable harm to Defendants and potentially to inmates and pre-trial detainees throughout the State of Louisiana.

Thus, Plaintiffs' Request for Temporary Restraining Order was denied.

**M.    If the Court orders injunctive relief, significant security should be required.**

FRCP 65(c) provides "[t]he court may issue a preliminary injunction or a temporary

---

[358] *Id.* at 3-4.
[359] *Valentine v. Collier*, 2020 WL 1934431, 956 F.3d 797 (5th Cir. Apr. 22, 2020); *Marlowe v. LeBlanc*, ⸺ Fed. Appx. ⸺, 2020 WL 2043425 (5th Cir. Apr. 27, 2020). Marlowe involved an inmate's complaints about the prison's response to the COVID pandemic.

restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Sheriff has provided ample reasoning that an injunction should be denied. However, if the Court finds otherwise, EBRP may have significant costs to bear, which will ultimately be borne by the East Baton Rouge Parish taxpayers. While Plaintiffs cite to two cases advising this court that the courts in this circuit do not require security in cases brought by indigent or incarcerated people, neither of the cases are from courts of the Fifth Circuit and are thus, not authoritative on the issue. Rather, the Fifth Circuit has determined that the security requirement serves two functions: (1) it assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency of the assured, and (2) it provides the plaintiff with notice of the maximum extent of its potential liability, since the amount of the bond "is the limit of the damages the defendant can obtain for a wrongful injunction, … provided the plaintiff was acting in good faith."[360] Courts have waived such a requirement when they have found that Plaintiff was financially responsible.[361]  The Sheriff has provided above significant grounds against being enjoined, and the Plaintiffs have not made any showing that they are financially responsible, thus, a security bond is necessary in this proceeding. Sheriff defendants urge this court to order the Plaintiffs to provide security within its discretion.

Sheriff defendants have incurred significant costs and attorneys fees to date, related to the subject proceedings pending the temporary restraining order and should thus be entitled to damages should they be wrongfully enjoined. Nonetheless, should the Plaintiffs request for a TRO be granted, additional security would account for a wide range or potential costs such as: hiring of

---

[360] *Continuum Co, Inc. v. Incepts, Inc.*, 873 F.2d 801, at 803 (U.S. 5th Cir. 1989).
[361] *Id.*

additional resources for cleaning all areas of the EBRP, having additional deputies within in the jail to enforce social distancing measures (thereby reducing the law enforcement presence in the community when deputies are already in strain due to the national climate on racism), purchase of additional PPE and sanitizing supplies (which is already exorbitant on primary or secondary markets), locating and paying alternate locations to house inmates including transportation and meal service to such facilities (if the court orders a reduction in inmate numbers in the EBRP, as the EBRSO cannot lawfully release inmates from custody), and defending potential lawsuits based on excessive force, prison conditions, or other claims and on sanctions for violating victim rights, caused by compliance with this Courts order. Such measures could easily cost a minimum of $500,000 to the EBRSO.

Granting injunctive relief without security would be analogous to the release of an inmate without posting bond, the likes of which will never be seen. For all these reasons, if the Court grants injunctive relief despite the significant arguments, authorities, exhibits, and explanation of the Sheriff and EBRSO personnel, the Court should require Plaintiffs to post a security interest of at least $500,000.

## V.        CONCLUSION

For all of the foregoing reasons, Sheriff Defendants respectfully request that this Court deny Plaintiffs' Motion for Temporary Restraining Order and dismiss the suit as premature because Plaintiffs failed to exhaust administrative remedies prior to filing suit.

Respectfully submitted:

**ERLINGSON BANKS, PLLC**

*s/Catherine S. St. Pierre*
MARY G. ERLINGSON (#19562)
CATHERINE S. ST. PIERRE (#18419)
RACHEL M. ABADIE (#34413)
One American Place

301 Main Street, Suite 2110
Baton Rouge, Louisiana 70801
Telephone: (225) 218-4446
Facsimile: (225) 246-2876
cstpierre@erlingsonbanks.com
*Counsel for Sheriff Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of June, 2020, a true and correct copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent by operation of the court's electronic filing system and/or via U.S. Postal Service to counsel of record.

Baton Rouge, Louisiana, this 5th day of June, 2020.

*s/Catherine S. St Pierre*
Catherine S. St. Pierre