# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CLIFTON BELTON, JR., JERRY BRADLEY, CEDRIC FRANKLIN, CHRISTOPHER ROGERS, JOSEPH WILLIAMS, WILLIE SHEPHERD, DEVONTE STEWART, CEDRIC SPEARS, DEMOND HARRIS, and FORREST HARDY, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 3:20-cv-000278-BAJ-SDJ |
| v. | |
| SHERIFF SID GAUTREAUX, in his official capacity as Sheriff of East Baton Rouge; LT. COL. DENNIS GRIMES, in his official capacity as Warden of the East Baton Rouge Parish Prison; CITY OF BATON ROUGE/PARISH OF EAST BATON ROUGE, | |
| Defendants. | |

## PETITIONERS' REPLY TO RESPONDENTS' OPPOSITIONS TO EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

### SUPPLEMENTAL FACTUAL BACKGROUND

As described in the more than twenty sworn declarations of people detained at the Jail, Respondents have failed to protect Petitioners during the COVID-19 pandemic and are incapable of implementing the social distancing necessary to prevent another COVID-19 outbreak. In an effort to demonstrate compliance with the CDC's COVID-19 guidance for carceral facilities, Respondents rely primarily on the existence of their own COVID-19 policies that purportedly govern the staff's conduct at the Jail and the sworn declaration of Warden Grimes. *R. Doc. 35-7*

(Grimes Decl. ¶ 27) (hereinafter "Grimes Decl.").[1]  But the question of whether Respondents, in practice, adhere to any given policy is unanswered by the mere existence of written policies, and Warden Grimes offers no evidence showing he has spent any significant time in the Jail observing the actions of his staff to ensure actual compliance with such policies.

In detailed contrast, Petitioners timely filed an *additional* 13 sworn declarations by putative class members in support of their motion for temporary restraining order.  *R. Doc. 39* (Notice of Filing of Declarations).  This testimony corroborates the existing record regarding the inability to social distance, medical neglect (particularly to those with known medical vulnerabilities), retaliation towards those seeking medical care, punitive use of solitary confinement as a form of medical quarantine, failure to provide adequate information about COVID-19, and failure to provide adequate supplies of hygiene products, sanitation products, and personal protective equipment at the Jail.  Based on his inspection of the jail and his review of the declarations, Dr. Fred Rottnek confirms these deficiencies and opines that the immediate release of the medically vulnerable is critical.  *See* Ex. 1, Rottnek Suppl. Decl. ¶¶ 30-31.

Collectively, twenty-three people detained throughout numerous housing units in the Jail in an overlapping and condensed time period speak with one voice about their experiences and make the record clear.  Medically vulnerable Petitioners are at a particularly grave and ongoing risk of severe illness and death from COVID-19 in the Jail.  Respondents are aware of this substantial risk of serious harm which has not been—and cannot be—sufficiently mitigated by Respondents' actions.[2]

---

[1] Both sets of Respondents refer to the same declaration from Warden Grimes throughout their briefs, and Petitioners cite this declaration as evidence of the practices of both sets of Respondents.

[2] Rottnek Suppl. Decl. ¶¶ 2, 11-19, 22-24.

I.    **RESPONDENTS' REFUSAL TO TEST DETAINEES FOR COVID-19 REVEALS THE DEFICIENCY IN THEIR DATA AND DEMONSTRATES THEIR FAILURE TO MEASURE THE PANDEMIC'S SPREAD**

Respondents' assertion concerning their "successful" handling of the COVID-19 pandemic is belied by their own actions.  Respondents first claim that the "number of positive cases of COVID-19 have consistently gone down since May 4, 2020," and that "[t]he number of new infections in the jail has not increased since May 12, 2020," Grimes Decl. ¶¶ 57, 60.  But Respondents fail to account for their practice of *refusing* to test symptomatic detainees, a fact well documented by Petitioners' evidentiary record, *see infra*.  The effect of Respondents' practice is to deliberate ignore the risk posed to the medically vulnerable by presymptomatic, asymptomatic, and mildly symptomatic people from whom medically vulnerable people cannot social distance. *Cf. R. Doc. 42-4 at 8* (admitting they do not test asymptomatic or presymptomatic detainees). Accordingly, a single a-contextual data point does not and cannot accurately reflect the number of positive COVID-19 cases in the Jail; Respondents' failure to adequately measure and track the spread of COVID-19 inside the Jail is itself an indication of neglect and deliberate indifference.

II.    **THE ADDITIONAL DECLARATIONS OF PUTATIVE CLASS MEMBERS CONFIRM THAT RESPONDENTS HAVE PLACED THE MEDICALLY VULNERABLE SUBCLASS AT GRAVE RISK OF HARM[3]**

a.  **Social distancing is impossible at the Jail.**

Putative class members confirm that social distancing is "impossible" in the Jail and that guards don't even "try to keep [detainees] six feet apart."  *R. Doc. 39-5* ¶ 12 ("Denning Decl."); *R. Doc. 39-12* ¶ 6 ("Stirgus Decl."); *cf. R. Doc. 21-1 at 7*.  The holding tanks in central booking force people to "sleep shoulder to shoulder on the wet, nasty floor that they barely clean" and share

---

[3] Petitioners incorporate by reference the factual recitation provided in their motion for temporary restraining order. R. Doc. 21-1 at 6-21.  Petitioners focus here on summarizing the additional declarations filed on June 5, 2020.

an unsanitized latrine covered with feces and urine. *R. Doc. 39-8* ¶ 4 ("Mancuso Decl."). These tanks often hold forty to fifty people, Mancuso Decl. ¶ 4, but social distancing is not possible even for a group of twenty-five, *R. Doc. 39-2* ¶ 5 ("Vinning Decl."). People can be kept in central booking for upwards of a week and a half before being moved to another line in the Jail. Vinning Decl. ¶ 5.

And social distancing is not possible in the housing units. People are at most a few feet from each other on their beds, Denning Decl. ¶ 12; *R. Doc. 39-6* ¶ 7 ("Tasco Decl."); Stirgus Decl. ¶ 5, "not even arms-length apart from each other," *R. Doc. 39-14* ¶ 7 ("Weatherspoon Decl."), and the beds are "welded together" in certain housing units, Stirgus Decl. ¶ 5; Tasco Decl. ¶ 7. There is also "no way to social distance" in the day rooms, where up to "120 people [are] piled on top of each other without space" and the tables are bolted to the ground. Denning Decl. ¶ 12; Tasco Decl. ¶ 6. There is no space to social distance when using the phones, watching television, or in the bathroom. Mancuso Decl. ¶ 11; Denning Decl. ¶ 13 ("always a traffic jam" in the bathroom, sinks and showers are less than a foot apart, and water routinely splashes from one to the next). Nor is it possible to social distance in the infirmary, *R. Doc. 39-9* ¶ 13 ("Evans Decl."), or the condemned COVID-19 solitary confinement blocks of the Jail, *R. Doc. 39-4* ¶ 18 ("Thomas Decl."); *R. Doc. 39-11* ¶ 11 ("Alford Decl.").

