# EXHIBIT 1

## SUPPLEMENTAL DECLARATION OF DR. FRED ROTTNEK

**Background and Qualifications:**

1. My name is Fred Rottnek, MD, MAHCM. I submitted a declaration at the filing of this case. (DE 11) My background, qualifications, biography, and C.V. are described or attached therein. This supplemental declaration builds upon that declaration to incorporate new information that has been made available since this case was filed. In addition to the declarations and references I reviewed for my original declaration, I have now also reviewed the declarations of detainee-witnesses Alford, Cage, Denning, Evans, Hodges, Mancuso, Tasco, Thomas, Thomason, Vinning, and Weatherspoon. I also inspected the East Baton Rouge Parish Prison on June 5, 2020.

2. Based on my June 5, 2020 inspection of the Jail, I am convinced that the facility is unable to achieve social distancing and prevent the spread of COVID-19, both within the facility and to the broader Baton Rouge Parish. (The report of this inspection is forthcoming. Due to the urgency of the release of medically vulnerable detainees, and the scheduling of hearings, this declaration focuses on the impact of continued incarceration on medically vulnerable populations).

3. I have provided this supplemental declaration on a pro bono basis. If I am asked to provide testimony to the court, I will be providing testimony on a pro bono basis.

4. Jails, much like cruise ships, were early incubators for the coronavirus. Strictly following CDC guidelines mitigates the risk of infection and sequelae to detainee and staff populations and the general public.[1] However, these measures are designed to manage and mitigate—not eliminate—the increased risk to jail populations.[2] Due to the nature of jail facilities, even if the CDC measures were precisely adhered to, jail detainees would remain at substantially higher risk than the average person in a community where an outbreak occurs.[3]

---

[1] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (hereinafter CDC Interim Guidance).

[2] *See* Matthew J. Akiyma, et al., *Flattening the Curve for Incarcerated Population—COVID-19 in Jails and Prisons*, The New Engl. J. of Med. (Apr. 2, 2020), https://www.nejm.org/doi/full/10.1056/NEJMp2005687 ("Irrespective of . . . interventions [to limit the number of people entering and leaving jails], infected persons—including staff members—will continue to enter correctional settings . . . . A recent SARS-CoV-2 outbreak among cruise-ship passengers and crew in Yokohama, Japan, provides a warning about what could soon happen in correctional settings."); CDC Interim Guidance ("The integration of [multiple] components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors. Consistent application of specific preparation, prevention, and management measures can help *reduce the risk* of transmission and severe disease from COVID-19.") (emphasis added)

[3] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 8, 1047-1055 (Oct. 15, 2007), https://academic.oup.com/cid/article/45/8/1047/344842 (identifying factors

5. For a jail located in a community where COVID-19 is spreading, there are no steps that administrators can take to entirely ensure that the disease will not enter and spread through the jail and back out to the community.[4] Moreover, the presence of a jail in a community would continue to increase the risk to all community members, even if CDC guidelines were strictly followed. For this reason, the best mitigation strategy for slowing the spread of infection, for people inside the jail and outside in the community, is limiting the number of people confined in a congregate environment like the jail.

6. As the pandemic continues, there have emerged clear strategies for reducing risk and death among jail populations, including detainees, staff, and visitors,
   a. Release medically vulnerable detainees as quickly as possible.[5]
   b. Reduce the population that remains in order to best approximate social distancing
   c. Enforce CDC guidelines to reduce the risk of infection and sequelae to all in the jail environment, including detainees, correctional staff, medical staff, vendors, and other visitors.

