**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| CLIFTON BELTON, JR., individually and on behalf of all others similarly situated,<br><br>     Petitioners/Plaintiffs,<br><br>v.<br><br>SID GAUTREAUX, in his official capacity as Sheriff of East Baton Rouge, et al.,<br><br>     Respondents/Defendants. | Case No. 3:20-cv-000278-BAJ-SDJ<br><br>**IMMEDIATE RELIEF SOUGHT**<br><br>**CLASS ACTION** |

**PETITIONERS' POST-HEARING BRIEF**

**UNDISPUTED FACTS[1]**

**A. Social Distancing, the Only Method to Protect Medically Vulnerable Persons, Is Impossible At The Jail**

There are three crucial undisputed facts in the record before this Court: 1) COVID-19 is a highly infectious disease that poses life threatening risks to medically vulnerable individuals; 2) social distancing must be the cornerstone of any effort to protect against the spread of COVID-19 and the only realistic means to protect the medically vulnerable; and 3) social distancing is impossible in the Jail. Dr. Rottnek, Warden Grimes, and Ms. McNeel agreed during their live testimony that COVID-19 is a serious and dangerous disease that poses a substantial threat of harm to the medically vulnerable Petitioners. *See* Tr. at 73:1-9; 144:18-25; 188:25, 189:1-7. Each of the witnesses further agreed that social distancing is critical to preventing the spread of COVID-19. Tr. at 71:15-19 (Rottnek); *id.* at 126:16-19 (Grimes); *id.* at 196:25-197:3 (McNeel).[2]

Nonetheless, the live testimony confirmed that social distancing in the Jail is impossible.

---

[1] Unless otherwise indicated, defined terms have the same meaning as they were given in briefs in support of Petitioners' Emergency Motion for a Temporary Restraining Order. *See* R. Doc. 21-1, 67.

[2] Ms. McNeel, the lone witness to claim that social distancing was possible at the Jail (without any support for her conclusion), admitted that she had not visited the Jail since the middle of April. *Id.* at 197:4-9; 204:4-12.

1

Dr. Rottnek, having visited the Jail five days prior, observed that beds are bolted to the floor "within a couple feet of each other," *id.* at 78:16-79:2; toilets, showers, and sinks are "within a couple feet of each other," with soap shared at the sinks, *id.* at 77:4-11; and even patients in the infirmary were "standing next to each other within a few feet" without masks, *id.* at 78:8-16. Warden Grimes admitted that social distancing in the E and F housing lines is "hard" and that, in order to properly socially distance, it would be necessary to decrease the number of detainees below the current number. *Id.* at 157:12-18; 159:8-10. The Jail's alternative to social distancing—having detainees sleep head to toe, *see id.* at 126:24-127:18—is not an effective substitute. Dr. Rottnek testified that not only did he fail to observe any detainees actually sleeping head-to-toe, but even if enforced, the strategy would make no difference in preventing the spread of COVID-19 because the beds remained too close together. *Id.* at 220:22-221:5.

The witnesses also concurred that the medically vulnerable face the highest level of risk from COVID-19. *Id.* at 72:8-20 (Dr. Rottnek); *id.* at 152:9-22 (Grimes); *id.* at 189:3-7 (McNeel). But, in spite of this, the Jail's efforts to protect the medically vulnerable from COVID-19 have been virtually non-existent. Warden Grimes has not moved any medically vulnerable person because of their susceptibility to COVID-19, and Respondents pointed fingers at each other when addressing responsibility for the medically vulnerable. *Id.* at 152:9-17 ("Grimes: That would be something that would come from the Medical Department"); *id.* at 197:10-18 ("McNeel: Correct Health does not determine where the [medically vulnerable] inmates are placed. That is up to Warden Grimes in corrections."). The lack of accountability at the Jail places medically vulnerable detainees in even more danger. Consistent with the consensus of public health opinion, the only safe option for the medically vulnerable is to be released from the Jail. *Id.* at 87:7-17.

