# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CLIFTON BELTON, JR., JERRY BRADLEY, CEDRIC FRANKLIN, CHRISTOPHER ROGERS, JOSEPH WILLIAMS, WILLIE SHEPHERD, DEVONTE STEWART, CEDRIC SPEARS, DEMOND HARRIS, and FORREST HARDY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SHERIFF SID GAUTREAUX, in his official capacity as Sheriff of East Baton Rouge; LT. COL. DENNIS GRIMES, in his official capacity as Warden of the East Baton Rouge Parish Prison; CITY OF BATON ROUGE/PARISH OF EAST BATON ROUGE,<br><br>Defendants. | Case No. 3:20-cv-000278-BAJ-SDJ |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO SHERIFF SID J. GAUTREAUX, III, AND LT. COLONEL DENNIS GRIMES'S MOTION TO DISMISS

### INTRODUCTION AND PROCEDURAL HISTORY

On May 27, 2020, ten individuals detained in the East Baton Rouge Parish Prison ("Jail") filed this lawsuit on behalf of all people detained in the Jail.[1] They did so in the middle of a global pandemic, alleging that the Jail's beleaguered medical care system is failing to protect detainees

---

[1] R. Doc. 4. Plaintiffs reflect the full range of people subject to East Baton Rouge Parish's criminal justice system—pretrial detainees, individuals convicted of a crime, and people accused of violating their conditions of probation or parole—and seek to represent a class of all people detained in the Jail. R. Doc. 8. Collectively, they are protected by the Eighth and Fourteenth Amendments to the United States Constitution. *See, e.g.*, *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 649 (5th Cir. 1996) (With the exception of their conditions of confinement theory and not having to prove subjective deliberate indifference, the care due a pretrial detainee and person convicted of a crime are the same. Put another way, "there is no legally significant situation in which a failure to provide an incarcerated individual with medical care or protection from violence *is* punishment yet *is not* cruel and unusual.").

from COVID-19, the disease caused by a novel and highly infectious coronavirus.[2]  On July 3, 2020, after briefing and an evidentiary hearing, this Court denied Petitioners' motion for a temporary restraining order seeking the immediate release of medically vulnerable individuals under 28 U.S.C. § 2241.[3]

On July 18, 2020, pursuant to the parties' agreement to conduct limited expedited discovery, the Sheriff Defendants and Defendant City of Baton Rouge/East Baton Rouge Parish ("City Defendant") produced a limited sample of documents related to the Jail's population, response to the pandemic, and Plaintiffs' medical conditions and treatment which, when it is timely to consider, would substantiate Plaintiffs' allegations.  On July 28, 2020, the Sheriff Defendants filed a Motion to Dismiss all of Plaintiffs' claims pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure,[4] which Plaintiffs hereby oppose.  This Court has jurisdiction over Plaintiffs' 28 U.S.C. § 2241 and 42 U.S.C. § 1983 claims, Plaintiffs have standing to bring this lawsuit, and their First Amended Class Action Complaint ("Complaint") clearly states claims under the Eighth and Fourteenth amendments and 42 U.S.C. § 1983.

## STATEMENT OF FACTS[5]

Since Plaintiffs filed their Complaint, the number of people diagnosed with COVID-19 in East Baton Rouge Parish has more than quadrupled, from 3,319 on May 21, 2020 to 12,875 on August 17th.[6]  As to be expected with such a contagious virus, cases are again reappearing in the

---

[2] R. Doc. 4
[3] R. Doc. 90.
[4] R. Doc. 92.
[5] As described below, the Court may only look to the well-pled allegations of the complaint to evaluate the sufficiency of Plaintiffs' claims for relief under Rule 12(b)(6), although it may consider additional evidence, including expert and witness testimony, when evaluating Plaintiffs' standing and the Court's subject matter jurisdiction under Rule 12(b)(1).  The new facts set forth here go to Plaintiffs standing, while Plaintiffs' well-pled allegations in their Complaint support the inference of liability under Plaintiffs' substantive legal claims.
[6] *See La. Coronavirus Map & Case Count*, N.Y. Times (Aug. 17, 2020, 4:37 P.M. E.T.), *available at* https://www.nytimes.com/interactive/2020/us/louisiana-coronavirus-cases.html#county; *see also* Exh. 1, Decl. of Dr. Susan Hassig ("Hassig Decl.") ¶¶ 2-3 (noting that East Baton Rouge's cases rose from 1,629 last month to

2

Jail, contrary to the Sheriff Defendants' assertion in their motion to dismiss that no new male detainees have been diagnosed, and exposed individuals have been moved into general population.[7]  The reality, of course, is that no one knows how many people in the Jail have the virus because Defendants refuse to test everyone, including people who are not symptomatic but who nevertheless can transmit the virus.[8]  Simply declaring, as the Sheriff Defendants do, that the pandemic in the Jail is under control without testing ignores the fact that, if proper surveillance testing were done, a great number of detained people may be shown to have the virus.[9]

Publicly available documents show that the Jail failed to provide sufficient health care to people detained there for years prior to the pandemic.[10]  In 2015, the Sheriff himself told the Metro Council that the "old part of the prison is really in *deplorable* condition.  We have issues with ventilation; with plumbing.  Really it's laid out in the old way, that poses a problem from a safety standpoint for the safety of the inmates in the prison . . . ."[11]  A doctor who worked at the Jail for years witnessed a "significant decline in care to patients" due to underfunding and understaffing.[12]

---

5,340 this month and that East Baton Rouge is among the worst parishes in one of the most impacted states).

[7] *Compare* Exh. 2, Decl. of Travis Day ("Day Decl.") ¶¶ 3-4 (men moved from isolation to general population after exposure, and men in general population are sick); Exh. 3, Decl. of Ransom J. Parker ("Parker Decl.") ¶¶ 6-9, 15-16 (trustees were exposed to sick guard, and there are 6 sick men on COVID-19 lockdown);

eExh. 4, Decl. of Demaris Carter ("Carter Decl.") ¶ 3 (men in general population are sick); Exh. 5, Suppl. Decl. of Devonte Stewart ("Suppl. Stewart Decl.") ¶ 13 (sick man was brought onto M01); Exh. 6, Suppl. Decl. of Derick Mancuso ("Suppl. Mancuso Decl.") ¶ 8-11 (there are sick men on COVID-19 lockdown and Jail staff isn't taking seriously cases on the line); Exh. 14, Decl. of Jimmie Knoten ("Knoten Decl.") ¶ 12 (coughing man moved to general population) *with* R. Doc. 92 at 6 ("There have been no new cases diagnosed among male inmates since May 12, 2020."). *Accord* Exh. 1, Hassig Decl. ¶ 5-6.

[8] R. Doc. 84 at 109 (Dr. Fred Rottnek testifying that, without surveillance testing, there is simply no way to know how many people in the Jail have COVID-19); *see also id.* at 196 (responding to a question about surveillance testing of asymptomatic detainees, CorrectHealth's health supervisor stated, "Why would we [test them]?"); *accord* Exh. 5, Suppl. Stewart Decl. ¶ 5; Exh. 4, Carter Decl. ¶ 3; Exh. 2, Day Decl. ¶¶ 3, 5, 7; Exh. 6, Suppl. Mancuso Decl. ¶¶ 6-7; Exh. 8, Decl. of Alvin Banks ("Banks Decl.") ¶ 6, 12, 13, 16-18, 20-21; Exh. 7, Decl. of Casey Wade Harris ("C. Harris Decl.") ¶¶ 34-35; Exh. 9, Decl. of Jocquenee Bernard ("Bernard Decl.") ¶¶ 4, 6, 8; Exh. 10, Decl. of John Leagard ("Leagard Decl.") ¶¶ 18-19; Exh. 13, Decl. of Calvin Kemp ("Kemp Decl.") ¶¶ 13, 19, 31.

[9] *See, e.g.*, Assoc. Press, *At Louisiana prison, 192 out of 195 inmates test positive for COVID-19*, Market Watch (May 5, 2020), *available at* https://www.marketwatch.com/story/louisiana-prison-unit-has-192-of-195-inmates-test-positive-for-covid-19-2020-05-05.

[10] R. Doc. 4 ¶¶ 71-73.

[11] *Id.* ¶ 71 (emphasis added).