In opposition, Warden Grimes claims that Jail staff has "worked to ensure social distancing guidelines by (1) allowing limited or curtailed recreation[4] to reduce movement, (2) only allowing a limited number of inmates their hall time at a specific time, and (3) require that inmates sleep 'head to toe.'" Grimes Decl. ¶ 27. He further claims that the large cafeteria "Chow hall" has been

---

[4] Witnesses explain that this "recreation" is, at most, one 15- to 30-minute trip outside once since the Jail began its quarantine and that only some detainees were able to participate. Mancuso Decl. ¶ 12; Vinning Decl. ¶ 16; Stirgus Decl. ¶ 6; Tasco Decl. ¶ 14.

closed, "[p]ill call" is now on the line to "reduce movement," and that during count, detainees are ordered to "social distance as much as possible." *Id*. ¶¶ 24, 25, 30. However, these policies fail to account for the realities of the Jail's infrastructure and layout, as testified to by numerous detainees at the Jail (and a correctional health expert), including (a) the limited space in the sleeping halls, holding tanks, and day rooms, and (b) the proximity of beds, furniture (much of it bolted to the floor), toilets, showers, sinks, and communal items. The inability to social distance in these spaces—the CDC's "cornerstone" of protection against COVID-19[5]—of the Jail remains uncontradicted by Respondents' conclusory assertions. Further, Respondents admit that they require all detainees on a wing to gather for roll call, effectively undermining all other efforts. Grimes Decl. ¶ 29; *see also R. Doc. 21-6* (Rogers Decl. ¶ 48); *R. Doc. 21-7* (Hardy Decl. ¶ 8); *R. Doc. 21-9* (Spears Decl. ¶ 17). Even taking Respondents' efforts into account, the record demonstrates that no action, short of release, will provide constitutionally adequate confinement for the medially vulnerable.

### b. Respondents' medical neglect and retaliatory actions are particularly dangerous in the midst of a viral pandemic.

Respondents' briefs are devoid of any details or factual support regarding the medical care that detainees purportedly receive at the Jail. The Sheriff Respondents attest solely that temperatures and COVID-19 symptoms are monitored in quarantined areas and that detainees' symptoms are closely monitored in isolation. *R. Doc. 35-2 at 13-14*. These conclusory assertions are supported solely by conclusory statements in Warden Grime's declaration; Respondents provide no further citation or evidentiary support. *See* Grimes Decl. ¶¶ 41, 46.

The City/Parish's brief is similarly deficient. It claims without citation that "[i]n the event

---

[5] *R. 4-4 at 4* (CDC Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities).

an inmate has symptoms of COVID-19, he is tested by Correcthealth staff" and relies on the approval of Dr. Catherine O'Neal, the Chief Infectious Disease Physician at Our Lady of the Lake Regional Medical Center ("OLOL"), who toured the jail for a only single day in early April.  *R. Doc. 38 at 8, 9; R. Doc. 38-2, ¶ 7* (Fontenot Decl.).  Notably, the cited evidence for Dr. O'Neal's approval is an email written not by Dr. O'Neal, but by Major Fontenot, an employee at the Jail. *Id., Ex.* D.[6]

Respondents' meager factual showing fails to address the overpowering evidence submitted by Petitioners detailing the routine medical neglect and retaliation suffered by detainees. *R. Doc. 21-1 at 8-9, 12-14, 16-18*.  One putative class member shared that jail medical staff treat them "like diseased rats" rather than "people."  Mancuso Decl. ¶ 10.  Detainees were told that if they complained about COVID-19, they will "be shipped to Angola" or "punished," Denning Decl. ¶ 8, and many are afraid to report their COVID-19 symptoms for fear of being forced into punitive solitary confinement, Weatherspoon Decl. ¶ 7; Vinning Decl. ¶ 18.  Retaliation is not new to the Jail—for example, others have been forced into a "freezing cold" holding tank for five hours after seeking medical help prior to the pandemic, including a wheelchair bound putative class member with congestive heart failure and liver disease who requested help for an issue with his heart. Thomas Decl. ¶ 13.

The experiences of putative class members demonstrate that in violation of their own policies, Respondents also neglect detainees suffering from COVID-19 symptoms.  Detainees have had to rattle the bars of their cells to get attention for a detainee who was vomiting and had a high fever (and the guards responded to the rattling with mace) or resort to other extreme measures, like

---

[6] The City/Parish also references an unfiled affidavit by CorrectHealth that will be "supplemented upon receipt." *See, e.g.*, R. *Doc. 38  at 7*. As of the date of this filing, this affidavit has not been made part of the record.

sending back their food twice in one day and refusing to cross over for roll call, to receive the medical attention they are entitled to.  Mancuso Decl. ¶ 9; Vinning Decl. ¶ 11; Alford Decl. ¶ 22.

Symptomatic detainees are not tested for COVID-19 if their temperatures do not rise above 100 degrees, Weatherspoon Decl. ¶ 5; Mancuso Decl. ¶ 7, and others were even told that temperatures of 100 or 101 degrees were not high enough to warrant testing. Vinning Decl. ¶ 6. Those exhibiting serious symptoms were provided *at most* Tylenol, Mucinex, or Vitamin C as treatment, Stirgus Decl. ¶ 9; Tasco Decl. ¶ 10; some symptomatic people were only allowed one Tylenol pill throughout the span of their infection, *R. Doc. 39-13* ¶ 9 ("Ware Decl."), or were denied it altogether, Weatherspoon Decl. ¶ 6; Mancuso Decl. ¶¶ 5-6 (forced to purchase it from commissary).  Respondents waited about a month after the pandemic reached the Jail to begin taking people's temperatures, Weatherspoon Decl. ¶ 4; Stirgus Decl. ¶ 11, and staff either fail to take or fail to record the temperatures of detainees upon intake, Mancuso Decl. ¶ 4; Ware Decl. ¶ 3; *R. Doc. 39-7* ¶ 23 ("Cage Decl.").  Symptomatic people were often left in general population, creating an increased risk of an unmanageable COVID-19 outbreak, Weatherspoon Decl. ¶¶ 4, 8. Those who request mental health care are denied it entirely.[7]  Denning Decl. ¶ 5.

### c. **The medical neglect of medically vulnerable people is especially dangerous in this pandemic.**

Notably, no Respondent argues that specialized precautionary measures are given to the medically vulnerable in the Jail.  Despite known medical vulnerabilities in the detained population, no tailored precautions are given to those who are at high risk of infection, illness, and death. Guards do not provide extra masks or other forms of assistance to the medically vulnerable.  Tasco

---

[7] In fact, contrary to Respondents' assertions, *see R. Doc. 35-30, ¶ 11* (Gissel Decl.); *Grimes Decl. ¶ 53*, *R. Doc. 35-8 at 43* (claiming that to "ease the burden on inmates . . . all co-pays and fees were waived."), detained people were charged for their medical care during this pandemic – one putative class member was charged $140 for Tylenol and a steroid shot after he had a fever and threw up blood in his sleep. Cage Decl. ¶ 7.

Decl. ¶ 13.  Staff even transfer people exhibiting known symptoms of COVID-19 onto general population units housing medically vulnerable detainees.  Thomas Decl. ¶ 10.

Medically vulnerable people are instead treated exactly the same as every other detainee in the Jail, notwithstanding their heightened susceptibility to COVID-19.  Like other detainees, they are placed on lines for COVID-19 positive patients before they have tested positive and, in some cases, when they do not even have COVID-19.  Thomas Decl. ¶¶ 15-16.  They were also shipped to Angola when they test positive for COVID-19, which reduces their ability to obtain hospital-based the medical services that they are more likely to need.  Cage Decl. ¶¶ 19-23.

As Petitioners outline and putative class members confirm, people are sent to COVID-19 lockdown before they receive their own test results, where they are exposed to others who have already tested positive for the virus.  Vinning Decl. ¶ 18.  The City/Parish admits to engaging in this dangerous practice, *R. Doc. 38* at 8, which applies to the medically vulnerable and, contrary to Warden Grimes's suggestion that it was limited to "the early stages of the pandemic," this practice has continued into recent weeks.  Thomas Decl. ¶¶ 16, 19.  Jail staff often disregarded CDC guidelines and alleged Jail policies by failing to get near the lockdown lines, even to provide medically vulnerable detainees with essential items like food, because the staff "have families too."  Alford Decl. ¶¶ 16, 23 (noting he lost ten pounds while on lockdown due to lack of food). People on COVID-19 lockdown struggled to receive even potable water.  Alford Decl. ¶ 21.  And lockdown is also inaccessible for those with physical disabilities, such as wheelchair-bound putative class members who are unable to go into the shower or are not provided sufficient space to use their wheelchair in lockdown.  Thomas Decl. ¶¶ 17-18.