**Medically Vulnerable Detainees at the East Baton Rouge Parish Prison**

7. As mentioned in my original declarations, jails and prisons typically house detainees with chronic conditions, particularly in men, that were not well controlled prior to incarceration. Many of these chronic conditions are contained in the list of diagnoses provided by the CDC that would describe a detainee as being medically vulnerable for purposes of COVID-19:
   - Asthma
   - Chronic kidney disease being treated with dialysis
   - Chronic lung disease, such as emphysema and COPD
   - Diabetes
   - Hemoglobin Disorders, including sickle cell anemia
   - Immunocompromised persons, including those with HIV/AIDS
   - Liver disease, including hepatitis
   - People aged 65 years and older
   - Serious heart conditions, including past myocardial infarctions, and congestive heart failure
   - Severe obesity

---

that make jails inherently dangerous with respect to infectious disease); Dr. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, The New York Times (Mar. 16, 2020), https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html ("It is not a matter of if, but when, this virus breaks out in jails and prisons").

[4] Christian Berthelsen, *No Escape From Virus Threat for 2 Million Crammed in Prisons*, Bloomberg (Mar. 11, 2020), https://www.bloombergquint.com/global-economics/no-escape-from-virus-threat-for-2-million-crammed-in-prisons.

[5] No author, *Responses to the COVID-19 Pandemic*, Prison Policy Initiative (Last updated June 5, 2020), https://www.prisonpolicy.org/virus/virusresponse.html.

2

In my judgment, I would add detainees that have diagnosis that require regular medication administration and lab monitoring, such as detainees with
- Neurological conditions, such as epilepsy
- Serious mental illness (those that severely impact daily functioning), such as schizophrenia, bipolar affective disorder, major depression

### Inability of East Baton Rouge Parish Prison to Provide Conditions and Behaviors to Protect Medically Vulnerable Populations from COVID-19

8. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of adverse outcomes from both their chronic conditions and COVID-19, as untreated health conditions increase the risk of infection and infection related morbidity and mortality if the individual does become infected. For these reasons, detention facilities should avoid complete isolation of detainees whenever possible. Isolation reduces an individual's access to necessary and ongoing medical care and exacerbates existing mental health issues—which themselves have a negative impact on health outcomes. The lack of adequate medical care in isolation at the Jail has been described by numerous Plaintiffs and witnesses. (Rogers, 37; Stewart, 26; Cage, 15). If part of a COVID-19 containment or response strategy involves isolation of detainees, as in East Baton Rouge, the detention facility must acknowledge this requires increased monitoring of detainees' safety, detainee mental health, and suicidality wellness checks, and increase staffing accordingly. By failing to take such measures, East Baton Rouge jail administrators place detainees' physical and mental health at serious risk.

9. Proper response to a COVID-19 outbreak in a jail setting necessarily includes identifying all of the people held in their custody who are medically vulnerable. This task is critical for several reasons, and the daily updating of the list and locations of high-risk patients is critical to basic outbreak management. Creating a real-time list of high-risk patients allows for:
    a. Identification of high-risk patients who are eligible for release from detention
    b. Implementing of active surveillance, special housing arrangements, and other protective measures for high-risk patients who are not ill
    c. Implementing enhanced surveillance and protective measures for high-risk patients who are in a quarantine setting, or who develop symptoms of COVID-19
    d. Development and implementation of re-entry plans of care and support with community partners for high-risk patients

10. Regular, chronic care of detainees with known or new conditions is not occurring per numerous Plaintiffs' and witnesses' affidavits. Examples of untreated diagnoses include hypertension, hepatitis C, chronic post-surgical back pain, congestive heart failure, chronic pain, and edema from retained bullet fragments. (Weatherspoon, 3; Thomason, 4; Hodges, 4; Tasco, 4). Specific medically vulnerable patients and their experiences at East Baton Rouge Parish Prison follow:

    a. Detainee-witness Thomas is 59-years-old with chronic conditions including hypertension, congestive heart failure, liver disease, edema, and muscle spasms.