**B.     The Jail Does Not Know How To Contain The Spread Of COVID-19.**

Warden Grimes' and Ms. McNeel's testimony confirm that the Jail is either unaware or incapable of properly testing and treating its detainees for COVID-19. Dr. Rottnek explained that, in order to slow the spread of COVID-19, testing must be "plentiful" and "available on demand," *id.* at 80:24-81:4, for both diagnostic and surveillance purposes. *Id.* at 81:1-4. Specifically, testing should be administered on "a widespread basis" in order to monitor the spread of the virus even among asymptomatic people, as "the vast majority of people with the virus are not symptomatic." *Id.* at 81:11-82:2; 82:18-21. Yet Ms. McNeel, the supervisor of the Jail's medical department, *id.* at 167:10-14, showed little to no understanding of the process for or necessity of widespread testing. When asked about such testing, Ms. McNeel stated that the Jail doesn't "just go around and test people" and offered a shockingly misguided—and revealing—hypothetical: "if you didn't show any symptoms of diabetes or you weren't sick, would you go to the doctor?" *Id.* at 187:9-20. Asked if the Jail makes efforts to test asymptomatic detainees, she simply responded: "Why would we?" *Id.* at 193:9. Ms. McNeel's rejoinders draw an obviously false distinction between communicable and non-communicable diseases and completely ignore all medical literature regarding the asymptomatic spread of COVID-19. Ms. McNeel's assertion—without a shred of evidence—that she does not believe there is a single asymptomatic individual currently in the Jail can be characterized only as deliberately indifferent. *Id.* at 196:12-20.

The Jail is currently conducting only limited diagnostic testing and *no* surveillance testing. *Id.* at 196:21-24. Neither Warden Grimes nor Ms. McNeel were able to even identify the total population of detainees and staff to be tested at the Jail, only the number of tests that had been administered. *Id.* at 146:14-147:6; 196:6-15. More concerning, Warden Grimes conceded that the information was unavailable precisely because "our prison people are moving in and out every 20

minutes . . . to every hour or so during the course of a day, because our population goes in and out." *Id.* at 146:14-147:6.[3]  The movement of potentially asymptomatic COVID-19 carriers into and out of—as well as throughout, in the case of guards, trustees, and hall men—the Jail only increases the risk to all detainees and especially those with medical vulnerabilities.[4]  Respondents' testimony raises critical doubts about their ability to properly ascertain or treat sick detainees, placing both detainees and staff at grave risk of contracting and further spreading COVID-19.

## ARGUMENT

These facts, in combination with the voluminous corroborating fact and expert testimony in this case, demonstrate that the risk to pretrial subclass members is excessive in relation to any governmental need, in violation of the Fourteenth Amendment.  *See* R. Doc. 21-1 at 28-32; R. Doc. 67 at 19-21.  Respondents' awareness that their ongoing confinement of medically vulnerable post-conviction Petitioners in the "deplorable" conditions at the Jail poses a serious risk of infection and death also amounts to deliberate indifference in violation of the Eighth Amendment.  *See* R. Doc. 21-1 at 32-37; R. Doc. 67 at 21-24.[5]  These violations must be remedied, even if Respondents are not originally responsible for the Jail's overcrowding.  Under 28 U.S.C. § 2241, this Court has jurisdiction to order the release of individuals detained "in violation of the

---

[3] *See* Exh. A, Declaration of Michael A. Mitchell (Mitchell Decl.) ¶ 9 (people are still being booked into the Jail); Timothy Williams, Libby Seline, & Rebecca Griesbach, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. Times (June 16, 2020), https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html.

[4] The Jail's contact tracing procedures are similarly deficient.  As Dr. Rottnek testified, contact tracing does not work where the Jail quarantines only the unit that a positive detainee previously resided on.  Tr. at 221:6-16; 151:6-25. (Grimes).  Not only does the Jail fail to test any officers or staff who may have come into contact with that detainee, but it overlooks where the detainee may have been housed or moved around previously and who else may have been exposed to COVID-19 as a result.  Tr. at 221:6-16.

[5] *Valentine* and *Marlowe* do not require a different result, either.  Notably, the Fifth Circuit has withdrawn the non-binding stay order issued by a motions panel in *Valentine*, 956 F.3d 797 (5th Cir. 2020), on which *Marlowe* relied heavily.  *See Trevino v. Davis*, 861 F.3d 545, 548 n.1 (5th Cir. 2017) (explaining that motions panel decisions are non-binding).  In remanding the case to the district court for fact finding in connection with a requested permanent injunction, the panel highlighted the serious threats to medically vulnerable individuals in correctional facilities.  *See Valentine v. Collier*, No. 20-20207, slip op. at 2-4 (5th Cir. June 5, 2020) (Davis & Graves, JJ., concurring).