[12] *Id.*

In 2015, Councilwoman Banks-Daniel described the health care situation in the Jail as "catastrophic."[13]  With a mortality rate above the national average, Defendants outsourced health care to a private, for-profit provider in 2016.[14]  Since then, the death rate has risen even higher.[15]

Into this constitutionally deficient health care system comes the pandemic.  Efforts to reduce the Jail's population, conceivably to permit social distancing, resulted in a population decrease of less than 24%.[16]  Parts of the Jail's physical structure are decrepit and the conditions so "deplorable" that, by Warden Grimes's own admission, if the federal government were to inspect it, they would force its closure.[17]

Overlaid onto the Jail's overcrowded and inadequate physical structure, Plaintiffs allege, are policies and practices that fail to protect the detainees, including but not limited to:

- General population housing lines are made up of either [one] or two large dorm rooms filled with bunk beds or a row of cells that house approximately two to four people, along with a communal "day room" and a multi-person bathroom.  There is no way to socially distance on these lines, even with population reductions spurred by the pandemic.  The dorm-style housing lines can hold between 24 and approximately 100 people in each dorm room.[18]
- Detainees sleep in bunks that are no more than a few feet apart, or in some cases only a couple of inches apart.  The aisles between the rows of beds are only wide enough for two people to pass at once.  The individuals on these lines cannot be six feet apart while they are sleeping or moving around these dorm rooms.[19]
- Detainees spend most of their days in the day rooms on each line and cannot socially distance here either.  During shift change and roll call, which happens twice a day and lasts for up to an hour each time, detained people are all required to be in the day room, often clumped around the door waiting for guards to call their names.  The twice-a-day "pill call" is much the same:  detained men and women are required to line up one closely behind the other in the day room to receive their prescribed medications—for conditions such as high blood pressure, diabetes, HIV, and mental health needs—from CorrectHealth's nurses . . .

---

[13] *Id.*
[14] *Id.* ¶ 72.
[15] *Id.* ¶ 73.
[16] *See, e.g.*, R. Doc. 84 at 121-22 (Warden Grimes testifying that the Jail's population one year ago was 1347 and had been reduced to 1031 on June 10, 2020).
[17] *Id.* at 144-145.
[18] R. Doc. 4 ¶ 86.
[19] *Id.* ¶ 87 (footnote omitted).

without the opportunity to wash their hands first.[20]

- It is not possible to maintain adequate social distance in the bathrooms. Toilets, sinks, and showerheads are so close that the detainees can touch each other while using them. None of the toilets in the Jail have lids to contain splashes or particulate matter.[21]

- Detained individuals also share the limited number of telephones on the lines, and the telephones are not cleaned between uses. Without chemicals or cleaning wipes, the detainees do their best to wipe the heavily used phones on their uniforms or clean them with soap and water. But this is insufficient, and detainees are left to put a sock on the phone (and sometimes also on their hands) to attempt to protect themselves from transmission of the virus.[22]

- Jail staff do not provide detainees with sufficient information about the coronavirus, its symptoms, or how to protect themselves from the virus. On the Q9-10 lines, guards even turned off the television when news about the coronavirus came on. Jail staff keep information from detainees about coronavirus in the facility and in the community, and they do not instruct detainees on proper handwashing or mask-wearing techniques.[23]

- Individuals who have or are suspected of having COVID-19 are moved to a solitary confinement line in the A, B, or C wings, the same wings of the old Jail that were condemned and shut down in 2018. Upon information and belief, the Jail did not repair or deep clean these lines before they moved detainees onto them. The lines remain filthy and unsafe. In addition to the conditions that plague the rest of the Jail, these lines are covered in black mold; are home to large rats and spiders; have showers that leak water down the hallway; and have only questionably potable water in the cells. Individuals detained on solitary confinement lines are not permitted to leave their lines for any reason.[24]

- Individuals on the A, B, and C lines are confined in small, often poorly ventilated units with either one or four-person cells. Detainees on the B line often share their cells with one or two other people, and the beds in those cells are less than four feet apart, making it impossible to maintain a distance of at least six feet. The cells on each of these lines are separated by thin metal walls, but the front of the cells have bars that allow for the consistent circulation of ambient air. Men can reach out of the bars on the front of their cells and into the cells next to them; they pass hygiene supplies, books, and food up and down the line this way.[25]

- Detainees in solitary confinement are locked in their cells by the guards for approximately 23 hours per day. Some individuals get as little as 15 minutes out of their cell each day to shower and call their loved ones. The solitary confinement lines have no access to televisions or radios. Guards beat up, mace, or threaten men who seek extra time out of their cells to shower or make phone calls. After they've finished giving every detainee their turn out of their cells, the guards often leave the lines entirely—sometimes for hours at a time—and detainees have to beat on the door or kick their walls to get the guards'

---

[20] *Id.* ¶ 88.
[21] *Id.* ¶ 95.
[22] *Id.* ¶ 96.
[23] *Id.* ¶ 100.
[24] *Id.* ¶ 109.
[25] *Id.* ¶ 110.

attention if they need it.[26]

- The same concerns regarding social distancing, sanitation, and protections against transmission that exist on the quarantined general population lines are present in the solitary confinement lines as well.[27]

- As in the quarantined general population lines, all detainees on a solitary confinement line share the same shower and telephone. But these amenities are generally not cleaned between each use—even though many of the men on the line are sick—and may not even be cleaned every day. Detainees put a sock over the phone to protect themselves when they call their loved ones or their attorneys. The showers on most of these lines are so cold that they're unusable, and men often have to bathe in the sinks in their cells.[28]

- In short, the solitary confinement lines that Defendants use to warehouse people who have contracted COVID-19 or are displaying symptoms commensurate with the virus are incredibly punitive and indistinguishable from the lines used for disciplinary segregation.[29]

- Social scientists uniformly document that solitary confinement, even for a period of days or weeks can have profound psychological and physical effects, such as a heightened state of anxiety and nervousness, headaches, insomnia, lethargy or chronic fatigue (including lack of energy and lack of initiative to accomplish tasks), nightmares, heart palpitations, and fear of impending nervous breakdowns. Other documented effects include obsessive ruminations, confused thought processes, an oversensitivity to stimuli, irrational anger, social withdrawal, hallucinations, violent fantasies, emotional flatness, mood swings, chronic depression, feelings of overall deterioration, as well as suicidal ideation. Individuals in prolonged solitary confinement frequently fear that they will lose control of their anger, and thereby be punished further.[30]

- Although persons sent to the A, B, and C solitary confinement lines have cell- and/or line-mates, being locked up around the clock—particularly in the cramped conditions in the Jail's solitary confinement lines—does not necessarily compensate for the feelings of isolation and disorientation that these individuals frequently experience.[31]

These policies and practices are further supported by declarations of the Plaintiffs and numerous witnesses in this case, which demonstrate the substantial risk of harm they face, sufficient to support standing. Plaintiffs incorporate by reference the summaries provided in their Motion for Temporary Restraining Order, R. Doc. 21-1 at 7-23, and Reply in Support of their Motion for Temporary Restraining Order, R. Doc. 67 at 3-12, *see also* R. Doc. 39 to 39-14. In addition to those detailed factual statements, Plaintiffs submit an additional 11 declarations. The

---

[26] *Id.* ¶ 111.
[27] *Id.* ¶ 112.
[28] *Id.* ¶ 113.
[29] *Id.* ¶ 116.
[30] *Id.* ¶ 117.
[31] *Id.* ¶ 118.

harrowing details in these declarations demonstrate that "[n]othing has really improved since the attorneys did their inspection in this case in early June.  If anything, things have gotten worse" since the first wave of the pandemic.[32]  Though the Sheriff Defendants claim otherwise, these declarations show that the Jail is not following the CDC's guidelines.[33]  Detainees in the Jail remain unable to socially distance on the housing lines,[34] and the Jail is in fact bringing more people back onto the lines, exacerbating this problem.[35]  The Jail still is not providing proper supplies to clean the lines.[36]  Many guards and detainees are no longer wearing their masks,[37] increasing the risk of viral transmission as a second wave picks up steam in the Jail.[38]  The guards are not enforcing rules to protect detainees from the risk of contracting COVID-19.[39]

In addition, the medical staff continues to refuse to test detainees for coronavirus or conduct

---

[32] Exh. 11, Decl. of Billy Pettice ("Pettice Decl.") ¶ 26; *see also* Exh. 10, Leagard Decl. ¶¶ 19 ("Nothing has changed in the way the jail handles things or in our ability to get sick again. . . . How are they going to stop us from getting sick again?  They didn't stop it the first time."), 23 ("Not really much has changed since the inspection in early June.  They're getting away with everything they're doing that's out of line."); Exh. 5, Suppl. Stewart Decl. ¶ 6 (guards moved men off lockdown before the inspection to falsely make the situation look better); *accord* Exh. 1, Hassig Decl. ¶ 19 ("the danger COVID-19 poses to detainees in the East Baton Rouge Parish Prison is now more severe than it was in May") Exh. 12, Decl. of Dr. Fred Rottnek ("Rottnek Decl.") ¶ 37 ("it is my professional judgment that conditions are worsening in the facility").

[33] *See, e.g.*, Exh. 1, Hassig Decl. ¶ 9.