In addition, those who have preexisting medical conditions rendering them vulnerable to COVID-19 are unable to obtain the medication or testing they need to manage their conditions,

including people with high blood pressure, Weatherspoon Decl. ¶ 3 (no medication), diabetes, Evans Decl. ¶ 7 (receives only sporadic blood sugar level tests); Cage Decl. ¶¶ 15, 26 (given only half the medication he needs on a dangerously delayed schedule and refused the insulin pens his wife could provide), and Hepatitis B, Denning Decl. ¶¶ 2, 3, 10 (no medication); *R. Doc. 39-3* ¶ 4 ("Thomason Decl.") (no medication).  People with bronchitis and asthma have not been provided the inhalers they need to protect their ability to breathe during this pandemic.  Cage Decl. ¶ 3; Alford Decl. ¶ 5.

Respondents' assertions that "[n]o new [detainee] was moved to the quarantine line during a fourteen day period" is inaccurate, Grimes Decl. ¶ 44, particularly with respect to the critical J01 line: the housing unit used to quarantine new individuals entering the facility from the community. On J01, guards routinely take people on and off the line and interrupt the quarantine process.  One putative class member was quarantined on J01 for 22 days, during which time about forty to fifty people cycled through the 40-man line.  Thomason Decl. ¶ 6.  Respondents' conclusory assertions regarding the lack of movement in quarantine, and even that detainees in isolation are provided sufficient food and water to meet their daily needs,[8] Grimes Decl. ¶¶ 24, 26, 41, 44, 46, are belied by the corroborating testimony of numerous detainees.

### d. Failure to provide adequate information about COVID-19 or supplies for hygiene, cleaning, and personal protective equipment

---

[8] The sole supporting piece of evidence is a partial log page reflecting a Sergeant's actions on a single day, March 23, 2020, on only the "B-wing" of the Jail, that purportedly "show[s] water being offered at 06[0]0, 0830, and again at 10:30."  Grimes Decl. ¶ 26 & Ex. R, *R. Doc. 35-7, 35-8*.  This partial piece of evidence is certainly insufficient to support the conclusion that the Jail routinely provides adequate provisions to detainees in COVID-19 lockdown.  In addition, there is sufficient evidence before this Court from other litigation against the Jail indicating a widespread practice of jail staff entering information into logbooks that simply has not happened.  *See, e.g., Lewis ex rel. Johnson v. E. Baton Rouge Parish,* No. 16-352-JWD-RLB, 2017 WL 2346838 (M.D. La. 2017), R. Doc. 38-3 (declarations from detainees noting that guards do not do their rounds, yet falsely log in the logbooks that they do); *see also  Zavala v. City of Baton Rouge/Parish of E. Baton Rouge,* No. 17-656-JWD-EWD, 2018 WL 4517461 (M.D. La. 2018), R. Doc 197-13, pp. 30-31 (sworn report by Dr. Jeffrey Schwartz noting that comparing video with log book entries, staff logged having walked the cell block to check on the well-being of detainees 30-50% more often than video shows they did).

Putative class members also corroborate Petitioners' detailed assertions regarding Respondents' failure to provide adequate cleaning supplies or wear PPE to protect against transmission and infection.  *R. Doc. 21-1 at 8, 9-10, 15-16.*  People are provided bandanas rather than masks due to the higher cost of masks, Ware Decl. ¶ 12, and the thin, porous cloth coverings are taken from one line to another, a sanitation concern given that the bandanas are often not washed properly,[9] Stirgus Decl. ¶ 12; Thomas Decl. ¶ 21; Evans Decl. ¶ 27.  Contrary to the Jail's purported policies and training, most guards do not always wear their masks, Vinning Decl. ¶ 17; Alford Decl. ¶ 27, and they often do not wear gloves, Alford Decl. ¶¶ 18, 21; Evans Decl. ¶ 25, even after they test positive for the virus and return to work after only a few days off, Alford Decl. ¶ 26.  Nurses do not always wear masks while distributing medication, Alford Decl. ¶ 27, nor do they change gloves or sanitize devices, like thermometers, between patients, Evans Decl. ¶ 11.

The cleaning chemicals are watered down, Mancuso Decl. ¶ 13, bleach is often not provided, Evans Decl. ¶ 24, and although cleaning supplies are scheduled to be provided twice a day, detainees sometimes "just get the dirty mop and water from the previous night" or are, at most, provided supplies every other day, Mancuso Decl. ¶ 14; Vinning Decl. ¶ 9; Ex. 1, Rottnek Suppl. Decl. ¶ 20 (the mop buckets he observed "contained brown, dirty water solutions").  To clean the tables, benches, and other high-touch surfaces on the line, detainees are forced to use rags, water, and the soap the jail issues them to wash their bodies. Ware Decl. ¶ 14. Detainees are often provided nothing to wipe their hands after they clean the line or use the bathroom, except their own uniforms.  Evans Decl. ¶ 24.  The Jail is described as "horrible," "terrible," and "nast[y]," Mancuso Decl. ¶ 14; Weatherspoon Decl. ¶ 9; Tasco Decl. ¶ 8, and the reopened condemned blocks

---

[9] Moreover, although Respondents argue that the detainees' bandanas are "laundered with Opticlean-V-Liquid with Bleach detergent in hot water," *R. Doc. 35-2 at 12,* the cited exhibit and declaration provide only a schedule of face covering pickups and make no mention whatsoever of the method of cleaning.  Grimes Decl. ¶ 23 & Ex. Q.

of the Jail are even worse, Alford Decl. ¶ 14; Thomas Decl. ¶ 15.

A close look at Respondents' cited evidence regarding PPE and cleaning protocols reveals the meager depth of their challenges to Petitioners' evidentiary record.  *See, R. Doc. 35-2 at 8, 11, 12.* The only evidence offered that deputies do spray and clean certain portions of the housing units is a report of a single instance of cleaning on a single day in mid-March on a female line in the Jail.  Grimes Decl. ¶ 19, Exhibit N.  Especially given that a small minority of the detainees are women, Grimes Decl. ¶ 4, this scant evidence fails to contradict the voluminous record of Respondents' lack of cleaning across other lines and areas in the jail.

In addition, the only evidence provided by Respondents regarding the provision of cleaning supplies, such as detergents and disinfectants, suggests that these supplies are provided only twice a week, Grimes Decl. ¶ 18, Exhibit M, rather than twice a day, and there is no evidence to contest the chorus of Petitioners' voices testifying that cleaning supplies are so diluted they are ineffective or that guards fail to distribute them with adequate frequency.  Finally, Petitioners do not challenge whether there are sufficient supplies of personal protective equipment in the storage rooms of the Jail.  Rather, they testify that staff fail to properly wear PPE when interacting with detainees, regularly fail to provide gloves,[10] and that the thin and poorly washed bandanas they have are insufficient to protect them from the virus—all points that Respondents fail to adequately rebuke.[11]

---

[10] *See, e.g.,* Evans Decl. ¶ 25; R. Doc. 21-6, Rogers ¶¶ 51, 12 ("prison says they won't pass out gloves because they're contraband"); R. Doc. 21-5 Shepherd ¶ 19; R. Doc. 21-6, Spears ¶ 24.