His health status has deteriorated so much that, while using a cane or walker prior to incarceration he is now wheelchair bound. (Thomas, 3,4). He is housed on L1 with other "older" detainees, but the space is too small to hold all the beds in a manner that would allow for social distancing. Instead, my inspection of this line revealed that several sets of bunks were clustered together in a corner of the room, with minimal space between the beds. it is also impossible to social distance in the L line (Thomas, 9). The men literally sit next to other. (*See* Exhibit A). Also, I observed that the toilet and shower are in the same room, with no physical barrier between them and the bunks. Mr. Thomas also reports it was impossible for him to get his wheelchair into the shower on B3, the COVID-19 solitary confinement line he was placed on when he became sick. And he states his wheelchair needs repairs, but he is afraid to tell anyone this, because he has been threatened by medical staff that they will take his chair away. He has been wheelchair-bound in the facility for 2 years (Thomas, 22)

b. Detainee-witness Evans is a 56-year-old black male with diabetes, hypertension, diabetic retinopathy (with loss of functional vision in his right eye), osteomyelitis (bone infection), Charcot joint of the ankle (fused ankle), chronic kidney failure, deep vein thrombosis (blood clot) in his leg, arthritis, obstructive sleep apnea (requiring CPAP), and a hernia. (Evans, 4-8). He has been housed in the medical observation unit. On April 12th, he registered an elevated temperature; the next day he was transferred to Our Lady of the Lake Hospital for intensive COVID-19 care. He was intubated, ventilated, and in a coma for most of the 17 days in the hospital. During the hospitalization, he developed a urinary tract infection from the catheter, bed sores, and a dislocated shoulder—the latter from falling on the return to the jail while he was detained in black box cuffs. Guards and nursing staff are aware of Evans medical condition; despite this, he has not received any wound care or physical therapy since his return from the hospital. (Evans, 10).

c. Detainee-witness Cage is a 38-old-male with diabetes, hypertension, bronchitis, and chronic edema due to a traumatic laceration. (Cage, 3). On or around March 9, he reported feeling ill and began vomiting blood. He registered a very high fever at a subsequent visit to the medical department—104.9. (Cage, 6). He was sent back to his line after a steroid injection. He stated he started feeling better, but he continued with fevers. He was seen by a physician by video conferencing on 4/7/2020, was finally tested for COVID-19, and was then sent to the B-line. (Cage, 10). He graphically describes the B-line—rat and spider infested, with mold and rust throughout. (Cage, 11). He was on 23+ hour lockdown and reports receiving no medical care other than blood sugar checks and pill call. (Cage, 15). He was sent to Angola on 4/10/2020 and stayed until 4/22/2020. He reports losing 115 pounds during his time with an active COVID-19 infection. He was not provided a suit that fit; he was told by the officers that they didn't have his size. (Cage, 21-24).

d. Detainee-witness Denning is a 35-year-old with diagnoses of hepatitis C (for which he had a prescription for medication prior to his arrest but that was not

4

filled at the jail), a seizure disorder, arthritis, and PTSD related to incarceration. He is not receiving his typical medications for PTSD, and he was told by the doctor that the only other thing that would work for his PTSD was therapy, but that he could not get therapy in the jail (Denning, 5). Mr. Denning recounts that the first COVID-19 infection among the inmates was a man who worked in the chow hall and as a hall man, so he had access to much of the building. Another early infection among deputies was a deputy who died less than a week after working at the prison serving food to detainees. (Denning, 6, 7).

11. East Baton Rouge Parish Prison does not have adequate facilities to provide safe care to medically vulnerable detainees, much less the ability to protect medically vulnerable detainees from COVID-19. During the tour, Major Catherine Fontenot corrected me when I referred to certain rooms as part of the infirmary. She informed me that they do not have 24-7 nursing staff and providers are available by phone. She stated that these units are more of post-hospitalization transition units. The medical unit as well as the COVID-19 positive medical unit have beds bolted to the floor that are just a few feet away from each other. Their showers, sinks, and toilets are communal and infrequently cleaned. (Evans, 24)

**Inability of East Baton Rouge Parish Prison to Observe CDC Guidelines by Detainees and Staff**

12. The current census of East Baton Rouge Parish Prison, the dormitory style housing units, the dramatic state of disrepair, the lack of enforcement of behaviors such as appropriate mask-wearing, hygiene, and regular and as-needed cleaning, and the physical structure of the complex makes it impossible to follow CDC guidance for social distancing measures, which places detainees, staff, and any visitors at risk for COVID-19 infection. Congregate environments such as those at the East Baton Rouge Parish Prison for dining, sleeping, showering, toileting, watching television, and using the telephone are overcrowded such that it is impossible to maintain the required 6 feet of separation between detainees.