4

Constitution and laws of the United States," 28 U.S.C. § 2243; *Boumediene v. Bush*, 542 U.S. 723, 759 (2004).[6]

## A. The Exhaustion Doctrine[7] Does Not Limit This Court's Jurisdiction To Hear Petitioner's Claims, Nor Does It Prevent This Court From Granting A Writ Of Habeas Corpus Under 28 U.S.C. § 2241

Because Petitioners' TRO does not ask the Court to order a change in jail conditions, and because the only remedy for Petitioners' unconstitutional confinement is release, this Court has habeas jurisdiction under 28 U.S.C. § 2241.[8] Exhaustion is not required under § 2241, nor is it a jurisdictional requirement; courts counsel the exhaustion of state remedies under § 2241 primarily as a matter of comity. *Montano v. Texas*, 867 F.3d 540, 542 (5th Cir. 2017); *see also McGee v. Estelle*, 722 F.2d 1206, 1210 (5th Cir. 1984). Cases imposing an exhaustion requirement typically recognize that principles of comity mandate that state courts should have the first opportunity to pass on the legality of their own state laws or processes, *see Rose v. Lundy*, 455 U.S. 509, 518 (1982); but Petitioners in no way seek to interpret or question state law in a manner that would show disrespect to the state judiciary, they simply make a routine request to impose obligations on state officials presently acting in violation of the Constitution. Indeed, the Supreme Court has explained the need for a flexible approach to exhaustion under § 2241 to ensure the functional availability of the writ of *habeas corpus*:

> [W]e have consistently rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its effectiveness with the

---

[6] The term "release" refers to the discharge of individuals from the physical confines of the Jail, not necessarily release from all forms of custody. Release options may include supervised release, halfway house residential placement, transfer to a hospital or other facility, or diversion to community and treatment programs.

[7] Respondents did not argue exhaustion in their opposition to Petitioners' TRO, even though it is classified as a non-jurisdictional affirmative defense requiring Respondents to demonstrate plausible grounds for exhaustion. Therefore, the argument should be deemed waived. In addition, because the Jail's own Inmate Grievance Procedure ("IGR") explicitly "does not apply to matters outside the jurisdiction of the [Jail], such as . . . *habeas corpus proceedings*," Petitioners address the exhaustion doctrine as it applies to first instance relief in state court, not administrative relief through the IGR. *See* R. Doc. 35-29 at Exh. A, E.B.R. Parish Prison Inmate Rules and Regulations at 25 (emphasis added).

[8] *See* R. Doc 21-1 at 39-41 (citing cases); R. Doc. 67 at 15-17 (same).

5

>manacles of arcane and scholastic procedural requirements. The demand for speed, flexibility, and simplicity is clearly evident in our decisions concerning the exhaustion doctrine . . . .

*Hensley v. Mun. Ct., San Jose Milpitas Jud. Dist., Santa Clara Cty., Cal.*, 411 U.S. 345, 350 (1973). Accordingly, the Fifth Circuit has recognized that "[e]xceptions to the exhaustion requirement are appropriate where the available . . . remedies either are unavailable or wholly inappropriate to the relief sought, or where the attempt to exhaust such remedies would itself be a patently futile course of action." *Montano*, 867 F.3d at 542-43 (quoting *Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir. 1994)). Here, the available state court processes appear incapable of providing relief, let alone with the urgency to meet the needs of the subclass members in this case.

As an initial matter, the state courts adjudicating each subclass member's underlying criminal charges were functionally closed for the first two months of the pandemic and are operating on only a limited basis since May 15, 2020. *See* Exh. A, Mitchell Decl. ¶¶ 7-8. The only process available was an informal one involving the District Attorney, Public Defender, and the Judges of Baton Rouge's 19th Judicial District Court. *Id.* ¶¶ 2, 3, 7. This informal, uncodified process was not public, did not provide a mechanism for subclass members to put their name forth and seek release, did not include notice to subclass members that they had been considered and denied, and did not provide for any form of appeal. *Id.* ¶ 3. Each of the Medically Vulnerable Subclass representatives in this case were considered and rejected through this informal process. *Id.* ¶ 5. These back-room dealings—the only game in town for much of the pandemic—was thus unavailable to subclass members and an ineffective substitute for relief before a court.