[34] *See, e.g.*, Exh. 11, Pettice Decl. ¶¶ 27-28, 34-35; Exh. 6, Suppl. Mancuso Decl. ¶ 14; Exh. 10, Leagard Decl. ¶¶ 6-9; Exh. 9, Bernard Decl. ¶¶ 13-15; Exh. 7, C. Harris Decl. ¶¶ 27-28, 31, 37, 39, 42, 44-45; Exh. 3, Parker Decl. ¶ 10; Exh. 8, Banks Decl. ¶¶ 7, 9; Exh. 2, Day Decl. ¶¶ 8-9; Exh. 4, Carter Decl. ¶¶ 6-8; Exh. 5, Suppl. Stewart Decl. ¶¶ 5, 10; Exh. 13, Kemp Decl. ¶¶ 23, 25-27, 32; Exh. 14, Knoten Decl. ¶ 7; Exh. 1, Hassig Decl. ¶ 9.

[35] *See, e.g.*, Exh. 11, Pettice Decl. ¶ 27; Exh. 6, Suppl. Mancuso Decl. ¶ 5; Exh. 10, Leagard Decl. ¶ 5; Exh. 9, Bernard Decl. ¶ 13; Exh. 7, C. Harris Decl. ¶ 36; Exh. 13, Kemp Decl. ¶¶ 21, 24; *cf.* Exh. 8, Banks Decl. ¶ 12; Exh. 1, Hassig Decl. ¶ 9.

[36] *See, e.g.*, Exh. 11, Pettice Decl. ¶¶ 29-33; Exh. 6, Suppl. Mancuso Decl. ¶¶ 15-16; Exh. 10, Leagard Decl. ¶ 4; Exh. 9, Bernard Decl. ¶ 16; Exh. 7, C. Harris Decl. ¶ 46; Exh. 3, Parker Decl. ¶ 12; Exh. 8, Banks Decl. ¶¶ 7, 11, 22; Exh. 13, Kemp Decl. ¶¶ 17, 33-34; Exh. 14, Knoten Decl. ¶¶ 7, 10, 18.

[37] *See, e.g.*, Exh. 11, Pettice Decl. ¶¶ 36-37; Exh. 6, Suppl. Mancuso Decl. ¶¶ 13, 17; Exh. 10, Leagard Decl. ¶¶ 11-12; Exh. 9, Bernard Decl. ¶¶ 3, 9-10; Exh. 3, Parker Decl. ¶¶ 5, 9; Exh. 8, Banks Decl. ¶ 8; Exh. 4, Carter Decl. ¶¶ 5-6; Exh. 5, Suppl. Stewart Decl. ¶ 12; Exh. 13, Kemp Decl. ¶¶ 29-30, 38-39; Exh. 14, Knoten Decl. ¶¶ 10-11, 16; Exh. 12, Rottnek Decl. ¶ 19.

[38] *See, e.g.*, Exh. 12, Rottnek Decl. ¶¶ 5-6; *cf.* Exh. 1, Hassig Decl. ¶¶ 7 (noting that bandanas—like those used in the Jail—"in fact may enhance the spread of coronavirus through smaller aerosolized droplets"), 10.

[39] *See, e.g.*, Exh. 11, Pettice Decl. ¶¶ 34, 37-38; Exh. 6, Suppl. Mancuso Dec. ¶¶ 14, 17; Exh. 7, C. Harris Decl. ¶¶ 37, 46; Exh. 9, Bernard Decl. ¶¶ 10, 14; Exh. 5, Suppl. Stewart Decl. ¶ 12; Exh. 10, Leagard Decl. ¶¶ 6-7; Exh. 13, Kemp Decl. ¶¶ 22, 24; Exh. 14, Knoten Decl. ¶ 17.

any other surveillance checks for coronavirus symptoms.[40]  They continue to provide poor care for coronavirus patients[41] and even for individuals who present with more typical medical conditions.[42]  The medical staff has further failed to adequately care for—or, in some cases, even identify—serious after-effects in individuals who have recovered from COVID-19.[43]

Perhaps most concerning, however, is the fact that a second wave of the virus is beginning in the Jail, and Jail staff continue to needlessly expose detainees to the virus and have failed to implement any mechanisms to track the viral spread during this wave.[44]  It is as if they believe that they have met their duty to care for the individuals trapped in their facility simply if those individuals do not die, without regard to the injuries presented by exposure, infection, or long-term impacts of this virus.  But the declarations of Plaintiffs and witnesses in the facility call into question whether the Jail has even prepared enough to prevent deaths during this wave of the virus, and Plaintiffs' expert further opines that prior infection with COVID-19 may not provide immunity against future infections.[45]

Plaintiffs thus have standing and their allegations more than state a claim for relief.  No one denies the danger the novel coronavirus poses:  since Plaintiffs filed their Complaint on May

---

[40] *See, e.g.*, Exh. 12, Rottnek Decl. ¶ 22; Exh. 6, Suppl. Mancuso Decl. ¶¶ 6, 7, 12; Exh. 10, Leagard Decl. ¶¶ 18-19; Exh. 9, Bernard Decl. ¶¶ 4, 6, 8; Exh. 7, C. Harris Decl. ¶¶ 34-35; Exh. 3, Parker Decl. ¶ 8; Exh. 8, Banks Decl. ¶¶ 6, 12, 13, 16; Exh. 2, Day Decl. ¶¶ 3, 5, 7; Exh. 4, Carter Decl. ¶ 3; Exh. 5, Suppl. Stewart Decl. ¶ 5; Exh. 13, Kemp Decl. ¶¶ 13, 19, 31; Exh. 14, Knoten Decl. ¶ 7; Exh. 1, Hassig Decl. ¶ 10.

[41] *See, e.g.*, Exh. 14, Knoten Decl. ¶¶ 13, 19, 21; Exh. 9, Bernard Decl. ¶¶ 4, 8; Exh. 8, Banks Decl. ¶¶ 13, 16-18, 20-21; Exh. 13, Kemp Decl. ¶¶ 13, 15-16, 19; Exh. 6, Suppl. Mancuso Decl. ¶ 7; Exh. 10, Leagard Decl. ¶ 19, 21.

[42] *See, e.g.*, Exh. 8, Banks Decl. ¶¶ 28-31 (hepatitis C, high blood pressure, diabetes); Exh. 6, Suppl. Mancuso Decl. ¶ 21 (stroke-like symptoms); Exh. 14, Knoten Decl. ¶¶ 5-6, 19 (hepatitis C, asthma, liver and lung disease, PTSD, depression); Exh. 13, Kemp Decl. ¶¶ 7, 27, 29 (diabetes); Exh. 10, Leagard Decl. ¶¶ 20, 21 (tooth); Exh. 9, Bernard Decl. ¶ 18 (glasses).

[43] *See, e.g.*, Exh. 11, Pettice Decl. ¶¶ 39-41 (abdominal pain and potential kidney issues); Exh. 6, Suppl. Mancuso Decl. ¶ 22 (more frequent headaches, joint pain, raspy throat, fatigue); Exh. 1, Hassig Decl. ¶¶ 14, 16-19; Exh. 12, Rottnek Decl. ¶ 28 (noting the lack of adequate medical care in EBRPP); *cf.* Exh. 5, Suppl. Stewart Decl. ¶¶ 9, 11 (high blood pressure in young man with no other risk factors).

[44] *See, e.g.*, Exh. 12, Rottnek Decl. ¶ 22; Exh. 2, Day Decl. ¶¶ 3-4; Exh. 4, Carter Decl. ¶ 3; Exh. 5, Suppl. Stewart Decl. ¶ 13; Exh. 3, Parker Decl. ¶ 15; Exh. 6, Suppl. Mancuso Decl. ¶ 11; *cf.* Exh. 13, Kemp Decl. ¶ 19.

[45] *See, e.g.*, Exh. 1, Hassig Decl. ¶ 15.

27, when the seven-day average of new infections in Louisiana was 465, the number has more than doubled to 933 on August 17, 2020.[46]  Although there may be a chasm between Plaintiffs' factual allegations and the Sheriff Defendants' claim that they have taken sufficient measures to protect people in the Jail from the COVID-19 pandemic, the allegations in Plaintiffs' Complaint nonetheless state a viable claim for relief.