[11] Although Respondents state there is a total of 92 positive cases in the jail, Grimes Decl. ¶ 51, earlier information indicates that as of May 14, 2020, 93 detainees had already been tested for the virus.  *R. Doc. 4-2.*  And although Respondents state that only three people have been transferred to an outside hospital facility related to COVID-19, Grimes Decl. ¶ 59, about eighteen detainees were transferred to Angola due to the seriousness of their COVID-19 cases, and some of the original eighteen remain at Angola.  *Cf.* Jerry Iannelli, *Louisiana's Data on Coronavirus Infections Among Prisoners is Troubled and Lacks Transparency*, The Appeal (May 1, 2020), https://theappeal.org/louisiana-doc-covid-19-data.

Moreover, the record suggests this number undercounts the total number of people hospitalized due to COVID-19. An announcement from the Mayor's Office indicated that by April 9, four people had been sent to the OLOL Hospital due to the coronavirus.  *R. Doc. 4,* ¶ 78.  The record further suggests that when people are hospitalized for COVID-19, they may be misclassified.  Evans Decl. ¶ 18 (he was "in a coma and on a ventilator for most of the"

Putative class members also corroborate the failure to provide adequate information regarding COVID-19 at the Jail. *R. Doc. at 20-21.* Jail staff "try to hide the coronavirus," Cage Decl. ¶ 29, did not inform detainees that there were active COVID-19 cases in the Jail for two weeks, Mancuso Decl. ¶ 15, and even failed to inform detainees about basic precautionary measures like washing their hands or social distancing, Denning Decl. ¶ 11.

## III.   SUPPLEMENTAL EXPERT FINDINGS SUPPORT THE IMMEDIATE NEED FOR RELEASE

Dr. Fred Rottnek's inspection of the Jail on June 5, 2020, further bolsters Petitioners' testimony about the Jail's inadequate response to this pandemic. Dr. Rottnek reached his findings even after the Jail prepared for the inspection by "cleaning the line[s] a lot more than usual," "like they never did before," and by having jail staff "threaten[] to retaliate [against detainees] by kicking [them] in the teeth, shutting off the phones and TV, and punishing [them] if [they] were not properly dressed and wearing [their] bandana masks when the inspector comes," Mancuso Decl. ¶ 16; Cage Decl. ¶ 30; Evans Decl. ¶¶ 31, 33; Alford Decl. ¶ 32.

Based on his inspection of the jail and his review of declarations from the people detained inside, Dr. Rottnek determined that the Jail is noncompliant with the CDC's guidelines in numerous ways. First, Dr. Rottnek found that social distancing is not possible within the Jail: the "current census" and "physical structure of the housing units do not allow social distancing"; people are not able to social distance in many lines (including the medical unit and COVID-19 positive units) due to the close proximity, "location and configuration of the bunks," many of which were welded together or bolted to the floor; the close proximity of toilets and showers in

---

over two weeks he was at OLOL, but the Jail informed his father he was hospitalized for arthritis, not COVID-19); Grimes Decl. ¶¶ 49-50 (the first case of COVID-19 in the Jail was discovered because the detainee suffered from a drug overdose and was tested at the hospital).

the bathrooms without physical barriers between them; and the small size of the holding tanks. Ex. 1, Rottnek Suppl. Decl. ¶¶ 17, 19, 20, 22.  Dr. Rottnek also outlined the "incorrect[]" and "sporadic[]" use of personal protective equipment by staff, the fact that bandanas are considered "'homemade masks' by the CDC" and do not qualify as personal protective equipment, the degree of inadequate medical care at the Jail, "the dramatic state of disrepair," the inadequate opportunities to sanitize living areas, among other deficiencies, and the lack of education and information about the virus, among other deficiencies.  *Id*. ¶¶ 20, 22-24.  Dr. Rottnek's supplemental declaration effectively undermines Respondents' argument that Petitioners' release plans continue to expose them to the virus, an argument that functionally asserts Petitioners are safer inside the Jail.  As Dr. Rottnek notes, however, jails are incredibly dangerous, and there is no way to keep medically vulnerable detainees in the East Baton Rouge Parish Prison sufficiently safe from the virus.  *Id.* ¶¶ 2, 4, 25a.

Dr. Rottnek also confirms there is no evidence to indicate that being infected with COVID-19 results in lasting immunity from the virus.  *Id*. ¶ 20.  There is no evidence that the novel coronavirus is remaining stable (with no mutations), that COVID-19 provides lasting antibody protection post-infection, or that a large majority (generally at least 70%) of the population has even been infected, and of course there has not yet been a vaccine developed for the virus.  *Id*.  The factual record in this case supports Dr. Rottnek's caution: at least two of our Petitioners who have tested negative have also tested positive again.  *R. Doc. 21-8* (Bradley Decl. ¶¶ 8, 22); *R. Doc. 21-11* (Williams Decl. ¶¶ 13, 15).

## ARGUMENT

I. **BECAUSE THE PLRA DOES NOT APPLY TO § 2241 HABEAS PROCEEDINGS, RESPONDENTS' ATTEMPT TO INVOKE VARIOUS REQUIREMENTS OF THE PLRA IS ENTIRELY MISPLACED**

Respondents attempt to invoke various requirements under the Prison Litigation Reform Act ("PLRA") throughout their briefs, including PLRA requirements to exhaust available administrative remedies, to narrowly draw preliminary relief, and to satisfy certain prerequisites before convening a three-judge panel for an order of release. In so doing, Respondents reveal a misunderstanding of the nature of Petitioners' motion for temporary restraining order and of the relevant case law. The *only* claim currently before the Court in Petitioners' emergency motion is their § 2241 habeas claim, wherein Petitioners challenge the fact, not the conditions, of their confinement. Petitioners' § 1983 claim, which would fall under the purview of the PLRA, is not yet before this Court.

The Fifth Circuit has made clear that, due to the nature of habeas proceedings and the legislative history surrounding the PLRA, "[t]he PLRA . . . does not apply to § 2241 proceedings." *Davis v. Fechtel*, 150 F.3d 486, 490 (5th Cir. 1998). Numerous other courts of appeals are in accord. *See, e.g., Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001); *Walker v. O'Brien*, 216 F.3d 626, 633-34 (7th Cir. 2000); *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 812 (10th Cir. 1997). Accordingly, Respondents' invocation of the PLRA and its various requirements is inapposite. So too is Respondents' reliance on various district court opinions[12] regarding procedural hurdles under the PLRA, where the courts discussed claims sounding in

---

[12] The district court opinions cited by the Sherriff Respondents on pages 60-62 of their opposition brief discuss procedural barriers and claims that sound in § 1983 and are therefore inapposite. Moreover, the voluminous record of inaction, indifference, and neglect here is easily distinguishable from the facts at issue in those cases.

§ 1983, not § 2241 habeas.[13]

## II. THIS COURT'S JURISIDICTION TO HEAR THIS CASE ARISES UNDER 28 U.S.C. § 2241

### a. *Valentine* and *Marlowe* Do Not Foreclose *Habeas* Relief

Respondents' argue that "the Fifth Circuit's recent decisions in *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020) and *Marlowe v. LeBlanc*, [No. 20-30276], 2020 WL 2043425 (5th Cir. 2020) preclude this Court from granting [Petitioners'] motion for TRO". *See R. Doc. 35-2 at 2*. Respondents misunderstand the relief Petitioners seek. *Marlowe* and *Valentine* both consider "conditions of confinement" claims under 42 U.S.C. § 1983 ("conditions claims"). But Petitioners here challenge the fact of their confinement under 28 U.S.C. § 2241 ("fact claims"). As such, the holdings in *Marlowe* and *Valentine* are not dispositive as to Petitioners' claims. Respondents' argument fails to appreciate this central difference.