13. The foundation of the CDC's guidance to the general public accurately reflects the scientific consensus that social distancing is the first and most critical defense to reduce risk of transmission. In contrast, the CDC's guidance to jails is less stringent and appears to be a request to do the best that they can, while still urging everyone outside of a jail to take more extensive measures to protect themselves. Unless this gap between recommendations is eliminated, the risk of transmission remains significantly greater inside the jail than outside the jail. People moving between the two settings become vectors for spreading the virus. There is increased risk of transmitting COVID-19 in jails like East Baton Rouge Parish Prison where social distancing is not possible. This creates greater risk for spread through the entire community outside the jail walls.

    a. The physical structure of the housing units does not allow social distancing.

    b. In situations where detainees could approximate 6 feet among them, the officers are not enforcing appropriate behavior. Examples include:

5

      i. Detainees are not sleeping head-to-foot per CDC guidelines. All the people I saw in their bunks who were sleeping or reclining during the inspection were aligned in parallel. And due to the layout of the beds and bunks in the dormitory-style housing throughout the facility, and the fact that these fixtures are bolted to the ground, sleeping head to toe would still not provide adequate distancing.

      ii. The booking line has in a confined space where detainees are shoulder-to-shoulder (Mancuso, 4) in filthy conditions.

      iii. Upon inspection, I noticed that in less congested spaces, such as the women's line, even though the Jail could have spread out the women across the bunks so they could socially distance among the empty bunks, the Jail did not and instead assigned the women bunks close together. This is an instance in which the officers could have enforced social distancing but chose not to.

      iv. There was crowding and lack of social distancing in shared congregate areas. This was particularly prominent in my observation of the Q, E, F, and L lines. The officers did not encourage social distance during the inspection, which tracked the declarations of several men on these lines. (Mancuso 11, Thomason, 6; Hodges 6, 7, 10) Moreover, it was obvious during our inspection that the officer walking ahead of the group of us was reminding inmates to pull their bandanas up over their faces. Almost all the inmates on most of the units were seen pulling up their bandanas when we arrived on the lines. It was apparent to me that the guards were enforcing this rule for purposes of my inspection, and this led me to question whether they were enforcing this rule outside of the inspection.

14. East Baton Rouge Parish Prison does not have adequate secondary mitigation strategies for COVID-19.

    a. Officers and other jail staff do not regularly wear protective gear, as outlined by the CDC. Multiple Plaintiffs and witnesses, like Williams, Rogers, Hardy, and Shepherd, report seeing guards who were not wearing masks, gloves, or other protective equipment. Williams Decl. ¶ 26; Rogers Decl. ¶ 35; Hardy Decl. ¶ 21; Shepherd Decl. ¶ 22. The jail also failed to give Plaintiffs and witnesses, even COVID-19-positive Plaintiffs and witnesses, adequate protective equipment; they are instead given thin bandanas. Rogers Decl. ¶ 36. While bandanas are certainly better than nothing as a barrier, they are considered "homemade masks" by the CDC and are not considered PPE. They should only be used as a crisis capacity strategy.