Second, even if pretrial subclass members could access state courts, an individual's health is not a statutorily recognized factor to consider in bond proceedings. *See* LA. CODE. CRIM. PROC. ANN. art. 316 (listing factors to be considered in determination of bail amount). Indeed, the procedures for setting bail and modifying conditions of release do not require any review of

whether Petitioners are "in custody in violation of the Constitution," as 28 U.S.C. § 2241 requires. Moreover, the Louisiana statute governing suspension and deferral of sentences in felony cases applies only "*after* a first, second or third conviction of a noncapital felony" and is subject to additional exclusions and limitations. LA CODE CRIM. PROC. art. 893 (emphasis added); *Busby v. Bonner*, --- F. Supp. 3d ---, 2020 WL 3108713, at *5 (W.D. Tenn. Jun. 10, 2020) (waiving exhaustion where no state remedy exists to challenge custody based on medical vulnerability).[9] Medically vulnerable pretrial detainees are thus in no position to seek release in state court based on their at-risk status. In light of the functional unavailability and apparent futility of relief in state court, this Court is within its discretion to excuse non-exhaustion of state court remedies here.

Third, the Supreme Court recognizes that exhaustion is not required in habeas cases "where exceptional circumstances of peculiar urgency are shown to exist." *Lundy*, 455 U.S. at 515–16. The COVID-19 pandemic is the "quintessential example of when unusual and exceptional circumstances exist" and in which "peculiar urgency" is required. *Cameron v. Bouchard*, --- F. Supp. 3d ---, 2020 WL 2569869, at *14, *15 (E.D. Mich. May 21, 2020) (waiving exhaustion of state-court remedies in "unusual circumstances"); *Hensley*, 411 U.S. at 350 (habeas relief is appropriate in "cases of special urgency" and "more conventional remedies [are left] for cases in which the restraints on liberty are neither severe nor immediate"). Indeed, "[i]f medically vulnerable detainees are not released as soon as possible, in a matter of days rather than weeks, they are at risk of infection, sequelae such as long-lasting and permanent organ damage, and even death." Rottnek Suppl. Decl. at ¶ 23. The time needed for "more conventional remedies" would therefore "hobble [the] effectiveness" of the critical habeas remedy here. *Id.* at 350.

---

[9] Likewise, the Department of Public Safety and Corrections' policy regarding medical releases is limited to those with terminal illnesses or permanent incapacitations and is therefore unhelpful to the medically vulnerable subclass members seeking to avoid a potentially terminal illness. *See* Exh. C, La. Dep't of Pub. Safety & Corrs., No. HC-06, Medical Releases (2010) ¶¶ 4, 7.

Finally, Petitioners seek class-wide relief, and Respondents cannot suggest how Louisiana state courts could adjudicate potentially hundreds of individual bail reduction motions and take into account class members' medical vulnerabilities in the urgent manner necessary. *See McPherson v. Lamont*, No. 3:20-cv-534 (JBA), 2020 WL 2198279, at *7 (D. Conn. May 6, 2020) (waiving § 2241 exhaustion requirement because state courts were unlikely to respond to the volume of emergency petitions required for class members to exhaust state law process).

### B. The Court has Broad Discretion to Release Medically Vulnerable Detainees under the Equitable Doctrine of Bail Enlargement Pending Habeas Corpus

a. *Bail Pending Habeas is Proper Here*

Federal district courts have inherent power and jurisdiction to release prisoners, including state prisoners, on bail pending determination of a federal habeas corpus petition. *See In re Wainwright*, 518 F.2d 173, 174 (5th Cir. 1975) (per curiam); *see also Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974) (per curiam). In *post-conviction* proceedings, where principles of comity and finality are at their zenith, to be released on bail pending habeas review, the petitioner must demonstrate that he "has raised substantial constitutional claims upon which he has a high probability of success, and also when extraordinary and exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective." *Calley*, 496 F.2d at 701. Based on these considerations, federal courts have begun releasing pre- and post-conviction detainees during the current pandemic while their class action habeas petitions are pending.