## LAW AND ARGUMENT

### I.    APPLICABLE LEGAL STANDARD

Under the 12(b)(6) standard, all well-pleaded facts must be viewed in the light most favorable to the plaintiff.  *Hale v. King*, 642 F.3d 492, 498-99 (5th Cir. 2011) (*en banc*).  Courts generally confine their analysis under Rule 12(b)(6) to the complaint and its proper attachments, which "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "Generally, then, even though a court must view all well-pleaded facts in the light most favorable to the non-moving party, the factual allegations must be enough to raise a right to relief above the speculative level."  *Cleveland v. Gautreaux,* 198 F. Supp. 3d 717, 733 (M.D. La. 2016) (citations omitted).  In the exceptional case where a complaint is found deficient under Rule 12(b)(6), the proper remedy is usually to allow the plaintiff to amend the complaint to cure any deficiencies, rather than dismissing the matter with prejudice.  *Pub. Health Equip. & Supply Co. v. Clarke Mosquito Control Equip., Inc*., 410 F. App'x 738, 740 (5th Cir. 2010).

When assessing subject matter jurisdiction, courts are not confined to the four corners of

---

[46] *See La. Coronavirus Map & Case Count*, N.Y. Times (Aug. 17, 2020, 4:37 P.M. E.T.), *available at* https://www.nytimes.com/interactive/2020/us/louisiana-coronavirus-cases.html#county.

the complaint and "may consider affidavits and other evidence outside the pleadings in resolving a motion to dismiss under Rule 12(b)(1)." *See Wije v. Texas Woman's Univ.*, No. 4:14-CV-571-ALM-CAN, 2015 WL 9872534, at *3 (E.D. Tex. Dec. 22, 2015). But a court evaluating a motion to dismiss pursuant to Rule 12(b)(1) must nonetheless continue to "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008); *see also Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237 (5th Cir. 2009).

## II. THIS COURT HAS JURISDICTION TO HEAR PLAINTIFFS'/PETITIONERS' FEDERAL CONSTITUTIONAL CLAIMS

### A. The Court has jurisdiction over Petitioners' well-pled claim under 28 U.S.C. § 2241 for the release of the medically vulnerable subclass

The Sheriff Defendants argue that Petitioners' § 2241 claims should be dismissed with prejudice based on the Court's ruling on Petitioners' Motion for Temporary Restraining Order ("TRO Motion"). R. Doc. 92-1 at 13-14. Defendants' arguments primarily rely on two aspects of the Court's opinion: its language regarding the exhaustion of state court remedies as well as the nature of—and jurisdiction over—Petitioners' § 2241 claim. *Id.*

Critically, different legal standards govern a motion for temporary restraining order and a motion to dismiss—the former demands that petitioners demonstrate a likelihood of success on the merits, while the latter examines the sufficiency of an alleged claim at the pleading stage. The Court's decision on the TRO motion is thus *not controlling* on the motion to dismiss, contrary to Defendants' suggestion. *See, e.g.*, *DGG Grp., LLC v. Lockhard Fine Foods, LLC*, Case No. A-20-cv-330-RP, 2020 WL 2475821, at *4 (W.D. Tex. May 13, 2020) (the legal standard for a preliminary injunction "is much more stringent than the standard used" for a motion to dismiss).

#### 1. Petitioners' § 2241 claim properly sounds in habeas because it challenges the fact, rather than the conditions, of confinement

Citing this Court's order denying the TRO motion, Defendants argue that dismissal is proper because this Court lacks jurisdiction over Petitioners' § 2241 claim. R. Doc. 92-1 at 14. However, the TRO opinion—the only citation Defendants include in support of their argument—did not categorically conclude that the Court lacked jurisdiction over Petitioners' claim. Rather, the Court stated it was "not persuaded" by Petitioners' arguments with the limited factual record and case citations then before the Court for the motion for temporary restraining order. R. Doc. 90 at 8-10. The procedural posture of this case is now, of course, different. The nature of Petitioners' allegations and the growing legal consensus in support of Petitioners' claim demonstrate that dismissal would be improper at this preliminary pleading stage of litigation.

As Petitioners' allegations make clear, they challenge the fact of their confinement under 28 U.S.C. § 2241.[47] The necessity of release to protect the health and lives of the medically vulnerable is undisputed: even Warden Grimes agrees that a reduction in the Jail population is required to properly allow for social distancing. R. Doc. 84 at 161:19-163:2. Although Petitioners' § 2241 challenge requires some discussion of the conditions inside the Jail, the remedy they seek (accelerated release from incarceration, rather than any changes in conditions at the Jail) as well as the nature of their challenge (that there are *no* sets of conditions inside the Jail sufficient to protect their constitutional rights) demonstrate that their claim squarely attacks the fact, rather than the conditions, of their confinement. Indeed, it is the fact that medically vulnerable individuals remain confined at all—not the specific conditions under which they are detained—that is the basis for the injury alleged in this case.

---

[47] *See, e.g.*, R. Doc. 4 ¶¶ 162-64 (alleging there is no available remedy absent release that could protect their constitutional rights), ¶¶ 125-34 (alleging release is necessary to ensure social distancing and to protect the medically vulnerable from unconstitutional violations threatened by their confinement). That Petitioners brought separate Eighth and Fourteenth Amendment claims in addition to their § 2241 claim does not impact jurisdiction.

11

The Court's TRO opinion referenced two cases cited by Petitioners in their motion that purportedly "declined to rule on whether claims attacking conditions of confinement properly sound in habeas." R. Doc. 90 at 9-10 (citing *Vasquez Barrera v. Wolf*, --- F.3d ---, 2020 WL 1904497 (S.D. Tex. Apr. 17, 2020), and *Poree v. Collins*, 866 F.3d 235, 243 (5th Cir. 2017)). However, this specific question—whether a conditions-of-confinement claim that does *not* challenge the fact of confinement can nonetheless properly sound in habeas—misunderstands the habeas claim and arguments presented by Petitioners in this case.

For the reasons asserted above, Petitioners' § 2241 claim attacks the fact of their confinement, not the conditions of their confinement, and therefore properly invokes habeas jurisdiction. As the *Vazquez Barrera* court found, the petitioners' claim "falls squarely in the realm of habeas corpus" because they "challeng[e] the fact of their detention as unconstitutional and seek relief in the form of immediate release"; "[t]he mere fact that [their] constitutional challenge requires discussion of conditions . . . does not necessarily bar such a challenge in a habeas petition." *Vasquez Barrera*, 2020 WL 1904497 at *4.

Many other courts have arrived at the same conclusion. The Sixth Circuit held that where, as here, petitioners "contend that the constitutional violations occurring at [the jail or prison] as a result of the pandemic can be remedied only by release," the claim falls into "'the heart of habeas corpus'" and "jurisdiction is proper under § 2241." *Wilson v. Williams*, 961 F.3d 829, 838 (6th Cir. 2020). Numerous district courts are in accord, as noted in Petitioners' TRO motion and reply briefs. *See* R. Doc. 21-1 at 52; R. Doc. 67 at 15-17.[48] And after Petitioners filed their post-hearing

---

[48] For the Court's convenience, below is a sampling of these cases. *See, e.g.*, *Mohammed S. v. Tritten*, No. 20-cv-783, 2020 WL 2750109, at *2 (D. Minn. May 27, 2020) (finding that although "habeas proceedings are not available to challenge conditions of confinement" in the Eighth Circuit, habeas jurisdiction was appropriate "where the relief requested is release, and the argument is that confinement itself is unconstitutional"); *Dada v. Witte*, No. 1:20-cv-00458, 2020 WL 2614616, at *1 (W.D. La. May 22, 2020) (finding that a petition for release due to medical vulnerability to COVID-19 challenged the fact, rather than the conditions, of confinement and sounded in

12

brief with the Court, additional district courts reached the same conclusion. *See Torres v. Milusnic*, --- F. Supp. 3d ---, 2020 WL 4197285, at *7 (C.D. Cal. July 14, 2020) (where "Petitioners contend there are no set of conditions of confinement that could be constitutional, the Court finds Petitioners challenge the fact of their confinement."); *Fernandez-Rodriguez v. Licon-Vitale*, No. 20 Civ. 3315, 2020 WL 3618941 (S.D.N.Y. July 2, 2020) (finding that petitioners' claim "challenged, at least in part, the 'fact of confinement' because they sought the remedy of release, which they alleged was "necessary" to "effectively practice social distancing"); *McKissic v. Barr*, No. 1:20-cv-526, 2020 WL 3496432, at *2 (W.D. Mich. June 29, 2020) (same).

In light of the nature of the allegations, the remedy sought, and the growing legal support before the Court, Petitioners have provided an adequate basis for this Court to invoke jurisdiction over the habeas claim at this early pleading stage. Dismissal would be improper.

### 2. The exhaustion doctrine permits Petitioners' § 2241 claim to proceed

Contrary to Defendants' assertions, the record demonstrates that state court remedies were unavailable to Petitioners prior to filing this case. The Court's opinion supports rather than undercuts the extraordinary circumstances imposed by the pandemic and the unavailability of state court remedies. To the extent that it relies on an informal release process as an available state court remedy, the opinion shows that Petitioners have already exhausted their claims.