Generally speaking, habeas claims challenge the fact of detention, while conditions claims are a vehicle to attack unconstitutional conditions of confinement and do not seek to undermine the underlying basis for detention within those conditions. *See Cook v. Tex. Dep't of Crim. Justice Transitional Planning Dep't*, 37 F.3d 166, 168 (5th Cir. 1994). But the mere fact that Petitioners' challenge requires discussion of the conditions in the Jail "does not necessarily bar such a challenge in a habeas petition." *Vazquez Barrera v. Wolf*, No. 4:20-CV-1241, 2020 WL 1904497,

---

[13] Exhaustion for purposes of § 1983 is not properly before the court as the Temporary Restraining Order is limited to Petitioners' § 2241 habeas claims for release, which Respondents have waived by failing to raise substantively. *See McGee v. Estelle*, 722 F.2d 1206, 1213 (5th Cir. 1984) ("the defense of non-exhaustion is waived by the failure of the state's legal officer to raise it at the proper time . . . . [and the waiver may be] implicit as well as explicit"). Petitioners note, however, that the PLRA requires exhaustion of only *available* administrative remedies, 42 U.S.C. § 1997(a), and the Jail's own Inmate Grievance Procedure ("IGR") explicitly does not apply to "matters outside the jurisdiction of the [Jail] such as . . . *habeas corpus proceedings* . . . and court decisions." EBRPP Inmate Grievance Procedure at pg. 2 (emphasis added). How the IGR makes an administrative remedy "available" to habeas petitioners in light of this disclaimer is anyone's guess. *Id*. at 805. Petitioners are prepared to provide further briefing on the issue of PLRA exhaustion if and when it is properly before this Court.

at *4 (S.D. Tex. Apr. 17, 2020).  This would be true even if this *were* a conditions case—the Fifth

Circuit has not explicitly foreclosed habeas petitions based on conditions claims.  *See id.* at *3-4.[14]

In a fact case like this, however, habeas relief is appropriate if a ruling in the petitioner's favor

would "automatically entitle [the petitioner] to accelerated release."  *Id.* at *4 (citation omitted).

Unlike the broad and detailed injunctions pursuant to 42 U.S.C. § 1983 sought in *Marlowe*

and *Valentine*, the medically vulnerable subclass here seek their immediate release under 28 U.S.C.

§ 2241.  Although *Marlowe* and *Valentine* imposed sweeping alterations to conditions and daily

practices at the facility, *see Valentine*, 956 F.3d at 799 (noting injunction regulates prison conduct

"in minute detail"), Petitioners here seek no changes in conditions at the Jail because there is no

set of plausible conditions in the Jail that would prevent a deprivation of their constitutional rights.

Courts in the Fifth Circuit have considered nearly identical claims to the ones at issue here and have

determined that they were properly brought as fact claims under 28 U.S.C. § 2241.  *See Vazquez*

*Barrera*, 2020 WL 1904497, at *4; *Dada v. Witte*, No. 1:20-CV-00458, 2020 WL 2614616, at *1

(W.D. La. May 22, 2020).[15]  As the Court explained in *Vazquez Barrera*, in finding that the medically

vulnerable plaintiffs were likely to succeed on the merits of their habeas claim, notwithstanding

defendants' mitigation efforts:

> The current case is not one where such injunctive relief [the adoption of certain
> specific COVID-19 risk mitigation measures] is available.  We are living in
> unprecedented times. . . . With no known vaccine or cure for COVID-19 and the
> highly contagious and asymptomatic nature of the novel coronavirus, as well as
> overwhelmed medical systems throughout our communities, our prisons, jails, and
> detention facilities are facing outbreaks that differ from any infectious disease
> outbreaks that have occurred in the past.

---

[14] The Supreme Court has never explicitly foreclosed the use of habeas for conditions claims, either.  *See*
*Boumediene v. Bush*, 553 U.S. 723, 792 (2008).

[15] Although these cases considered immigration detainees, it is well settled that "[i]mmigration detainees are civil
detainees, and thus, entitled to the same constitutional due process protections as pretrial detainees."  *See Vazquez*
*Barrera*, 2020 WL 1904497, at *5; *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

*Id.*; *see also Dada v Witte*, 1:20-cv-00458, 2020 U.S. Dist. LEXIS 90911, at *16-17 (W.D. La. Apr.

30, 2020), *report and recommendation adopted*, 1:20-CV-00458, 2020 WL 2614616 (W.D. La.

May 22, 2020) ("ICE detainees who are at elevated risk of contracting COVID-19 in a detention

facility, and who seek immediate release, may do so through 'fact or duration' claims asserted under

28 U.S.C. § 2241").[16]  Where unconstitutional conditions cannot be remedied, habeas corpus provides

the only form of redress for the subclass of medically vulnerable detainees.[17]

      Defendant Gatreaux's argument that he is not the proper party to this habeas petition cannot be

taken seriously.  It matters nothing to the Court's broad habeas power that the Sheriff does not have

independent authority under *state* law to make bail or release or other discretionary determinations.

*See R. Doc. 35-2 at 49-50*.  The Sheriff is bound to comply with the "Constitution or laws . . . of the

United States," 28 U.S.C. § 2243(c), and as the immediate custodian over the petitioners –*i.e.* the entity

that holds the keys to the jailhouse door, *see Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004), *Masingene*

*v. Martin*, 19-CV-24693, 2020 WL 465587, at *2 (S.D. Fla. Jan. 27, 2020) (habeas jurisdiction pertains

over relevant "official most directly responsible for overseeing the contract facility")—the Sheriff must

---

[16] Numerous Courts outside the Fifth Circuit have reached the same conclusion.  *See, e.g.*, *Essien v. Barr*, No. 20-CV-1034-WJM, 2020 WL 1974761, at *3 (D. Colo. Apr. 24, 2020) ("In theory, these causes of action are oil and water: a habeas claim may lead to an order releasing the prisoner or detainee or nothing at all; whereas a conditions-of-confinement claimant may only lead to an order requiring the government to improve the conditions of confinement, but not an order releasing the prisoner or detainee."); *Martinez Franco v. Jennings*, No. 20-CV-02474-CRB, 2020 WL 1976423, at *3 (N.D. Cal. Apr. 24, 2020) ("[I]t is "fairly well established" that a federal detainee can challenge the conditions of his confinement in an action brought under 28 U.S.C. § 2241."); *Doe v. Barr*, No. 20-CV-02141-LB, 2020 WL 1820667, at *8 (N.D. Cal. Apr. 12, 2020) ("[T]he court can address the plaintiff's challenges to the conditions of confinement in a § 2241 petition."); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) ("Supreme Court and Sixth Circuit precedent support the conclusion that where a plaintiff claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas").

[17] Petitioners will later seek injunctive relief on their Section 1983 claims on behalf of the broader class to ensure compliance with CDC Guidance; only at that point would the *Marlowe* and *Valentine* cases become relevant. Though the question is premature, *Marlowe* and *Valentine* would not dispose of subsequent Section 1983 injunction because the factual record, supported by the findings from an expert inspection, will be far stronger than the record considered in the emergency TRO posture presented in those cases.

comply with orders from this Article III Court directing the Sheriff to release Petitioners. Further, habeas corpus is, "above all, an adaptable remedy," *Boumediene*, 553 U.S. at 780, and federal courts retain "broad discretion in conditioning a judgment granting habeas relief . . . 'as law and justice require'." *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) (quoting § 2243). That authority includes an order of release, *Boumediene*, 553 U.S. at 779, so as "to insure that miscarriages of justice within [the writ's] reach are surfaced and corrected." *Harris v. Nelson*, 395 U.S. 286, 291 (1969).