    b. There appear to be adequate cleaning supplies on hand, but plaintiffs and witnesses report inadequate cleaning—both scheduled and as needed. Staff are not cleaning multiple times daily and/or on an as needed basis. Detainees report they do not receive adequate cleaning supplies. Many cleaning supplies were seen during the inspection; however, only 3 trustees were seen cleaning in the entire complex during the inspection. Also, all the mop buckets contained brown, dirty

       water solutions, and mops and brooms appeared dirty. (See Exhibit B, Mop & Broom)
- v. Plaintiffs and witnesses reported the following in terms of supplies and cleaning behaviors
    1. What they are given is plain water or watered-down cleaning product with no odor of bleach or other chemicals (Mancuso, 13; Alford 28; Denning, 15)
    2. Shared spaces are not wiped down regularly (Vinning, 14; Denning 15)
    3. Detainee-witness Hodges (8) reports detainees having to stretch or water-down products themselves, including a product that could just be household-use Fabuloso, which is not on the CDC's list for cleaning supplies that protect against COVID-19.
    4. Plaintiffs and witnesses reported not receiving supplies daily. (Hodges, 21).
- vi. One statement summarizes structure and behaviors among the staff: "This is the nastiest jail I've ever been in in my life. They just don't care about cleanliness or our health here. They're supposed to give us cleaning supplies twice a day, but sometimes we just get the dirty mop and water from the previous night. The jail doesn't clean the mops. The jail doesn't wipe down the fountain, it doesn't wipe down the phones, it doesn't even tell us to wipe these things down before we use them. Even now, during this pandemic." (Mancuso, 14) In my observations during the inspection, I can confirm that the conditions, even in this reportedly unusually clean state, were appalling for the filth and for harm to those who live and work in them. (*See* Exhibit B and Exhibit C).

15. Structural issues at the East Baton Rouge Parish Prison do not allow for adequate social distancing, cleaning, or even basic safe hygiene practices. While more detailed information will be provided in the upcoming inspection report, my observations below are the basis for this statement.

    a. Specific lines
        i. A, B, C: In these lines, metal surfaces were rusted to thickness of 1cm or more of rust, bars were rusted with layers of chipping paint (likely lead paint in the building built before 1978. That was the last year lead was routinely used in house paint), and surfaces were irregular. (*See* Exhibit D and Exhibit E). These conditions were mentioned in detail by detainee-witness Alford (10-23).
        ii. E, F: In these lines, detainees were not allowed to socially distance in their bunkroom, due to location and configuration of the bunks, which were welded together. (*See* Exhibit F). Due to the size of the room and the number of detainees, they were not able to socially distance in the dayroom either. (*See* Exhibit G and Exhibit H). Toilets and showers are only separated a few feet from the bunks with no physical barriers. In E,

7

        two of the four showers are broken, and rats have been seen by Plaintiff Tasco (8) running the pipes visible in the wall.
  iii. L: These lines for older detainees—according to Warden Grimes—were also arranged so that it is impossible to social distance while sleeping or awake. Toilets and showers are separated only a few feet from the bunks with no physical barriers. (*See* Exhibit A.)
  iv. Central Booking: In these holding cells, men were grouped in common cells, and they were not observing social distancing. (See Exhibit I). In the women's cell, 6 or 7 people were crowded into a cell of no more than 100 square feet. (See Exhibit J)

b. Bunkbeds: Throughout the facility, bunks were uniformly covered in rust and peeling paint. Many had holes from the rusting process. It is a common practice for detainees to line these surfaces with newspapers prior to laying their mattress on them. Layers of newspaper fragments observed during the inspection confirm this practice. (See Exhibit F).
c. Walls, ceilings, bars, metal surfaces: Throughout the facility, I observed surfaces with chipping paint and rust. Many of these rusted areas are deep enough to cause lacerations and are risks for tetanus infection. Many ceilings were also observed to have rust stains from leaks.
d. Showers: Many showers were observed to have mold on the grout and around the drain. Many were broken. (*See* Exhibit K and Exhibit L).
e. Toilets:
  i. By estimate, approximate 20-25% of toilets and urinals were broken and either clogged or covered in plastic to deter use. (*See* Exhibit M and Exhibit N).
  ii. I have reviewed the declaration of Dr. Amir Moheb Mohareb regarding the aerosolization of COVID-19. I agree with his conclusions and find that it is supported based on my understanding of the medical science. Viruses that are aerosolized can travel and can "remain suspended in the air and remain infective over several hours and over long distances." Surgical masks such as those distributed to detainees at the East Baton Rouge Parish Prison are ineffective at preventing the spread of aerosolized viruses. I reach this conclusion based on my examination of these masks during the inspection.
  iii. Studies demonstrate that one-way COVID-19 spreads is through fecal-oral contact. This contact can be spread through touch, but fecal matter can also be aerosolized through the act of voiding and by flushing toilets. It is my medical opinion, based on my observations, that the East Baton Rouge Parish Prison's configuration creates a serious risk of contracting COVID-19 due to the congregate nature of the restrooms in each housing unit. The toilets are close together and near other utilities in the bathroom, and none of the toilets have lids, based on my observations during my inspection. Detainees share toilets in the housing