For example, a federal court in the District of Massachusetts has released (and continues to release) civil immigration detainees on non-monetary bond conditions while their class action habeas petition is pending. *See Savino v. Souza*, No. 20-10617-WGY, 2020 WL 1703844, at *8-*9 (D. Mass. Apr. 8, 2020). The *Savino* petitioners sought habeas relief because the civil detention facilities in which they are housed are too cramped and unsanitary to protect them from contracting

8

COVID-19. *Id.* at *1-*3. Finding "extraordinary circumstances" in "this nightmarish pandemic," the court opted to "diligently entertain[] bail applications while the petitions for habeas corpus are pending." *Id.* at *9. The district court requested and rapidly considered an initial list of 50 detainees for bail and has since considered class members' bail applications in groups of 10. Order, *Savino v. Souza*, No. 20-10617-WGY, Doc. No. 44, at 3 (Apr. 4, 2020).[10]

Both of the conditions for bail pending habeas are met here. The medically vulnerable Petitioners are likely to succeed on their petitions for habeas corpus because continuing to detain them despite the unreasonable risk of contracting COVID-19 violates their due process rights. This is a substantial constitutional claim, one that raises important issues about the rights of detained people during an unprecedented global pandemic. And the circumstances are extraordinary. The overwhelming and uncontested consensus of medical experts is that members of the Medically Vulnerable Subclass face a serious risk of painful illness, permanent bodily damage, and death if they contract COVID-19.

### b. *The Court Has Latitude to Develop a Plan for Bail Pending Habeas*

The Court has several options to consider in exercising its equitable authority. As a matter of equity, the Court (or a special designee such as a magistrate or master) could go through groups of presumptively innocent detainees to determine which individuals should be released pending the adjudication of the habeas petition. R. Doc. 21-1 at 26-27. The Court could also release on bail every medically vulnerable pretrial detainee charged with an offense that does not have as an element of use or threatened use of violence or unwanted sexual touching of another person.

---

[10] *See also id.*, ECF No. 45 at 1-3 (listing class members in groups of 10 for bail consideration); *id.*, ECF No.77 at 1-3 (Apr. 10, 2020) (same). On April 15, 2020, the Court denied the government's request to stay the releases. In its Order, the Court explained: "We are in the midst of a pandemic unprecedented in our lifetime. . . . [T]he Court will continue, on an individual basis, to work through the difficult issues of bail in the present crisis. . . . Moreover, compelling issues of individual, institutional, and community health preclude the luxury of a stay so counsel can 'consider their appellate options.'" *Id.*, ECF No. 86 at 1-3 (Apr. 15, 2020).

Similarly, the Court could release every pretrial detainee who would be eligible for release if they paid a certain amount of bail. All of these filters would significantly aid Respondents in achieving the social distancing urgently recommended by medical experts, and all of them can be done without serious dispute that those released are a threat to public safety.

When adopting such an approach, this Court could order that any and all non-financial conditions of release already ordered by a state court in any person's case remain the same. This approach would help ensure that any intrusion on state court proceedings is minimal and targeted only at terminating pretrial detention of presumptively innocent people in dangerous conditions. Indeed, this Court could even convert the secured bail amount to an unsecured bond amount, meaning that the same financial condition of release remains in each person's case, but merely removing the obligation to pay prior to release. Under such unsecured bonds, the person would still owe the same money as they would with a secured bond if they ultimately violate the conditions of the bond. As the Southern District of Texas held, based on a thorough review of the empirical literature, unsecured bonds are just as effective as secured bonds at ensuring court appearances and public safety. *See ODonnell v. Harris Cty.*, 251 F. Supp. 3d 1052, 1144 (S.D. Tex. 2017) ("[T]he record evidence shows that secured money bail is not more effective at increasing the likelihood of appearance or law-abiding behavior before trial than release on an unsecured or nonfinancial condition."), *aff'd as modified*, 892 F.3d 147 (5th Cir. 2018).

Respectfully submitted, this 16th day of June, 2020.

*/s/ David J. Utter*  
David J. Utter (LA Bar No. 23236)  
FAIR FIGHT INITIATIVE  
410 East Bay Street  
Savannah, Georgia 31401  
(912) 236-9559 Telephone  
david@fairfightinitative.org  
*Attorneys for Plaintiffs*

*/s/Miriam R. Nemeth*  
Miriam R. Nemeth (DC Bar No. 1028529)**  
ADVANCEMENT PROJECT  
1220 L Street NW, Suite 850  
Washington, DC 20005  
(202) 728-9557 Telephone  
mnemeth@advancementproject.org  
*** Lead Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 16, 2020, a copy of the foregoing was filed electronically with the Clerk of the Court, using the CM/ECF system.  Notice of this filing will be sent by operation of the court's electronic filing system and/or via U.S. Postal Service to counsel of record.

      /s/ *David J. Utter*
      David J. Utter