Petitioners incorporate by reference the legal and factual arguments set forth in their post-hearing brief, including their argument that exhaustion of § 2241 remedies is not jurisdictional and that the remedies at issue were not available here. R. Doc. 81 at 5-8. Specifically, the state courts were unavailable because they were closed for much of the pandemic.[49] R. Doc. 90 at 8;

---

habeas); *Malam v. Adducci*, --- F. Supp. 3d ---, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020) ("[W]here a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas.").

[49] Even if state courts had been available, attempts at exhaustion would have been inappropriate and futile given the

*see also* R. Doc. 81-2, Mitchell Decl. ¶¶ 7-8; *Rose v. Lundy*, 455 U.S. 509, 515-16 (1982);

*Montano v. Texas*, 867 F.3d 540, 543 (6th Cir. 2017).[50]  The informal collaboration between the

District Attorney, Public Defender, and 19th Judicial District Court Judges to release certain

individuals was similarly unavailable: it was neither public nor transparent, did not provide a

mechanism for people to apply or advocate for their own release, did not provide notice to anyone

who was considered or denied, and offered no way to file an appeal.  R. Doc. 81-2, Mitchell Decl.

¶ 3.  It would be unreasonable to demand that people avail themselves of a process they could

neither access nor participate in, or to describe such an opaque and exclusive process as

meaningfully available.[51]  In any event, the issue of exhaustion is, as Defendants admit,[52] one in

which additional facts obtained through discovery should be considered, and Petitioners request

additional discovery if this Court is inclined to dismiss their habeas claim on this ground.

Finally, the overlay of the current pandemic certainly constitutes an extraordinary

circumstance warranting waiving the exhaustion doctrine.[53]  Federal courts agree that judge-made

---

relevant statutory limitations.  An individual's health is not a statutorily recognized factor in bond proceedings, *see* La. Code Crim. Proc. Ann. Art 316 (listing factors to be considered in determining bail amount), and medical releases are limited by statute to those with terminal illnesses or permanent incapacitations, R. Doc. 81-3, La. Dep't of Pub. Safety & Corrs., No. HC-06, Med. Releases (2010) ¶¶ 4, 7.  Further, procedures for setting bail and modifying conditions of release do not require any review of whether one is "in custody in violation of the Constitution," as 28 U.S.C. § 2241 requires.

[50] *Cf.* Exh. 3, Parker Decl. ¶ 18; Exh. 9, Bernard Decl. ¶ 20; Exh. 10, Leagard Decl. ¶ 3; Exh. 13, Kemp Decl. ¶ 2.

[51] That Petitioner Clifton Belton was released to home confinement after the filing of this lawsuit does not contradict Petitioners' allegations or the proffered record regarding the unavailability of state court remedies.  *See* R. Doc. 90 at 8.  Mr. Belton was incarcerated pretrial because he could not afford his bond and holds from other parishes demanded his continued incarceration.  The success of his attorneys in negotiating with parishes beyond Baton Rouge and in connecting Mr. Belton to the YWCA Bail Fund have no bearing on the question of state court exhaustion, and it would be unreasonable to hold this zealous advocacy against him and the rest of the Petitioners.

[52] Defendants assert that they will soon move for summary judgment to dismiss Plaintiffs' § 1983 claims for failure to exhaust administrative remedies under the Prison Litigation Reform Act.  R. Doc. 92-1 at 2.  Plaintiffs note that this motion is premature, given that critical discovery on the question of exhaustion has not yet been completed, and Plaintiffs request the opportunity to complete that discovery before summary judgment briefing begins.  *See Dillon v. Rogers*, 596 F.3d 260, 272-73 & nn.3-4 (5th Cir. 2010).

[53] *See, e.g.*, R. Doc. 21-1 at 2-22 (outlining the surge in cases nationally and locally, as well as the devastating experiences of people detained in the Jail); R. Doc. 4 ¶¶ 2, 78 (identifying that as of May 14, over 90 people had tested positive for COVID-19 in the Jail and at least one Sheriff's deputy had died from the virus); R. Doc. 48-2 (outlining additional testimonies of people incarcerated in the Jail); R. Doc. 84 at 148:6-14 (Sheriff Grimes acknowledging that COVID-19 posed a serious threat to "everyone"); *see also* Exh. 1, Hassig Decl. ¶¶ 4-7, 19.

exhaustion requirements for § 2241 claims should be waived in the current pandemic. *See, e.g.*, *Cameron v. Bouchard*, --- F. Supp. 3d ---, 2020 WL 2569868, at *15 (E.D. Mich. May 21, 2020) (finding that the pandemic constituted a "quintessential example of when unusual and exceptional circumstances exist"), *vacated on other grounds*, --- F. App'x ---, 2020 WL 3867393 (6th Cir. July 9, 2020); *Baez v. Moniz*, --- F. Supp. 3d ---, 2020 WL 2527865, at *2 n.5 (D. Mass. May 18, 2020) (declining to apply a "providential exhaustion requirement" to a § 2241 habeas claim in part due to the "extraordinary circumstances and unprecedented public health risks" arising from the coronavirus pandemic). This Court should reach the same conclusion.

Notably, on the day Defendants filed their motion to dismiss, Louisiana reported a higher seven-day average of new coronavirus cases than at any point in the spring,[54] and recent statistics demonstrate that the state leads in COVID-19 cases per capita (outpacing even Florida, New York, and Arizona).[55] The death toll is continuing to rise.[56] And East Baton Rouge recently reported the second highest number of COVID-19 cases in the state, surpassing Orleans Parish. Governor Edwards has himself acknowledged, "[t]here's no doubt in my mind we have more of this virus in Louisiana today than we've had at any point thus far."[57] And rising infection rates are not limited to the community—declarants in the Jail testify that infection rates in the Jail are increasing too, from two in early August to six as of the beginning of the week.[58] Individuals

---

[54] *See La. Coronavirus Map & Case Count*, N.Y. Times (Aug. 17, 2020, 4:37 P.M. E.T.), *available at* https://www.nytimes.com/interactive/2020/us/louisiana-coronavirus-cases.html#county.

[55] William Taylor Potter & Michael Stucka, *Louisiana: The rare case of a state ravaged twice by COVID-19*, USA Today (Aug. 2, 2020, 11:53 AM), *available at* https://www.usatoday.com/in-depth/news/2020/08/01/louisiana-second-covid-19-wave-worse-than-first-no-1-per-capita/5558862002/; *cf.* Exh. 1, Hassig Decl. ¶¶ 2-3.

[56] Jeff Adelson & Sam Karlin, *As a possible plateau in Louisiana coronavirus cases brings hope, fear of rising deaths looms*, Nola.com (Aug. 1, 2020, 8:00 PM), *available at* https://www.nola.com/news/coronavirus/article_bfa0a4ba-d380-11ea-8dd0-8bf67ae4e59a.html.

[57] Scottie Hunter, *East Baton Rouge Parish surpasses Orleans Parish in COVID-19 cases, has second highest in state*, WAFB 9 (July 28, 2020, 10:19 PM), *available at* https://www.wafb.com/2020/07/28/ east-baton-rouge-parish-surpasses-orleans-parish-covid-cases-has-second-highest-state/.

[58] *See* Exh. 3, Parker Decl. ¶ 16; Exh. 8, Banks Decl. ¶ 21; Exh. 14, Knoten Decl. ¶ 15.

exposed to the sick men have been moved to general population without additional quarantining or any coronavirus testing; it is thus impossible to know how far this wave of the infection may already have spread in the Jail.[59]  The exceptional urgency created by this pandemic—as well as the unavailability of state court remedies—should excuse any requirement to exhaust in this case.

If the Court finds that none of the above exceptions apply—and if it finds that the informal collaborative process provided an available state court remedy, *cf.* R. Doc. 90 at 8—then the factual record before this Court indicates that Petitioners' habeas claims have already been exhausted.  As the Court noted, "Warden Grimes testified that *all* inmates at the jail have been considered for release" pursuant to this process,[60] and the record confirms that Petitioners Belton, Franklin, and Shepherd were all "considered during this informal process but were not released."[61]  There was nothing more that Petitioners could have done to fully exhaust: even if they had somehow learned of the denial of their release, they would have been unable to request reconsideration or file an appeal.  *Id*. ¶ 3.  Accordingly, to the extent this informal process constituted an available state court remedy, R. Doc. 90 at 8, the factual record confirms that Petitioners exhausted their § 2241 claim.[62]

## B.  Plaintiffs' Face a Substantial Risk of Severe Illness and Death that Constitutes a Legally Cognizable Injury Sufficient to Confer Standing

Defendants' characterization of Plaintiffs' injury as "speculative"—insofar as they have not demonstrated an instance of COVID-related death or an even more widespread outbreak in the Jail—is incorrect as a matter of law and fact.  R. Doc. 92-1 at 6, 9, 11.  To demonstrate an injury-

---

[59] *See, e.g.*, Exh. 2, Day Decl. ¶¶ 3-4; Exh. 4, Carter Decl. ¶ 3; Exh. 5, Suppl. Stewart Decl. ¶ 13; Exh. 3, Parker Decl. ¶ 15; Exh. 6, Suppl. Mancuso Decl. ¶ 11; Exh. 14, Knoten Decl. ¶ 12; Exh. 1, Hassig Decl. ¶ 10.