### b.  The *Younger* Abstention Doctrine does not apply; this Court has Jurisdiction

The Sheriff Respondents alone argue that the Court should forego its "virtually unflagging obligation" to assert jurisdiction, citing the *Younger* abstention doctrine, which was designed to prevent a district court from interfering with "ongoing state proceedings." *R. Doc. 35-2 at 43* (citing *Younger v. Harris*, 401 U.S. 37 (1971)). But *Younger* abstention does not apply "simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). Petitioners here make no request to enjoin *any* pending state proceeding. *R. Doc. 21-1 at 1-2*.

The Sheriff Respondents tellingly do not cite a single legal authority, and Petitioners have found none, for the proposition that Petitioners are attempting to intervene in a pending state court proceeding, and instead rely on conclusory assertions and an erroneous understanding of the relevant standard.[18] *R. Doc. 35-2 at 44-45*.

Relevant authority points to the opposite conclusion: this Court has jurisdiction. In rejecting the same argument the Sheriff Respondents make here, the court in *McPherson v.*

---

[18] The Sheriff Respondents' wholesale reliance on the *Middlesex* factors is outdated and misplaced; the Supreme Court in *Sprint* clarified that the *Middlesex* factors "were not dispositive." *Sprint*, 571 U.S. at 81-82 ("Divorced from their quasi-criminal context, the three *Middlesex* conditions would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest. That result is irreconcilable with our dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the "exception, not the rule.").

*Lamont*, No. 3:20CV534 (JBA), 2020 WL 2198279, at *13 (D. Conn. May 6, 2020), explained that the relief sought by the petitioners did not "ask this Court to *order the state courts to act* to effectuate" their release, but instead asked the Court *directly* to "order Defendants . . . to release the members of the medically vulnerable subclasses, without imposing any requirement upon the state courts to act in any particular way." *McPherson*, 2020 WL 2198279, at *13 (emphasis in original). Abstention is inapposite here.

## III.    THE MEDICALLY VULNERABLE SUBCLASS IS LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

Despite Respondents' stated policies and procedures, the dire situation inside the Jail shows that Respondents are subjecting detainees to an unreasonable risk of harm in violation of pretrial detainees' Fourteenth Amendment rights and are otherwise deliberately indifferent to the substantial risk faced by the medically vulnerable subclass, in violation of the Eighth Amendment.

### a.   The Continued Detention of Medically Vulnerable Pre-Trial Detainees Violates Those Petitioners' Fourteenth Amendment Rights.

Most members of the medically vulnerable subclass—including Mr. Belton—are pretrial detainees entitled to Due Process protection under the Fourteenth Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). The Fourteenth Amendment forbids detention as punishment, and therefore the detention of pretrial class members must remain "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690; *see also Bell v. Wolfish*, 411 U.S. 520, 535 (1979). When detention is no longer "reasonably related to a legitimate goal," it becomes an impermissible punishment. *Wolfish*, 441 U.S. at 539; *Hare v. City of Corinth*, 74 F.3d 633, 640 (5th Cir. 1996).

Respondents[19] correctly cite the *Bell* standard, but their analysis minimizes the substantial and

---

[19] Although the City/Parish mentions Petitioners' Fourteenth Amendment rights in a section heading, their brief is curiously devoid of any analysis to refute Petitioners' argument that they are likely to succeed on the merits of their Fourteenth Amendment claims. *See R. Doc 38* at 18.

likely imminent harm faced by those in the Jail who are medically vulnerable.  *See R. Doc. 35-2*
Sheriff Opp. at 33 (citing *Bell*, 411 U.S. at 536-37).  Petitioners do not dispute that "[t]he effective
management of a detention facility is a valid objective that may justify imposition of conditions and
restrictions on pretrial detention."  *R. Doc. 35-2 at 34*.  But the question here is not whether the
management of the Jail is a legitimate government purpose as a general matter or in normal times.
The question of being subjected to an unreasonable risk under *Bell* turns on whether "detention of
[Petitioners], who are at high risk of serious illness or death if they contract COVID-19, in [an
environment] where social distancing and proper hygiene are impossible" reasonably relates to a
legitimate governmental purpose.  *See Vazquez Barrera*, 2020 WL 1904497, at *5.  It clearly does
not.  *See Shepherd v. Dallas Cty.*, 591 F.3d 445, 453-54 (5th Cir. 2009) ("When the State by the
affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care
for himself, and at the same time fails to provide for his basic human needs . . . it transgresses the
substantive limits on state action set by the Eighth Amendment and the Due Process Clause."
(quoting *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996)).

The court in *Vazquez Barrera* reached the same conclusion.  2020 WL 1904497, at *5.
Finding that plaintiffs were likely to succeed on their due process claim, the court held that,
"[r]equiring medically vulnerable individuals to remain in a detention facility where they cannot
properly protect themselves from transmission of a highly contagious virus with no known cure is
not rationally related to a legitimate government objective."  *Id.* at *6; *see also Dada*, 2020 U.S. Dist.
LEXIS 90911, at *23 ("Petitioners may succeed on their substantive due process claims by . . .
showing . . . that, due to their age, immune deficiencies, or other comorbidities, they face an elevated
risk of contracting the virus, or suffering serious illness from it; that their particular circumstances
also heighten these risks; and that preventive measures are difficult or impossible, leaving them

unduly exposed to contracting the virus").

Respondents cannot rely on *Marlowe* and *Valentine* in this context. First, plaintiffs in those cases were post-conviction detainees, and it is well established that the Fourteenth Amendment affords greater Due Process protection where, as here, the majority of the Petitioners have not been convicted of a crime. *See Bell*, 411 U.S. at 539; *Hare*, 74. F.3d at 639. Second, Respondents' reliance on *Valentine* for the proposition that the "'incidence of diseases or infections, standing alone,' do[es] not imply unconstitutional conditions" minimizes the effect of the COVID-19 pandemic on this particular subclass. *See R. Doc. 35-2 at 34-35*; Ex. 1, Rottnek Suppl. Decl. ¶¶ 7-10, 20-23. This pandemic is "a novel and highly contagious disease" and is "unlike any 'incidence of disease' that our society has faced in generations." *Vazquez Barrera*, 2020 WL 1904497, at *6. It is acutely felt by those who are already medically susceptible. As such, the Fourteenth Amendment requires that the Court grant *habeas corpus* here.[20]

   b. **Respondents' Eighth Amendment Argument Downplays The Unprecedented Risks Associated With COVID-19, As Well As Their Inadequate Response**

The conditions in this decrepit Jail to which medically vulnerable detainees are subject are so extreme that Petitioners meet and exceed the Eighth Amendment's "subjective and objective" requirements as well. *Valentine*, 956 F. 3d at 801 (citing *Farmer v. Brennan*, 511 U.S. 825, 846 (1994)). Even though Respondents attempt to downplay the severity and impact of COVID-19, *by their own admission* the virus and disease impose an objectively serious harm to detainees, particularly the medically vulnerable: "COVID-19 can pose a risk of serious or fatal harm to prison