   units and have complained of a lack of toilet paper as well as cleaning supplies. (*See* Exhibit O)

  f. Ventilation:
    i. Grids over vents were commonly clogged with dirt and dust. Many were covered over with newspaper and plastic bags. (*See* Exhibit P)
    ii. Many grid covers were rusted over. (*See* Exhibit O).

16. Detainees at the East Baton Rouge Parish Prison are not receiving education about coronavirus, COVID-19, and information about cleaning frequency and reentry planning.
    a. Signage from the CDC or any other health authority is scare in the facility. A few units have a low-literacy page of information on the wall, but the information is typically outdated, so inmates are not aware of what we are learning about the virus and how it may present. This lack of knowledge further endangers both inmates and staff.
    b. Many detainees report the only information they receive is from the television news and the occasional newspaper. (Mancuso 15).

17. Detainees at the East Baton Rouge Parish Prison are not receiving testing and treatment for illnesses consistent with COVID-19. The declarations I reviewed are remarkably consistent on several points of care and housing.
    a. Detainees report poor medical care, waiting days to be evaluated by medical staff, inability to get tested despite typical symptoms of coronavirus. (Mancuso 5-7; Weatherspoon, 5; Vinning, 10-12; Alford, 6; Thomason, 8, 9; Hodges, 13-18; Denning, 8, 9; Cage 6, 10)
    b. Detainees report living on the same lines as detainees who had symptoms days before they did, lack of coordination of housing of detainees with known or suspected COVID-19 status, (Mancuso 8-10; Alford 6, 9; Hodges, 13-18);
    c. Detainees are disincentivized to get their temperature checked or report symptoms because of repercussions, teasing, and transfer to a COVID-19 solitary confinement line without appropriate testing (Vinning, 18)

18. Officers, medical staff, and institutional workers (trustees) are not consistently displaying CDC recommended behaviors
    a. Inconsistent and improper use of masks among staff and trustees (Alford, 27; Evans, 25). Upon inspection, I observed both inmates and staff putting bandanas and/or PPE in place as we walked onto the lines.
    b. Plaintiffs and witnesses report that officers have not formally told them about coronavirus (Hodges, 24)
    c. Officers cycle detainees in and out of housing units—particularly the J01 line, which is supposed to be a 14-day quarantine line for new intakes at the Jail. Plaintiffs and witnesses report that these groups of men are not being cohorted. (Thomason, 6).

19. Behaviors by officers and administration reported by plaintiffs and witnesses are consistent with general lack of urgency of the health crisis or respect of the detainees.

9

   a. Plaintiffs and witnesses report threatened retaliation if they do not engage in behaviors that were not usually enforced—all for the inspection on 6/5/2020. (Alford, 32);
   b. Plaintiffs and witnesses report no response to grievances about coronavirus-related issues. (Hodges 25, 26).
   c. Plaintiffs and witness were threatened with transfer to Angola if they complained about the coronavirus and feeling ill (Denning, 8).