[60] R. Doc. 90 at 8 (emphasis added).

[61] R. Doc. 81-2, Mitchell Decl. ¶ 5.

[62] If this Court dismisses the § 2241 claim for failure to exhaust, this dismissal should be without prejudice to allow Petitioners to return once state court remedies are exhausted.  *See Farris v. Allbaugh*, 698 F. App'x 950, 958 (10th Cir. June 22, 2017) (dismissing § 2241 claim without prejudice "to provide Farris the opportunity to exhaust his remedies in the [state] courts"); *Bataldo-Castillo v. Bragg*, 678 F. App'x 166, 166 (4th Cir. Mar. 3, 2017) (same).

in-fact, Plaintiffs need show only a "substantial risk" of injury. *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019). Contrary to Defendants' position, R. Doc. 92-1 at 11, Plaintiffs do not need to demonstrate the actual onset of the injury, let alone the occurrence of death, when the *risk* of harm is present in a prison setting. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004) (prisoner "does not need to show that death or serious illness has yet occurred to obtain relief. He must show that the conditions pose a substantial risk of harm."); *M.D. v. Perry*, 294 F.R.D. 7, 34 (S.D. Tex. 2013) ("plaintiff does not need to wait until actually harmed, until the risk of harm is realized").

The Complaint's allegations demonstrate that Plaintiffs and the other individuals detained in the Jail they face a substantial risk of harm. Numerous Plaintiffs have already contracted COVID-19, and there have been at least 92 reported COVID-19 cases in the Jail as of May 14, 2020, *see, e.g.*, R. Doc. 84 at 151-52, 215. Presently, COVID-19 continues to linger in the Jail, threatening the lives of individuals who are still incarcerated, and new cases are being discovered daily.[63] Not only does COVID-19 already exist in the Jail, but Plaintiffs' expert explains that Defendants' practices have created a "tinderbox" for a COVID-19 outbreak that cannot be contained inside the Jail. *See, e.g.*, Exh. 12, Rottnek Decl. ¶¶ 11, 12. Specifically, Dr. Fred Rottnek stated that, "The lack of implementation and maintenance of [the most basic measures to control the spread of COVID-19], as well as the increasing census, and uncontrolled spread of the virus in East Baton Rouge Parish have created a tinderbox for a viral outbreak in the facility and

---

[63] *See, e.g.*, Exh. 12, Rottnek Decl. ¶ 26;. Exh. 3, Parker Decl. ¶¶ 6-9, 15-16; Exh. 2, Day Decl. ¶¶ 3-4; Exh. 4, Carter Decl. ¶ 3; Exh. 6, Suppl. Mancuso Decl. ¶¶ 6-11; Exh. 5, Suppl. Stewart Decl. ¶ 13; *cf.* Exh. 7, C. Harris Decl. ¶¶ 34-35; Exh. 10, Leagard Decl. ¶ 19; Exh. 14, Knoten Decl. ¶¶ 12, 14.

even more viral spread in the surrounding community." *Id.* ¶ 11. In addition, Plaintiffs have already shown that they are unable to socially distance in the Jail and that the hygiene measures implemented by Defendants have not protected them from actually contracting COVID-19.[64]

Courts regularly find standing in COVID-19 detention cases, even when the petitioners have yet to contract COVID-19. In *Pimentel-Estrada v. Barr*, the court found that a medically vulnerable individual in immigration detention who had not yet contracted COVID-19 met the threshold showing for an injury-in-fact by alleging his inability to follow social distancing and hygiene measures, in the face of public health consensus that such measures are the "only defense against the virus." No. C20-495 RSM-BAT, 2020 WL 2092430, at *9 (W.D. Wash. Apr. 28, 2020). General allegations of unsafe conditions are sufficient to meet the injury-in-fact requirement, because "[c]ourts have recognized that unsafe conditions in a prison or detention center in and of themselves constitute a concrete injury, even if further resulting harm has not yet occurred." *Id.* Similarly, in *Matos v. Lopez Vega*, the court found an injury-in-fact based on the "highly contagious nature of the virus," despite the absence of *any suspected* COVID-19 cases at the facility and even with the possibility that petitioners may *never* contract COVID-19. No. 20-CIV-60784-RAR, 2020 WL 2298775, at *4-7 (S.D. Fla. May 6, 2020); *see also Helling*, 509 U.S. at 33 (finding an Eighth Amendment remedy where detainees are crowded in cells with "infectious maladies," "even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed." (citation omitted)).

Cases like *Pimentel-Estrada* and *Matos* are overwhelmingly the norm. But rather than looking to the myriad cases finding standing for detainees raising COVID-19 challenges, Defendants rely almost exclusively on a mischaracterization of *Marlowe v. LeBlanc*, No. 18-63-

---

[64] *See, e.g.*, Exh. 12, Rottnek Decl. ¶ 20; Exh. 1, Hassig Decl. ¶ 9; R. Doc. 21-1 at 7-23; R. Doc. 67 at 3-12.

BAJ-EWD, 2020 WL 1955303 (M.D. La. Apr. 23, 2020).  Contrary to Defendants' claim, the basis for the court's standing finding was not solely attributable to the increase in COVID-19 cases.  *See* R. Doc. 92-1 at 12.  The court found that the plaintiff had standing despite not having contracted the virus himself because of the inherent "nature of [COVID-19]."  *Marlowe*, 2020 WL 1955303, at *2  ("Due to the nature of this virus, the Court finds that the risk of contracting the virus in a prison environment, where at least 23 inmates have already tested positive, poses a sufficiently high risk . . . even though Plaintiff has not contracted the virus."); *accord Coreas v. Bounds*, --- F. Supp. 3d ---, 2020 WL 1663133, at *5 (D. Md. Apr. 3, 2020) (injury exists even without confirmed cases, because of inherent dangers of congregate facilities and the "widespread havoc the virus can wreak once inside these facilities.");[65] *Fofana v. Albence*, No. 20-10869, 2020 WL 1873307, at *8 (E.D. Mich. Apr. 15, 2020) ( "Petitioners do not need to allege that the jails currently have COVID-19 cases or that they have contracted the virus to demonstrate standing"); *Fraihat v. U.S. Immigration & Customs Enf't*, No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570, at *21 (C.D. Cal. Apr. 20, 2020) ("[e]ven if no detainee . . . had tested positive" the court "rejects the contention that the risk of COVID-19 is overly speculative.").

And, aside from being legally irrelevant to the standing inquiry, Defendants' factual assertion that COVID-19 cases have been steadily declining in the Jail rings hollow.  Defendants appear to assume that, in the absence of regular testing, there are no cases.  R. Doc. 92-1 at 11-12. This is not how the virus—with rampant asymptomatic spreading—works.  *Coreas*, 2020 WL 1663133, at *6 (noting that "it is impossible to point to any confirmed cases . . . when

---

[65] *Coreas* also held that petitioners met the redressability requirement of standing, finding absurd the claim "that someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty."  *Id*. at *6 (noting further that "Petitioners have provided multiple expert opinions supporting the contrary conclusion, such as that of Dr. Greifinger, who has stated that [d]etention centers are extraordinarily high-risk environments for the transmission of infectious diseases" (internal quotations omitted)).

Respondents have not conducted any COVID-19 tests at those facilities."); *see also* Exh. 1, Hassig Decl. ¶ 9; Exh. 12, Rottnek Decl. ¶ 22. In *Valentine v. Collier*, a court in this Circuit found that because Plaintiffs pled that 267 inmates tested positive for COVID-19, "it is clear that Plaintiffs were facing and continue to face a threat of imminent injury." 2020 WL 3625730, at *1 (S.D. Tex. July 2, 2020); *see also Valentine v. Collier*, 2020 WL 3491999, at *1 (S.D. Tex. June 27, 2020). There, the number of confirmed cases reflected implementation of "mass testing" of inmates. 2020 WL 3491999, at *8. Where, as here, almost 100 individuals at the Jail have already tested positive for COVID-19, in the absence of comparable "mass testing," R. Doc. 4 at ¶¶ 2, 78, 102-105,[66] the logic of *Valentine* compels a finding of injury-in-fact in this case as well.