---

[20] This Court can—based on the crisis that has been the history of the jail's health care system, *R. Doc. 4, ¶¶ 71-74,* and the consistent evidence from Petitioners' and witnesses' sworn declarations—find that the City and Sheriff Respondents have a policy of denying adequate health care to people in the jail. *See, e.g., O'Quin v. Gautreaux*, No. 14-cv-98-BAJ-SCR, 2015 WL 1478194, *3 (M.D. La. Mar. 31, 2015) (citing *Shepherd v. Dallas Cty.*, 591 F.3d 445, 453 (5th Cir.2009); *Colbert v. City of Baton Rouge*, No. 17-cv-28-BAJ-EWD, 2018 WL 344966, *6-7 (M.D. La. Jan. 9, 2018). Clearly Plaintiffs allege such a history in the instant matter. *R. Doc. 4, ¶¶ 71-74.*

inmates and that certain inmates such as the plaintiff in *Marlowe* who was a diabetic is particularly vulnerable to the virus's effect," *R. Doc. 35-2 at 31*; *see also Vazquez Barerra*, 2020 WL 1904497, at *2 ("It cannot be contested that the novel coronavirus that causes COVID-19 is highly contagious, and that among those who develop COVID-19, many require extended intensive emergency care, assistance breathing using mechanical ventilators, and round-the-clock professional medical care."); *Dada*, 2020 U.S. Dist. LEXIS 90911, at *5 ("COVID-19 remains medically 'incurable'").  COVID-19 is the textbook "serious" and "communicable disease" from which the Constitution requires incarcerated people be protected.  *See Helling v. McKinney*, 509 U.S. 25, 33-34 (1993).  Even young and otherwise healthy COVID-19 patients might feel as though they are "drowning in [their] own blood," or like "they've been hit by a truck."  *See R. Doc. 4*, ¶ 35.  The risk for medically vulnerable populations is even more severe.  *Vazquez Barerra*, 2020 WL 1904497, at *2; Ex. 1, Rottnek Suppl. Decl. ¶¶ 7-10, 20-23.[21]

Likewise, the facts reveal that Respondents have been deliberately indifferent to the risks associated with COVID-19.  Respondents argue that the Eighth Amendment standard is not met because "Plaintiffs have cited no evidence that Defendants believed its measures were inadequate."  *R. Doc. 35-2 at 32*.  This is disingenuous at best.  The Jail's recognized history of medically neglecting its inmates demonstrates the near "criminal recklessness" that *Valentine* imposed.  *See* 956 F.3d at 802.  Sheriff Gautreaux himself admitted, even prior to the pandemic, that the Jail is "not adequate for providing health care" and that "if [DOJ investigators] came to [the] prison today, they would shut half of it down"—notably, the half where they now house the sickest

---

[21] The Fifth Circuit in other circumstances has acknowledged that the unprecedented risks associated with COVID-19 justify extreme judicial remedies.  *In re Abbot*, 954 F.3d 772, 781, 794 (5th Cir. 2020) (holding that "[g]iven the surging tide of COVID-19 cases and deaths," petitioners have shown "exceptional circumstances necessary to grant writ of mandamus. And noting that "[i]n mill-run cases, it might be a sufficient remedy to simply wait until the expiration of the TRO . . . those methods would be woefully inadequate here.")

COVID-19 patients.  *See R. Doc. 4*, Ex. 17; *see also,* Ex. 18 (Councilwoman describing healthcare in the parish prison as "catastrophic").

Second, for infectious diseases like COVID-19, deliberate indifference is satisfied when correctional officers "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," *Helling*, 509 U.S. at 33; *see also Hope v. Pelzer*, 536 U.S. 730, 738 (2002); *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974). The Court need not "await a tragic event" after which Respondents can no longer deny that are maintaining unconstitutional conditions of confinement amid a global pandemic. *See Helling*, 509 U.S. at 33.  So long as the risk of serious harm is "likely," the Eighth Amendment is violated.  *Id.*

Here, the risk of harm has already been realized.  Numerous detainees, including medically vulnerable Petitioners, have developed COVID-19.  *See e.g.*, Belton Decl. ¶ 5; Franklin Decl. ¶ 40; Shepherd Decl. ¶ 7; Bradley Decl. ¶ 8.  Some have tested positive multiple times—calling into question either the reliability of the testing or the belief that people cannot be infected multiple times.  Further, Respondents refuse to test people who are symptomatic unless they meet certain criteria.  Without robust testing, it is impossible to know what the true nature of the infection at the Jail is.

Respondents astoundingly argue that they "have shown that they have taken protective measures and continue to take measures, based on CDC guidelines for correctional institutions and by medical professionals."  *R. Doc. 35-2 at 31*.  Even if this were sufficient to ameliorate the severe risk of harm associated with COVID-19 (it is not), *see* Hassig Decl. ¶ 5 (opining that CDC guidance is "not stringent enough to actually achieve the goal of keeping both staff and detainees safe from the virus"), the facts reveal that it is not true.  Respondents continue to impose conditions that make the risk of developing COVID-19 by medically vulnerable individuals inevitable.  This

includes forcing detainees to "line up" or "clump" in close proximity, Belton Decl. ¶ 11; Rogers Decl. ¶ 48; Hardy Decl. ¶ 8; Spears Decl. ¶¶ 17, 28, failing to provide adequate treatment for sick detainees, Franklin Decl. ¶ 42; Bradley Decl. ¶ 15; Shepherd Decl. ¶ 9; Williams Decl. ¶ 17, and failing to equip detainees with—and failing to ensure that staff are provided with and *actually wear*—adequate PPE.  Shepherd Decl. ¶¶ 13, 19, 22-23; Williams Decl. ¶ 26; Bradley Decl. ¶ 5; Rogers Decl. ¶¶ 12, 50-51; Hardy Decl. ¶ 21; Spears Decl. ¶¶ 24, 28.  Respondents cannot credibly deny that they lack awareness of the risk of harm which they continue to permit.

## IV.    ABSENT AN INJUNCTION, MEDICALLY VULNERABLE INMATES AT THE JAIL WILL SUFFER IRREPERABLE HARM

To sustain a finding of irreparable harm, "it is not necessary to demonstrate that harm is inevitable," only that there is a "significant threat of injury from the impending action [and] that the injury is imminent."  *See Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Respondents point to *Marlowe*, R. *Doc. 35-2 at 37*, although it is inapposite, *supra* pp. 14-17, and wave off Petitioners' concerns about COVID-19 in the Jail as primarily "speculation and conjecture," even as they detail their efforts to release eligible prisoners to protect them from the spread of COVID-19.  *R. Doc 38* at 24-25.  Even after these efforts, Respondents do not and cannot show that CDC-recommended social distancing is feasible with even a reduced capacity of 1,062 incarcerated individuals now in the prison.  *Cf.* Ex. 1, Rottnek Suppl. Decl. ¶¶ 2, 12, 13, 15, 24b(i). The risk to medically vulnerable subclass members is thus still too high.[22]

Moreover, Respondents confirm that six individuals tested positive for the virus since June 1, 2020.  *R. Doc. 38 at 22*.  That number seriously underestimates the threat of infection and serious

---

[22] Respondents cite to a number of cases, mostly commercial trademark disputes, to half-heartedly argue that Petitioners' purported delay in bringing this action undercuts its urgency.  R. *Doc. 42-4 p. 24*.  But this case is not about a trademark infraction; the COVID-19 pandemic continues with disastrous effects, and Petitioners are incarcerated in a highly restricted environment that raises communication and access challenges other potential plaintiffs do not confront.  Petitioners' initiation of this action was not delayed, and the matter is urgent.

harm Petitioners face.  Several putative class members report that staff refuse to test even many symptomatic inmates who do not meet certain arbitrary Jail criteria.  *See supra* pp. 3, 7. Respondents themselves only claim to test inmates who present with COVID-19 symptoms, *see R. Doc. 38* at 8, necessarily a small subset of those actually infected, since "[i]nfected people typically show no symptoms for 2-14 days and some never become symptomatic, even though they may be spreading the disease . . . ," Ex. 1, Rottnek Decl. at ¶38. Consequently, there remains a grave and unaccounted for risk posed to the medically vulnerable by untested presymptomatic, asymptomatic, and mildly symptomatic people from whom social distancing cannot be achieved within the confines of the Jail.