**What if the Status Quo is Maintained?**

20. The ability of COVID-19 to confer herd immunity on a population such as that in a correctional facility is an unproven concept. Herd immunity occurs when a large majority of the population, generally at least 70%, becomes immune to a disease by one of two routes: vaccination or sustained antibody production following an infection with an agent, in this case the coronavirus. [6]Herd immunity requires strong lasting antibody protection post-infection; there is no evidence that COVID-19 provides this yet. The second requirement is that the virus remains stable and doesn't mutate, so that the protection remains. Likewise, there is no scientific evidence of that yet. The other cost of herd immunity would be the death toll required for 70% or so of the population to be infected with coronavirus. At current rate of spread of coronavirus infectivity, it will be well into 2021 before the virus spreads to 70% of the population. If death rates remain at current levels, over 500,000 Americans would die of COVID-19 by that time. [7]

21. The CDC has defined medically vulnerable patients and populations. As the pandemic continues, the CDC has clarified that black and brown communities are particularly at risk for sickness and death. Many reasons for overrepresentation of these groups as casualties of COVID-19 include living conditions—living in more densely populated areas, residential segregation, food deserts, multi-generational households; work circumstances—working outside the home in essential, at-work roles, less paid sick leave; less access to healthcare and health insurance; more stigma and systemic inequalities; and, particularly relevant to this declaration, sustained overrepresentation in jails and prisons due to lack of resources, lack of effective representation, and institutional racism.[8] Nationally, black deaths from COVID-19 are nearly twice greater than expected based on their share of the population. COVID-19 has magnified the

---

[6] Mayo Clinic, *Herd Immunity and COVID-19 (coronavirus): What you Need to Know,* June 6, 2020, https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/herd-immunity-and-coronavirus/art-20486808.

[7] David Dowdy and Gypsyamber D'Souza, *Early immunity against COVID-19: Dangerous Misconception,* Johns Hopkins University and Medicine (Last visited June 8, 2020). https://coronavirus.jhu.edu/from-our-experts/early-herd-immunity-against-covid-19-a-dangerous-misconception.

[8] Racial and Ethnic Minority Groups, CDC (Last reviewed June 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html

disparities in health between white communities and black and brown communities in the U.S. [9] As a result, jails will perpetuate and accelerate the civil unrest currently gripping the country if action is not taken now.
22. Additionally, since inmates are locked in place, but the staff are moving in and out of the facility, the staff may be carrying the virus with them as long as the virus is present in the community. This back-and-forth from the community into the jail puts medically-vulnerable inmates at risk of infection with every shift change.

23. If medically vulnerable detainees are not released as soon as possible, in a matter of days, rather than weeks, they are at risk of infection, sequelae such as long-lasting and permanent organ damage, and even death. Survival from COVID-19 does not guarantee a life free from damage from the virus. Long-term effects of COVID-19 infection include the following:

    a. Lung scarring and decreased lung capacity
    b. Stroke, embolism, and blood clotting disorders, which may result in permanent disabilities and amputations
    c. Heart damage, including cardiomyopathy and enlarged, ineffectively pumping hearts
    d. Neurological deficits, psychological deficits, and mental illness[10]

Many of the inmates in EBRPP already have these deficits; infection with coronavirus could cause additional permanent damage and impairment.

**Summary and Recommendations**

24. The administration and staff have made several steps forward to create a safer environment for detainees and staff by complying with some of the CDC's guidelines; however, there are multiple areas of non-compliance that are critical with respect to the health and safety of medically vulnerable detainees in particular.

    a. Area of compliance with CDC guidelines
        i. Releasing some inmates to begin lowering the census at the jail
        ii. Maintaining a large inventory of cleaning supplies and soap
        iii. Using disposable utensils and plates for meals
        iv. Posting some limited—albeit outdated—signage from the CDC

    b. Lack of compliance
        i. There is still a lack of social distancing, which in the essential primary mitigation strategy. Many lines are just too populated to support social distancing. The built environment contains fixtures that are bolted to

---

[9] Maria Godoy and Daniel Wood, *What Do Coronavirus Racial Disparities Look Like State By State,* NPR (May 30, 2020), https://www.npr.org/sections/health-shots/2020/05/30/865413079/what-do-coronavirus-racial-disparities-look-like-state-by-state.
[10] Lois Parshley, *The Emerging Long-Term Complications of Covid-19 Explained,* VOX (May 8, 2020), https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms.