Indeed, the risk of infection in the Jail is speculative only if one believes multiplication is speculative. Baton Rouge is reporting some of the highest numbers of COVID-19 cases in Louisiana.[67] Social distancing—the only effective remedial measure against transmission—is impossible in the Jail, which is otherwise decrepit, unhygienic, and unsafe.[68] Furthermore, contrary to Defendants' claim of a decrease in cases, individuals within the Jail have been experiencing a second wave of cases within the facility, with more than six detainees having spent time on the coronavirus lockdown line since the beginning of the month.[69]

Finally, Defendants' reliance on *O'Shea v. Littleton*, 414 U.S. 488 (1974), and *City of Los*

---

[66] Defendants have administered tests in only the most limited circumstances, reserving testing for people who were so sick they had to be moved to the solitary confinement lines. R. Doc. 4 at ¶¶ 2, 78, 102-05.

[67] Scottie Hunter, *East Baton Rouge Parish surpasses Orleans Parish in COVID-19 cases, has second highest in state*, WAFB9 (July 28, 2020), *available at* https://www.wafb.com/2020/07/28/east-baton-rouge-parish-surpasses-orleans-parish-covid-cases-has-second-highest-state/; *cf.* Exh. 1, Hassig Decl. ¶¶ 2-3; Exh. 12, Rottnek Decl. ¶ 35.

[68] Notably, all the declarants agree about these facts. *See* Exh. 12, Rottnek Decl. ¶ 39; Exh. 11, Pettice Decl. ¶¶ 8, 12, 25, 27, 28, 33-35; Exh. 6, Suppl. Mancuso Decl. ¶¶ 5, 14, 16; Exh. 10, Leagard Decl. ¶¶ 4-10; Exh. 9, Bernard Decl. ¶¶ 13-15, 17, 21; Exh. 7, C. Harris Decl. ¶¶ 7, 11, 21, 23, 26-29, 31, 36, 37, 39, 42, 44-45; Exh. 3, Parker Decl. ¶ 10; Exh. 8, Banks Decl. ¶¶ 7, 9, 11, 19, 23, 27; Exh. 2, Day Decl. ¶¶ 4, 6, 8-9; Exh. 4, Carter Decl. ¶¶ 6-8; Exh. 5, Suppl. Stewart Decl. ¶¶ 5, 7, 10; Exh. 13, Kemp Decl. ¶¶ 23, 25-27, 32-37; Exh. 14, Knoten Decl. ¶¶ 7, 10, 14, 18; Exh. 1, Hassig Decl. ¶ 9.

[69] *See, e.g.*, Exh. 2, Day Decl. ¶¶ 3-4; Exh. 4, Carter Decl. ¶ 3; Exh. 5, Suppl. Stewart Decl. ¶ 13; Exh. 3, Parker Decl. ¶ 15; Exh. 6, Mancuso Decl. ¶ 11; *cf.* Exh. 8, Banks Decl. ¶¶ 19, 21; Exh. 14, Knoten Decl. ¶¶ 14-15.

*Angeles v. Lyons*, 461 U.S. 95 (1983), is misplaced.  First, unlike in those cases, Plaintiffs in no way base their claim of injury on past misconduct by the defendants; their risk of harm stems from the clinical way in which the virus will likely appear—or reappear any number of times—and spread in a congregate facility where social distancing is impossible.  Second, the risk of injury here is fundamentally different than that in *Lyons*, which the Court stressed depended upon a series of escalating contingencies that would likely never happen to Mr. Lyons again: that is, to be subject to the unlawful chokehold again, Lyons would have to commit a traffic violation, be caught and confronted by police officers, and verbally or physically assault the police officers so as to trigger the chokehold restraint he was challenging.  *Id.* at 98, 110; *cf. Hernandez v. Cremer*, 913 F.2d 230, 234-35 (5th Cir. 1990) (distinguishing *Lyons* because the "injury alleged to have been inflicted did not result from an individual's disobedience of official instructions and Hernandez was not engaged in any form of misconduct; on the contrary, he was exercising a fundamental constitutional right.").  Here, there was no disobedient or unlawful act by the Plaintiffs that resulted in a subsequent injury—the only thing they have to do is breathe to contract COVID-19.  And there is no contingent escalation of their situation by Plaintiffs that could exacerbate the risk they face—in fact, it is quite the opposite:  Plaintiffs are being threatened by remaining in the same unsafe situation in which they already exist every day.[70]

## III.    PLAINTIFFS HAVE STATED VIABLE CLAIMS FOR RELIEF UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THEIR EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

In addition to their *habeas* claims, Plaintiffs seek relief from this Court under 42 U.S.C. § 1983 for their confinement under unconstitutional conditions.  Without the benefit of any

[70] *See, e.g.*, Exh. 3, Parker Decl. ¶¶ 6-9, 15-16; Exh. 2, Day Decl. ¶¶ 3-4; Exh. 4, Carter Decl. ¶ 3; Exh. 6, Suppl. Mancuso Decl. ¶¶ 6-11; Exh. 5, Suppl. Stewart Decl. ¶ 13; Exh. 7, C. Harris Decl. ¶¶ 34-35; Exh. 10, Leagard Decl. ¶ 19; Exh. 13, Kemp Decl. ¶¶ 17-19, 22-23, 25-34, 37-40; Exh. 1, Hassig Decl. ¶ 9; Exh. 12, Rottnek Decl. ¶ 36; *cf.* Exh. 6, Suppl. Mancuso Decl. ¶ 18 (describing escalating shakedowns since the lawsuit).

meaningful discovery however, the Sheriff Defendants appear to think that these claims are ripe for dismissal under Rule 12(b)(6).[71]  R. Doc. 92-1 at 6.  Even examining only the allegations in the Complaint and its attachments—as this Court is bound to do under Rule 12(b)(6)—Defendants' arguments are patently without merit.

**A.  Plaintiffs Detained Pre-Trial State a Claim Under the Fourteenth Amendment**

"Pretrial detainees look to the procedural and substantive due process guarantees of the Fourteenth Amendment for their 'rights to basic needs such as medical care and safety.'" *Cleveland v. Gautreaux*, 198 F. Supp. 3d at 733 (citing *Hare v. City of Corinth, Miss.*, 74 F.3d 633 (5th Cir. 1996)).  "[T]he substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee . . . and [a]ny 'punishment' of a pretrial detainee, therefore, will run afoul of the Constitution." *Cleveland*, 198 F. Supp. at 733 (citations and quotation marks omitted).  "The medical care a prisoner receives is just as much a 'condition' of his [or her] confinement as the food he [or she] is fed." *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Conditions amount to impermissible punishment if they are unreasonably excessive as compared a legitimate government purpose. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Hare*, 74 F.3d at 639.

Plaintiffs challenge their unconstitutional treatment under both a conditions-of-confinement theory and an episodic-act-or-omission theory. *See, e.g.*, *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 462-64 (5th Cir. 2015) ("there is no rule barring plaintiff from pleading both alternative theories, and a court may properly evaluate each separately").  Conditions-of-confinement challenges are "attacks on general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74 F.3d at 644.  Plaintiffs' Complaint alleges facts that "demonstrate

[71] The Sheriff Defendants allege that Plaintiffs have not adequately pled the prerequisites for release under the Prison Litigation Reform Act. *See* 18 U.S.C. § 3626(a)(2) (requiring plaintiff to request release from a three-judge panel and present "materials sufficient to demonstrate that the requirements [for release] have been met").  How they expect Plaintiffs to make this showing without meaningful discovery is left unanswered in their brief.

a pervasive pattern of serious deficiencies in providing for [Plaintiffs'] basic human needs." *Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009).[72]  They "reflect an unstated or de facto policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'"  *Id.* at 452 (quoting *Hare*, 74 F.3d at 645).

Plaintiffs do not need to affirmatively plead that Defendants acted with malice, "for even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices."  *Hare*, 74 F.3d at 644.  The only legitimate government interest in the detention of pre-trial detainees is limiting the risk of flight.  But subjecting these Plaintiffs to a serious risk of exposure, illness, or death to serve that interest[73]— particularly where there exist non-bail alternatives to detention—plainly "nudges" Plaintiffs' claim that the serious conditions at the Jail are not "reasonably related to a legitimate governmental interest," *id.* (quoting *Wolfish*, 441 U.S. at 539), "across the line from the conceivable to plausible." *Iqbal*, 542 U.S. at 680.