The risk of COVID-19 infection is particularly elevated in the Jail given the virus' transmissibility, the ineffectiveness of Respondents' containment measures, and the overwhelming evidence from Petitioners and putative class members of the deplorable conditions in the Jail that render social distancing utterly impossible. *See e.g.*, Denning Decl. ¶ 12; Stirgus Decl. ¶ 5; Weatherspoon Decl. ¶ 7.  Respondents do not rebut Dr. Rottnek's assessment that social distancing is "difficult if not impossible" in jails and prisons generally—nor could they.  *See R. Doc. 21-1* Ex. 9, ¶16; *see also R. Doc. 21-1* Ex. 27, ¶5 ("anything less than 6 ft distancing is inadequate . . . .").

Respondents also point to the proposed subclass representatives' reported recovery from COVID-19 to say that Petitioners cannot show a risk of imminent harm.  *R. Doc. 42-4 p. 24*.  But a court "need not await a tragic event" to afford injunctive relief.  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Respondents cite a handful of secondary sources, *R. Doc. 35-2 at 38*, but offer no medically sound evidence that vulnerable individuals who have recovered from COVID-19 establish immunity that precludes them from relapsing.  Rottnek Suppl. Decl. ¶**.  Nor do Respondents suggest that *other* medically vulnerable detainees in the Jail are not at risk of exposure

in the Jail.  And in at least some instances, Respondents' protocols appear to put medically vulnerable inmates at risk of exposure.  Thomas Decl. at ¶¶ 3,16 (suffering from "congestive heart-failure and liver disease" but transferred to isolation with individuals who had tested positive for COVID-19 before receiving confirmation of his negative status); *see also supra* pp. 1-13.

## V.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF PETITIONERS' REQUESTED TEMPORARY RESTRAINING ORDER

Where, as here, the government is a party to the case, the third and fourth injunction factors—the balance of the equities and the public interest—merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *El Paso Cty., Texas v. Trump*, 407 F. Supp. 3d 655, 665 (W.D. Tex. 2019).

It is clear from the record that the substantial risk of serious harm to the Medically Vulnerable Subclass of contracting a deadly disease far outweighs any potential harm to Respondents.  The balance of equities and the public interest favor release of the medically vulnerable subclass because they cannot be constitutionally held in the Jail.  Critically, the public interest is served by the protection of constitutional rights.  *See Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *Cohen v. Coahoma Co.*, 805 F. Supp. 398, 408 (N.D. Miss. 1992).

As a point of departure, releasing this subclass of Petitioners will benefit—not harm—Respondents.  Respondents will save money and reduce substantial burdens on guards and health care staff because of their release.  The release of Medically Vulnerable Subclass members makes the entire jail safer and increases the likelihood of achieving social distancing for those who remain.  And although Respondents cite *Valentine* to argue that Petitioners' requested relief would harm them, that case is inapplicable to the claims presently before this Court because it involved different relief under 42 U.S.C. § 1983 than the relief Petitioners currently seek under 28 U.S.C. § 2241.

Given the grave risk of substantial harm to the Medically Vulnerable Subclass because of the fact of their continued confinement in the Jail, this Court can and should act quickly to implement a system for ordering their release. Contrary to Respondents' assertions, the temporary release of Medically Vulnerable Subclass members can be achieved through a system that includes a robust consideration of Respondents' asserted public interest. The Court in *Cameron v. Bouchard*, for example, developed such a system. __ F. Supp. 3d __, 2020 WL 2569868 (E.D. Mich. 2020). The *Cameron* system considered the immediate release of members[23] of the subclass who fall into the following categories: (1) subclass members being held on bail who are charged with an offense that does not have as an element the use or threatened use of violence or unwanted sexual touching of another person; (2) subclass members serving sentences for offenses that do not have as an element the use or threatened use of violence or unwanted sexual touching of another person; (3) subclass members whose sentences, regardless of the charged offense, expire by within 2 months of the Court's order, a period throughout which the COVID-19 epidemic is likely to remain a major risk in the Jail and the community. For each of these categories of the subclass, the Court could first determine as a categorical matter that the public interest in reducing the Jail population exceeds any danger in releasing the individuals. And, by quickly taking this step, the remainder of the class—and Respondents' staff for that matter—would be made better

---

[23] Several such systems already exist. For example, a federal court in the District of Massachusetts has released (and continues to release) numerous immigration detainees on non-monetary bond conditions while their class action habeas petition is pending. *See Savino v. Souza*, __ F. Supp. 3d __, No. 20-10617-WGY, 2020 WL 1703844, at *8-9 (Apr. 8, 2020) (explaining its decision to grant bail pending habeas). Finding "exceptional circumstances" in "this nightmarish pandemic," the court opted to "diligently entertain[] bail applications while the petitions for habeas corpus are pending." *Id*. at *9. The district court requested and rapidly considered an initial list of 50 detainees for bail and has since considered class members' bail applications in groups of ten. *See* Order, *Savino v. Souza*, No. 20-10617-WGY, Doc. No. 44, at 3 (Apr. 4, 2020); *see id*., Doc. No. 45 at 1-3 (listing class members in groups of ten for bail consideration).

off by the Jail becoming a somewhat safer place. Remaining members of the subclass could be promptly evaluated on a case-by-case basis by the Court or by an appointed magistrate or special master. That evaluation could weigh any risk to the public of releasing the individual against the risk to public health of failing to further reduce the jail population. If the Court finds, after careful consideration, that temporary release of certain members of the subclass is outweighed by the risk to the public, the Court could deny emergency relief to those specific individuals.

## CONCLUSION

For the reasons stated herein and in Petitioners' Motion for Temporary Restraining Order, Petitioners' respectfully request that this Court order all Defendants, their agents, representatives, and all persons or entities acting in concert with them to release those in the Medically Vulnerable Subclass.

Respectfully submitted, this 8th day of June, 2020.

/s/ David J. Utter_____
David J. Utter (LA Bar No. 23236)
William R. Claiborne (GA Bar No. 126363)
FAIR FIGHT INITIATIVE
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@fairfightinitative.org
will@fairfightinitative.org

/s/Miriam R. Nemeth_____
Thomas B. Harvey (MBE #61734MO)
Miriam R. Nemeth (DC Bar No. 1028529)**
Tiffany Yang (DC Bar No. 230836)
ADVANCEMENT PROJECT NATIONAL OFFICE
1220 L Street NW, Suite 850
Washington, DC 20005
(202) 728-9557 Telephone
tharvey@advancementproject.org
mnemeth@advancementproject.org
tyang@advancementproject.org

/s/ Lillian S. Hardy_____
Lillian S. Hardy (DC Bar No. 991282)
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5884 Telephone
lillian.hardy@hoganlovells.com

/s/ William P. Quigley_____
William P. Quigley (LA Bar No. 00769)
Loyola University New Orleans
7214 St. Charles Avenue
Campus Box 902
New Orleans, LA 70117

/s/ Robert L. Toll_____

/s/ Baher Azmy_____
Baher Azmy (NY Bar No. 2860740)

Robert L. Toll (DC Bar No. 1021934)*            Omar Farah (NY Bar No. 4641247)^
Hogan Lovells US LLP                            Brittany Thomas (NY Bar No. 5683834)^
390 Madison Avenue                              CENTER FOR CONSTITUTIONAL RIGHTS
New York, NY 10017                              666 Broadway, 7th Floor
(212) 918-307 Telephone                         New York, NY 11201
robert.Toll@hoganlovells.com                    (212) 614-6427 Telephone
                                                bazmy@ccrjustice.org
                                                ofarah@ccrjustice.org
                                                bthomas@ccrjustice.org

*Attorneys for Plaintiffs*

*Pro Hac Vice motion pending*
^*Pro Hac Vice motion forthcoming*
** *Lead Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2020, a copy of the foregoing was filed electronically with the Clerk of the Court, using the CM/ECF system.  Notice of this filing will be sent by operation of the court's electronic filing system and/or via U.S. Postal Service to counsel of record.

/s/ *David J. Utter*
David J. Utter