11

the floor and are too close to each other to allow distancing. Inmates are not routinely reminded to maintain a safe distance.

ii. The Jail lacks a consistent approach to housing detainees based on their known COVID-19 status. Detainees are not consistently housed or moved based on signs, symptoms, or testing. Detainees report infections and what are likely reinfections based on lack of proper cohorting, lack of effective isolation/quarantine, and lack of prompt medical intervention.

iii. Lack of secondary mitigation:
  1. Face masks are used sporadically and often incorrectly. Thin cloth bandanas are not PPE.
  2. Cleaning surfaces: Detainee-witness Mancuso (16) reports that "This week, the guards have been cleaning the line a lot more than usual." This was presumably in preparation for the visit on 6/5/2020. (The declaration is dated 6/3/2020). Detainee-witness Evans reports the same (31, 33). This is again repeated by witness Cage. (30). And while this effort to clean is better than routine practice, it still left a filthy, toxic environment due to rust, mold, paint chips, and disrepair that could never be adequately cleaned.

iv. Lack of education and information about the virus was a recurrent theme in the declarations and in the site visit.

v. Lack of adequate testing. There are two types of testing: diagnostic testing is used when someone feels ill, and a provider makes a diagnosis; surveillance testing is used to see the prevalence or presence of coronavirus infection in a community. Surveillance testing is done for asymptomatic individuals. Surveillance testing is particularly important for coronavirus because the majority of people who are infected with the virus are asymptomatic.
  a. Surveillance testing would allow staff to identify asymptomatic positive detainees and inform them to make appropriate housing decisions. Surveillance testing would also identify staff who may be positive and shedding virus inside the facility and out in the community. The declarations in this case repeatedly state that diagnostic testing is inadequate. There is no mention of surveillance testing.
  b. Medical staff and correctional staff cannot rely only on temperatures and verbal screens to identify people who are infectious and may be shedding the virus to others. To control this outbreak and future outbreaks, both types of testing must be available for inmates, correctional staff, medical staff, and anyone else visiting the complex. Positive test results then need to followed up with contact tracing, for decisions regarding housing and repeat testing.
    i. Several declarations report that medical staff in the Jail have stopped checking detainees' temperatures. (Tasco, 12, Stirgus, 11). While temperature checks alone cannot

       prevent an outbreak, when combined with surveillance testing and screening measures they are a necessary to prevent future outbreaks.

    c. The East Baton Rouge Parish Prison remains an incubator for the coronavirus and current practices ensure that people within the facility are not only a risk to themselves, they are also a profound risk to the surrounding parish.

25. In my opinion, East Baton Rouge Parish Prison needs to move as quickly as possible, in a timeline of days rather than weeks, to:

    a. Release as many medically vulnerable inmates from East Baton Rouge Parish Prison as possible. Delays will result in more infections among inmates and staff, more advanced disease, more disease brought back to the community, and preventable disease and death. There is no effective way to eliminate the risk for medically vulnerable detainees in the jail. The best chance for medically vulnerable inmates to survive the pandemic is to release them from the jail so they have the opportunity to practice social distancing.

    b. Continue reducing the population that remains in order to best approximate social distancing. Enough inmates should be released so that remaining inmates can more closely approximate social distancing as defined by the CDC.

    c. Enforce CDC guidelines to reduce the risk of infection and sequelae, through strict adherence to use of PPE, cleaning, and hygiene practices, to all in the jail environment, including inmates, correctional staff, medical staff, vendors, and other visitors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

*Fred Rottnek*                                                                                    06-08-20

Fred Rottnek, MD