Under this circuit's episodic-act-or-omission theory of liability, a "pre-trial detainee must establish that an official acted with subjective deliberate indifference."  *Hare*, 74 F.3d at 649 n.4. The detainee must also sufficiently allege that the "employee's act resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the detainee's constitutional rights."  *Id.*  The Sheriff Defendants are sued in their official capacity only.[74]

---

[72] *See* R. Doc. 4 ¶¶ 71-73, 83 (showing that since at least 2015, policymakers—including the named Sheriff Defendants—knew the Jail failed to provide safe conditions of confinement and adequate health care to detainees).
[73] *See, e.g.*, R. Doc. 4 ¶¶ 1-6, 109-11 (alleging that, in the midst of a global pandemic from a highly infectious and deadly novel coronavirus, the Sheriff Defendants detain Plaintiffs in conditions of confinement that expose them to the virus, fail to permit them to protect themselves, and house individuals infected with the virus in solitary confinement cells that were closed years ago due to their unsuitability for humans beings).
[74] R. Doc. 4 ¶¶ 26-27.

Official capacity claims under an episodic-acts-and-omissions theory must allege a constitutional violation and satisfy official capacity liability, which requires:  (1) an official policy, practice, or custom that could subject the municipality to § 1983 liability; (2) the official policy is linked to the constitutional violation; and (3) the official policy reflects the municipality's deliberate indifference to that injury.  *Lawson v. Dallas Cty.*, 286 F.3d 257, 263 (2d Cir. 2002).

Plaintiffs' allegations demonstrate that the Sheriff Defendants are liable under both a conditions-of-confinement theory and an episodic-act-or-omission theory.  The Complaint alleges that the Jail's conditions of confinement and health care delivery system violate Plaintiffs' constitutional rights to relative safety from COVID-19 and access to adequate health care.[75]  Since at least early 2015, the Sheriff Defendants have personally and publicly discussed the need for a new Jail, tacitly admitting that the current facility is unsafe.[76]  Plaintiffs' Complaint alleges that Sheriff Defendants knew the "old part of the prison is really in deplorable condition.  We have issues with ventilation; with plumbing."[77]  In spite of this knowledge, Plaintiffs allege that the Sheriff Defendants place detainees with COVID-19 into living areas they closed years ago and fail to provide access to adequate medical care.[78]  The conditions alleged—"walls and floors are filled with mold and rust, the showers and toilets are broken or bug infested, . . . rats have overrun some dorm areas, requiring detainees to sleep with their food to prevent it from being eaten by vermin" and blood streaked walls[79]—violate the Constitution.   *See, e.g.*, *Gates*, 376 F.3d at 338 (filthy cell conditions may constitute a violation of the constitution (citations omitted)); *Foulds v. Corley*, 833 F.2d 52, 54 (5th Cir. 1987) ("Allegations of a cold, rainy, roach-infested jail cell, with

---

[75] R. Doc. 4 ¶¶ 71-73, 82-83.
[76] *Id.* ¶ 71; *see also* R. Doc. 84 at 144-145.
[77] R. Doc. 4 ¶ 71; *see also* R. Doc. 84 at 144-145 (Warden Grimes admits parts of the Jail are "deplorable").
[78] R. Doc. 4 ¶¶ 82-83.
[79] R. Doc. 4 ¶ 82.

inoperative toilet facilities, stated a cause of action under the eighth and fourteenth amendments." (citations omitted)).  Plaintiffs further describe how those conditions and the policies, patterns, and practices adopted by the Sheriff Defendants caused and continue to cause harm to all detainees and impose a constitutionally intolerable exposure to a deadly virus.[80]  Under both theories of liability, the Sheriff Defendants expose Plaintiffs to the virus that causes COVID-19 and refuse to allow Plaintiffs to take the precautions necessary to avoid this serious illness.

### B.  Plaintiffs Also State a Claim Under the Eighth Amendment

Although an Eighth Amendment imposes a higher standard on the post-conviction class, the detailed allegations in the Complaint plausibly support an inference that Defendants have also been deliberately indifferent to the medical needs of post-conviction detainees.[81]  To prove an Eighth Amendment violation, Plaintiffs must show that the Sheriff Defendants "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Having sufficiently alleged such knowledge and indifference in their 168-paragraph Complaint and corresponding 27 exhibits there is a "reasonable expectation that discovery will reveal evidence of" the elements of an Eighth Amendment claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 552 (2007).

Plaintiffs' Complaint—which is all the Court is permitted to consider on this Rule 12(b)(6) challenge— is replete with graphic allegations of overcrowding, unsanitary conditions, inadequate provision of hygiene supplies, lack of COVID-19 testing, and inadequate opportunities for social distancing.[82]  New detainees arrive at the Jail every day without adequate screening, while the

---

[80] R. Doc. 4 ¶¶ 86-88, 95-96, 100, 109-113, 116-118; *see also* R. Doc. 21-1 at 7-23 (summarizing the declarations).
[81] *Id.*
[82] *See, e.g.*, *id.* ¶¶ 2, 33, 76, 105, 108 (inadequate testing); *id.* ¶¶ 43, 80, 141 (daily arrival of new people); *id.* ¶¶ 5, 82, 98-99, 109, 112-114 (unsanitary conditions); *id.* ¶¶ 5, 8, 86-90, 95, 110, 112 (lack of distancing/overcrowding).

Jail's existing detainee population continues to be forced into close quarters.[83]   Plaintiffs' allegations highlight the complete absence of surveillance testing, the daily arrival of new detainees, the vivid testimony of unsanitary conditions, and the lack of social distancing.[84]   These allegations paint a stark picture of ongoing Eighth Amendment violations inside the Jail.

Notably, the Court can take judicial notice that the pandemic rages at unprecedented levels outside the Jail, but the Sheriff Defendants cannot assert at this stage of the proceedings that their post-filing actions have reasonably abated the risk simply because there are a low number of confirmed cases and there have been no recorded COVID-19 deaths in the Jail.

Finally, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.  Here, Plaintiffs' constitutional claims hinge on the Sheriff Defendants' awareness of the substantial risk of COVID-19 to their health, when they acquired such awareness, and what they did or did not do in response.

## CONCLUSION

For the reasons stated above, Plaintiffs/Petitioners respectfully request that the Court deny the Sheriff Defendants' Motion to Dismiss.

Respectfully submitted, this 18th day of August, 2020.

/s/ David J. Utter                              /s/Miriam R. Nemeth
David J. Utter (LA Bar No. 23236)               Thomas B. Harvey (MBE #61734MO)
William R. Claiborne (GA Bar No. 126363)        Miriam R. Nemeth (DC Bar No. 1028529)**
FAIR FIGHT INITIATIVE                           Tiffany Yang (DC Bar No. 230836)
410 East Bay Street                             ADVANCEMENT PROJECT NATIONAL
Savannah, Georgia 31401                         OFFICE
(912) 236-9559 Telephone                        1220 L Street NW, Suite 850
(912) 236-1884 Facsimile                        Washington, DC 20005
david@fairfightinitiative.org                   (202) 728-9557 Telephone

---

[83] *Id.* ¶¶ 86-90, 95, 110, 112.
[84] *See, e.g.*, *id.* ¶¶ 2, 33, 76, 105, 108 (inadequate testing); *id.* ¶¶ 43, 80, 141 (daily arrival of new people); *id.* ¶¶ 5, 82, 98-99, 109, 112-114 (unsanitary conditions); *id.* ¶¶ 5, 8, 86-90, 95, 110, 112 (lack of social distancing).

will@fairfightinitative.org

tharvey@advancementproject.org
mnemeth@advancementproject.org
tyang@advancementproject.org

/s/ Lillian S. Hardy
Lillian S. Hardy (DC Bar No. 991282)
Jessica B. Bigby (DC Bar No. 1617315)
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5884 Telephone
lillian.hardy@hoganlovells.com
Jessica.Bigby@HoganLovells.com

/s/ William P. Quigley
William P. Quigley (LA Bar No. 00769)
Loyola University New Orleans
7214 St. Charles Avenue
Campus Box 902
New Orleans, LA 70117

/s/ Baher Azmy
Baher Azmy (NY Bar No. 2860740)
Omar Farah (NY Bar No. 4641247)
Brittany Thomas (NY Bar No. 5683834)
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 11201
(212) 614-6427 Telephone
bazmy@ccrjustice.org
ofarah@ccrjustice.org
bthomas@ccrjustice.org

/s/ Robert L. Toll
Robert L. Toll (DC Bar No. 1021934)
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-307 Telephone
robert.Toll@hoganlovells.com

/s/ David Bastian
David Bastian (MA Bar No. 691785)
Hogan Lovells US LLP
125 High Street, Suite 2010
Boston, MA 02110
(617) 371-1022 Telephone
David.bastian@hoganlovells.com

*Attorneys for Plaintiffs*
*** Lead Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2020, a copy of the foregoing was filed electronically with the Clerk of the Court, using the CM/ECF system.  Notice of this filing will be sent by operation of the court's electronic filing system and/or via U.S. Postal Service to counsel of record.

/s/ David J. Utter
David J. Utter